CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 17, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
          DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| MATAN GOLDSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE RECTOR AND VISITORS OF THE | ) | |
| UNIVERSITY OF VIRGINIA (a/k/a and | ) | |
| hereinafter referred to as "THE | ) | |
| UNIVERSITY OF VIRGINIA" or | ) | |
| "UVA"); RECTOR ROBERT D. | ) | CIVIL ACTION NO. 3:24cv00036 |
| HARDIE, in his personal and individual | ) | |
| capacity; PRESIDENT JAMES E. RYAN, | ) | **JURY TRIAL DEMANDED** |
| in his personal and individual capacity; | ) | |
| FACULTY FOR JUSTICE IN | ) | |
| PALESTINE UVA CHAPTER (a/k/a and | ) | |
| hereinafter referred to as "FJP at UVA"); | ) | |
| STUDENTS FOR JUSTICE IN | ) | |
| PALESTINE AT UVA (a/k/a and | ) | |
| hereinafter referred to as "SJP at UVA"), | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

*"We have come to know Man as he really is. After all, man is that being who invented the gas chambers of Auschwitz; however, he is also that being who entered those gas chambers upright, with the Lord's Prayer or the Shema Yisrael on his lips."*

Rabbi Harold S. Kushner, as quoted in the preface to Viktor Frankl's transcendent work, Man's Search for Meaning.

### COMPLAINT

COMES NOW PLAINTIFF Matan Goldstein, through undersigned counsel, who hereby avers, alleges, and complains of the Defendants as follows:

### I. STATEMENT OF THE CASE

1.       The instant lawsuit is a civil action sounding in federal constitutional and statutory and state statutory and common law causes of action and theories of relief.

1

2.      In this civil action, the Plaintiff, individually and on his own behalf, seeks injunctive and declaratory relief, compensatory damages, punitive damages, attorneys' fees, and interest:

   a.      In this civil action, the Plaintiff, individually and on his own behalf, seeks a declaratory judgment against all Defendants;

   b.      In this civil action, the Plaintiff, individually and on his own behalf, seeks injunctive relief, compensatory damages, attorneys' fees, and interest pursuant to Title VI, found at 42 U.S.C. § 2000d *et seq.*, and 42 U.S.C. § 1988 against the University of Virginia;

   c.      In this civil action, the Plaintiff, individually and on his own behalf, seeks injunctive relief, compensatory damages, punitive damages, attorneys' fees, and interest pursuant to 42 U.S.C. §§ 1981, 1983 & 1988 against Defendants Ryan and Hardie in their individual, personal, and official capacities;

   d.      In this civil action, the Plaintiff, individually and on his own behalf, seeks injunctive relief, compensatory damages, punitive damages, attorneys' fees, and interest under 42 U.S.C. §§ 1981 & 1988; Virginia common law torts of Negligence, Gross Negligence, and Intentional Infliction of Emotional Distress; and statutory causes of action under Virginia Code § 8.01-42-1 against Defendants Faculty for Justice in Palestine UVA Chapter, and Students for Justice in Palestine at UVA.

3.      This actual, justiciable controversy revolves around the Defendants' individual and collective liability for gross misconduct and the impairment and deprivation of the Plaintiff's right to live, study, learn, and thrive at a public university free of hate-based discrimination, abuse, harassment, and retaliation.

4.      The Plaintiff is a victim of hate-based, intentional discrimination, severe harassment and abuse, and illegal retaliation.

5.      The Plaintiff alleges that the Defendants have illegally and maliciously changed his life forever, depriving him of fundamental rights, privileges, opportunities, and enjoyments, and have harmed him financially, physically, and mentally.

6.      The Plaintiff has suffered extensive and serious physical, emotional, mental, psychological, and economic harm as a direct and proximate result of the Defendants' malicious wrongdoing. The Plaintiff alleges that he has lost the entirety of the expectations, benefits, privileges, and enjoyments of a freshman, or "First Year," student at the University of Virginia, and that his entire college experience has been materially impaired and altered, all because of the Defendants' egregious acts, errors, and omissions.

7.      Each Defendant owed the Plaintiff a number of duties of care, and the Defendants' reckless breach and wanton disregard of those duties entitles the Plaintiff to a substantial financial award against each Defendant to the maximum extent permitted by applicable law.

## II. JURISDICTION AND VENUE

8.      The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

9.      Subject matter jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 in the United States District Court for the Western District of Virginia.

10.     Venue is proper in the United States District Court for the Western District of Virginia under 28 U.S.C. § 1391 because all of the events, acts, errors, and omissions giving rise to the Plaintiff's claims occurred within this judicial district.

11.     The United States District Court for the Western District of Virginia possesses and may exercise personal jurisdiction over all Defendants under applicable law.

### III. PARTIES

12.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

**A.     THE PLAINTIFF**

13.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

14.     The Plaintiff Matan Goldstein is a quiet, studious, respectful, and shy young man who came to Charlottesville in August of 2023 to study at The University of Virginia.

15.     Matan is Jewish and a young man of deep faith and spiritual conviction. Matan is Israeli-American, meaning he is the first member of his family to be born in the United States. Both of his parents and his ancestors are Jewish and Israeli. By virtue of his heritage, Matan is a dual citizen of Israel and the United States.

16.     Matan is observant of his Jewish faith. Judaism, and Matan's Jewish and Israeli heritage, are very important to Matan and play a significant and cherished part of his identity.

17.     Prior to the events of this year, Matan openly practiced and expressed his faith and his Jewish identity in public, including wearing his Kippah or Yarmulke and a necklace outside of his shirt bearing the Star of David.

18.     Upon his arrival at the University of Virginia for orientation and registration, Matan began to suspect two things about his new school, his new environment, and his new administrators: antisemitism appeared to be alive and well "on Grounds," and the

University's leadership was uninterested in hearing or doing anything about it. That would not portend well for the Jewish community just a few short weeks later.

19. Matan matriculated to the University of Virginia in the Fall of 2023 to study Classics. He is soft-spoken and diligent about his studies and his academic commitments. Matan is a serious student and a conscientious member of the University Community, and those who know him respect and cherish his presence at UVA.

**B.    DEFENDANT THE UNIVERSITY OF VIRGINIA**

20. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

21. "The Rector and Visitors of the University of Virginia" is the official, corporate, and statutory name for the entity known and referred to herein as "The University of Virginia" or "UVA." The University of Virginia is governed by a Board of Visitors, whose duties and powers are determined and controlled by the statutes of the Commonwealth of Virginia, as amended from time-to-time by the General Assembly. The portions of the Code of Virginia that provide for the general organization and governance of The University of Virginia may be found in Va. Code Sections 23.1-2200, *et seq*. The Manual of the Board of Visitors of the University of Virginia constitutes the corporate bylaws of The University of Virginia and sets forth the Board of Visitors' internal organization, procedures of operation, and the responsibilities of the administrative officers selected by it to carry out its directives of policy and program. According to the Manual, the University of Virginia is a:

> public institution of higher learning guided by a founding vision of discovery, innovation, and development of the full potential of talented students from all walks of life. It serves the Commonwealth of Virginia, the nation, and the world by developing responsible citizen leaders and

professionals; advancing, preserving, and disseminating knowledge; and providing world-class patient care.

22.     The University of Virginia is a vast, powerful, and prestigious institution and entity. Most importantly, the University is a *public* entity, and its officers and directors are *public officials and actors*, who swear oaths to act in the best interests of the Commonwealth of Virginia. The University, President James E. Ryan, and Rector Robert D. Hardie owe many duties to the Commonwealth, the University as an institution of higher learning, and the members of the University Community, but none are more sacrosanct or incontrovertible than their duty to protect and safeguard students' physical well-being.

23.     Defendants The University of Virginia, President Ryan and Rector Hardie, possess a veritable arsenal of instruments and capabilities that may be brought to bear in any crisis, circumstance, or situation. These assets include the University Police; the Office of University Counsel; the University Public Relations Apparatus;[1] the "Division of Diversity, Equity & Inclusion" ("DEI"), which includes the Office of Equal Opportunity and Civil Rights or "EOCR"; the Division of Student Affairs and the Office of the Dean of Students; and, finally, the Student Affairs Divisions' student organizations known as "Agency Organizations" and "Special Status Organizations" in which the student-administrators are considered agents of the University, are afforded the benefit of legal

---

[1]     The University has an extensive and sophisticated public relations, marketing, and crisis management division that traverses multiple physical and digital universes. Public relations and crisis consultant professionals operate from the central University administration and are staffed within various departments throughout the University. When the University, President Ryan, and Rector Hardie approve of a message or an ideology, the University media apparatus is quick to act. This apparatus includes multiple physical and online publications, text and smartphone applications, social media accounts with tens of thousands of followers, and a subtle media and press engagement operation used to selectively "leak" and "plant" University messaging and favorable stories. This PR machine also utilizes "popular" administrators and professors who work in tandem to broadcast or amplify particular messages or positions. The University's public relations and crisis management professionals include former government spokespersons who have served in state and federal administrations.

counsel, and are covered by the University's Risk Management Plan—these organizations include the Honor Committee, the University Judiciary Committee, and Student Council.

24.     These are the most powerful and resourceful—and intimidating—of the many tools and instruments available to Defendants UVA, Ryan, and Hardie.

25.     These apparatuses employ hundreds of people. Few, if any, have any scholarly or teaching roles or obligations, but most are tasked—at least nominally—with protecting students from discrimination, harassment, abuse, violence, and retaliation, including antisemitism. The citizens of the Commonwealth of Virginia expend tens of millions of dollars annually on the salaries of these university administrators with the expectation that they will protect students from the harms that they are now enduring.

26.     The University of Virginia and these legions of administrators, "deans" and "vice presidents," including Defendants Ryan and Hardie, have thoroughly and completely failed in that charge.

27.     The President of the University and the Rector of the University enjoy the full authority and power to direct, initiate, limit, alter, modify, or terminate the actions of these assets.

28.     As to Defendant The University of Virginia, the Plaintiff seeks a declaratory judgment, injunctive relief, compensatory damages, and attorneys' fees and costs under Title VI and 42 U.S.C. § 1988. At all times and in all events relevant and material to this action, Defendant The University of Virginia acted under color of state law and authority.

**C.     DEFENDANT PRESIDENT JAMES E. RYAN**

29.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

30.    Defendant James E. Ryan, who is being sued in his official, individual, and personal capacities, is the ninth President of the University of Virginia and was serving in that position at all times relevant to this action. Pursuant to Sections 4.22(1), (7), (8) and (9) of <u>The Manual of the Board of Visitors of the University of Virginia</u>:

> As the principal administrative officer of the University and chief executive officer of the Academic Division, the President shall have the following powers and duties:
>
> ***
>
> (1) The President shall have responsibility for the operation of the University in conformity with the purposes and policies determined by the Board;
>
> ***
>
> (7) The President shall at all times maintain cordial relationships with the students, guarding and protecting their best interests;
>
> ***
>
> (8) The President shall use particular efforts to preserve and foster the Honor System;
>
> ***
>
> (9) The President shall be responsible for the discipline of students with the power to impose appropriate penalties including expulsion;
>
> ***

31.    President Ryan lives at Carr's Hill, the University President's mansion across from the Rotunda on the University Grounds in Charlottesville. According to public interest groups who have conducted studies and evaluations of salaries and compensation at the University of Virginia, the value of President Ryan's annual compensation and benefits purportedly exceed a taxpayer cost of $2,000,000.

32.    Defendant President Ryan is the University of Virginia's supreme and ultimate arbiter and administrator over the protection of every student's "best interests," including their physical safety and most fundamental civil rights. Defendant President Ryan does not have the legal authority to shirk or abrogate his ultimate responsibilities, and he is not legally permitted to delegate away his duties to protect his students' "best interests" and their constitutionally protected civil rights, even under the guise of "student self-government."

33.    By operation of law, as a matter of fact, and according to his own admissions, President Ryan was and remains to this day the sole person with the authority to render and approve the decisions, efforts, strategy, resolution, and disposition of Matan Goldstein's student experience; his mistreatment at the hands of the University itself; the University's tolerance and encouragement of discrimination, harassment, and abuse on University premises and during the course and scope of University operations by University actors, agents, and University Community members; the University's mishandling of these matters, including the instant litigation; and, finally, the University's purposeful retaliation against Matan for engaging in protected activities.

34.    As to Defendant Ryan, the Plaintiff seeks a declaratory judgment, injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1981, 1983, and 1988. At all times and in all events relevant and material to this action, President Ryan acted under color of state law and authority, and he is sued in his personal, individual, and official capacities. Defendant Ryan is a resident of Charlottesville, Virginia, is competent and capable of suing and being sued, and is subject to the jurisdiction of this Honorable Court.

**D.      DEFENDANT RECTOR ROBERT D. HARDIE**

35.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

36.   Defendant Robert D. Hardie currently occupies and has, at all times relevant to this Complaint, occupied the position "Rector of the University of Virginia," a position of enormous prestige, influence, and power. The roster of past Rectors of the University of Virginia include some of the greatest Americans and Virginians to have ever lived. Presidents Thomas Jefferson, James Madison, and James Monroe all served in the revered position, as did former United States Secretary of State Edward R. Stettinius, Jr., Congressman D. French Slaughter, Jr., and numerous other important politicians, businessmen and women, and luminaries. The Rector acts as the Chairman of the Board of Visitors and the position includes wide powers and privileges regarding the operations of the University of Virginia and the acts and omissions of the University President.

37.   Rector Hardie received his undergraduate, master's (MBA), and doctorate degrees from the University of Virginia. Rector Hardie is serving in his third term as a member of the Board of Visitors, having been appointed to the Board first by Governor Tim Kaine, then Governor Terry McAuliffe, and finally Governor Ralph Northam. Rector Hardie's father-in-law served multiple terms as a member of the Board of Visitors, including as its Rector. Rector Hardie is a financier whose commercial roles include chief executive positions of several private equity and investment banking concerns. The Hardie family and their affiliated family offices and commercial investment vehicles own or control notable assets such as Keswick Hall, Kiawah Island Golf Resort, the Jefferson Hotel (Richmond), and the Hermitage Hotel (Nashville), to name but a few.

38.     As to Defendant Hardie, the Plaintiff seeks a declaratory judgment, injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1981, 1983, and 1988. At all times and in all events relevant and material to this action, Rector Hardie acted under color of state law and authority, and he is sued in his personal, individual, and official capacities. Rector Hardie is a resident of Charlottesville, Virginia, is competent and capable of suing and being sued, and is subject to the jurisdiction of this Honorable Court.

## E.     DEFENDANTS FACULTY FOR JUSTICE IN PALESTINE UVA CHAPTER & STUDENTS FOR JUSTICE IN PALESTINE AT UVA

39.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

40.     Faculty for Justice in Palestine UVA Chapter is a formal faculty group that exists and operates at and within the institution of the University of Virginia. Defendant FJP at UVA is an entity that is capable of suing and being sued and is subject to the jurisdiction of this Honorable Court.

41.     Faculty at the University of Virginia are employees of the Commonwealth of Virginia and, as such, owe a host of duties to the Commonwealth, the University Community, and their students—meaning the entire student body, not just those "comrades" with whom they "stand" in ideological "solidarity."

42.     The very existence of FJP at UVA and membership in FJP at UVA, along with the numerous acts of misconduct set forth below are definitively antisemitic and are, as a matter of law, a breach of each faculty member's legal duties.

43.     Students for Justice in Palestine at UVA is a formal student group that exists and operates at and within the institution of the University of Virginia. Defendant SJP at UVA is an

entity that is capable of suing and being sued and is subject to the jurisdiction of this Honorable Court.

44. Students at the University of Virginia are bound by numerous policies and codes of conduct, including anti-discrimination, anti-bias, anti-harassment, and anti-retaliation policies. Those policies and codes establish the duties owed by students and student groups to other students, including the entire student body, and the University Community.

45. The very existence of SJP at UVA; membership in the antisemitic, pro-Hamas organization; repeated violations of University policies and student codes of conduct; and the innumerable instances of hate-based misconduct alleged and referred to below constitute, as a matter of law, breaches of the numerous duties owed by SJP at UVA and its student-members to Matan and other members of the University community.

46. On May 1, 2024, several courageous and selfless victims of the October 7, 2023, terrorist attacks in Israel filed a ground-breaking lawsuit in the United States District Court for the Eastern District of Virginia, Alexandria Division, against National Students for Justice in Palestine. The lawsuit bears the caption *Parizer, et al., v. AJP Educational Foundation, Inc. (a/k/a American Muslims for Palestine) and National Students for Justice in Palestine*, 1:24-cv-00724 (EDVa).

47. The *Parizer* lawsuit eloquently and precisely details the origins of the group known as National Students for Justice in Palestine ("NSJP") for which Defendants FJP at UVA and SJP at UVA act as "chapters" and to which they have pledged their allegiance. The allegations, which are the product of months of research and effort by preeminent constitutional scholars and superlative litigators (and their law firms), are chilling.

48. According to the *Parizer* lawsuit:

Hamas is a United States designated Foreign Terrorist Organization founded in 1987 with the express goal of destroying the State of Israel. . . .

Hamas employs unconventional weapons to continue its terrorist attacks, including taking hostages, using noncombatants as human shields, and spreading lies, propaganda, and chaos around the world. To that end, within hours of its terror attack, Hamas sent out a global call for its allies to mobilize and propagate Hamas's disinformation campaign and instigate chaos through the West, including the United States. Hamas's propaganda directed at American audiences is instrumental to its strategy.

Defendant AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine ("AMP") serves as Hamas's propaganda division in the United States. AMP was founded from the ashes of disbanded organizations created by senior Hamas officials after those organizations and related individuals were found criminally and civilly liable for providing material support to Hamas and other affiliated terrorist groups. In 2010, AMP expanded its operation to American college campuses when it founded Defendant National Students for Justice in Palestine ("NSJP") to control hundreds of Students for Justice in Palestine ("SJP") chapters across the country. Through NSJP, AMP uses propaganda to intimidate, convince, and recruit uninformed, misguided, and impressionable college students to serve as foot soldiers for Hamas on campus and beyond.

On October 8, the day after Hamas's terrorist attack, AMP and NSJP were prepared and responded to Hamas's "call for mass mobilization" by disseminating a manifesto and plan of attack ("NSJP Toolkit") which includes materials that appear to have been created before the attack. In the NSJP Toolkit, AMP and NSJP identify themselves as "PART of" a "Unity Intifada," governed by Hamas's "unified command" of terrorist operations in Gaza. As part of Hamas's movement, AMP and NSJP state that they seek "liberation," which they describe as a "real process that requires confrontation by any means necessary," including "armed struggle" and other acts of violence. "All [resistance] is legitimate, and all of it is necessary." The plain text of the NSJP Toolkit confirms that AMP and NSJP do not merely assist Hamas's ongoing terror campaign abroad—they perpetuate it in the United States.

AMP and NSJP enacted the NSJP Toolkit as written and beset their army of college students on American streets and college campuses. Through threats, violence, and vocal support for "globalizing" attacks against Jews and anyone who dares to support them, AMP and NSJP have intentionally instigated a mass culture of fear, threats, violence, and overt hatred to intimidate politicians and institutions for Hamas's substantial benefit. As of the filing of this Complaint, AMP and NSJP are—among other things—coordinating the occupation of dozens of college campuses across the

country to "force" the American government and academia to bend to Hamas's will.

There is a legal chasm between independent advocacy and knowingly serving as the propaganda and recruiting wing of a Foreign Terrorist Organization in the United States. AMP and NSJP are the latter. They are not innocent advocacy groups, but rather the propaganda arm of a terrorist organization operating in plain sight.

***

74.     [AMP & NSJP] continue to provide crucial ongoing public relations services to Hamas to generate support for its ongoing terrorism. As a sanctioned FTO, Hamas is prohibited from hiring an American public relations firm. [AMP & NSJP] fill this critical gap by providing invaluable communication services that Hamas cannot receive or pay for elsewhere in the United States.

75.     [AMP & NSJP] do not just parrot Hamas's talking points. Indeed, Hamas has regularly adopted [AMP & NSJP's] propaganda language and framing. For example, by October 2023, Hamas's Political Bureau, in English, expressly adopted NSJP's position that not only hostage taking, but "everything we do, it is justified." By November, Hamas had also begun mirroring NSJP's message that "settlers are not civilians," stating, "any person occupying [our] land is a combatant, not a civilian. . . . All the settlers in the Gaza Envelope are armed, so they are all combatants." In January 2024, Hamas issued a document in English bearing the title "Our Narrative—Operation Al-Aqsa Flood." Aside from the fact that the 16-page document echoes the NSJP toolkit in a number of significant ways—particularly the repeated usage of the term "resistance"—the cover of the propaganda book features an image very similar to one of the images provided by NSJP in the NSJP Toolkit for use by its chapters and affiliates.

76.     Further, [AMP & NSJP] consistently respond to Hamas and its allies' calls for mass protests and support. Indeed, [AMP & NSJP] seem to almost always answer the calls from Hamas, and Hamas, in turn, continues to express its organizational appreciation[.]

49.   The Plaintiff hereby expressly incorporates and includes each and every allegation and claim set forth in the *Parizer* lawsuit as if alleged, word-for-word, in this action.[2]

---

[2]     Despite the national prominence of the *Parizer* Lawsuit and the importance, relevance, and urgency of the allegations contained therein to the crises on Grounds at UVA, the University Administration has ignored the *Parizer* Lawsuit and has refused to evaluate the claims therein to determine if safety precautions should be taken to protect UVA's Jewish and Israeli students and faculty.

50.     Defendant FJP at UVA is a formal faculty organization created at and existing within the University of Virginia. FJP at UVA is an unincorporated association organized, located, and operating under the laws and within the Commonwealth of Virginia, particularly the jurisdiction of Albemarle County, Virginia, where the University of Virginia is physically located.

51.     FJP at UVA is comprised of over one hundred, and perhaps several hundred, "scholars," (self-described), "teachers," (self-described), faculty, employees, administrators, graduate students, and "members of the UVa Community" (self-described). Many FJP at UVA faculty members are tenured professors who occupy endowed "chairs" or prestigious positions within the academic infrastructure of the University. These positions carry and connote great influence and power over other professors and administrators, and, most importantly, students.

52.     FJP at UVA acts in concert with and/or acts and speaks for dozens of other pro-Hamas groups at the University of Virginia. Collectively, these groups appear to be comprised of hundreds of University faculty, staff, and administrators.

53.     FJP at UVA raises funds and seeks donations; convenes meetings; hosts events; promotes other pro-Hamas entities and their events and efforts; makes University-wide "announcements"; issues "Open Letters" to UVA students and the world; has ratified "Principles of Unity" that include a pledge of fealty to "SJP" along with antisemitic declarations; has established a website and an email address; and has a governing body and executive, including the designation of "liaisons" to negotiate with the University of Virginia Administration:



*Members of FJP at UVA at the May 2024 pro-Hamas "encampments" that it established on Grounds, depicting faculty members and faculty "liaisons."*

54.   According to FJP at UVA's announcements and materials, "FJP supports, amplifies, and protects the work of SJP [National Students for Justice in Palestine] and other pro-Palestinian students and student groups at UVA," and "we have come together as a community of scholars, activists, and university staff in solidarity with our colleagues across the world to demand the liberation of the Palestinian people."

55.   One of the Hamas-National SJP proxies or alter-egos is a group operating under the alias "US Campaign for the Academic and Cultural Boycott of Israel" who "issued a call to form Faculty for Justice in Palestine (FJP) groups on campuses in order to support NSJP, protect local SJP organizers, offer faculty defense, organize teach-ins and other actions, and engage in Palestine solidarity work generally." According to FJP at UVA, "we have established the University of Virginia Chapter of Faculty for Justice in Palestine (FJP) in response to the call by USACBI."

56.   In other words, Hamas's US-based public relations arm, National SJP, issued a call to supporters of Hamas on college campuses nationwide to form loyal faculty and student

cells or "chapters" of National SJP to support, amplify, and carry out the directives and mission of Hamas. Defendant FJP at UVA and Defendant SJP at UVA heard and heeded the call.

57. Defendant FJP at UVA is a pro-Hamas entity. FJP at UVA is an "arm" or "cell" or "chapter" of the Hamas proxy, National Students for Justice in Palestine along, with its aliases and alter-ego organizations.

58. Defendant Students for Justice in Palestine at UVA ("SJP at UVA") is a formally recognized (and perhaps funded) student group at the University of Virginia. It is known as a "CIO" or "Contracted Independent Organization." A majority of its members must be actively enrolled students and the members and its organizations are supposed to be subject to the University's various anti-discrimination and anti-harassment policies, student codes of conduct, and, of course, local, state, and federal laws.

59. SJP at UVA appears to be a formal, unincorporated association organized and operating under the laws of the Commonwealth of Virginia and located in Albemarle County, Virginia at the University of Virginia. SJP at UVA has members, has an organizational structure, including a "president" or executive, convenes meetings, communicates with members and the public, organizes protests and disruptive measures on campus, takes actions for itself and its members, raises money through donations, has an online identity, or "web presence," and has adopted and ratified its "mission," "vision," and "values" statements.

60. SJP at UVA and its principals have created and act on behalf of and in concert with dozens of similar student organizations that appear to be mere alter egos or aliases for SJP at UVA and are simply additional antisemitic facsimiles of SJP at UVA. These antisemitic, anti-

Israel, pro-Hamas organizations bear names such as "UVA Apartheid Divest" and "Dissenters @ UVA," to name but a few. During a recent planned meeting with Defendant President Ryan regarding the antisemitic "BDS" movement, the President of SJP at UVA purported to speak for and was planning to have representatives present from as many as *forty-three* pro-Hamas, anti-Israel, antisemitic formal student organizations.

61.    SJP at UVA, according to its own marketing and publicity, "is" National Students for Justice in Palestine:





*Social Media "posts" by National SJP and the "@SJPUVA" social media account for Defendant Students for Justice in Palestine at UVA.*

**239 likes**

**sjpuva** 🇵🇸 WE ARE ALL SJP! 🇵🇸 Our universities have chosen profit and reputation over the lives of the people of Palestine and our will as students. The supposed power of our administrators is nothing compared to the strength of the united students, staff, and faculty committed to realizing justice and upholding Palestinian liberation on campus. In the footsteps of our comrades at Rutgers-New Brunswick SJP, Tufts SJP, and Columbia SJP, we will take back our university and force our administration to divest, for the people of Gaza!

View all 3 comments

*Continuation of Social Media "post" by the "@SJPUVA" social media account for Defendant Students for Justice in Palestine at UVA professing allegiance to and solidarity with National SJP and other "cells" or "chapters" such as Columbia University, where open calls for violence and actual violent assaults against Jewish students are/were occurring with regularity.*



*SJP at UVA flyer distributed directing media inquiries and requests to National SJP.*

62.     Defendant SJP at UVA is pro-Hamas entity. SJP at UVA is an "arm" or "cell" or "chapter" of the Hamas proxy, National Students for Justice in Palestine along with its aliases and alter-ego organizations.

## IV. THE FACTS

63.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

64.     An aura of menace has once again descended upon Charlottesville.

65.     Hate has returned to the "Grounds" of the University of Virginia, this time from within.

66.     Virulent antisemitism, antisemitic discrimination, and antisemitic harassment, abuse, and bullying are rampant throughout everything that is the University of Virginia and its community.

67.     On October 7, 2023, the state and people of Israel, people of Jewish faith worldwide, and, indeed, every decent and civilized person with even an ounce of dignity or humanity within them, suffered and experienced the single most catastrophic act of antisemitic terrorism since the Holocaust. The atrocities are too numerous and the savagery too grotesque to adequately depict in this Complaint.

68.     Make no mistake, however, the atrocities were numerous. The savagery was grotesque. The acts constituted crimes against humanity.

69.     On that day, in Israel, more than 1,200 innocent people, almost all of them Jews, were butchered, murdered, mutilated, raped, and tortured by Hamas. On that day, babies were slaughtered, whole families were burned alive, women were raped and sexually mutilated, and well over one thousand innocent people lost their lives. On that day, 250 innocent civilians were taken hostage and removed from Israel to hidden Hamas bunkers and other

terrorist encampments deep within Gaza, where many continue to be held, murdered, tortured, and raped to this very day.

70.   While the following excerpt of evidence from the attacks obtained by Israeli defense and security forces is but one tiny glimpse into the perverted display of inhumanity exhibited by Hamas and those who support it, it is telling nonetheless. Thoroughly disturbing and unsettling, it must be read to understand the depravity of the antisemitic pestilence that has been allowed to shroud the University of Virginia in a cloak of hate:

| | |
|---|---|
| Terrorist: | "*Hey Dad, I'm calling you from Miflasim!* [the Israeli Kibbutz] *Open WhatsApp now and see all the murdered! Look how many I killed with my hands! Your son just killed Jews!*" |
| Father: | "*Allahu Akbar!*" [Allah is the greatest] |
| Terrorist: | "*This is from Miflasim!*" |
| Father: | "*Allah yahfazuk!*" [May Allah keep you safe] |
| Terrorist: | "*Dad, I'm calling you from the phone of a Jew! I just killed her and her husband with my own hands! I killed 10! Dad, I killed 10 with my own hands! Dad, open WhatsApp and see how many I killed!*" |

71.   Among the living, the dead, and the missing were family members and friends of many UVA students and faculty. Actively enrolled UVA students learned that relatives were sequestered in bomb shelters. Actively employed UVA faculty learned that close relatives had been brutally murdered. UVA Community members learned that friends and relatives had been taken hostage. Students and faculty alike watched their phones and computers for news of friends and family on a second-by-second basis.

72.   The innocent Jewish, Israeli, and Israeli-American members of this nation and this University Community did not know that Hamas, the foreign terrorist organization

responsible for the atrocities, had simultaneously mobilized its United States-based propaganda arm and proxies to launch pre-programmed public relations campaigns aimed at promoting Hamas and societal disruption within the United States.

73.     Hamas's attack on Israel took months, if not years, to plan and execute, and its efforts within the United States were likewise meticulously crafted and coordinated.

74.     On Hamas's signal, United States-based proxies, affiliates, and "chapters" launched an offensive campaign within our borders to advance Hamas's antisemitic, anti-Israeli, and Anti-American objectives.

75.     Within the United States, pro-Hamas support groups, activists, and agents number in the tens of thousands and encompass hundreds of organized and regimented groups, affiliates, and "chapters."

76.     In the immediate aftermath of October 7, 2023, posts and openly expressed sentiments such as the following became ubiquitous and commonplace throughout the United States:[3]



---

[3]     Every aspect of this vile post, whether taken literally or within some "context," qualifies as hate speech. Sadly, the words and their meaning are entirely consistent with the epithets and treatment hurled at Jewish students at the University of Virginia during the 2023-24 academic year.

77.   Describing the storm clouds of antisemitic hate that have darkened the skies above our nation, particularly on university and college campuses nationwide since October 7, 2023, United States President Joseph R. Biden, speaking at the United States Capitol for the Holocaust Memorial Museum's *Days of Remembrance* ceremonies on May 7, 2024, remarked, in pertinent part (highlighting added):

> Germany, 1933.  Hitler and his Nazi party rise to power by rekindling one of the world's oldest forms of prejudice and hate: antisemitism.  His rule didn't begin with mass murder.  It started slowly across economic, political, social, and cultural life: propaganda demonizing Jews; boycotts of Jewish businesses; synagogues defaced with swastikas; harassment of Jews in the street and in the schools; antisemitic demonstrations, pogroms, organized riots.

> With the indifference of the world, Hitler knew he could expand his reign of terror by eliminating Jews from Germany, to annihilate Jews across Europe through genocide the Nazi's called the "Final Solution" — concentration camps, gas chambers, mass shootings.

> By the time the war ended, 6 million Jews — one out of every three Jews in the entire world — were murdered.

> This ancient hatred of Jews didn't begin with the Holocaust; it didn't end with the Holocaust, either, or after — or even after our victory in World War Two.  This hatred continues to lie deep in the hearts of too many people in the world, and it requires our continued vigilance and outspokenness.

> That hatred was brought to life on October 7th in 2023.  On a sacred Jewish holiday, the terrorist group Hamas unleashed the deadliest day of the Jewish people since the Holocaust.

> Driven by ancient desire to wipeout the Jewish people off the face of the Earth, over 1,200 innocent people — babies, parents, grandparents — slaughtered in their kibbutz, massacred at a musical festival, brutally raped, mutilated, and sexually assaulted.  Thousands more carrying wounds, bullets, and shrapnel from the memory of that terrible day they endured.  Hundreds taken hostage, including survivors of the Shoah.

> Now, here we are, not 75 years later but just seven and a half months later, and people are already forgetting.  They're already forgetting that Hamas unleashed this terror, that it was Hamas that brutalized Israelis, that it was

Hamas who took and continues to hold hostages. I have not forgotten, nor have you, and we will not forget. (Applause.)

And as Jews around the world still cope with the atrocities and trauma of that day and its aftermath, **we've seen a ferocious surge of antisemitism in America and around the world: vicious propaganda on social media, Jews forced to keep their — hide their kippahs under baseball hats, tuck their Jewish stars into their shirts**.

**On college campuses, Jewish students blocked, harassed, attacked while walking to class**.

**Antisemitism — antisemitic posters, slogans calling for the annihilation of Israel, the world's only Jewish State**.

Too many people denying, downplaying, rationalizing, ignoring the horrors of the Holocaust and October 7th, including Hamas's appalling use of sexual violence to torture and terrorize Jews.

It's absolutely despicable, and it must stop.

Official White House Transcript, found at www.whitehouse.gov.

78.  One such college campus is the University of Virginia.

79.  One such college student victim is Plaintiff Matan Goldstein.

80.  For Hamas, the softest target on our nation's underbelly is "elite" colleges and universities, populated by cadres of radicalized students and the pseudo-intellectual faculty and administrator zealots who indoctrinate them.

81.  Akin to activation of sleeper cells, as part of its terror campaign, Hamas directed its United States proxy, National Students for Justice in Palestine, to prepare its followers—students and faculty in dozens of "chapters" across the United States—to amplify Hamas's public relations campaign, propagate hate and sow widespread dissension in their communities.

82.  Within mere hours of the gruesome attacks in Israel and while many members of the University of Virginia Community were still reeling and trying to confirm whether their loved ones were dead, alive, or taken hostage, a number of formal and well-organized, pro-

Hamas, UVA faculty and student groups emerged publicly with slick messaging and public relations efforts, pre-prepared by Hamas-proxy National SJP, specifically calculated to promote Hamas, to oppose Israel, Israelis, and people of the Jewish faith, and to create a toxic, abusive, intimidating educational environment for Jews and Israelis in this community:



*Official Statement of Students for Justice in Palestine at UVA at approximately 8:43AM on October 8, 2023, transmitted widely to the University Community. In the very first paragraph, the pronouncement states that the hate-based terrorist attack constituted an "unprecedented feat for the 21st century."*

83.    This UVA-based, pro-Hamas campaign of abuse and harassment would become widespread, pervasive, coordinated, and include an "all-University" effort involving every constituency and apparatus of the higher education institution and its mission.

84.    In addition to the pronouncement above, on October 8, 2023, SJP at UVA, identifying itself as "We, Students for Justice in Palestine," and "students at the University of Virginia's SJP Chapter," published a "SJP Statement on occupied Palestine" that was co-signed by *thirty-eight* student organizations, including the Black Student Alliance, the National Pan-Hellenic Council, and the "secret society" known as the "13 Society," to name but a few.

85.   Many of the student leaders and executive officers of some of the most prominent, influential, and powerful student Agency Organizations and Special Status Organizations, such as the Honor Committee, are members of the student groups that co-signed the antisemitic, hate-based manifesto published by SJP at UVA.

86.   On October 27, 2023, FJP at UVA published a pro-Hamas, antisemitic "Open Letter," co-signed by at least *eighty* professors, some of whom hold endowed chairs at the University and some of whom would become members of the Ryan-Hardie Administration's so-called "Task Force on Religious Diversity and Belonging," which the Administration created in December 2023 as a half-hearted public relations smokescreen to allow it to claim it was "evaluating" the state of "religious diversity" on Grounds. The Ryan-Hardie Administration staffed the "Task Force" with professors who are *members of FJP at UVA* and others who are "DEI" administrators who have no experience or history working with the Jewish Community or combatting antisemitism. Those decisions, in and of themselves, are compelling evidence of UVA's deliberate indifference to the existence of a virulent and violent hate-based, antisemitic hostile educational environment on Grounds.

87.   These efforts were accompanied and soon followed by other pro-Hamas, anti-Israel disruptive rallies organized and staffed by National SJP's UVA proxies:



*Note the location and use of University facilities, the use of the official University logos and banners, the official-sounding "Coalition of Concerned Faculty Members," the professional, highly-technical "QR Code," and the availability of "pizza and beverages." Most importantly, the notion of UVA faculty hosting a "Teach-In" is grounds for imputing liability to the University as these are official acts and duties by University faculty and employees, on University premises.*

88.     Jewish students, faculty, and parents within the University of Virginia Community <u>immediately</u> began lodging cries for help and formal complaints with every available University outlet, agency, and program.

89.     Letters were written to Defendant President Ryan and Defendant Rector Hardie's Board of Visitors describing the hate and hostility towards Jews and Israelis on Grounds. Open letters, available to the entire University Administration, were published by the school's Jewish constituency. Police reports were filed with the University Police regarding antisemitic criminal behavior. Formal complaints with the University's "EOCR" department were initiated. Reports of antisemitism through the University's "Just Report It!" system were lodged. Even federal authorities such as the United States Department of Education's Office of Civil Rights opened investigations.

90.     Despite being apprised of these statements and indicia of hate and despite possessing the actual knowledge that this behavior constituted the creation and development of an illegal

hostile educational environment at UVA for Jewish students and a hostile work environment for Jewish faculty, President Ryan did . . . nothing. Rector Hardie did . . . nothing.

91.     State and federal leaders and politicians such as Congressman Bob Good, Virginia Governor Glenn Youngkin, and Virginia Attorney General Jason Miyares quickly and unequivocally condemned the atrocities in Israel <u>and</u> the antisemitic expressions of hate and hostility at the University of Virginia.

92.     The University itself, the President of the University, and the Rector of the University refused to condemn antisemitism on Grounds and continue to refuse to condemn antisemitism on Grounds.

93.     The University itself, the President of the University, and the Rector of the University refused to threaten to hold students and faculty who engaged in antisemitic discrimination and abuse accountable or responsible for their misconduct.

94.     Instead, in the few instances when the University itself, the President of the University, or the Rector of the University "spoke" about a matter related to the virulent antisemitism on Grounds, if the word "antisemitism" was mentioned, it was quickly followed by the words "and Islamophobia!" This behavior is patently antisemitic and retaliatory. The practice constitutes denial and gaslighting.[4]

95.     The University itself, the President of the University, and the Rector of the University refused to deploy any of the University's vast resources to support and protect Jewish and Israeli students and faculty.

---

[4]     By contrast are the University's own past lectures and rebukes of any student or faculty member who dared utter the phrase "All Lives Matter" when confronted with the phrase "Black Lives Matter."

96.     University of Virginia Associate Vice President for Student Affairs Marsh Pattie and Associate Dean of Students Alex Hall communicated with the Plaintiff by Zoom regarding his complaints of harassment, abuse, and physical assault—complaints that the University would later claim were never "formally filed" as an excuse for inaction. Vice President Pattie and Dean Hall informed Matan that he was free to "move out" of the First Year dorms if he felt unsafe or uncomfortable on Grounds. That was it.

97.     Thus, the University itself, the President of the University, and the Rector of the University did . . . nothing.

98.     They said . . . nothing.

99.     The University itself, the President of the University, and the Rector of the University stood silent while their Jewish students, including the Plaintiff, were abused, harassed, targeted for disparate treatment, and driven off Grounds in a state of fear and anguish.

100.    The University itself, the President of the University, and the Rector of the University remained deliberately indifferent while a noxious and dangerous cloud of anti-Israeli and antisemitic hate swept into the Academical Village, descended into the school's classrooms and common spaces, and brought an environment of hostility, intimidation, and fear to a substantial portion of the student body, including the Plaintiff.

101.    Among the tactics used by those who hate Jewish people, who despise Israel, and who have pledged to destroy those who support Jews or the state of Israel, is the practice of "gaslighting," which is nothing more than this generation's version of Holocaust Denial, an act of antisemitic hate in and of itself.

102.    From October 7, 2023, to the present, denial, downplaying, and gaslighting would be the watchwords and hallmarks of the University of Virginia Administration and Defendants

Ryan and Hardie's responses to UVA Jewish students', including the Plaintiff's, complaints and cries for help.

103.   The National Students for Justice in Palestine's campaign for Hamas, carried out by "chapters" such as Defendants SJP at UVA and FJP at UVA, was crafted to include a series of organized "protests" meant to disrupt the entire academic year's worth of university operations, terrify the Jewish communities within those schools, and batter the already feeble and compliant administration into permanent capitulation:



*Students for Justice in Palestine at UVA and Faculty for Justice in Palestine at UVA flyer, distributed on or around October 8, 2023, calling for a "Teach-In" on University property involving University faculty, students, and resources. The image is a doctored photograph depicting the massacre site where terrorists (edited by SJP at UVA out of the image) entered the Israel Kibbutz to murder innocent civilians. The image itself is shocking and offensive and is, in and of itself, a vulgar act of intimidation.*

104.   "Decolonization" is a call to violence, in this case, a call for violence against Jews and Israelis. Posters bearing these calls for genocide against Jews were posted in early October 2023 and remain posted in positions of prominence at the University to this very day.

30

105.   A well-trodden tactic employed by hate groups and now used by the pro-Hamas student and faculty groups at the University of Virginia is the wearing of masks to create an atmosphere of intimidation while hiding the identity of the agitators. The practice is also a crime under Virginia law:



*Flyer widely distributed by Defendants SJP at UVA and FJP at UVA directing pro-Hamas students and faculty members to disrupt classes and operations at the University of Virginia on October 25, 2023. Note the professional nature of the communique and instructions, the directives to avoid being "identified," and the pejorative and hostile use of the term "Zionist."*

106.   The instructions and directions issued by the pro-Hamas student and faculty groups clearly demonstrate both the coordinated and conspiratorial nature of their misconduct and their actual awareness that wearing masks was a criminal act.

107.    On October 25, 2023, FJP at UVA (two days after the publication of their pro-Hamas "open letter") and SJP at UVA, among other student and faculty groups, conducted a disruptive and riotous "protest," called a "walk out" during which students and faculty members abruptly rose from their seats or podiums in class and left to join a march to the Rotunda, Thomas Jefferson's "temple of knowledge" at the center of the University's Academical Village, a UNESCO World Heritage Site. Hundreds of students and faculty members, most wearing masks and adorned with "keffiyehs," the symbol of Hamas and pro-Palestinian "resistance" groups, converged on the Rotunda, chanting slogans of hate.

108.    The event occurred barely two months after classes had begun at UVA. Matan learned that other Jewish and Israeli students were afraid to attend or even be seen observing the rally for fear of being harassed or abused by the protesters and out of fear of retaliation by the Ryan-Hardie Administration.

109.    Matan, in an extraordinary act of courage, conviction, and faith—an 18 year-old, college freshman away from home for the first time—decided to attend, wearing his Yarmulke, his Star of David, and carrying the flag of Israel.

110.    Matan asked a Jewish, Israeli UVA professor to escort him. When interviewed months later by the University Police, the professor stated that he did not "want" to go to the event, but when Matan expressed fear, the professor felt it was his moral and ethical duty as a professor, teacher, adult, Jew, and Israeli to escort Matan and "bear witness" to the events.

111.    At the event, Matan was berated, insulted, threatened with violence, and physically assaulted. The UVA professor was forced to intervene and identify himself as a UVA professor in order to protect Matan and himself from imminent physical assault.

112.    The events of the October 25, 2023, "rally" deeply scarred Matan and have had lasting negative effects upon him and his experience at The University of Virginia.

113.    SJP at UVA's misconduct was intentional, intended to discriminate, and intended to create a hostile environment towards and against Matan.

114.    SJP at UVA's actions towards and against Matan were motivated by racial, religious, ethnic, national origin, and shared ancestry animus and would not have occurred "but for" those protected characteristics.

115.    Likewise, "but for" those same characteristics, and in the absence of retaliatory animus, Defendants UVA, Ryan, and Hardie would not have taken the actions they did regarding Matan and would not have failed to take the actions they should have taken regarding Matan.

116.    Every maneuver by these university-based Hamas proxies was purposefully crafted to achieve the goals of advancing the Hamas agenda here and abroad and creating an inhospitable and toxic environment for Jewish and Israeli people in this community.

117.    As stated in Paragraph 39 of the *Parizer* Lawsuit, National SJP's message to UVA and its Jewish community through FJP at UVA and SJP at UVA is unambiguous:

> violent attacks are a justified response to Zionism as an idea, to Israel as an entity, and to Zionists as people. The purpose of this messaging is not only to justify the terrorism of Hamas and its affiliates in Gaza within Western academia and society at large but also to establish an environment where violence against Jews and anyone else associated with Israel could be construed as acceptable, justified, or even heroic.

118.    The Boycott, Divest, Sanctions Movement, known as "BDS," is an antisemitic, anti-Israel, anti-Israeli, and anti-Zionist "movement" that has taken root at many "elite" universities. A number of prominent and courageous universities, some considered "ultra-liberal," have

declared the BDS Movement and its "student referendums" to be patently antisemitic and violative of their policies and codes of conduct. UVA is not one of those courageous places.

119.   President Jim Ryan not only promised to meet with "BDS" activists whenever and wherever the activists demanded, he and the Ryan-Hardie Administration allowed a student referendum supporting BDS to take place and then promised to bring the results of the referendum and the BDS leaders' "concerns" to the University's various investment administrators and officials.

120.   President Ryan refused to condemn or even comment upon the BDS "referendum," only stating, after the fact, that if "he were a student, he would have voted against it."

121.   A profile in courage this most definitely was not.

122.   The phrase and chant "*From the River to the Sea, Palestine will be Free*," is patently antisemitic. It is meant and intended to instill fear and trepidation into the hearts and minds of Jewish people. It is a call to genocide. It calls for and praises the wholesale destruction of a people, an ethnicity, a religion: the Jewish people; the Jewish state of Israel; the Jews who live in Israel; and Jewish people wherever they are found. In fact, the United States House of Representatives passed a resolution expressly denouncing the phrase as antisemitic.

123.   The phrase "*Intifada Revolution – There is only One Solution*," is patently antisemitic. It is a call for the destruction and elimination of Jewish peoples globally (while also evoking the Holocaust's "Final Solution"). "Intifada" has one meaning and one meaning only— organized terror campaigns against Israel, Israelis, and Jews.

124.   Images and depictions of Hamas "fighters" (terrorists) are patently antisemitic and symbols of hate:



*Image of a "Lawn Room" door, shortly after October 7, 2023, and remaining in similar condition to the date of filing on a central University facility that is open to the public and located in the center of the UNESCO World Heritage Site. Note both the depiction of Hamas terrorists and the antisemitic phrase "From the River to the Sea, Palestine will be Free."*

125.    Images such as the "Bloody Handprint," which recalls and refers to a specific act of terror

in which two innocent, young, male Israelis were tortured, mutilated, and murdered, after

which one of the Hamas terrorists proudly displayed his blood-stained hands to a throng of

wildly cheering pro-Hamas antisemites, are antisemitic and symbols of hate:



*An Instagram "post" by UVA Student Council <u>President</u> "reposting" a widely-distributed post from Defendant SJP at UVA of the antisemitic and plainly threatening "Bloody Handprint" image (while taunting and threatening the Hillel at UVA - Brody Jewish Center).*

126.    Today, hundreds of UVA faculty members have openly expressed their support and allegiance to the pro-Hamas movement at UVA. Pro-Hamas faculty members have served as "liaisons" between designated University Administration officials and pro-Hamas faculty and student groups for the coordination of disruptive protests and the entreaty of antisemitic "demands," in other words, the maintenance of a hostile educational environment for Jewish people. Pro-Hamas faculty members have staged their own

demonstrations, disrupting University operations and harassing Jewish students and faculty members in the process.

127. These include the "UVA Encampment for Gaza"—planned, coordinated, and supported by Hamas through the National SJP organization. The encampments occupied substantial portions of the central Grounds, the Academical Village, meaning that Jewish students and faculty members were forced to pass by and navigate around antisemitic banners, oaths, and slurs whenever they went to the library, class, or even passed by the University's "campus."

128. Pro-Hamas faculty members have rendered the entirety of the physical "Grounds" or campus of the University of Virginia, a hostile, unwelcoming, and dangerous space for Jewish students and faculty members. The hostile environment is pervasive, severe, unwelcome, objectively offensive, and subjectively offensive. Those acts and decisions and the hostile environment constitute express and tangible education actions that have altered and modified the terms and conditions of the educational experience and expectations of the Plaintiff. They are unlawful and actionable as to the professors who committed them. The creation of the hostile environment, the hostile environment itself, and the tolerance of the hostile environment's existence go far beyond deliberate indifference and are imputed, as a matter of law, to the University of Virginia.

129. Pro-Hamas faculty members have canceled classes so that they and their students could attend anti-Israel protests. Those acts and decisions are express and tangible education actions that are unlawful and actionable as to the professors who committed them and, as a matter of law, are imputed to the University of Virginia itself.

130.   Pro-Hamas faculty members have offered "extra credit" and boosts in grades to students who attend anti-Israeli, antisemitic rallies. Those acts and decisions are express and tangible education actions that are unlawful and actionable as to the professors who committed them <u>and</u>, as a matter of law, are imputed to the University of Virginia itself.

131.   Pro-Hamas faculty members have offered to tutor and assist pro-Hamas students with their final examination and term paper obligations. Those acts and decisions are express and tangible education actions that are unlawful and actionable as to the professors who committed them <u>and</u>, as a matter of law, are imputed to the University of Virginia itself.

132.   Pro-Hamas faculty members have offered sanctuary and benefits within the confines of pro-Hamas, illegal "encampments" and "liberated zones" where Jewish and Israeli students are unwelcome, unsafe, and uncomfortable. Those acts and decisions are express and tangible education actions that are unlawful and actionable as to the professors who committed them <u>and</u>, as a matter of law, are imputed to the University of Virginia itself.

133.   Pro-Hamas faculty members and groups of faculty members have threatened to withhold final grades for their students, with the full understanding that doing so will cause tremendous harm to the students, even preventing graduation. Some of these faculty members who have issued such threats have acknowledged the harm that they will cause, and have claimed that their pro-Hamas misconduct and misbehavior will help pressure the United States to change course regarding support for Israel. This is the very definition of illegal discrimination and unlawful harassment. Those acts and decisions—whether mere threats or actually carried out—are express and tangible education actions that are unlawful and actionable as to the professors who committed them <u>and</u>, as a matter of law, are imputed to the University of Virginia itself:



*Social media post by the United Campus Workers of Virginia confirming the withholding of grades by pro-Hamas professors and teaching assistants.*

134.    These tangible adverse acts and decisions also call into question the legitimacy of all of these professors' and teaching assistants' acts and decisions, past, present, and future. How can any student be confident that their grades, their lessons, their experience, and their treatment were free from prejudice, bias, and hate?

135.    Dozens of faculty groups, such as the American Association of University Professors – UVa Chapter, to name but one, have either joined, sponsored, or expressed their support and "solidarity" in writing for the formal, pro-Hamas entity known as Faculty for Justice in Palestine UVA Chapter.

136.    Entire academic departments such as the world-renowned Center for Politics, the vaunted UVA Department of English, the esteemed UVA Corcoran Department of History, the Department of Religious Studies, and the Department of Global Studies, again, naming just

39

a few, have expressed their "support and solidarity" in writing with pro-Hamas UVA faculty and students and the antisemitic discrimination and harassment that has taken place on Grounds against Jewish and Israeli students and faculty.

137. When hundreds of faculty members, dozens of formal University faculty groups, and entire major academic departments act in unison to support antisemitic discrimination and harassment in the course and scope of their employment and their respective positions of authority within the University, they can be said, as a matter of law, to be acting on behalf of the University of Virginia, or, put another way, as a matter of law, the University of Virginia is engaged in illegal antisemitic discrimination and harassment.

138. Additionally, pro-Hamas, antisemitic UVA students have formed multiple formal student groups dedicated to antisemitic objectives and dedicated to making the University of Virginia an inhospitable place for Jews and Israelis.

139. The pro-Hamas, antisemitic UVA students, numbering in the hundreds, if not thousands, of actively enrolled members of the student body, have engaged in a wide range of hate-based, discriminatory harassment, abuse, and intimidation, and they have done so on an open, obvious, pervasive, and continuous basis since October 7, 2023.

140. From October 7, 2023, to the present, the pro-Hamas, antisemitic UVA students staged and managed multiple aggressive, disruptive protests and other riotous acts for the purpose of creating a hostile environment for Jewish students and attempting to force the University Administration and by extension the people of the Commonwealth of Virginia to bend to their will regarding Israel and support for Hamas. The students were joined by faculty and administrators.

141.   To be sure, pro-Hamas demonstrations and events occurred on a weekly, if not daily, basis in the central campus or original "Grounds" of the University that connect nearly every aspect of student life and the student body to one another. The "Grounds" <u>are</u> the University of Virginia, and they are thoroughly permeated and infected with antisemitism.

142.   The pro-Hamas actors—faculty and students alike—have published horribly offensive slurs and threats on various physical and online platforms within and outside the University Community.

143.   On such platforms, pro-Hamas UVA students and faculty have approved of and celebrated the rape, mutilation, and murder of Jews in Israel.

144.   On such platforms, pro-Hamas UVA students and faculty have endorsed violent acts and violent threats against Jews and Israelis by their "comrades" and "chapters" at other schools, thereby implying that similar violence should be feared by Jews and Israelis at UVA.

145.   At UVA, Jewish students (including the Plaintiff) have been and continue to be berated as "filthy Jews," "Hitler," "Nazi," and "genocidal fucks," among many other despicable slurs.

146.   Jewish students (including the Plaintiff) have been physically assaulted and threatened with physical violence.

147.   Pro-Hamas, antisemitic UVA students and faculty have emblazoned most spaces at the University, especially the cherished central "Academical Village" or "Lawn" with antisemitic posters and markings.

148.   On or around April 30, 2023, Defendants FJP at UVA and SJP at UVA and their affiliated groups and members, as well as alias and alter-ego organizations, began constructing "encampments" on either side of the Rotunda, which is the centerpiece of the University

Case 3:24-cv-00036-RSB-JCH   Document 1   Filed 05/17/24   Page 42 of 79   Pageid#: 42


of Virginia. Once established, it was impossible for students, faculty, or townspeople to even drive past the University without encountering the encampments.

149. During the times that the encampments were in place, it was impossible for students and faculty to access many of the main academic buildings or main University offices or the libraries without encountering the encampments and their antisemitic proclamations and utterances of hate.

150. The encampments included group chants of antisemitic slogans, numerous antisemitic banners and posters, intermittent amplified sound (in violation of University policies), tents (in violation of University policies), and the materials for constructed, rigid barriers and structures.

151. The Ryan-Hardie Administration has admitted that the occupants of the encampments and protesters violated University policies and broke the law, as well as committed acts of violence and threatened to commit further acts of violence and disruption of University operations. The Ryan-Hardie Administration has admitted that "outsiders" who are "known to law enforcement" as participants in riotous or violent acts "elsewhere in the Commonwealth" were among the occupants of the encampments. Given the alleged attire and behavior of these "outsiders," reasonable minds could conclude that the pro-Hamas encampment occupants included members of local Antifa chapters.

152. Defendants FJP at UVA and SJP at UVA or their alias and alter-ego organizations staffed, manned, and built the encampments. Defendants FJP at UVA and SJP at UVA appointed "liaisons" to interact with University Administrators and proxies for Defendants Ryan and Hardie.

153.   Defendant UVA assigned members of its administration, such as Vice President for Student Affairs Kenyon Bonner, Dean of Students Cedric Rucker, Associate Vice President for Student Affairs Marsh Pattie, and University Police Chief Timothy Longo to maintain a close, cordial, and interactive presence with the protesters and encampment dwellers. At various times throughout the day on May 1, 2024, and May 2, 2024, these UVA administrators were observed engaged in deep dialogue with masked pro-Hamas encampment dwellers who were serving as "liaisons" between FJP at UVA and SJP at UVA and the University Administration.

154.   On Thursday, May 3, 2024, or thereabouts, Defendants FJP at UVA and SJP at UVA posted a list of demands to the University of Virginia and its administration. The demands are patently antisemitic. The protesters demanded a response by 12:00PM the following day, Friday, May 4, 2024.

155.   On May 4, 2024, sometime shortly after the deadline imposed by the protesters (and in any event less than twenty-four hours later), the University of Virginia produced a lengthy response to the demands, in writing, signed by Vice President and Chief Student Affairs Officer Kenyon Bonner and Brie Gertler, Vice Provost for Academic Affairs. The letter included the following statements, in pertinent part:

a.     "We welcome the opportunity for further conversation."

b.     In response to the "encampment's" antisemitic demands for "divestment" from Israel and support for the "BDS movement," both of which have been deemed to be antisemitic and prohibited by even the most liberal of universities nationwide, the University Administration stated that it would "welcome the opportunity to hear

more about your questions and concerns. We would be happy to arrange this [a meeting with President Ryan and other senior administrators] for you."

c.    The administrators agreed that the protestors, despite violating numerous University anti-discrimination policies, codes of conduct, and state and federal civil rights laws, based on their conduct to date, would not be charged with or face any University disciplinary measures or proceedings and could continue on without fear of "administrative discipline."

156.   The pro-Hamas antisemitic UVA students and faculty inhabiting the "encampments" who trashed and defaced the UNESCO World Heritage Site that was littered with antisemitic banners and symbols, wrote, in bold red letters the words "BULLSHIT" and "FREE PALESTINE" across the University's response letter and then posted it at the encampment and online for the world to see.

157.   The effect of these behaviors has been to make Jewish and Israeli students (including the Plaintiff) and faculty feel unwelcome and unsafe, feel ashamed of their immutable, protected characteristics, feel uneasy moving freely within the University Community and attending classes and exams, and feel uncertain and insecure about their experience and whether they are being treated fairly by professors and peers. Most disturbing of all, the effect of these behaviors has been to place Jewish and Israeli students and faculty at UVA in imminent and constant fear of physical attack, violence, and even death.

158.   On Saturday, May 4, 2024, University, local, and state police were summoned to remove and dismantle the encampments and their occupants. Arrests were made. However, the University never claimed or charged the antisemitic protesters with charges or criminal accusations related to hate, hate-based violence, or illegal harassment and abuse. Instead,

the University claimed that the basis for dismantling the encampments was the violation of the University's "tent policy."

159.   The University's treatment of pro-Hamas students and faculty is entirely different in tone, tenor, content, and meaning than the short shrift that was dribbled out to Jewish students and their parents.

160.   When Jewish students and their parents asked President Ryan for help and petitioned him for a meeting, he forced them to wait nearly four months before he would meet with them. When President Ryan did agree to meet with his Jewish students, he demanded that the meeting be limited to only four Jewish parents, who were forced to attend in person with their "biological child" student in attendance with them. A more obvious act of denial, retaliation, and intimidation is difficult to fathom. President Ryan insisted that the meeting take place in his office, in person. Despite being a matter of serious, public importance at a public school, President Ryan insisted that the meeting be "confidential." During the meeting, the Jewish parents and students delivered a multi-media presentation attempting to bring their plight and the state of antisemitism at UVA to President Ryan's attention. The Jewish students informed President Ryan that they felt afraid on campus. They felt intimidated on campus. They felt forced to hide indicia of their faith, lest they be targeted by pro-Hamas students and faculty. They feared retaliation by the University. To be sure, the Jewish community feared retaliation from President Ryan.

161.   They were right to fear retaliation by the University and its senior administrators.

162.   The University of Virginia ignored and rejected the Plaintiff's pleas for help. Instead, after the meeting with President Ryan, and while University, state, and federal investigations

into antisemitic civil rights violations were ongoing, the Plaintiff suffered retaliation at the hands of the Defendants.

163.   Because Jewish students and their parents repeatedly advised President Ryan and Rector Hardie that they were traumatized by bias-related incidents that included threats of violence, they reasonably believed that they would have allies and protectors within the University Administration. Far from responding to their concerns, President Ryan and Rector Hardie "gaslighted" the Jewish students with a series of lies, evasions, and acts of retaliation, further confirming Defendant UVA's deliberate indifference toward antisemitic abuse, harassment, and intimidation that had sadly become a fact of everyday life for Jewish students and their parents at UVA.



*This email, more than four months after the terrorist attacks and following months of negotiations regarding the terms under which President Ryan would agree to meet with victims who were his own students, speaks for itself and is the best evidence of the Ryan-Hardie Administration's total lack of seriousness and its deliberate indifference to the profound and severe suffering being experienced by UVA's Jewish students.*

164.   On or around March 1, 2024, approximately two weeks after the meeting between President Ryan and the few victims of antisemitic hate at UVA who he allowed to attend, the University Board of Visitors held its Spring Meeting, at which President Ryan, Rector

Hardie, University Counsel Cliff Iler, and others were in attendance. During the meeting, in open, recorded session, Board of Visitors member Bertram "Bert" Ellis attempted to raise the subject of antisemitism on Grounds.

165.   Defendant Rector Hardie interrupted Visitor Ellis, claiming that the subject of antisemitic harassment, abuse, violence, and discrimination on Grounds would not be discussed in "open session." Mr. Ellis was courageously undaunted and insisted that the Board of Visitors bring the matter of antisemitism to the table for discussion. Mr. Ellis commented that he had received "hundreds" of complaints from Jewish students and parents and that the University Community deserved to have the matter addressed openly by the Board.

166.   Rector Hardie became heated and aggressive, proclaiming that Mr. Ellis was "out of line" and "out of order" for attempting to bring this matter of national and international importance to the Board's attention.

167.   Rector Hardie, acting at all times within the course and scope of his position as a public official and as Rector of the University of Virginia, under color of state law, with the apparent or express consent and approval of Defendant Ryan, and upon the advice of University Counsel, raised his voice and then threatened Mr. Ellis.

168.   When Mr. Ellis persisted in raising his objections to Rector Hardie's refusal to allow the Board of Visitors to address or even consider addressing hate-based discrimination and violence against Jewish students at the University of Virginia, Rector Hardie, in an unprecedented display of hostility, arrogance, and retaliatory animus, promised Board of Visitors member Ellis that he would be "reprimanded" for his efforts.

169.   Rector Hardie's unprecedented behavior constituted misconduct and a serious breach of his duties as a public official of the Commonwealth of Virginia. To date, Rector Hardie

has not apologized or retracted his threats, nor has he apologized to the Jewish Community, including Jewish UVA students, for his obviously retaliatory behavior.

170.    Rector Hardie's outburst was telling and served as strong evidence of the downplaying and denial of antisemitism that has plagued the University for nearly a year. Equally disturbing was the open exposure of the Rector's retaliatory intent, the University Administration's willingness to retaliate against those who refuse to remain silent, and the culture of retaliation generally that has defined the Ryan-Hardie Administration.

171.    Importantly, despite Rector Hardie claiming (very loudly) that the issue of antisemitism at UVA is a "student safety" matter during the tumultuous Board meeting, the Ryan-Hardie Administration took no action whatsoever to protect the safety of Jewish students or even act as if they were addressing safety or antisemitism on Grounds following the meeting.

172.    Not surprisingly, shortly after Rector Hardie's outburst and admissions, a bogus "motion" or "petition" of some sort was alleged to have been brought by one of the Ryan-Hardie Administration's suppliants on the Board of Visitors to punish Mr. Ellis for the temerity of attempting to protect Jewish students at UVA.

173.    In the days or weeks following the early March 2024 Board of Visitors meeting, a "video truck" appeared on Grounds, calling for the resignation of Rector Hardie. The truck resembled vehicles bearing similar messages at Ivy League schools up North where administrators (many of whom are very close friends and longtime colleagues of Defendant Ryan) were accused of ignoring or denying antisemitism on their campuses. Who arranged or paid for the video truck that was spotted at UVA remains unknown. What is known is that Rector Hardie, President Ryan, or the Ryan-Hardie Administration are alleged to have

immediately ordered an investigation into the truck's origins—an effort that found no purchase.

174. However, the anger and response to the appearance of the video truck was yet another instance of the Ryan-Hardie Administration's willingness to retaliate against those who challenge them, and the culture of retaliation that permeates the University Community and keeps the victims of hate and discrimination silent.

175. When a Jewish parent corresponded with President Ryan and Rector Hardie regarding the reaction to the video truck and failure to initiate any action into the claims of antisemitism and hate on Grounds, President Ryan and Rector Hardie responded in writing, calling the parent's concerns "offensive." The written admonition curiously cited the University's "response" to an Anti-Defamation League ("ADL") investigation into antisemitism on college campuses as evidence of its actions to combat hate at UVA.

176. Ironically, the very next day, the ADL issued a "grade report" that awarded the University of Virginia the grade of "F" for antisemitism on its campus. Even Columbia University, where graduation was canceled because of pro-Hamas disturbances, only received a grade of "D" for antisemitism from the ADL, further highlighting UVA's sorry history and handling of antisemitism.

177. Rather than accepting the esteemed ADL's concerns and pledging to investigate, expose, and remediate antisemitism on Grounds, the Ryan-Hardie Administration went (or continued) on the offensive.

178. UVA deployed its well-oiled and seasoned public relations and crisis management machine to seize and reverse the narrative in a stunning act of denial and display of retaliatory animus.

179.   On repeated occasions, UVA's media liaisons falsely reported the claim that only a few Jewish students had complained, and then only mildly, about a limited number of isolated and minor incidents that were, at worst, only slightly offensive. The UVA media apparatus falsely claimed that no major and, more importantly, "formal" complaints had been lodged or initiated, even while their own lawyers were responding to formal, federal investigations.

180.   However, worst of all, the Ryan-Hardie Administration and their media and public relations teams took a step far over the line of honesty, integrity, and decency when they stated to various media outlets that:

> ongoing inquiries into those allegations have yet to return evidence to substantiate the claims or to warrant disciplinary measures, despite substantial investigative efforts. This includes specific allegations of violence against one student at a protest, after which University Police investigated thoroughly, using video evidence, witness statements, and other methods.

181.   These statements are reprehensible, irresponsible, and, most of all, false.

182.   The only explanation for such a breach of ethics and honesty is retaliatory animus.

183.   This startling breach of trust could not have been published without express prior approval from President Ryan and Rector Hardie. The actions of Defendants Ryan and Hardie and actions of the administrators who executed their orders are, as a matter of law, imputed to the Defendant University.

184.   This example of Defendant UVA's use of its response to reporting about the ADL's "Grade F" for UVA regarding antisemitism as a means of retaliation against the Plaintiff is but one example of the discriminatory, abusive, and retaliatory measures that Defendants UVA, Ryan, and Hardie will resort to in order to silence dissent and crush those who raise legitimate grievances regarding mistreatment on campus.

185.    One of the retaliatory tactics employed by National SJP, through its "chapters," is the use of various forms of "lawfare" to target Jewish students and student-journalists who stand up and speak out against antisemitism and hate. At Princeton, for example, National SJP is reported to have filed multiple "No Contact Orders" against innocent students and journalists in order to silence them.

186.    At the University of Virginia, Defendant SJP at UVA, through its self-identified "President," filed a bogus and false Honor Charge against the Plaintiff in a similar act of retaliatory "lawfare." Defendant SJP at UVA did not even bother to disguise its motives: it admitted, in the false "charge," that it was doing so in retaliation for the Plaintiff speaking to a member of the national media about antisemitism at UVA.

187.    An Honor Charge is the most serious accusation and infraction in the University of Virginia universe. UVA professors and administrators will readily admit that a student has more likelihood of rehabilitating his or her reputation and career following a *murder conviction* than from an Honor Charge at UVA. Accused students are known to have suffered severe mental, emotional, psychological, and physical harm simply by being charged. Suicide attempts and ideations are not uncommon. It is the proverbial "Black Spot" of Robert Louis Stephenson's *Treasure Island*. Innocent or guilty, convicted or acquitted, an Honor Charge represents a terrible Rubicon that once crossed, cannot be uncrossed.

188.    Once a charge has been filed, no matter how obviously bogus, fraudulent, or fake, the University claims that it cannot be withdrawn *by the accuser or "reporter."* The charge can, however, be summarily dismissed, *sua sponte*, by the University or its Honor Committee, and this has happened numerous times in the past.

189.   Upon filing, the charge and the prosecution of the charge become the University's responsibility. The University immediately assumes the role of accuser, investigator, judge, jury, and executioner.

190.   The University of Virginia and Defendant Ryan administer and supervise all aspects of the Honor System, including the acceptance of a charge and the decision to proceed with a prosecution. Defendants Ryan and Hardie retain authority and ultimate responsibility for the legality and correct execution of the University's most stern, severe, and grave disciplinary process.

191.   The absurdity and fraudulence—and the thorough illegality—of the Honor Charge brought by SJP at UVA and quickly accepted for prosecution by the University against the Plaintiff were abundantly clear and obvious on the very face of the "Honor Report" or Charge.

192.   Defendant UVA has admitted that the Administration, which includes Defendants Ryan, and Hardie, possessed actual knowledge of the Charge and had reason to fully know of its retaliatory and fraudulent nature. They allowed it to proceed nonetheless. Defendant UVA's Office of University Counsel, acting on behalf of Defendants UVA, Ryan, and Hardie, assisted and counseled the Honor Committee in its decisions to accept and move forward with the fraudulent and retaliatory proceeding, even in the face of the Plaintiff's personal plea that the Honor Charge was false and retaliatory.

193.   Before filing, Defendant SJP at UVA knew that the Honor Charge it lodged was false and retaliatory, and that a University of Virginia professor had witnessed and confirmed all of the events regarding the Plaintiff's responses to the national media reporter.

194.   Defendants UVA, Ryan, and Hardie knew, had reason to know, and should have known that Defendant SJP at UVA's "Honor Charge" was false, improper, illegal, and retaliatory.

195. Defendants UVA, Ryan, and Hardie did nothing to assist the Plaintiff or call a halt to the illegal and retaliatory and tremendously damaging and painful proceeding.

196. The Plaintiff was forced to engage private counsel at his own expense. The Plaintiff was forced to secure the sworn declaration, under penalty of perjury, from the UVA professor who witnessed all of the events and incidents. After enduring nearly a month of extreme stress, anguish, and excruciating pain as an accused in the most grave of UVA disciplinary proceedings, the Plaintiff filed a motion to dismiss outlining the deficiencies and illegality of the proceedings. The very next day, the Honor Committee met and mysteriously decided that the Honor Charge lacked any evidence to support it—a fact that was plainly obvious and well-known at the time of filing of the Charge.

197. Though the Charge was dismissed and the Plaintiff exonerated, the illegal and improper aims and objectives of SJP at UVA and National SJP were achieved.

198. Even in the aftermath, the University, President Ryan, and Rector Hardie have not offered any comfort, support, or words of encouragement to the Plaintiff, nor have their subordinates or agents.

199. So, at this very moment, the *only* action that the University of Virginia and its two most senior administrators, President Ryan and Rector Hardie, have taken regarding antisemitic hate, discrimination, harassment, and abuse at the University of Virginia was the Honor Charge that UVA chose to prosecute against the lone Jewish student who was a victim of antisemitism and spoke out against hate.

200. In fact, the most serious charge or consequence that any student or faculty member has faced in this entire hateful saga are the charges and consequences faced by the Jewish Plaintiff for the "crime" of speaking to a reporter about the antisemitism he suffered. There

is simply no excuse for this. These facts, in and of themselves, are compelling and substantial evidence of the Defendants' guilt and liability.

201. On the day that the Honor Committee dismissed the bogus and fraudulent charges against the Plaintiff, Virginia Attorney General Jason Miyares personally communicated with the Plaintiff, offering support and encouragement and providing the Plaintiff with a means to communicate with his office and him if he ever needed anything or if the antisemitism and hate continued.

202. President Ryan and Rector Hardie have never said or done anything remotely similar to those small acts of kindness and compassion for these victims of hate on their own campus.

203. The University of Virginia, under the presidency and administration of Defendant Ryan, and under Defendant Hardie's multiple terms as a Board of Visitors member and, now, as Rector, has a troubling and problematic history with the subject of race and racialist decision-making and disparate treatment. Multiple lawsuits, formal grievances, and media reports have identified the University's racially discriminatory behavior and treatment of students and employees under the Ryan Administration. The recent case of *Bettinger v. The Rectors and Visitors of the University of Virginia,* filed in the United States District Court for the Western District of Virginia, and found at 3:23-cv-00041-NKM, particularly pages 47-61, paragraphs 179-195, detail specific examples of racially disparate treatment and racially discriminatory decisions by UVA under the Ryan-Hardie Administration. The Plaintiff hereby refers to and incorporates those portions of the *Bettinger* Matter Complaint into this lawsuit as if alleged word-for-word.

204. Proof of President Ryan, Rector Hardie, and UVA's willingness to treat people and circumstances differently based on race is demonstrated by comparison and contrast of the

handling and decisions surrounding the September 7, 2022, "Homer Noose Incident" versus the handling of antisemitism Grounds since October 7, 2023.

205.   On September 7, 2022, a rope or object fashioned into a "noose" was found draped on the "Homer Statue" on the Lawn. Within minutes, President Ryan concluded that a "hate crime" had occurred, convened the "Threat Assessment Team," and summoned the University Police, Albemarle County Police, and the Federal Bureau of Investigation. "Community Alerts" were broadcast warning of the commission of a "hate crime." Meetings between President Ryan and the African-American Community were immediately scheduled and would be frequently held for months following the discovery of the "noose." Within a few hours of the discovery, President Ryan published an open letter, stating "The facts available indicate that this was an act intended to intimidate members of this community. A noose is a recognizable and well-known symbol of violence, most closely associated with the racially motivated lynchings of African Americans." President Ryan appeared at multiple events with students, faculty, and alumni to "assure" them that the perpetrator would be caught and punished, that measures were being implemented to ensure the safety of community members, most notably African-Americans, and that he would be hosting multiple, regular meetings with African-American students, faculty, and local residents on the subject of the noose and racism on Grounds.[5]

206.   President Ryan and Rector Hardie did <u>none</u> of these things for the Jewish Community when the *very same area on Grounds* where the "noose" was found hanging would be adorned

---

[5]   Not long after the discovery of the "noose," the Administration learned, but did not report, that the incident was not a racial hate-crime, but instead was a protest against pedophilia by a mentally ill individual. The perpetrator was convicted of "disorderly conduct," not any hate crimes.

with the modern-day equivalents of the most widely and internationally recognized symbols of antisemitic hate. The only explanation for these obvious disparities is impermissible and illegal discrimination.

207. The pro-Hamas, antisemitic students and faculty have intentionally created the very definition of a hostile environment.

208. Every single incident of antisemitic behavior, including all of the instances of hate-based abuse, harassment, and intimidation set forth in this Complaint, violate numerous University bias and anti-discrimination policies. Still, to this day, the University of Virginia and Defendants Ryan and Hardie refuse to take any action to correct or prevent the antisemitic misconduct on campus by students and faculty members. Thus, those Defendants have created, fostered, and enabled a hostile educational environment for Jewish students and have exhibited nothing but disdain, discrimination, deliberate indifference, and retaliatory animus regarding the events and their Jewish students.

209. The pro-Hamas UVA students have turned what once was a beautiful bastion of enlightened freethinking and tolerance into a trash-laden wasteland of antisemitic and anti-Israeli hate, and Defendants UVA, Ryan, and Hardie allowed it to happen.

210. It is simply impossible for anyone—senior UVA official or administrator or otherwise—to claim that they were unaware of the antisemitism on Grounds or that Jewish students were being harassed and suffering from discrimination. Frankly, doing so under the veritable tsunami of evidence is simply further evidence of their antisemitism and deliberate, intentional indifference.

211. Sometimes, hate needs no further explanation or elaboration than a simple image:



*Photograph depicting University of Virginia students and faculty intimidating Jews and Israelis with the antisemitic hate symbols of the "bloody hands" during a pre-planned ambush on the Lawn.*

212.   The phrases, chants, and slogans shouted at UVA are antisemitic words of hate.

213.   The symbols, totems, and runes displayed at UVA are antisemitic emblems of hate.

214.   Antisemitism at the University of Virginia is pervasive and constant and has thoroughly infected the entire institution.

215.   Today, antisemitism and antisemitic behavior at the University of Virginia are offensive, threatening, intimidating, and intolerable for Jewish students.

216.   The hostile environment has changed and altered the terms and conditions of and the rightful expectations of the Plaintiff and other Jewish students for a safe, legal, and "normal" college and higher education experience.

217.   The words, deeds, actions, and threats at UVA are no different than swastikas.

218.   The words, deeds, actions, and threats at UVA are no different than the "Totenkopf."

219.   No. Different.

220.    And yet, President Ryan and Rector Hardie refuse to acknowledge the antisemitism, refuse to acknowledge the hate, refuse to deploy and execute the massive assets that the University possesses to protect and help students like the Plaintiff, and refuse to personally even speak a few words of kindness, encouragement or support to Matan or his fellow Jewish students.

221.    When UVA students and faculty print and chant antisemitic slogans; when they display antisemitic images; when they emblazon antisemitic symbols of hate on University spaces, in classrooms, in student facilities, on sacred, historical places like the Lawn; when they assault Jewish students; when teachers give special privileges to those who act on behalf of or profess loyalty to the pro-Hamas movement; when opportunities are denied to Jewish students; the acts, the words, and symbols mean the same exact thing as the infamous, vile words that should have been eradicated from the world and our collective lexicon long ago: "*Juden Verboten*."

222.    Today, at the University of Virginia, for the Plaintiff and students like him, the intent of those words and deeds and the consequences are the same as those vile words, spoken so long ago:[6]

---

[6]    This image is but one of hundreds, if not thousands, of images, social media posts, emails, and other forms of evidence depicting antisemitism at the University of Virginia that occurred between October 7, 2023, and the present and that had the direct and proximate effect of creating a hostile environment in contravention of state and federal law and directly and proximately caused or led to actual, severe injury and harm to the Plaintiff.



*Photograph depicting Matan Goldstein, wearing his Yarmulke bearing the Star of David, during Defendants' FJP at UVA and SJP at UVA's anti-Israel "demonstration," on October 25, 2023, at the UVA Rotunda steps, where Plaintiff was surrounded, threatened, ridiculed, and physically assaulted. Most of the pro-Hamas protesters were masked, in violation of Virginia law, at the express direction of SJP at UVA.*

## V. THE PLAINTIFF'S DAMAGES

223.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

224.   The Plaintiff has suffered damages as a direct, proximate, and foreseeable result of the acts, errors, omissions, and breaches of duty by the Defendants.

225.   The Plaintiff's life has been irrevocably altered, harmed, and impaired.

226.   The Plaintiff's ambitions, career prospects, reputation, physical and mental well-being, and opportunities for happiness have been altered, harmed, and impaired.

227.   The Plaintiff has lost his innocence, his sense of safety and security, and his belief in the goodness and sanctity of the institutions where he should feel safe and secure and be free to live, study, learn, and thrive as a young adult.

228.   The Plaintiff has been threatened, physically assaulted, and called vile names and slurs on multiple occasions. "Filthy Jew" is but one of the many epithets to which the Plaintiff is treated on a regular basis.

229.   The Plaintiff is acutely aware that Defendant UVA views and treats him as a "second-class citizen" solely because of his Jewish identity, his national origin, his ethnicity, and his shared ancestry. The Plaintiff has been denied the protections and privileges that UVA affords non-Jewish students. As a result of Defendants UVA, Ryan, and Hardie's failure and refusal to comply with UVA's own policies and legal obligations to prevent and prohibit discrimination and harassment against Jewish students, the Plaintiff, unlike other UVA students, has been totally denied and deprived of the benefits that those other students enjoy at UVA. As a result of Defendants UVA, Ryan, and Hardie's direct, discriminatory acts and deliberate indifference, the Plaintiff has been isolated and ostracized.

230.   Pro-Hamas students and faculty, including the Defendants FJP at UVA and SJP at UVA, acting individually and in concert with other groups and individuals, taunt, malign, ridicule, assault, abuse, harass, intimidate, isolate, exclude and marginalize the Plaintiff with impunity and without consequence.

231.   The Plaintiff does not feel physically safe in Charlottesville or anywhere on University premises and spends as much time at home, away from his college friends, his teachers, and his college experience, as he can in order to remain safe and secure.

232.   The antisemitic events and incidents described and set forth in this lawsuit have devastated and totally frustrated the ability of the Plaintiff to participate in and enjoy UVA's educational and other programs.

233.   The Defendants individually and collectively created, nurtured, fostered, permitted, and encouraged a toxic environment of racial and religious animus and hostility and harassment directed specifically at Plaintiff Matan Goldstein.

234.   The hostile environment and harassment were unwelcomed, unwanted, subjectively offensive, and objectively offensive.

235.   The abuse and harassment and bullying to which the Plaintiff was subjected was on the basis of protected characteristics, was because of protected characteristics, was because of his protected characteristics, and would not have occurred but for his protected characteristics.

236.   For Matan Goldstein, as a result of the University, President Ryan, and Rector Hardie's intentional acts, errors, omissions, specifically including their steadfast refusal to protect Matan, his educational space and environment—his University, his University Community, his "place" on "Grounds" —were so severely permeated with discriminatory intimidation, ridicule, and insult that the benefits, privileges, terms and conditions of his educational experience, and his relationship with the University of Virginia were irrevocably altered, diminished, impaired, frustrated, and destroyed. The harassment, abuse, bullying, humiliation, intimidation, ridicule, and threats of injury and even death were regular, constant, pervasive, so extraordinarily severe that even in isolation, a hostile educational environment existed as a matter of law.

237.   The Plaintiff does not feel safe walking on Grounds, being on University property or in University facilities, or going to class. The Plaintiff is fearful—resulting in constant, unhealthy vigilance—that he will be identified as Jewish and targeted as a result of his identity, faith, national origin, ethnicity, and shared ancestry.

238.   Today, while in Charlottesville, the Plaintiff lives in hiding—he fled his First Year dormitory and has been taken in by sympathetic families who choose not to disclose either their identities, their address, or the Plaintiff's whereabouts out of fear of retribution.

239.   The Plaintiff has been ostracized from University society and student life.

240.   The Plaintiff has been denied meaningful access to all of the benefits and resources of UVA student life, including health and safety resources.

241.   The Plaintiff has been denied an advocate or administrator *in loco parentis* dedicated to acting on his behalf, to whom he can turn and from whom he can expect protection, counsel, and loyalty.

242.   The Plaintiff has suffered a profound wounding—a lasting heartache and deep disappointment—as a result of the Defendants' discrimination, harassment, and retaliation.

243.   The Plaintiff has lost an entire year of college—the sacred and near-mythical "UVA First Year Experience" and his entire college experience will be forever tarnished, impaired, and ruined.

244.   The Plaintiff's legitimate expectations for his college career and experience—rights, privileges, and opportunities—have been entirely frustrated, impaired, and lost.

245.   The Plaintiff has suffered significant physical injuries, harms, and damages. Privacy concerns limit the detail with which the Plaintiff feels comfortable sharing in a public pleading, but the physical injuries are severe and substantial.

246.   The Plaintiff has suffered mental anguish, severe emotional distress, paralyzing anxiety, constant oppressive fear, depression, feelings of worthlessness, humiliation, embarrassment, and a constant sense of dread and impending doom. Privacy concerns limit the detail with which the Plaintiff feels comfortable detailing the extent of his mental,

emotional, and psychological damages, harm, and suffering, but those injuries are real, severe, and substantial.

247.   The Plaintiff has lost the joys of his academic pursuits and the adoration of his studies as a result of the inhospitable environment.

248.   The Plaintiff has suffered actual economic and financial damages and will continue to experience and suffer long-term economic and financial repercussions and damages.

249.   Worst of all, the Plaintiff, a young man of deep faith and adoration of his religion, has been forced to deny his faith, to hide his Jewish identity, to shield himself from recognition as a Jew and an Israeli. This has caused him endless personal suffering of a spiritual nature.

250.   All of the damages that the Plaintiff has suffered—physical, emotional, mental, psychological, economic, and financial—are the direct, proximate, and foreseeable result of the illegal, immoral, and egregious acts, errors, and omissions of each Defendant individually and collectively.

## VI. LEGAL CLAIMS & CAUSES OF ACTION

*"Those who kept silent yesterday will remain silent tomorrow."*
<u>Night</u>, Elie Wiesel.

251.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

### COUNT I
### VIOLATIONS OF TITLE VI – 42 U.S.C. § 2000d *et seq.*
### *Against The University of Virginia*

252.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

253.   Title VI, found at 42 U.S.C. § 2000d *et seq.*, prohibits intentional discrimination, including disparate treatment and harassment, on the basis of race, color, or national origin in any program or activity that receives federal funds or other federal financial assistance.

254.   The University of Virginia receives federal funds and financial assistance and has admitted in other matters and at other times that it falls within the jurisdiction and purview of Title VI. In imposing liability under Title VI upon public universities that qualify as state actors, Congress has abrogated any sovereign or Eleventh Amendment immunities that might otherwise apply to the University of Virginia.

255.   On May 25, 2023, just one year ago, The Honorable Catherine E. Lhamon, the United States Department of Education Assistant Secretary for Civil Rights, writing to universities and colleges nationwide who are subject to Title VI in what is known as a "Dear Colleague Letter," stated the following:

> I write to remind you of schools' legal obligation under Title VI of the Civil Rights Act of 1964 (Title VI) to provide all students, including Jewish students, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.

> Earlier this year, the Department of Education's Office for Civil Rights (OCR) issued a fact sheet - Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics - explaining how the protection offered by Title VI, which prohibits discrimination based on race, color, or national origin by programs or activities of recipients of federal financial assistance, extends to students who experience discrimination, including harassment, based on their actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity.

> Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin. For example, OCR may investigate complaints that students have been subjected to ethnic or ancestral slurs; harassed for how they look, dress, or speak in ways linked to ethnicity or ancestry (e.g., skin color, religious attire, language spoken); or stereotyped based on perceived shared ancestral or ethnic characteristics.

256. Discrimination against Jews and Israelis, including based on actual or perceived shared ancestry, race, national origin, and/or ethnicity, is prohibited under Title VI.

257. The allegations set forth above describe direct violations of Title VI by the University of Virginia for intentional discrimination against the Plaintiff on the basis of race, national origin, shared ancestry, and ethnic characteristics.

258. The Plaintiff is and identifies as Jewish and Israeli and his status and identification as a Jew and an Israeli brings him within the purview and scope of Title VI's protections.

259. The University of Virginia created, tolerated, nurtured, fomented, and fostered intentional, severe, and pervasive harassment and abuse, known as a hostile environment, against the Plaintiff on the basis of his race, national origin, shared ancestry, and ethnic characteristics, in violation of Title VI.

260. The University of Virginia intentionally discriminated against the Plaintiff and treated the Plaintiff worse than other non-Jewish and non-Israeli students on the basis of the Plaintiff's race, national origin, shared ancestry, and ethnic characteristics, in violation of Title VI.

261. The University of Virginia's intentional discrimination and hostile educational environment deny and deprive the Plaintiff equal access to the full panoply of educational opportunities, experiences, benefits, and privileges that are available and afforded to non-Jewish and non-Israeli students in violation of Title VI.

262. "But for" the Plaintiff's race, national origin, shared ancestry, and ethnic characteristics, the University of Virginia would not have discriminated against or harassed the Plaintiff.

263. The allegations set forth above describe direct violations of Title VI by the University of Virginia for retaliation against the Plaintiff, including tangible adverse actions because of and as a result of the Plaintiff's engagement or participation in protected activities.

264.   The University of Virginia's own acts, errors, and omissions constitute violations of Title VI, meaning that Defendant UVA is directly responsible and liable to the Plaintiff for violations of Title VI.

265.   The University of Virginia is also vicariously liable for violation of Title VI, and the acts, errors, and omissions of administrators, employees and agents that violate Title VI are attributable and imputable to the University of Virginia.

266.   The University of Virginia's violations of Title VI, including intentional discrimination; the creation, maintenance, and deliberate indifference to a hostile educational environment; and retaliatory actions have directly, proximately, and foreseeably damaged, injured, and harmed the Plaintiff.

267.   As a result, the Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding the University of Virginia's Title VI violations.

268.   As a result, the Plaintiff is entitled to an award of compensatory damages in his favor regarding the University of Virginia's Title VI violations.

269.   As a result, the Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs pursuant to Title VI and 42 U.S.C. § 1988.

**COUNT II**
**VIOLATIONS OF 42 U.S.C. §§ 1981, 1983 & 1988**
***Against Defendants Ryan & Hardie***

270.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

271.   Defendants Ryan and Hardie are public officials who owe duties to the Commonwealth of Virginia and are state actors who acted at all times under color of state law and within the

course and scope of their positions, employment, and duties as representatives of the University of Virginia and as public officials.

272. At and in universities and colleges, 42 U.S.C. § 1981 prohibits intentional discrimination and hostile educational environments on the basis of race, shared ancestry, or ethnicity (whether perceived or actual) and prohibits retaliation based on participation or support of protected activities.

273. Courts are uniform in the conclusion that the "relationship" between student and university or college is "contractual in nature," bringing the conduct alleged in this lawsuit within the ambit, protections, and governance of 42 U.S.C. § 1981.

274. Intentional discrimination against Jews and Israelis, including based on actual or perceived shared ancestry, race, and ethnicity, is prohibited under 42 U.S.C. § 1981.

275. Defendants Ryan and Hardie intentionally discriminated against the Plaintiff on the basis of the Plaintiff's race, shared ancestry, and ethnicity or ethnic characteristics in violation of 42 U.S.C. § 1981.

276. The creation, toleration, nurturing, fomenting, and fostering of intentional, severe, and pervasive, harassment and abuse, on the basis of his race, shared ancestry, and ethnicity or ethnic characteristics, called a "hostile environment," is prohibited by 42 U.S.C. § 1981.

277. Defendants Ryan and Hardie intentionally and deliberately created, tolerated, nurtured, fomented, and fostered a hostile environment of severe and pervasive harassment, intimidation, and abuse on the basis of his race, shared ancestry, and ethnicity or ethnic characteristics in violation of 42 U.S.C. § 1981.

278. Retaliation against those who engage or participate in protected activities or support others who do is prohibited 42 U.S.C. § 1981.

279.   Defendants Ryan and Hardie intentionally and deliberately retaliated against the Plaintiff in response to and because of his participation and engagement in protected activities and because of, or "but for" his race, shared ancestry, and ethnicity or ethnic characteristics.

280.   "But for" the Plaintiff's race, shared ancestry, and ethnicity or ethnic characteristics, Defendants Ryan and Hardie would not have mistreated, discriminated, or retaliated against; maintained a hostile environment against; nor refused to protect the Plaintiff, all in violation of 42 U.S.C. § 1981.

281.   Defendants Ryan and Hardie's intentional discrimination and creation of a hostile educational environment deny and deprive the Plaintiff equal access to the full panoply of educational opportunities, experiences, benefits, and privileges on the basis of race, ethnicity, ethnic characteristics, and shared ancestry in violation of 42 U.S.C. § 1981.

282.   "But for" the Plaintiff's race, shared ancestry, and ethnic characteristics, Defendants Ryan and Hardie would not have discriminated against, harassed, or retaliated against the Plaintiff in violation of 42 U.S.C. § 1981.

283.   The Fourteenth Amendment of the United States Constitution, as applied to state actors and public officials and made actionable under 42 U.S.C. § 1983, prohibits unlawful discrimination, harassment, and retaliation on the basis of race, religion, national origin, ethnicity, or shared ancestry at public universities or colleges.

284.   The First Amendment of the United States Constitution, as applied to state actors and public officials and made actionable under 42 U.S.C. § 1983, prohibits unlawful discrimination, harassment, and retaliation on the basis of religion or expressions of faith, or other expressions of public concern at public universities or colleges.

285.    Defendants Ryan and Hardie intentionally discriminated against the Plaintiff on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities in violation of the First and Fourteenth Amendments of the United States Constitution, as applied to Defendants Ryan and Hardie by 42 U.S.C. § 1983.

286.    The creation, toleration, nurturing, fomenting, and fostering of intentional, severe, and pervasive, harassment and abuse, on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities violates the First and Fourteenth Amendments of the United States Constitution, as applied to Defendants Ryan and Hardie by 42 U.S.C. § 1983.

287.    Defendants Ryan and Hardie intentionally and deliberately created, tolerated, nurtured, fomented, and fostered a hostile environment of severe and pervasive harassment, intimidation, and abuse on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities in violation of the First and Fourteenth Amendments of the United States Constitution, as applied to Defendants Ryan and Hardie by 42 U.S.C. § 1983.

288.    Retaliation against those who engage or participate in protected activities or support others who do on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities violates the First and Fourteenth Amendments of the United States Constitution, as applied to Defendants Ryan and Hardie by 42 U.S.C. § 1983.

289. Defendants Ryan and Hardie intentionally and deliberately retaliated against the Plaintiff in response to and because of his participation and engagement in protected activities on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities in violation the First and Fourteenth Amendments of the United States Constitution, as applied to Defendants Ryan and Hardie by 42 U.S.C. § 1983.

290. "But for" the Plaintiff's religion, expressions thereof, protected free speech, national origin, shared ancestry, and ethnicity or ethnic characteristics, Defendants Ryan and Hardie would not have mistreated, discriminated or retaliated against, maintained a hostile environment against, nor refused to protect the Plaintiff, all in violation of the First and Fourteenth Amendments of the United States Constitution, as applied to Defendants Ryan and Hardie by 42 U.S.C. § 1983.

291. Defendants Ryan and Hardie's intentional discrimination and creation of a hostile educational environment deny and deprive the Plaintiff equal access to the full panoply of educational opportunities, experiences, benefits, and privileges on the basis of race, ethnicity, ethnic characteristics, and shared ancestry in violation of 42 U.S.C. § 1983.

292. "But for" the Plaintiff's race, religion, national origin, shared ancestry, and ethnic characteristics, Defendants Ryan and Hardie would not have discriminated against, harassed, or retaliated against the Plaintiff.

293. The Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendant Ryan and Hardie's violations of 42 U.S.C. §§ 1981 & 1983.

294. The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendant Ryan and Hardie's violations of 42 U.S.C. §§ 1981 & 1983.

295.   The Plaintiff is entitled to an award of compensatory damages in his favor arising from Defendants Ryan and Hardie's violations of 42 U.S.C. §§ 1981 & 1983. The Plaintiff is entitled to recover monetary relief and/or a financial award of compensatory damages for the profound and heartbreaking injuries and harm he has suffered, including substantial economic and non-economic damages and losses.

296.   Because Defendants Ryan and Hardie's acts, errors, and omissions that violated the federal civil rights laws were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages reflective of their purposeful intent, their willful disregard for the Plaintiff's federally protected rights, the extent of the harm they caused the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate under 42 U.S.C. §§ 1981 & 1983.

297.   The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendants Ryan and Hardie pursuant to 42 U.S.C. § 1988.

## COUNT III
### VIOLATIONS OF VIRGINIA CODE § 8.01-42.1
### *Against Defendants FJP at UVA & SJP at UVA*

298.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

299.   Virginia Code § 8.01-42.1 creates a civil cause of action for any person who is subjected to acts of intimidation, harassment, or violence based upon racial, religious, or ethnic animosity.

300.   As set forth in exacting and exhaustive detail above, the Plaintiff was subjected to and a victim of acts of intimidation, harassment, and violence by Defendants FJP at UVA and SJP at UVA that were motivated by racial, religious, and ethnic animosity.

301.   As a result, the Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendants FJP at UVA and SJP at UVA's violations of Virginia Code § 8.01-42.1.

302.   The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendants FJP at UVA and SJP at UVA's violations of Virginia Code § 8.01-42.1.

303.   The Plaintiff is entitled to an award of compensatory damages, including a financial award reflecting the substantial economic and non-economic damages and losses the Plaintiff has suffered from Defendants FJP at UVA and SJP at UVA's violations of Virginia Code § 8.01-42.1.

304.   Because Defendants FJP at UVA and SJP at UVA's acts, errors, and omissions were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages under Virginia Code § 8.01-42.1 is warranted.

305.   The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendants FJP at UVA and SJP at UVA under Virginia Code § 8.01-42.1.

**COUNT IV**
**NEGLIGENCE, GROSS NEGLIGENCE &**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
***Against Defendants FJP at UVA & SJP at UVA***

306.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

307.   Defendants FJP at UVA and SJP at UVA were negligent. Defendants FJP at UVA and SJP at UVA owed the Plaintiff and other students and faculty at the University of Virginia

certain duties of care, including the duty of ordinary care, the duty to follow the anti-discrimination and anti-harassment rules and policies of the University of Virginia, including those pertaining specifically to student and faculty conduct and the duty to faithfully adhere to local, state, and federal laws when "on Grounds" or acting as a student or faculty member associated with the University of Virginia.

308. As set forth in exacting and exhaustive detail above, Defendants FJP at UVA and SJP at UVA individually, separately, and repeatedly breached the applicable duties and standards of care and were repeatedly negligent in the discharge of each's duties and responsibilities as members of the University Community.

309. Defendant FJP at UVA is liable for negligence.

310. Defendant SJP at UVA is liable for negligence.

311. As set forth in exacting and exhaustive detail above, Defendants FJP at UVA and SJP at UVA's behavior and breaches constitute gross negligence. These Defendants separately and jointly engaged in egregious, hate-based misconduct. Defendants FJP at UVA and SJP at UVA separately and jointly engaged in acts, errors, and omissions that represented a heedless and palpable violation of the legal duties respecting the rights of others that amounted to the total and abject absence of slight diligence, or the want of even scant care. Defendants FJP at UVA and SJP at UVA's behavior and misconduct are shocking to fair-minded people and the Defendants exhibited willful recklessness and an utter disregard of prudence amounting to complete neglect of the safety of others.

312. Defendant FJP at UVA's acts, errors, and omissions constitute gross negligence. Defendant SJP at UVA's acts, errors, and omissions constitute gross negligence.

313.   Defendants FJP at UVA and SJP at UVA individually and jointly intentionally inflicted severe emotional distress upon the Plaintiff and, consequently, must answer in tort for their respective acts, errors, and omissions. As set forth in exacting and exhaustive detail above, Defendants FJP at UVA and SJP at UVA's behavior and breaches were purposeful, calculated, intentional, pre-meditated, and beyond reckless. Defendants FJP at UVA and SJP at UVA's behavior and breaches were outrageous and intolerable and entirely unacceptable in any version of decent society. Defendants FJP at UVA and SJP at UVA's behavior and breaches were specifically intended to and did in fact cause the Plaintiff severe emotional, mental, and psychological harm, and the emotional damages and harms suffered by the Plaintiff as a result of the Defendants' willful and heinous misconduct was the very definition of serious and severe.

314.   The Plaintiff has suffered substantial, severe, and permanent physical and psychological damages as well as financial and economic losses as a proximate, direct, and foreseeable result of Defendants FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

315.   The Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendant FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

316.   The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendant FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

317.   The Plaintiff is entitled to an award of compensatory damages, including a financial award reflecting the substantial economic and non-economic damages and losses the Plaintiff has

suffered from Defendants FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

318.   Because Defendants FJP at UVA and SJP at UVA's acts, errors, and omissions were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages is warranted.

319.   The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendants FJP at UVA and SJP at UVA.

**COUNT VII**
**VIOLATIONS OF 42 U.S.C. §§ 1981 & 1988**
***Against Defendants FJP at UVA & SJP at UVA***

320.   At and in universities and colleges, 42 U.S.C. § 1981 prohibits intentional discrimination and hostile educational environments on the basis of race, shared ancestry, or ethnicity (whether perceived or actual) and prohibits retaliation based on participation or support of protected activities.

321.   Courts are uniform in the conclusion that the "relationship" between student and university or college is "contractual in nature," bringing the conduct alleged in this lawsuit within the ambit, protections, and governance of 42 U.S.C. § 1981.

322.   Intentional discrimination against Jews and Israelis based on actual or perceived shared ancestry, race, and/or ethnicity, is prohibited under 42 U.S.C. § 1981.

323.   Defendants FJP at UVA and SJP at UVA intentionally discriminated against the Plaintiff on the basis of race, shared ancestry, and ethnicity or ethnic characteristics in violation of 42 U.S.C. § 1981.

324.  Harassment, intimidation, humiliation, and abuse, on the basis of his race, shared ancestry, and ethnicity or ethnic characteristics, called a "hostile environment," are prohibited by 42 U.S.C. § 1981.

325.  Defendants FJP at UVA and SJP at UVA intentionally and deliberately harassed, intimidated, humiliated, physically assaulted, and abused the Plaintiff on the basis of his race, shared ancestry, and ethnicity or ethnic characteristics in violation of 42 U.S.C. § 1981.

326.  Retaliation against those who engage or participate in protected activities or support others who do is prohibited 42 U.S.C. § 1981.

327.  Defendant SJP at UVA intentionally and deliberately retaliated against the Plaintiff in response to and because of his participation and engagement in protected activities and because of, or "but for" his race, shared ancestry, and ethnicity or ethnic characteristics when it fraudulently and maliciously filed a false "Honor Charge" against the Plaintiff with the sole purposes of silencing the Plaintiff, retaliating against the Plaintiff, and causing him excruciating and severe mental, emotional, and psychological distress along with reputational harm and financial and economic losses.

328.  Defendant SJP at UVA sought to drive the Plaintiff away from UVA, to "exterminate" him from his college experience, all because of his race, his shared ancestry, and his ethnicity.

329.  "But for" the Plaintiff's race, shared ancestry, and ethnicity or ethnic characteristics, Defendants FJP at UVA and SJP at UVA would not have mistreated, discriminated, harassed, or retaliated against the Plaintiff, all in violation of 42 U.S.C. § 1981.

330.  Defendants FJP at UVA and SJP at UVA intentional discrimination and harassment have the aim and result of denying and depriving the Plaintiff equal access to the full panoply

of educational opportunities, experiences, benefits, and privileges on the basis of race, ethnicity, ethnic characteristics, and shared ancestry in violation of 42 U.S.C. § 1981.

331. "But for" the Plaintiff's race, shared ancestry, and ethnic characteristics, Defendants FJP at UVA and SJP at UVA would not have discriminated against, harassed, or retaliated against the Plaintiff in violation of 42 U.S.C. § 1981.

332. The Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendants FJP at UVA and SJP at UVA's violations of 42 U.S.C. § 1981.

333. The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendants FJP at UVA and SJP at UVA's violations of 42 U.S.C. § 1981.

334. The Plaintiff is entitled to an award of compensatory damages in his favor arising from Defendants FJP at UVA and SJP at UVA's violations of 42 U.S.C. § 1981. The Plaintiff is entitled to recover monetary relief and/or a financial award of compensatory damages for the profound and heartbreaking injuries and harm he has suffered, including substantial economic and non-economic damages and losses.

335. Because Defendants FJP at UVA and SJP at UVA's acts, errors, and omissions that violated the federal civil rights laws were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages reflective of their purposeful intent, their willful disregard for the Plaintiff's federally protected rights, the extent of the harm they caused the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate under 42 U.S.C. § 1981.

336.   The Plaintiff is entitled to an award of attorneys' fees, pre- and post-judgment interest, and taxable litigation costs against Defendants FJP at UVA and SJP at UVA's pursuant to 42 U.S.C. § 1988.

## VII. JURY DEMAND

337.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

338.   The Plaintiff respectfully requests and demands a jury trial on all issues and matters so triable.

## VIII. PRAYER FOR RELIEF

339.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

340.   WHEREFORE, the Plaintiff respectfully prays for, petitions, and requests the Honorable Court to enter Final Judgment in the Plaintiff's favor, including the following award and relief:

a.   A Declaratory Judgment in the Plaintiff's favor pursuant to 28 U.S.C. § 2201;

b.   An order compelling permanent, prospective injunctive relief in the Plaintiff's favor;

c.   An award of compensatory damages against all Defendants to be determined by the jury and trier of fact, that is reasonably calculated to compensate the Plaintiff for the significant losses, injuries, and lasting damages and harm he has directly, proximately, and foreseeably suffered as a result of the Defendants' acts, errors, and omissions;

d.   An award of punitive damages against Defendants Ryan, Hardie, FJP at UVA, and SJP at UVA, separately and individually, in an amount to be determined by the jury that is calculated to reflect the severity of the harm inflicted upon and damages suffered by Matan Goldstein and taking into account for the intentional, purposeful, and deliberate nature of these Defendants' decisions, committed with the certainty that Matan Goldstein would be damaged and that his life and future would be irreparably impaired and ruined;

e.   An award of attorneys' fees and litigation and taxable costs to the maximum extent permitted by applicable law;

f.   Pre- and post-judgment interest to the maximum extent permitted by applicable law;

g.   Such other relief as the Court deems just and proper; and

h.   **A JURY TRIAL ON ALL ISSUES AND MATTERS SO TRIABLE.**

Respectfully submitted, May 17, 2024,

**MATAN GOLDSTEIN**

By his counsel:

/s/ Gregory W. Brown
GREGORY W. BROWN – VA Bar # 36369
KRISTI L. GAVALIER – VA Bar #96707
BROWN & GAVALIER, PLLC
320 West Main Street
Charlottesville, Virginia 22903
Telephone & Facsimile (One Talk): 434-996-2606
partners@brownandgavalier.com (Lawyers' Email)
admin@brownandgavalier.com (CM/ECF)
*Counsel for Matan Goldstein*