**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| MATAN GOLDSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-00036-RSB-JCH |
| | ) | |
| THE RECTOR AND VISITORS OF THE | ) | |
| UNIVERSITY OF VIRGINIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA,
RECTOR ROBERT D. HARDIE, AND PRESIDENT JAMES E. RYAN'S
MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT
<u>FOR LACK OF STANDING AND FAILURE TO STATE A CLAIM</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

PROCEDURAL BACKGROUND................................................................................. 21

LEGAL STANDARD................................................................................................... 23

ARGUMENT ............................................................................................................... 24

I.   Plaintiff has failed to allege that he has standing. .................................................. 24

II.   The Court should dismiss Counts I and II because Plaintiff alleges no intentional discrimination by any UVA Defendant based on his race or national origin under Title VI or the Equal Protection Clause under 42 U.S.C. § 1983. ........................................................ 27

    A. Plaintiff does not allege an adverse decision or disparate treatment. ................................. 28

    B. Plaintiff does not allege facts suggesting discriminatory intent........................................... 32

III.   The Court should dismiss Counts I and II because Plaintiff alleges no facts to support a retaliation claim under Title VI or 42 U.S.C. § 1983. ................................................. 33

IV.   The Court should dismiss Counts I and II because Plaintiff's hostile environment harassment claims fail under Title VI or 42 U.S.C. § 1983 ............................................................... 35

    A.   Plaintiff has not alleged facts showing severe, pervasive and objectively offensive harassment that effectively denies equal access to education programs and activities. ........... 36

        1.   Plaintiff's allegations are unrelated to Plaintiff. ................................................... 36

        2.   Plaintiff's alleged hostile environment is based in large part on speech not directed at Plaintiff and protected under the First Amendment. ..................................... 38

        3.   Plaintiff fails to adequately allege deprivation of educational benefits. ............... 40

    B.   Plaintiff has not sufficiently alleged actual knowledge by the UVA Defendants.......... 42

    C.   Plaintiff's allegations do not show deliberate indifference by the UVA Defendants. ... 43

    D.   Count II should be dismissed because Plaintiff has not alleged any facts suggesting that Hardie or Ryan was motivated by discriminatory intent......................................................... 45

V.   Count II should be dismissed because Plaintiff's claims against Hardie and Ryan are barred by the Eleventh Amendment and qualified immunity. ................................................. 47

    A. Official-capacity claims against Hardie and Ryan must be dismissed. ............................... 47

    B. Plaintiff's individual capacity claims fail to overcome qualified immunity........................ 48

CONCLUSION............................................................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*,
  819 F.3d 69 (4th Cir. 2016) ......................................................................................44

*Amison v. George Mason Univ.*,
  No. 23-1042, 2023 WL 8946774 (4th Cir. Dec. 28, 2023)...................................47, 48, 49, 50

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................49

*Barnes v. Glen Theatre, Inc.*,
  501 U.S. 560 (1991)...................................................................................................40

*Boyer-Liberto v. Fontainebleau Corp.*,
  786 F.3d 264 (4th Cir. 2015) ...................................................................................34

*Brown v. Porter*,
  No. 2:19-CV-376-RJK, 2019 WL 8503313 (E.D. Va. Nov. 26, 2019), *report
  and recommendation adopted as modified,* 438 F. Supp. 3d 679 (E.D. Va.
  2020) ........................................................................................................................47, 48

*Carter v. Wells Fargo Bank, Nat'l Ass'n*,
  689 F. Supp. 3d 253 (W.D. Va. 2023) ....................................................................23, 24

*Clark v. Liberty Univ., Inc.*,
  No. 6:20-CV-58-NKM, 2021 WL 1827256 (W.D. Va. May 7, 2021) ..............................22, 30

*Crawford v. Coll. Life Ins. Co. of Am.*,
  831 F.2d 1057 (4th Cir. 1987) ..................................................................................25

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022).............................................................................................25, 26, 41, 42

*Doe v. Bd. of Visitors of VMI*,
  494 F. Supp. 3d 363 (W.D. Va. 2020) .....................................................................36, 43

*Doe v. Fairfax Cnty. Sch. Bd.*,
  1 F.4th 257 (4th Cir. 2021) .................................................................................41, 42, 43, 44

*Doe v. Marymount Univ.*,
  297 F. Supp. 3d 573 (E.D. Va. 2018) ......................................................................22

*Doe v. Washington & Lee Univ.*,
  No. 6:14-CV-00052-NKM, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015)..............................23

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006)..............................................................................................22

*Facchetti v. Bridgewater Coll.*,
    175 F. Supp. 3d 627 (W.D. Va. 2016) ..........................................................42, 43, 44

*Falwell v. Liberty Univ., Inc.*,
    No. 6:23-CV-11-RSB, 2023 WL 4867432 (W.D. Va. July 31, 2023) ....................................5

*Felber v. Yudof*,
    851 F. Supp. 2d 1182 (N.D. Cal. 2011) .......................................................... *passim*

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) .................................................................33, 34, 46

*Garner v. Steger*,
    69 F. Supp. 3d 581 (W.D. Va. 2014) ..............................................................48

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)..............................................................................................42

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ..............................................................31

*Haidak v. Univ. of Massachusetts-Amherst*,
    933 F.3d 56 (1st Cir. 2019) ..............................................................30

*Healy v. James*,
    408 U.S. 169 (1972)..............................................................................................36

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)..............................................................................................28, 50

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ..............................................................39, 40

*Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*,
    566 F.3d 138 (4th Cir. 2009) ..............................................................49

*Jennings v. Univ. of N. Carolina*,
    482 F.3d 686 (4th Cir. 2007) ..............................................................41

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 (1989)..............................................................................................22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................23

*Mandel v. Bd. of Trustees of California State Univ.*,
    No. 3:17-CV-03511-WHO, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018).................... *passim*

*Mandel v. Bd. of Trustees of California State Univ.*,
    No. 3:17-CV-03511-WHO, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ..........................36

*Monegain v. Dep't of Motor Vehicles*,
    491 F. Supp. 3d 117 (E.D. Va. 2020) ......................................................................35

*Newman v. Howard Univ. Sch. of L.*,
    No. 1:23-CV-0436-TNM, 2024 WL 450245 (D.D.C. Feb. 6, 2024).....................................27

*Olgiati v. Breitschmid*,
    No. 7:23-CV-352-RSB, 2023 WL 8828647 (W.D. Va. Dec. 21, 2023)................................24

*Ortegel v. Virginia Polytechnic Inst. & State Univ.*,
    No. 7:22-CV-00510, 2023 WL 8014237 (W.D. Va. Nov. 20, 2023) .........................27, 28, 32

*Peters v. Jenney*,
    327 F.3d 307 (4th Cir. 2003) ...............................................................................33

*Phillips v. Rector & Visitors of Univ. of Virginia*,
    No. 3:22-CV-00075-RSB, 2024 WL 1201639 (W.D. Va. Mar. 20, 2024)...........................31

*Price v. City of Charlotte, N.C.*,
    93 F.3d 1241 (4th Cir. 1996) ...............................................................................25

*Raub v. Campbell*,
    785 F.3d 876 (4th Cir. 2015) ...............................................................................34

*Rock for Life-UMBC v. Hrabowski*,
    411 F. App'x 541 (4th Cir. 2010) ..........................................................................49

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) .....................................................................23, 24, 27

*Sheppard v. Visitors of Va. State Univ.*,
    993 F.3d 230 (4th Cir. 2021) ...............................................................................30

*Stover v. Coll. Of William & Mary in Virginia*,
    635 F. Supp. 3d 429 (E.D. Va. 2022) ......................................................................34

*Suarez Corp. Indus. v. McGraw*,
    202 F.3d 676 (4th Cir. 2000) ...............................................................................34

*Tigrett v. Rector & Visitors of Univ. of Va.*,
    97 F. Supp. 2d 752 (W.D. Va. 2000) ......................................................................47

*Wilcox v. Lyons*,
    970 F.3d 452 (4th Cir. 2020) ................................................34

**Statutes**

42 U.S.C. § 1981 .................................................................. *passim*

42 U.S.C. § 1983 .................................................................. *passim*

42 U.S.C. § 2000d ................................................................ *passim*

Va. Code § 23.1-2200 et seq. ................................................2

Va. Code § 23.1-2209(A)(ii) ...............................................21

Va. Code § 23.1-401 and -401.1 ...........................................4

**Other Authorities**

First Amendment .................................................................. *passim*

Eleventh Amendment ........................................................1, 47

Fourteenth Amendment ....................................................22, 34

Defendants The Rector and Visitors of the University of Virginia ("UVA" or "University"), Rector Robert D. Hardie ("Rector" or "Hardie"), and President James E. Ryan ("President" or "Ryan") (collectively, the "UVA Defendants"), move to dismiss Plaintiff's Complaint with prejudice for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).   In support of this Motion, Defendants state as follows:

## **INTRODUCTION**

The Complaint should be dismissed for lack of standing and failure to state a claim against UVA under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and against the Rector and President under 42 U.S.C. §§ 1981 and 1983 in their individual or official capacities, on the theories of (1) intentional discrimination, (2) retaliation, or (3) harassment/hostile environment.[1] Plaintiff fails to allege standing because he has not pled a particularized injury, traceability to the UVA Defendants or redressability.   Plaintiff alleges no intentional discrimination by any UVA Defendant.   Plaintiff alleges no facts to support a retaliation claim.   Plaintiff's hostile environment harassment claims fail because Plaintiff has not alleged facts showing severe, pervasive **and** objectively offensive harassment—indeed, his allegations appear to solely complain of protected speech not directed specifically at Plaintiff; he has not sufficiently alleged actual knowledge by the UVA Defendants; he has not alleged any deprivation of educational benefits; he has not alleged facts showing deliberate indifference by the UVA Defendants; and he has not alleged any facts that Hardie or Ryan were motivated by discriminatory intent.   Additionally, Plaintiff's claims against Hardie and Ryan are barred by the Eleventh Amendment and qualified immunity.

---

[1] Plaintiff names the Rector and President as defendants only in their individual capacities. Nonetheless, Plaintiff in Paragraph 2(c) of the Complaint alleges claims against the Rector and President "in their individual, personal, and official capacities." (Compl. ¶ 2(c).)

UVA condemns and prohibits discrimination on the basis of race or national origin, including antisemitism. UVA supports its Jewish students, including Plaintiff, and other students' First Amendment rights to free speech and free exercise of religion. UVA's support and care for its students is misconstrued and mischaracterized in the Complaint. While the Court can but does not need to take judicial notice to dismiss this Complaint, the University Defendants provide public reporting of additional facts that further support the dismissal of this Complaint. The Court should not be left with allegations that are untrue. The UVA Defendants take concerns of antisemitism very seriously and are prepared to intervene to de-escalate situations and pursue disciplinary action. However, Goldstein's Complaint fails to allege any actionable claims under Title VI or 42 U.S.C. §§ 1981, 1983 —regarding antisemitism or otherwise—and must be dismissed.

## FACTUAL BACKGROUND

UVA is an institution of higher education offering undergraduate and graduate programs of study with its principal Grounds in the City of Charlottesville and the County of Albemarle, Virginia. The University is an agency and instrumentality of the Commonwealth of Virginia under the name and style of "the Rector and Visitors of the University of Virginia." Va. Code § 23.1-2200 et seq. The University has nearly 26,000 undergraduate, graduate, and professional students across an Academic Division with 12 Schools and the College at Wise.

The University has adopted a comprehensive Notice of Non-Discrimination and Equal Opportunity (Notice of Non-Discrimination) that, among other things, prohibits discrimination and harassment on the basis of religion, national origin, and ethnicity.[2] In addition to the Notice of Non-Discrimination, the University maintains a policy that prohibits discrimination and

---

[2] *See* University of Virginia, Office for Equal Opportunity and Civil Rights, *Notice of Non-Discrimination and Equal Opportunity* (October 2023), https://eocr.virginia.edu/notice-non-discrimination-and-equal-opportunity.

2

harassment on the basis of protected characteristics, specifically including religion, national origin, and ethnicity (PADH).[3]  The University also maintains a policy that prohibits any adverse action against any individual who complains about discrimination or harassment or who assists or participates in a resolution process (PAR).[4]  The University's PADH and PAR polices contain requirements for University personnel to prevent prohibited conduct, ensure compliance obligations, provide access to complaint procedures and forms, and supply contact information for the University's Office for Equal Opportunity and Civil Rights (EOCR), the office responsible for administering and enforcing the PADH and PAR policies. The University's EOCR office maintains information and resources for prevention, education, and training.[5]  The University requires training of all employees on its PADH and PAR policies.  New employees complete training upon hiring and then enroll in re-training every two years.[6]

Consistent with federal and state law, the University also maintains robust protection for freedom of expression.  In June 2021, the University's Board of Visitors adopted the University's Statement on Free Expression and Free Inquiry, which was affirmed by the University's Faculty Senate in April 2022.[7]  In furtherance of its protection of the freedom of expression, the University maintains reasonable time, place, and manner restrictions on public speaking, expressive activity,

---

[3] University of Virginia, UVA Policy, *HRM-009: Preventing and Addressing Discrimination and Harassment (PADH)* (September 7, 2021), https://uvapolicy.virginia.edu/policy/HRM-009.

[4] University of Virginia, UVA Policy, *HRM-010: Preventing and Addressing Retaliation (PAR)* (July 20, 2021), https://uvapolicy.virginia.edu/policy/HRM-010.

[5] *See, e.g.*, University of Virginia, Office for Equal Opportunity and Civil Rights, *Prevention, Education, and Training*, https://eocr.virginia.edu/prevention-and-training; and *id.*, *PADHR Training FAQ*, https://eocr.virginia.edu/padhr-training-faq.

[6] University of Virginia, Office for Equal Opportunity and Civil Rights, *Prevention, Education, and Training*, https://eocr.virginia.edu/prevention-and-training.

[7] University of Virginia, Free Speech, *Statements on Free Expression and Free Inquiry* (April 2022), https://freespeech.virginia.edu/statement-free-expression-and-free-inquiry.

and the distribution of literature.[8]  The University's policy is consistent with federal and state law codified in Virginia Code § 23.1-401 and -401.1.

Defendant Students for Peace and Justice in Palestine at UVA (named in error as "Students for Justice in Palestine at UVA") is a Contracted Independent Organization (CIO).[9]  Defendant Faculty for Justice in Palestine at UVA is not a CIO.  CIOs are formed by University students to offer educational, service, and social opportunities.[10]  Membership is typically comprised primarily of students, faculty, staff, alumni, but limited community membership in the organizations is possible.  Pursuant to UVA's established policy, CIOs operate independent of the University and are not agents, servants, or employees of the University.  They do not have the authority to act for or commit the University to any activity, transaction, or agreement.  The University does not supervise, direct, or control CIOs' activities.  Further, a CIO understands and agrees that the University, the Commonwealth of Virginia, and its employees and agents will not be liable for injuries or harm caused to anyone in connection with or arising out of the CIO's activities, nor will they be liable for any of the CIO's contracts, torts, or other acts or omissions, or those of the CIO's directors, officers, members, advisors, coaches, staff, activity participants, or any other persons associated with the CIO.

<u>UVA's Response to the Israel-Palestine Conflict during the 2023-24 School Year</u>

The UVA Defendants agree, as Goldstein alleges, that on October 7, 2023, Hamas, a terrorist group, launched a horrific, premeditated, and large-scale terrorist attack on Israel,

---

[8] University of Virginia, UVA Policy, *PRM-017: Duties Toward Speakers and Use of University Facilities or Property* (February 16, 2024), https://uvapolicy.virginia.edu/policy/PRM-017.

[9]  University of Virginia, Students for Peace and Justice in Palestine, https://virginia.presence.io/organization/students-for-peace-and-justice-in-palestine-2.

[10] See University of Virginia, UVA Policy, *STAF-002: Terms and Conditions for Contracted Independent Organizations and Fraternal Organizations* (July 6, 2023), https://uvapolicy.virginia.edu/policy/STAF-002.

resulting in over 1,200 dead and 5,000 wounded, in addition to other atrocities.  (Compl. ¶¶ 67-69.)  Goldstein alleges that many of those harmed were "family members and friends of many UVA students and faculty."  (*Id.* ¶ 71.)  The UVA Defendants recognize that the attacks and the ensuing turmoil, around the world, have caused many students, including the Plaintiff, significant grief and concern.  To that end, the UVA Defendants and many other UVA officials have gone to extensive lengths to demonstrate care and sympathy for those affected and to offer supportive resources where they can be useful.

The Court may take judicial notice[11] of additional facts and events not alleged in the Complaint regarding UVA's response to the attack and support for its Jewish students[12]:

- On October 7, 2023, after Hamas' terrorist attack, the University's Interim Vice President for Student Affairs and its Vice Provost for Global Affairs wrote to the University's impacted international students to express support and concern.  In that communication, they encouraged students to access mental health and academic support resources. They reassured students that staff are ready to assist 24 hours a day, seven days a week.[13]

- On October 10, 2023, approximately 300 people attended a candlelight vigil at UVA's Amphitheatre in response to the October 7th terrorist attacks.  The vigil was organized by Jewish students and student organizations, including the Brody Jewish Center and Chabad House.[14] 

- On October 11, 2023, President Ryan issued a statement to the University community in which he expressed his concern for the well-being of members of the University

---

[11] *Falwell v. Liberty Univ., Inc.*, No. 6:23-CV-11-RSB, 2023 WL 4867432, at *1 n.2 (W.D. Va. July 31, 2023).  While the Court can but does not need to take judicial notice to dismiss this Complaint, the University Defendants provide factual allegations that further expose why this Complaint should be dismissed.

[12] UVA here solely seeks to address Plaintiff's contention that UVA disregarded its Jewish students, and does not include events and actions related to addressing Islamophobia.

[13] Jane Kelly, *UVA Diplomatic Expert on the Implications of War Between Israel and Hamas*, University of Virginia, UVAToday (October 9, 2023), https://news.virginia.edu/content/uva-diplomatic-expert-implications-war-between-israel-and-hamas.

[14] Caroline Hagood, *Community members gather in support of Israel after attacks*, The Cavalier Daily (October 11, 2023), https://www.cavalierdaily.com/article/2023/10/community-members-gather-in-support-of-israel-after-attacks.

community who were impacted by the terrorist attacks. He also condemned Hamas and the horrific violence against civilians, including children.[15]

- On October 31, 2023, the University announced various educational programming beginning that week related to the conflict in the Middle East.[16] The University's Provost also launched a website to provide a central platform for publications and announcements related to the conflict and information about upcoming educational events.[17]

- On October 27 and November 2, 2023, a Jewish student group conducted an event on Grounds to raise awareness for individuals held hostage by Hamas.[18] 

- On November 6, 2023, the University's executive leadership provided the University community with an Update on the University's response to the Middle East conflict.[19] With regard to safety, the update confirmed that:

> It is important to note that, as of this writing, the University has not received any reports of violence, or credible threats to physical safety, or other criminal activity in connection with the Oct. 7 attacks or the ensuing war. We recognize, however that the turmoil in the Middle East and the increase in demonstrations on our Grounds have inspired real concerns for members of our community about Antisemitism, Islamophobia, and other potential threats to their safety and well-being.

The Update then expressly restated the University's prohibition on discrimination and harassment, including a link to the PADH policy, and a link to the University on-line reporting platform, Just Report It:

> To be perfectly clear, Antisemitism, Islamophobia, or any other discrimination or harassment have no place at UVA. The University's

---

[15] *Ryan Appeals for Compassion, Offers Support in Aftermath of Attacks in Israel* , University of Virginia, UVAToday (October 11, 2023), https://news.virginia.edu/content/ryan-appeals-compassion-offers-support-aftermath-attacks-israel.

[16] Bethanie Glover, *UVA Sets Educational Programming Related to Conflict in the Middle East* University of Virginia, UVAToday (October 31, 2023), https://news.virginia.edu/content/uva-sets-educational-programming-related-conflict-middle-east.

[17] University of Virginia, Office of the Executive Vice President and Provost, *Events*, https://provost.virginia.edu/subsite/current-events-academic-programs/events.

[18] Caroline Hagood, *Jewish students on Grounds organize balloon installation to honor hostages*, The Cavalier Daily (November 4, 2023), https://www.cavalierdaily.com/article/2023/11/jewish-students-on-grounds-organize-balloon-installation-to-honor-hostages.

[19] *UVA Leaders Offer Update on Response to Middle East Conflict*, University of Virginia, UVA Today (November 6, 2023), https://news.virginia.edu/content/university-statement-war-gaza-and-its-effects-students.

Preventing and Addressing Discrimination and Harassment (PADH) policy prohibits discrimination and harassment on the basis of religion, race, and national or ethnic origin, as well as many other characteristics. Community members who feel they have been subjected to discrimination or harassment can file a report through UVA's Just Report It system, which will be reviewed by University staff for additional follow-up. We take concerns of bias, discrimination, and harassment very seriously and we are prepared to intervene to de-escalate situations and pursue disciplinary actions, as needed.

The Update also reminded the University community that representatives from the University's Student Affairs Division and Police Department plan for and monitor events to ensure the activities remain peaceful and non-disruptive.

As an additional reminder, the University Police Department works closely with other UVA safety professionals and our regional and commonwealth partners during demonstrations and other public events. In the case of recent events organized by students, University Police, Student Affairs and other public safety officials conducted safety assessments in advance, activated a command post to monitor events, assigned staff to strategic locations, and prepared plans to be ready to respond to any disorder or violence. Student Affairs representatives reach out to student groups organizing demonstrations to learn about plans and advise them of relevant University policies and will pursue disciplinary action if policies are violated.

Finally, President Ryan observed that "the University will have an ongoing responsibility to teach through the crisis and to care for members of this community, particularly those who are Jewish and Muslim. This conflict has shed new light on global Antisemitism and Islamophobia. It also has offered an important, though troubling, reminder that religious minorities often experience unique challenges in communities around the world, including our own."  President Ryan concluded "[w]e take seriously our responsibility to care for the safety and well-being of our students, faculty, and staff in a challenging moment for us all and greatly value those renewed expressions of our shared commitment."



- From December 7, 2023 to December 15, 2023, Jewish student groups displayed a large Menorah in the Amphitheatre for the duration of Hannukah with the University's support. President Ryan, along with other University leaders, attended the Menorah lighting.

- On January 18, 2024, President Ryan issued a video statement to the University community in which he directly addressed the ongoing conflict in the Middle East. President Ryan acknowledged the tragic loss of life, including members of the University community who have lost friends and family in the conflict. President Ryan acknowledged the increase across the county in antisemitism and Islamophobia, including discrimination and harassment on the basis of nationality. He stated: **"To be clear, these and any other forms of bigotry have no place in our Grounds."** He encouraged the University community to listen generously and with grace, reminding students and faculty "that the right to say something doesn't always mean it's right to say it. . . . Our world right now could use more understanding, more empathy, more light than heat, and more dedication to the unbiased search for truth."[20]

- In January 2024, the University announced the continuation of various educational opportunities focused on the Middle East conflict, including more than a dozen new courses, seminars, and discussions to help students, faculty and members of the community better understand the conflict.[21]

- On February 25, 2024, 300 people gathered for a Shabbat dinner to celebrate the Jewish community on Grounds including members of UVA Administration.[22]



- In early April, Rector Hardie requested a board briefing on investigations on Grounds, and what the University is doing to care for members of the community, specifically regarding the reports of antisemitic attacks. After the meeting, Rector Hardie released a public statement stating, "**The University Board of Visitors and the administration are united in our opposition to antisemitism and all forms of discrimination** . . . We care deeply for our students and are committed to supporting all members of our community as we

---

[20] *Ryan: Spring Semester Will Be a Time for Learning, Growing, Celebrating,* University of Virginia, UVAToday (January 17, 2024), https://news.virginia.edu/video/ryan-spring-semester-will-be-time-learning-growing-celebrating?utm_source=DailyReport&utm_medium=email&utm_campaign=news.

[21] Mike Mather, *UVA Will Offer More Opportunities To Understand the Middle East Conflict,* University of Virginia, UVAToday (January 17, 2024), https://news.virginia.edu/content/uva-will-offer-more-opportunities-understand-middle-east-conflict?utm_source=DailyReport&utm_medium=email&utm_campaign=news.

[22] Brody Jewish Center-Hillel at UVa, Shabbat 300 is back!, Facebook (February 26, 2024), https://www.facebook.com/story.php/?story_fbid=425627890028629&id=100077442645642&_rdr. The Brody Jewish Center, Hillel at the University of Virginia, is the focal point in a renaissance of Jewish life for the estimated 1,000 Jewish undergraduates on Grounds. Brody Jewish Center – Hillel at UVA, *About Us,* https://www.brodyjewishcenter.org/about-us.html.

continue to work through a deeply difficult time that is affecting our community and countless others around the world" (emphasis added).[23]

- On April 3, 2024, the UVA Jewish Leadership Advisory Board[24] sent a letter to the Board of Visitors that included the following statements:
  - o [W]e feel supported by the University's administration in issues surrounding Jewish students around Grounds.
  - o In the isolated incidents where student safety has been threatened, we have full confidence in the leadership of Chief Timothy Longo.
  - o We, the Jewish Leadership Advisory Board, fully reject the notion that Rector Hardie has acted in ways which have harmed our community. It would be a disgrace if Rector Hardie is forced to resign as a result of deceitful politics.
  - o We remain grateful to the University administration, including President Ryan, Provost Baucom, and Dean Rucker, for all that they have done regarding the safety and well-being of Jewish students.[25]

- In late April 2024, Ian Baucom, sent a message to the school's academic deans asking them to remind faculty that, "while students have a right to protest, UVA will continue with regular academic operations during this week's walkout and that course instruction was expected to continue."[26] And "in response to the report of a class having been canceled in contravention of that expectation, the Provost's office and School Dean will address this matter with the faculty member in question and undertake disciplinary measures if the instructor is found to have violated University policy."[27]

---

[23] Emily Hemphill, *A campaign is calling on UVa's rector to resign. But who is funding it?*, The Daily Progress (April 6, 2024), https://dailyprogress.com/news/local/education/a-campaign-is-calling-on-uvas-rector-to-resign-but-who-is-funding-it/article_4518c63a-ed14-11ee-9d1d-bf74121b4a22.html.

[24] JLAB is composed of students elected to govern the Hillel Jewish Leadership Council. This organization plans programming for Jewish students on Grounds, and carries out the Brody Jewish Center's self-proclaimed mission of empowering Jewish students to take ownership of their identity.     Brody Jewish Center – Hillel at UVA, *About Student Leadership*, https://www.brodyjewishcenter.org/student-leaders.html.     JLAB oversees the largest Jewish organization of Jewish students in Charlottesville, serving roughly 700 students each year with over 100 students regularly attending weekly events.

[25] Thomas Baxter, *Jewish Leadership Advisory Board criticizes politicization of Jewish student experiences*, The Cavalier Daily (April 16, 2024), https://www.cavalierdaily.com/article/2024/04/jewish-leadership-advisory-board-criticizes-politicization-of-jewish-student-experiences, citing to April 3, 2024 letter To the Board of Visitors, https://drive.google.com/file/d/1TD0V7M2UFJI7hFSPu9ZEh9KkD4UjMx-r/view.

[26] Haley Cohen, *UVA professor cancels class to support BDS as referendum passes*, Yahoo!News, JewishInsider (March 1, 2024), https://www.yahoo.com/news/uva-professor-cancels-class-support-084209510.html?guccounter=1.

[27] *Id.*

9

- On May 8, 2024, contrary to the suggestion in Compl. ¶ 211 that students ambushed and intimidated Jews and Israelis including the Plaintiff, students actually confronted the UVA President for the University's investment in Israel and actions with regard to anti-Israel protesters on May 4, 2024.[28]



- In May 2024, after University and State police shut down a pro-Palestinian protest that violated University policies, UVA's Division of Student Affairs referred eleven students to the University of Virginia's student-run Judiciary Committee for violations of the University's standard of conduct.[29]

In sum, dozens of publicly available facts and sources show that contrary to Plaintiff's allegations, UVA supports all of its students, including its Jewish students, even as UVA and its students have actively engaged with the ongoing conflict in the Middle East.

<u>Plaintiff's Allegations of General Harassment at UVA</u>

Plaintiff Matan Goldstein ("Goldstein") is a second generation Israeli-American—the first member of his family to be born in the United States.  (Compl. ¶ 15.)  He is both ethnically and religiously Jewish, and describes himself as having "deep faith and spiritual conviction" (*id.*), which "play a significant and cherished part of his identity" (*id.* ¶ 16.)  He openly practices his faith by wearing a Yarmulke and a necklace bearing the Star of David.  (*Id.* ¶ 17.)

Goldstein alleges that after the October 7, 2023 attack, Hamas and its U.S.-based supporters began an "offensive campaign" intended to advance an "antisemitic" and "anti-Israeli" objective,

---

[28] Jason Armesto, *Students confront UVa President Jim Ryan, demand answers after police crackdown on protestors*, The Daily Progress (May 9, 202), https://dailyprogress.com/news/local/education/students-confront-uva-president-jim-ryan-demand-answers-after-police-crackdown-on-protesters/article_7ae0ea66-0e4f-11ef-a08e-5bd6e13efa4e.html.

[29] Jason Armesto, *UVa withholds degrees from students who participated in pro-Palestine protest*, The Daily Progress (July 3, 2034), https://dailyprogress.com/news/local/education/uva-withholds-degrees-from-students-who-participated-in-pro-palestine-protest/article_ca695bb2-34ca-11ef-b74c-ff23e8b899af.html.

including offensive social media posts and other types of on-campus harassment across the U.S., including at UVA.  (*Id.* ¶¶ 76-77.)

On October 8, 2023, at 8:43 a.m., Goldstein alleges that Students for Justice in Palestine at UVA ("SJP") posted an Official Statement online, co-signed by numerous student organizations. (*Id.* ¶¶ 82-85.)  Goldstein includes a screenshot of the statement in his Complaint.  (*Id.* ¶ 82.)  The Statement called the October 7 attack on Israel an "unprecedented feat," which Goldstein alleges is offensive, anti-Israel, and antisemitic.  (*Id.*)  Goldstein does not allege whether he saw this post, how long it was posted, whether the post was taken down, and whether he reported the post to UVA Defendants, UVA Police, EOCR, or Just Report It.

Goldstein alleges that beginning on October 8, 2023, flyers and posters were distributed or posted around Grounds,[30] which included images that seemed to celebrate Hamas' attack on Israel, and words or phrases Goldstein found antisemitic and anti-Israel.  (*Id.* ¶ 103.)   For example, one poster referred to "Decolonization," which Goldstein believes represented "a call for violence against Jews and Israelis."  (*Id.* ¶ 104.)  Goldstein does not allege whether he saw this poster, where the poster was located, who posted the poster, how long it was posted, and whether he reported the poster to UVA Defendants, UVA Police, EOCR, or Just Report It.  Another phrase used was "Intifada Revolution – There is only One Solution," which Goldstein alleges is antisemitic because it "calls for the destruction and elimination of Jewish peoples globally."  (*Id.* ¶ 123.)  Again, Goldstein does not allege who, when, or where this phrase was used, or whether he heard or saw the phrase.  Goldstein does not allege whether he reported the phrase to the UVA Defendants, UVA Police, EOCR, or Just Report It.

---

[30] At UVA, the physical university campus is referred to as "Grounds."

Sometime in October 2023, a poster with the phrase, "From the River to the Sea, Palestine will be Free" was visible on a dormitory door. (*Id.* ¶ 122.) Goldstein alleges that this phrase is "intended to instill fear and trepidation into the hearts and minds of Jewish people" and is a "call to genocide." (*Id.*) Goldstein does not allege whether he saw this poster, where the poster was located, who posted the poster, how long it was posted, or whether he reported the poster to the UVA Defendants, UVA Police, EOCR, or Just Report It.

On an unidentified date, the UVA Student Council President posted a social media post containing "Bloody Handprint" imagery, which Goldstein alleges refers to a terrorist event in which two Israelis were tortured, mutilated, and murdered by a Hamas terrorist. (*Id.* ¶ 125.) Goldstein characterizes this post as "antisemitic and plainly threatening," although he does not allege when he saw it or whether he interacted with it. (*Id.*) Goldstein does not allege whether he reported the post to UVA Defendants, UVA Police, EOCR, or Just Report It.

Goldstein alleges that pro-Hamas, antisemitic UVA students, joined by faculty and administrators, "staged and managed multiple aggressive, disruptive protests and other riotous acts," which "occurred on a weekly, if not daily[] basis," on Grounds. (*Id.* ¶¶ 140-41.) He further alleges that faculty and students published "offensive slurs and threats on various physical and online platforms," which celebrated and endorsed violence against Jews and Israelis, and that antisemitic posters and markers were posted on Grounds. (*Id.* ¶¶ 142-144, 147.) He alleges that UVA Jewish students have been called "filthy Jews," "Hitler," "Nazi," "genocidal fucks," and physically assaulted and threatened with violence. (*Id.* ¶¶ 145-146.) Plaintiff specifically alleges that he was called a "filthy Jew," although he does not say who called him this, when, or whether this encounter occurred at UVA. (*Id.* ¶ 228.) He otherwise does not identify who, when, where, or through what medium these things were said, nor whether he was present. If this occurred at

UVA, Goldstein does not allege whether he reported any of these incidents to the UVA Defendants, UVA Police, EOCR or Just Report It.

On October 27, 2023, Faculty for Justice in Palestine at UVA ("FJP") published an "Open Letter" signed by over 80 professors, including professors later assigned to a Task Force on Religious Diversity and Belonging.  (*Id.* ¶ 86.)  Goldstein describes this letter as "pro-Hamas" and "antisemitic," although Goldstein does not include the text of the letter in his Complaint and does not allege whether he saw the letter.  (*Id.*)  On November 29, 2023, a "Coalition of Concerned Faculty Members" hosted an event called "Education and Action: A Teach-in on Palestine."  (*Id.* ¶ 87.)  Goldstein considered this event a "pro-Hamas, anti-Israel disruptive rall[y]."  *Id.*  Goldstein does not allege whether he attended.  Goldstein does not allege whether he reported the event to the UVA Defendants, UVA Police, EOCR, or Just Report It.

Goldstein alleges that on unidentified dates certain "pro-Hamas faculty members [] canceled classes so that they and their students could attend anti-Israel protests" (*id.* ¶ 129), that certain faculty members "offered 'extra credit' and boosts in grades to students who attend anti-Israeli, antisemitic rallies" (*id.* ¶ 130), and that some faculty "offered to tutor and assist pro-Hamas students with their final examination and term paper obligations" (*id.* ¶ 131).  Goldstein does not identify these professors or courses, and he does not allege whether he was in any of the affected classes.  Goldstein also alleges that certain pro-Hamas faculty members "threatened to withhold final grades for their students."  (*Id.* ¶ 133.)[31]  He does not allege that his faculty members made any such threats or that his grades were withheld.

---

[31] Although Goldstein claims that these acts should be "imputed" to UVA, he includes a social media screenshot which explains that these acts were directed *against* UVA: "Many of your [professors] and [teaching assistant]s are withholding grades in order to call for amnesty for student and faculty protestors: dropping their charges + NTOs and ending their UJC [University Judiciary Committee] proceedings. If UVA truly supports free speech, then it can't respond to civil

Goldstein complains that various professors' associations and academic departments at UVA expressed support and solidarity for "pro-Hamas UVA faculty and students" and thus "support antisemitic discrimination and harassment." (*Id.* ¶¶ 136-137.) He also complains about the forming of "formal student groups dedicated to antisemitic objectives." (*Id.* ¶ 138.) Goldstein does not describe what "formal" student groups are and does not allege he ever reported any concerns about such groups to the UVA Defendants, UVA Police, EOCR, or Just Report It.

On April 30, 2024, FJP, SJP, and affiliated groups "began constructing 'encampments' on either side of the Rotunda," at the heart of the University's Grounds. (*Id.* ¶ 148.) The encampments "included group chants of antisemitic slogans, numerous antisemitic banners and posters, intermittent amplified sound (in violation of University policies), tents (in violation of University policies), and the materials for constructed, rigid barriers and structures." (*Id.* ¶ 150.) Goldstein explains that this encampment "occupied substantial portions of the central Grounds" which forced Jewish students and faculty to "navigate around antisemitic banners, oaths, and slurs" on the way to the library or class. (*Id.* ¶ 127.) Goldstein does not allege any specific instance in which he went to or walked past the encampments or was impeded from attending any class near the encampment.

Goldstein alleges that on May 1 and May 2, 2024, UVA administrators including Vice President for Student Affairs Kenyon Bonner, Dean of Students Cedric Rucker, Associate Vice President for Student Affairs Marsh Pattie, and University Police Chief Tim Longo "engaged in deep dialogue with masked pro-Hamas encampment dwellers." (*Id.* ¶ 153.) On May 3, 2024, FJP and SJP "posted a list of demands to the University of Virginia and its administration" which

---

disobedience with police violence." (Compl. ¶ 133.) In other words, this post shows that UVA was indeed disciplining the protesting students and faculty who violated policies or engaged in misconduct.

14

Goldstein considered "patently antisemitic." (*Id.* ¶ 154.) They "demanded a response by 12:00PM the following day." (*Id.*)

Goldstein alleges that the following day, May 4, 2024, UVA "produced a lengthy response to the demands, in writing," which was signed by Vice President for Student Affairs Kenyon Bonner and Vice Provost for Academic Affairs Brie Gertler. (*Id.* ¶ 155.)[32]   UVA wrote that it "welcome[d] the opportunity for further conversation" and "to hear more about your questions and concerns." (*Id.*)   As to specific demands related to the Boycott, Divest, Sanctions ("BDS") Movement,[33] Goldstein alleges that UVA promised to arrange a meeting with administrators. Goldstein also alleges that UVA further agreed that the protestors "would not be charged with or face any University disciplinary measures or proceedings." (*Id.*)   Goldstein contends that this implied that the protestors "could continue on without fear of 'administrative discipline.'" (*Id.*) The same day, however, University, local, and state police removed and dismantled the encampments and their occupants. (*Id.* ¶ 158.)   Goldstein alleges that arrests were made, but complains that the police never pressed charges. (*Id.*)   Goldstein does not allege that any interaction by UVA Defendants with the encampments was directed at Goldstein or involved Goldstein.

---

[32] The full text of the letter is available online (https://news.virginia.edu/sites/default/files/2024-05/UVA%20Response%20to%20%E2%80%9CLiberation%20Zone%E2%80%9D%20for%20Gaza%20-%205.3.24.pdf).   Notably, the letter does not state that the protesters would "not be charged with or face any [] disciplinary measures," as Plaintiff alleges. (Compl. ¶ 155.)   To the contrary, the letter expressly noted that UVA will "enforce reasonable restrictions on the time, place, and manner of expressive activities, so as to assure the safety of our community and to avoid disruption to University life or the rights of others."   Indeed, at least 25 demonstrators *were arrested* for violating UVA policies on May 4, specifically in relation to the encampment.   Patrick Larsen, *UVA encampment cleared by force after four days; 25 arrested*, VPM: NPR (May 5, 2024 at 5:46 PM EST), https://www.vpm.org/news/2024-05-05/university-of-virginia-gaza-protest-state-police-arrests-grounds.

[33] Plaintiff alleges that the BDS movement is antisemitic and anti-Israeli. (Compl. ¶ 118.)

In contrast to these events, Goldstein alleges that on September 7, 2022, an item appearing to be a noose was found draped on a statue of Homer on the Lawn.  (*Id.* ¶ 205.)  In response, the UVA President immediately reported to various law enforcement agencies the commission of a hate crime and, within a few hours, published an open letter calling the event "an act intended to intimidate members of this community," notably African-Americans.  (*Id.*)  Goldstein contends that the UVA Rector and President "did none of these things for the Jewish community" when the Grounds were adorned with "internationally recognized symbols of antisemitic hate." (*Id.* ¶ 206.)

<u>General Allegations of Complaints against and Response by Administration</u>

Goldstein alleges that "Jewish students, faculty, and parents" lodged "cries for help and formal complaints with every available University outlet, agency, and program."  (Compl. ¶ 88.) These efforts included letters written to the UVA President and the Board of Visitors, open letters published on unidentified platforms, police reports, formal complaints with "EOCR," and formal complaints with the "Just Report It!" system.  (*Id.* ¶ 89.)  Goldstein claims that the United States Department of Education's Office for Civil Rights opened an investigation.  (*Id.*)  Goldstein does not allege whether or how he was involved in any of the efforts he describes, nor what the complaints said.

Goldstein alleges that despite receiving notice of harassment from these various unspecified complaints, the UVA Defendants "did . . . nothing."  (*Id.* ¶ 90.)  He complains that while certain public figures in Virginia had issued statements on the topic, the UVA Defendants did not "condemn antisemitism on Grounds," and they did not "threaten to hold students and faculty who engaged in antisemitic discrimination and abuse accountable."  (*Id.* ¶¶ 91-93.)  He further complains that when the UVA Defendants did speak about antisemitism, they also

discussed Islamophobia at the same time, a pairing of topics which he considered "antisemitic," "retaliatory," "denial," and "gaslighting."  (*Id.* ¶ 94.)[34]

When Jewish students and parents petitioned the UVA President for a meeting, the President "forced them to wait nearly four months," before he agreed to meet, and then he "limited [the meeting] to only four Jewish parents, who were forced to attend in person with their 'biological child' student in attendance with them."  (*Id.* ¶ 160.)  Goldstein claims that requiring both students and parents to attend this meeting was an "act of denial, retaliation, and intimidation[.]"  (*Id.*)  The President hosted the meeting "in his office, in person," and "insisted that the meeting be 'confidential'" despite its public importance.  (*Id.*)  The Jewish parents and students at the meeting delivered a "multi-media presentation" regarding "the state of antisemitism at UVA," and informed the UVA President that they felt afraid, intimidated, and forced to hide their faith while on campus.  (*Id.*)  Two days after the meeting, on February 16, 2024, the President emailed the attendees, saying, "I appreciate your taking the time to join us, and I'm grateful for your willingness to share your perspectives and ideas."  (*Id.* ¶ 163.)  Goldstein considered this email evidence of UVA's and the President's "deliberate indifference" toward antisemitism and "gaslight[ing]" of Jewish students.  (*Id.*)

On March 1, 2024, the UVA Board of Visitors held its spring meeting.[35]  (*Id.* ¶ 164.) During the meeting, Board of Visitors member Bertram Ellis allegedly "attempted to raise the

---

[34] The complained-of language pairing antisemitism and Islamophobia is almost identical to the language chosen by the top 100 law firms' letter to Deans of the major law schools addressing antisemitism. *See* Andrea Keckley, *More Firms Urge Law Schools To Combat Antisemitism*, Law360 (November 3, 2023 at 4:40 PM EDT), https://www.law360.com/articles/1740502/more-firms-urge-law-schools-to-combat-antisemitism.

[35] A video of the exchange Plaintiff has alleged can be seen online (The Jefferson Council, *Heated exchange between Board member Bert Ellis and Rector Robert Hardie*, YouTube (March 1, 2024), https://www.youtube.com/watch?v=9XNylWKevdY).

subject of antisemitism on Grounds." (*Id.*)  Rector Hardie allegedly interrupted Ellis, explaining

that antisemitism on Grounds "would not be discussed in 'open session.'" (*Id.* ¶ 165.)  Ellis stated

that he had received hundreds of complaints from Jewish students and parents and that the matter

should be openly addressed.  (*Id.*)  Goldstein alleges that "Hardie became heated and aggressive,"

calling Ellis "out of line" and "out of order."[36] (*Id.* ¶ 166.)  The Rector then allegedly "raised his

voice and [] threatened Mr. Ellis" (*id.* ¶ 167), then told Ellis that he "would be 'reprimanded'" (*id.*

¶ 168).  A motion was later brought to allegedly "punish Mr. Ellis for . . . attempting to protect

Jewish students at UVA." (*Id.* ¶ 172.)  Goldstein does not allege that he was present at, or in any

way connected to, the Board of Visitors meeting.

Goldstein further alleges that when UVA received a "failing" grade[37] from the Anti-

Defamation League related to antisemitism on campus, it did not "investigate, expose, [or]

remediate antisemitism on Grounds" (*id.* ¶ 177), but instead used its "media liaisons" to minimize

student complaints (*id.* ¶ 179).  Goldstein also alleges that UVA told the media that: "ongoing

inquiries into those allegations have yet to return evidence to substantiate the claims or to warrant

disciplinary measures . . . .  This includes specific allegations of violence against one student at a

protest, after which University Police investigated thoroughly, using video evidence, witness

---

[36] The Board of Visitors observes Roberts' Rules of Order, a parliamentary procedure for
conducting meetings.  *See* Manual of the Board of Visitors of the University of Virginia, § 2.38
Conduct of Business, https://bov.virginia.edu/sites/g/files/jsddwu1171/files/2024-
07/2024%20revisions%20with%20newest%20members%20-%20July%209%2C%202024_0.pdf
at p. 4; *see also Roberts' Rules online,* http://www.rulesonline.com/.

[37] Goldstein alleges no facts about how the Anti-Defamation League reached this grade, and offers
no basis from which to infer that the grading system is reliable or objective. The ADL report cards
have been widely criticized.  Arno Rosenfeld, *Why the ADL is struggling to find its campus footing*,
Forward (April 18, 2024), https://forward.com/forward-newsletters/antisemitism-
notebook/604351/why-the-adl-is-struggling-to-find-its-campus-footing/.

statements, and other methods." (*Id.* ¶ 180.)[38]  Goldstein alleges that this statement is false. (*Id.* ¶ 181.)  Goldstein found these media communications demonstrative of UVA's retaliatory animus. (*Id.* ¶ 178.)

Plaintiff's Alleged Harassment, Complaint, and Honor Charge

Goldstein matriculated as a First Year at the University of Virginia in August 2023. (Compl. ¶ 14.)  A few months later, on October 25, 2023, many students and faculty members joined a "walk out," many wearing keffiyehs, which Goldstein considers the "symbol of Hamas and pro-Palestinian 'resistance' groups." (*Id.* ¶ 107.)  Goldstein contends that the attendees were "chanting slogans of hate," although he does not allege what was said. (*Id.*)  Goldstein attended the event "wearing his Yarmulke, his Star of David, and carrying the flag of Israel." (*Id.* ¶ 109.)  Upon request, a Jewish-Israeli UVA professor escorted him to the event. (*Id.* ¶ 110.)  At the walk-out, Goldstein was "berated, insulted, threatened with violence, and physically assaulted." (*Id.* ¶ 111.)  When this happened, the UVA professor escorting him "intervene[d] and identif[ied] himself as a UVA professor in order to protect [Goldstein] and himself from imminent physical assault." (*Id.*)[39]

On an unidentified date, UVA Associate Vice President for Student Affairs Marsh Pattie and Associate Dean of Students Alex Hall "communicated with the Plaintiff by Zoom regarding his complaints of harassment, abuse, and physical assault." (*Id.* ¶ 96.)  Goldstein alleges that he was told he could "move out" of his dorm if he felt unsafe or uncomfortable. (*Id.)*  Goldstein does

---

[38] The complete statement made by UVA is available online (*UVA gets an F on Campus Antisemitism Report Card*, NBC29 WVIR (April 11, 2024 at 3:25 PM EDT), https://www.29news.com/2024/04/11/uva-gets-an-f-campus-antisemitism-report-card/).

[39] The interaction alleged by Plaintiff can be seen at the event in the background of this CBS19 news footage beginning around 0:20 (Felicity Taylor, *Pro-Palestine and pro-Israel students clash on Grounds*, CBS19 (October 25, 2023), https://www.cbs19news.com/story/49891572/pro-palestine-and-pro-israel-students-clash-on-grounds.

not allege what specific incidents were discussed during this meeting, and he does not allege the details of any other complaints, written or otherwise.

On an unidentified date, another student (████████████████████████[40]) filed an Honor Charge against Goldstein, "in retaliation for the Plaintiff speaking to a member of the national media about antisemitism at UVA." (*Id.* ¶ 186.) Goldstein does not say what honor violation the Charge alleged, and does not allege that the UVA Defendants had any role in deciding to file it.[41] Rather, Goldstein alleges that the UVA Defendants should have halted the Honor Committee's normal processes and prevented the Charge from proceeding.[42] (*Id.* ¶ 192.) As soon

---

[40] *See* █████ ███ ███ █████ ██ ██ ███ ██ ██ .

[41] The UVA Defendants attach the Confidential Honor Report Intake Form to which Goldstein's allegations refer as **Exhibit A.** ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[42] The University of Virginia Honor Committee Bylaws are publicly available online at https://honor.virginia.edu/sites/honor/files/Honor%20Committee%20Bylaws%20-%20June%2023%2C%202024.pdf [hereinafter, "Honor Committee Bylaws"]. The Bylaws explain that once a Report of an Alleged Honor Offense is made, and before making a formal accusation, the Honor Committee engages in an investigation. *See generally, id.* at Sections IV.a. and IV.b. The Bylaws further explain that during or after investigation, a charge can be dismissed before a formal accusation is made: "If either [student] Honor Advisor or either [student] Honor Investigator request that a case be dropped at any time prior to the Investigative Panel, the Executive Committee [of students] will determine, in its reasonable discretion, whether the case should continue or should be dropped, for reasons that include, but are not limited to, lack of evidence or Bad Faith." *Id.* at Section IV.B.7. Goldstein's Honor charge was dismissed for lack of evidence pursuant to this procedure, and he was never formally accused. (Compl. ¶ 196.) The Honor Committee, including the Executive Committee, is fully and solely composed of students. Honor Committee Bylaws at Section II.A.2(b). Nothing in the Bylaws gives the Rector or President any role in determining whether an Honor Charge is investigated or a student is formally accused. Indeed, the Rector has *no* power to involve himself in any kind of disciplinary proceeding. Pursuant to UVA policy and Va. Code § 23.1-2209(A)(ii), the President may, in

as Goldstein moved for dismissal, however, the Honor Committee dismissed the Charge for lack of evidence.  (*Id.* ¶ 196.)

As a result of these events, Goldstein alleges he feels unsafe on University premises.  (*Id.* ¶ 231.)  Goldstein claims he now "lives in hiding" in Charlottesville and "has been ostracized from University society and student life."  (*Id.* ¶¶ 238-39.)  He further alleges that he has suffered "significant physical injuries," and mental, spiritual, and emotional damages, although he does not share the nature or extent of these injuries.  (*Id.* ¶¶ 245-46, 249.)

## **PROCEDURAL BACKGROUND**

Plaintiff filed suit on May 17, 2024, naming the UVA, Hardie, Ryan, FJP, and SJP as defendants.

His claims against UVA (Count I) arise under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), which prohibits discrimination on the basis of race or national origin

---

extraordinary cases, intervene in an ongoing honor proceeding. However, none of the relevant factors justifying intervention were at issue here:

> The University President may initiate, intervene in, and preempt proceedings before any University body when the President determines, in his or her sole discretion, that established processes will be unable to timely or properly adjudicate a case or complaint including, but not limited to, cases involving **students arrested, charged, or convicted of criminal conduct** or other serious conduct not involving criminal proceedings which reasonably endangers or threatens to disrupt the University community or University operations. The foregoing shall include, without limitation, conduct involving the possession or distribution of controlled substances on or off University property, attempted or inflicted bodily injury or other harm to any member of the University community, and destruction or attempted destruction of University property.

*See* Statement of Student Rights and Responsibilities (STA-003), Section VIII, available online (University of Virginia, UVA Policy, *STAF-003: Statement of Students' Rights and Responsibilities* (September 9, 2018), https://uvapolicy.virginia.edu/policy/STAF-003) (emphasis added). The Rector is not alleged to, nor does he, have any role (or authority) with respect to the Honor Committee.

by entities that receive federal funds, including public universities such as UVA.  Within Count I, Goldstein appears to allege three theories of discrimination: (1) Intentional Discrimination (Compl. ¶ 257); (2) Harassment/Hostile Environment (*id.* ¶ 259); or (3) Retaliation (*id.* ¶ 263). His claim against UVA is based on his Israeli national origin and Jewish ethnicity and race.

His claims against the Rector and President (Count II) are brought under 42 U.S.C. § 1983, which provides a private right of action for damages against any person acting "under color of" state law who deprives the plaintiff of the "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  Plaintiff alleges he was deprived of his rights under the Equal Protection Clause of the Fourteenth Amendment, and the Free Exercise and Free Speech Clauses of the First Amendment.

Plaintiff also alleges a claim under Section 1981 against the Rector and President.  Section 1981 provides that individuals of all races and ethnicities have "the same right in every State and Territory to make and enforce contracts" and "the full and equal benefit of all laws and proceedings."  42 U.S.C. § 1981.  However, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental" actors.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989). Accordingly, Plaintiff's Section 1981 claim is subsumed by his Section 1983 claim, and Count II should be construed as a Section 1983 claim.[43]  Plaintiffs' claim under Section 1983 is based on

---

[43] Even if Plaintiff were asserting a standalone § 1981 claim, he has not established the elements of a contract between himself and the UVA Defendants.  "Any claim brought under § 1981, therefore, must initially identify an 'impaired contractual relationship' . . . under which the plaintiff has rights."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  To the extent Plaintiff would argue that there is a University policy or code of conduct which he seeks to enforce, well-established caselaw forecloses his claim.  *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 587 (E.D. Va. 2018) ("a [u]niversity's student conduct policies are not binding, enforceable contracts"); *Clark* 2021 WL 1827256, at *6 n.6 (university's Title IX policy was not a contract because "different versions of the policy can exist over time" and are "subject to the unilateral revisions of

the same theories: (1) Intentional Discrimination (Compl. ¶¶ 275, 285); (2) Harassment/Hostile Environment (*id*. ¶¶ 277, 287); and (3) Retaliation (*id*. ¶¶ 279, 289).

## **LEGAL STANDARD**

To survive a motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must show that (1) the plaintiff suffered an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) a causal connection by which the injury is traceable to the challenged action of the defendant, and (3) that it is "likely" that the injury alleged will be redressed by a favorable decision on Plaintiff's claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Notably, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 563. A court analyzing whether a plaintiff has sufficiently alleged his standing "need not accept factual allegations 'that constitute nothing more than 'legal conclusions' or 'naked assertions.'" *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (quoting *David v. Alphin*, 704 F.3 327, 333 (4th Cir. 2013)). As the Fourth Circuit has explained, a court may not "create [its] own jurisdiction by embellishing otherwise deficient allegations of standing." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990)).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint contains "sufficient factual matter to state a claim to relief that is plausible on its face." *Carter v. Wells Fargo Bank, Nat'l Ass'n*, 689 F. Supp. 3d 253, 254 (W.D. Va. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up)). To survive, a complaint must plead

---

the University"); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052-NKM, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (finding that a university's sexual harassment policies "are not contractual in nature because they are subject to 'continual examination and revision.'").

sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). A complaint "does not satisfy this standard with only 'labels and conclusions' or a 'formulaic recitation of the elements of cause of action.'" *Olgiati v. Breitschmid*, No. 7:23-CV-352-RSB, 2023 WL 8828647, at *2 (W.D. Va. Dec. 21, 2023) (citing *Iqbal*, 556 U.S. at 678). While the court must draw inferences in Plaintiff's favor, Plaintiff's legal conclusions are not entitled to any presumption of truth. *Carter*, 689 F. Supp. 3d at 254.

## ARGUMENT

Goldstein's Complaint is both long and animated. But it contains very few allegations related to Goldstein himself, and even fewer related to Defendants Ryan and Hardie. It contains no allegations at all that Hardie, Ryan, or UVA intentionally and directly discriminated against him. It contains no allegations at all that Hardie, Ryan, or UVA took any adverse action against him, much less one that was intended as a retaliation for Goldstein engaging in protected activity. And rather than alleging that UVA was deliberately indifferent to Goldstein's concerns about peer harassment, Goldstein has affirmatively alleged that UVA listened to his complaints, provided him protection, enforced University policies, and even dismissed the Honor Charge against him. Because Plaintiff's allegations show that he has no standing nor viable cause of action against the UVA Defendants, all claims against the UVA Defendants should be dismissed.

### I.    Plaintiff has failed to allege that he has standing.

Plaintiff's claims against the University Defendants fail to meet the bar set by *Lujan* and *S. Walk at Broadlands Homeowner's Ass'n, Inc*. First, he does not meet the particularized injury requirement. He expressly admits that he has failed to plead specific facts regarding his injuries, under the auspice of privacy. (Compl. ¶¶ 245-46.) The injuries he does allege, such as deprivation of educational benefits and chilling of his speech or expression, are made in conclusory terms,

with no factual allegations in support, and are not caused by the UVA Defendants' alleged actions. The other injuries he claims such as "profound wounding," "mental anguish, [and] severe emotional distress" (*id.* ¶¶ 242 and 246), are not redressable under Title VI and as pled by the Plaintiff. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022).[44]  His injuries further fail to meet *Lujan*'s "particularized" requirement—much of the conduct he challenges appears to be entirely unrelated to him.  For example, he does not describe how he suffered "particularized" harm from posters, protests, or other expression around campus that he never claims he saw or heard (Compl. ¶¶ 103, 122-23, 125, 140); from the actions and statements of faculty in courses he was not taking (*id.* ¶¶ 130-31); from the Board of Visitors meeting which he did not attend and which allegedly concerns a matter between the Rector and another Board member (*id.* ¶¶ 164-172); or from an encampment of protesters that he never alleges he passed or were protesting him (*id.* ¶¶ 148-154).  He further fails to articulate his involvement in actions crucial to the elements of his claims.  He alleges that complaints "were lodged" and police reports "were filed," but he does not allege who made those complaints and reports or what they said.  (*Id.* ¶ 89.)  Even those events that *are* specific to him come up short.  For example, one of Plaintiff's primary allegations relates to an Honor Charge filed against him by another student.  But even if this event was reasonably *particularized*, Plaintiff's own allegations show that he suffered no *injury*—the Honor Committee investigated and dismissed the charge for lack of evidence, and Plaintiff never faced any disciplinary action.

---

[44] While emotional distress injuries are theoretically available under 42 U.S.C. § 1983, Plaintiff's conclusory allegations—absent any facts about "physiological or psychological problems," are insufficient.  *Crawford v. Coll. Life Ins. Co. of Am.*, 831 F.2d 1057 (4th Cir. 1987).  In addition, his allegations do not suggest that any such distress "did in fact occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes."  *Price v. City of Charlotte, N.C.*, 93 F.3d 1241 (4th Cir. 1996).

His allegations similarly lack traceability and redressability.  He alleges that anonymous individuals at unknown locations and unknown times called him unidentified slurs, threatened him, or assaulted him.  (*Id.* ¶ 228.)  UVA states that it firmly abhors such alleged conduct.  But, given the complete lack of specificity in this allegation, it is impossible to form any basis to conclude that such conduct even related to UVA, much less could be attributable to UVA.  Plaintiff further alleges that he was "berated, insulted, threatened with violence, and physically assaulted" by unknown individuals at the walkout.  (*Id.* ¶ 111.)  But Plaintiff has not pled—nor ever reported to UVA—who assaulted him during the October 25, 2023 walkout, which, as apparent from publicly available video footage, was a public protest.[45]  Plaintiff has not alleged any specific facts that would show that either of these incidents—even if they are particular to him—are in any way traceable to the UVA Defendants.

Finally, Plaintiff does not show redressability—the majority of his alleged injuries are conclusory or speculative, and the others are forms of emotional distress that are not redressable under federal antidiscrimination statutes.  (*See* Compl. ¶¶ 225-227, 232, 239, 242-244, 246-247.)  *Cummings*, 596 U.S. at 230 (emotional distress damages unavailable under Title VI).  He does not articulate any meaningful educational harms for which he could seek compensation.  *See infra*, Part IV.A.3 (requiring decline in academic performance or attendance, professional treatment or diagnosis affecting education, or moving schools).  And he does not explain the nature of the injunctive relief he requests, nor any reason to suggest he faces imminent harm giving him standing

---

[45] Plaintiff can be seen at the event in the background of this CBS19 news footage beginning around 0:20 (Felicity Taylor, *Pro-Palestine and pro-Israel students clash on Grounds*, CBS19 (October 25, 2023), https://www.cbs19news.com/story/49891572/pro-palestine-and-pro-israel-students-clash-on-grounds.

26

to request such relief.  (Compl. ¶ 340.)  It is therefore unclear what redress he can gain from his lawsuit.

Ultimately, instead of pleading specifics, Plaintiff doubles down, for 340 paragraphs, on "naked assertions" and "legal conclusions" which are insufficient to establish standing.  *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 182.  This Court should dismiss Plaintiff's Complaint.

## II.    The Court should dismiss Counts I and II because Plaintiff alleges no intentional discrimination by any UVA Defendant based on his race or national origin under Title VI or the Equal Protection Clause under 42 U.S.C. § 1983.

Plaintiff alleges disparate treatment discrimination based on his Jewish ethnicity and/or his Israeli national origin, but his Complaint reveals that the UVA Defendants cared for UVA's Jewish students and families.  (*See* Compl. ¶¶ 257-258, 275, 285.)  To make out a disparate treatment claim, Plaintiff must allege facts, which, "if true, raise a plausible inference that the university discriminated against the student on the basis of [race or national origin]," and "demonstrat[e] the existence of a but-for causal link between the student's [ethnicity or national origin] and the university's challenged decision."  *Ortegel v. Virginia Polytechnic Inst. & State Univ.*, No. 7:22-CV-00510, 2023 WL 8014237, at *9-10 (W.D. Va. Nov. 20, 2023) (quoting *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235-36 (4th Cir. 2021) (cleaned up)).[46]  Absent direct evidence of discrimination, this means a plaintiff must "plead that he was treated differently from similarly situated . . . students of another race, and that such treatment was *because of* his race."  *Newman v. Howard Univ. Sch. of L.*, No. 1:23-CV-0436-TNM, 2024 WL 450245, at *10 (D.D.C. Feb. 6, 2024) (requiring a Title VI plaintiff to plausibly allege (1) membership in a protected class, (2)

---

[46] As explained in *Ortegel*, "Title VI parallels Title IX" and the two schemes "operate in the same manner."  2023 WL 8014237, at *10 (citation omitted).  Accordingly, the elements of sex discrimination claims under Title IX track the elements of race discrimination claims under Title VI, and it is appropriate to cite Title VI and Title IX case law interchangeably.

adverse action, and (3) facts giving rise to an inference of discrimination).  An equal protection claim contains essentially the same elements: "a litigant must first demonstrate that he has been treated differently from others with whom he is similarly situated," and that "the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." *Ortegel*, 2023 WL 8014237, at *10 (internal quotation marks and citations omitted).  In general, "the plaintiff must set forth specific factual allegations that are probative of an improper motive."  *Id.* Here, Plaintiff's discrimination claim fails because he does not allege any adverse decision (or disparate treatment) by the UVA Defendants, and because he fails to allege any facts plausibly suggesting discriminatory intent.

### A.    Plaintiff does not allege an adverse decision or disparate treatment.

Plaintiff does not point to a particular adverse decision by UVA, the President, or the Rector that he is challenging.  For this reason alone, his discrimination claim fails.  As to the Rector, Plaintiff's sole allegation is that during a Board of Visitors Meeting the Rector allegedly "became heated and aggressive" toward another member of the Board of Visitors—not Plaintiff. (Compl. ¶¶ 164-172.)  Indeed, Plaintiff does not allege he had any connection to the meeting.  Even assuming as true that the Rector had publicly censured another member of the Board of Visitors, that could not support his claim.  *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 475, 482 (2022) ("purely verbal" censure of one member of an elected body by other members of the same body cannot support a First Amendment retaliation claim).

Otherwise, Plaintiff alleges that the UVA Defendants engaged in disparate treatment of *others*, not himself, by:

- allowing faculty members to offer "extra credit" and boost in grades to students who attend anti-Israeli, antisemitic rallies (Compl. ¶ 130);

- allowing encampments for people who chant antisemitic slogans (*id.* ¶ 151);

- "forcing [Jewish students and parents] to wait nearly four months" to meet with President Ryan (*id.* ¶ 160), while responding quickly to pro-Palestinian encampment dwellers who demanded a response (*id.* ¶ 155);

- allowing a bogus Honor Charge against Plaintiff (*id.* ¶ 186-87); and

- not responding to on-Grounds protest activity, yet swiftly acting during the "Homer Noose Incident" (*id.* ¶ 204).

These allegations cannot support an intentional discrimination claim because Plaintiff fails to plead that he personally was treated differently on the basis of his race or national origin. As to the alleged disparate treatment by faculty, Plaintiff does not allege who these professors were, what courses they taught, whether he was in the courses, or how this treatment caused him harm in any way. Indeed, contrary to Plaintiff's allegations, UVA issued a statement expressly prohibiting faculty from engaging in such conduct.[47]

Indeed, even if Plaintiff were able to pursue these claims, the facts do not support any inference of discriminatory or disparate treatment. As to the encampments, for example, once occupants refused to comply with University policy and demonstrated a willingness to physically resist compliance, UVA permitted police intervention to secure the site—undermining Plaintiff's claim. Although scheduling the meeting with Jewish parents and students may have taken longer than Plaintiff expected, UVA, including its President, did not deny a request by Jewish parents and students to meet. And Plaintiff alleges no other facts suggesting unequal treatment.

To the extent Plaintiff seeks to raise this claim based on Ryan, Hardie, or UVA failing to stop his Honor Charge from proceeding to the motion to dismiss stage, (Compl. ¶¶ 192-95), as this

---

[47] Haley Cohen, *UVA professor cancels class to support BDS as referendum passes*, Yahoo!News, JewishInsider (March 1, 2024), https://www.yahoo.com/news/uva-professor-cancels-class-support-084209510.html?guccounter=1. ("[I]n response to the report of a class having been canceled in contravention of that expectation, the Provost's office and School Dean will address this matter with the faculty member in question and undertake disciplinary measures if the instructor is found to have violated University policy.")

Court explained in a similar case, this claim "fails because he was not subject to any discipline by [the school]." *Clark v. Liberty Univ., Inc.*, No. 6:20-CV-58-NKM, 2021 WL 1827256, at *7, n.5 (W.D. Va. May 7, 2021) (J. Moon) ("The fact that Liberty did not find Clark responsible for any wrongdoing is paramount in this case. Indeed, Liberty did not impose any sanctions or disciplinary punishment against him."). Plaintiff's hyperbolic effort to assert harms simply because another student filed an Honor Charge against him cannot serve to show any harm by any UVA Defendant.

Even if there were actionable harm here, Plaintiff's allegations fail. A selective enforcement claim regarding a school disciplinary proceeding requires the Plaintiff to plead that "the decision to initiate the proceeding was affected by the student's [race]." *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (quoting *Yusuf v. Vassar Coll*, 35 F.3d 709, 715 (2d Cir. 1994)).[48] Here, Plaintiff's own allegations show that the Charge never got off the ground—a student submitted a Report of an Alleged Honor Offense against Plaintiff, which the Honor Committee (a group of students) investigated, then dismissed for lack of evidence, deciding *not* to initiate formal proceedings. (Compl. ¶ 196; *see also* UVA Honor Committee Bylaws, Section IV (explaining that formal accusation occurs after an investigation into a report is completed, if a claim is not dismissed).) And Plaintiff pleads no facts that support an inference of racial motivation—in fact, Plaintiff does not plead any facts about the contents of the Charge at all, he simply states in a conclusory fashion that it was filed "in retaliation for the Plaintiff speaking to a member of the national media about antisemitism at UVA." (Compl. ¶ 186.)[49] Such conclusory allegations are insufficient to state a claim of discrimination.

---

[48] This framework was acknowledged, though not adopted, by the Fourth Circuit in *Sheppard*, 993 F.3d at 235 (finding "no inherent problem" with the selective enforcement theory under Title IX).
[49] Plaintiff also seems to allege that Ryan and Hardie discriminated against him by failing to offer "comfort, support, or words of encouragement to the Plaintiff." (Compl. ¶ 198.) Plaintiff does not

The allegations of intentional discrimination are also rebutted by the document itself.[50]



Exhibit A.

.[51]

Nor do Plaintiff's comparisons of UVA's response to on-Grounds protest activity with the Homer statue noose incident (Compl. ¶¶ 205-06) demonstrate disparate treatment. The activities on which Plaintiff's Complaint relies, including posters, slogans, and an encampment, are not comparable to the incident regarding the noose on the Homer statue. The on-Grounds activity alleged by Plaintiff, occurring over days or months and involving numerous students, presented different concerns than the single Homer noose incident, and thus merited different responses from

---

(and cannot) point to any legal obligation under which Ryan or Hardie must give "words of encouragement" or "comfort" after an Honor Charge is dismissed.

[50] The court may consider the contents of the Honor Charge for purposes of the UVA Defendants' motion to dismiss because it has been "explicitly incorporated into the complaint by reference," *Phillips v. Rector & Visitors of Univ. of Virginia*, No. 3:22-CV-00075-RSB, 2024 WL 1201639, at *2 n.6 (W.D. Va. Mar. 20, 2024), and because it is "integral" to Plaintiff's claims. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016).

[51]    *See*                                                                                      .

UVA.  But in any event, contrary to Plaintiff's vague criticisms, UVA *did* respond to the October 7, 2023 attack and to on-Grounds protest activity.  This Court may take judicial notice of the UVA Defendants' numerous actions supporting the Jewish community, condemning violence and anti-Semitism, and addressing safety concerns related to students' protected speech, in the aftermath of October 7, 2023.  *See generally*, Factual Background, at 6 to 11.  Even without taking judicial notice, Plaintiff himself acknowledges that the UVA Defendants listened to his concerns (Compl. ¶ 96), took down the encampments (*id.* ¶ 158), and engaged in dialogue with Jewish parents and students (*id.* ¶¶ 160-62), undermining his own disparate treatment theory.

### B.    Plaintiff does not allege facts suggesting discriminatory intent.

Plaintiff fails to plausibly allege any discriminatory intent.  Plaintiff does not allege that any actions (or failure to act) "caused a discriminatory effect", or "were motivated by a discriminatory purpose." *Ortegel*, 2023 WL 8014237, at *11.  Plaintiff fails to point to any "sufficiently particularized" allegations of discriminatory motive by the UVA Defendants such as "statements" or "patterns of decision-making" that show the influence of race.  *Id.* at *9.  For example, Plaintiff complains about Ryan's meeting with Jewish parents and his follow-up email, sent on Friday February 16, in which Ryan wrote, "I appreciate your taking the time to join us, and I'm grateful for your willingness to share your perspectives and ideas."  (Compl. ¶ 163.)  This sentence contains nothing suggesting a discriminatory motive.

To the extent Plaintiff suggests that the delay in Ryan's scheduling the parents' meeting in February demonstrated disparate treatment compared to the student affairs team's letter responding to the encampment protesters' demands in May, the two situations are not at all similarly situated. (*Id.* ¶¶ 154-55.)  Scheduling a planned meeting between the UVA President and multiple parents and students can take time for a completely nondiscriminatory reason: it is hard to coordinate so

many schedules (or even determine which of the parents and students would attend).  By contrast, the May encampment posed an imminent safety issue on Grounds.   Nothing in Plaintiff's allegations suggests that any discriminatory intent underlies UVA's different responses to each different situation.  Ultimately, Plaintiff's allegations do not show that any of the conduct allegedly attributed to the UVA Defendants was plausibly motivated by anything other than a nondiscriminatory purpose such as student safety, practical or logistical considerations, or a fair application of institutional policies and practices such as observance of a Board Agenda or the Honor Committee Bylaws.

In sum, Plaintiff fails to state a claim for intentional discrimination under Title VI or the Equal Protection Clause under 42 U.S.C. § 1983 against the UVA Defendants.

### III.   The Court should dismiss Counts I and II because Plaintiff alleges no facts to support a retaliation claim under Title VI or 42 U.S.C. § 1983.

Plaintiff's next theory is that the UVA Defendants retaliated against him for engaging in protected conduct.  To make out a claim for retaliation under Title VI, a plaintiff "must allege that [he] engaged in protected activity under Title [VI], and second, [he] must allege that — as a result of [his] protected activity — [he] suffered an adverse action attributable to the defendant educational institution."  *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018); *see also Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003) (Plaintiff "must show (1) that [he] engaged in protected activity; (2) that [Defendants] took a material adverse [] action against [him], and (3) that a causal connection existed between the protected activity and the adverse action.").

Retaliation is similarly actionable under § 1983, for violations the First Amendment.  "[P]laintiff must establish three elements in order to prove a First Amendment § 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. . . . Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the

plaintiff's constitutionally protected speech . . . . Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685–86 (4th Cir. 2000) (internal citations omitted).  *See also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (describing prima facie retaliation claim under § 1981).[52]  Specifically in the context of a § 1983 claim, courts require *but-for* causation: "It is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [Defendant] would not have taken the alleged retaliatory action."  *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (citation omitted).[53]

Like his intentional discrimination claim, Plaintiff's theory of retaliation is vaguely pled and hard to follow.  First, while Plaintiff claims to have engaged in protected activity, his allegations are unclear.  For example, while he alleges that he spoke to certain UVA administrators regarding some unidentified complaints (Compl. ¶ 96), he has not pled enough to show that this conversation would constitute protected activity.  *See, e.g., Hurley*, 911 F.3d at 694 (examples of "protected activities included advocating against and reporting sexual harassment, plus filing the OCR complaint"); *Stover v. Coll. Of William & Mary in Virginia*, 635 F. Supp. 3d 429, 444 (E.D. Va. 2022) ("complaint to the Office of Compliance and Equity was protected activity"); *see also Monegain v. Dep't of Motor Vehicles*, 491 F. Supp. 3d 117, 133 (E.D. Va. 2020) (noting that "a

---

[52]  The Equal Protection clause of the Fourteenth Amendment cannot support a retaliation claim on its own.  Such claims instead should be considered First Amendment retaliation claims. *See Wilcox v. Lyons*, 970 F.3d 452, 461 (4th Cir. 2020) ("To the extent a [plaintiff] contends [he] suffered adverse consequences for expressing complaints or reporting discrimination . . . , [his] claim arises under the First Amendment.").

[53] The Fourth Circuit has not held whether Title VI/IX claims require but-for causation, but has indicated that they may.  *See Hurley*, 911 F.3d at 696 n.10.  Here Plaintiff has not pleaded facts suggesting *any* causal connection, so he has certainly not met the "but-for" causation requirement.

litigant may not advance a First Amendment retaliation cause of action concerning a matter of mere personal interest"). Plaintiff simply alleges he made complaints about some unidentified conduct in a Zoom meeting with UVA administrators. (Compl. ¶ 96.) As to other activity he engaged in that might have been protected—such as publicly protesting and waving the Israeli flag (*id.* ¶ 109), or wearing his Yarmulke (*id.* ¶ 17), Plaintiff fails to connect that activity with *any* response, retaliatory or otherwise, by the UVA Defendants.

Plaintiff does not allege the UVA Defendants took any adverse action against him, nor any facts supporting a causal relationship between any alleged protected activity, including any complaints, and an adverse action. To the extent Plaintiff argues that the process following the Report of an Alleged Honor Offense filed by ██████████ constituted an adverse action, this fails for the reasons articulated above: 1) the UVA Defendants did not bring the Honor Charge, and 2) it was promptly dismissed. Plaintiff was never even accused, much less disciplined, by the UVA Defendants. Nor does Plaintiff allege any facts supporting a causal connection between any complaints to UVA administrators or protected First Amendment activity and the Honor Charge proceeding, which he expressly pleads was initiated by student group SJP, was investigated, and then dismissed by the student Honor Committee. (*See* Compl. ¶¶ 96, 186-200.)

Plaintiff's claims of retaliation against the UVA Defendants should be dismissed.

## IV.   The Court should dismiss Counts I and II because Plaintiff's hostile environment harassment claims fail under Title VI or 42 U.S.C. § 1983.

To state a claim under Title VI for student-to-student harassment that creates a hostile environment, Plaintiff must "allege conduct that is 'so severe, pervasive, and objectively offensive that it denies its victims the equal access to education' that the statute is designed to protect, and that the University acted with 'deliberate indifference' towards that conduct. *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187 (N.D. Cal. 2011) (quoting *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S.

629, 652 (1999)); *see also Doe v. Bd. of Visitors of VMI*, 494 F. Supp. 3d 363, 376–77 (W.D. Va. 2020).   Schools must interpret Title VI consistent with the First Amendment—indeed public universities are prohibited from violating students' First Amendment rights.  *Healy v. James*, 408 U.S. 169, 180-81 (1972) (public universities may not infringe upon the First Amendment rights of faculty, students, and staff); *see also* Gerald A. Reynolds, Assistant Sec'y, Off. for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter (July 28, 2003) ("Any private post-secondary institution that chooses to limit free speech in ways that are more restrictive than at public educational institutions does so on its own accord and not based on requirements imposed by" the Department.).

> **A.**     **Plaintiff has not alleged facts showing severe, pervasive and objectively offensive harassment that effectively denies equal access to education programs and activities.**

A hostile environment is one that is "so severe, pervasive, and objectively offensive, and that so detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities."  *Mandel v. Bd. of Trustees of California State Univ.*, No. 3:17-CV-03511-WHO, 2018 WL 5458739, at *21 (N.D. Cal. Oct. 29, 2018) (quoting *Davis*, 526 U.S. at 652).  Goldstein's allegations fail to meet this standard for a few reasons: (1) his allegations are vague, nonspecific, and do not show harms particularized to himself; (2) much of the harassment he alleges is protected speech that is not directed at a particular individual and is not actionable under Title VI; and (3) he fails to meaningfully allege loss of any educational benefits.

> **1.**  Plaintiff's allegations are unrelated to Plaintiff.

Courts have emphasized that the analysis of harassment under Title VI must be based on "specific current allegations or peer-to-peer harassment."  *Mandel v. Bd. of Trustees of California*

36

*State Univ.*, No. 3:17-CV-03511-WHO, 2018 WL 1242067, at *18 (N.D. Cal. Mar. 9, 2018)

[hereinafter *Mandel I*].  In *Mandel I*, for example, the plaintiffs also asserted claims of antisemitism

related to on-campus protest activity.  The court explained that the plaintiffs' allegations that the

defendant school "tolerates, if not promotes, anti-Semitism" were too "vague and conclusory" to

state a claim:

> There are no details with respect to time, frequency of occurrence, who was
> involved, and in some instances whether the acts were aimed at the Student
> Plaintiffs or otherwise known to the Student Plaintiffs. . . . The same is true of the
> allegations that "students" had to take alternative routes to class and hide their
> Jewish identity to avoid being threatened. In general, these vaguely identified
> events and assertions, without more factual support, cannot prop up the Student
> Plaintiffs' hostile environment claim.

*Mandel I*, 2018 WL 1242067, at *18.  *See also Felber*, 851 F. Supp. 2d at 1188 (dismissing Title

VI harassment claim where "a broad swath of the conduct alleged occurred at times and in places

where plaintiffs were not present").   Here too, the Complaint similarly makes numerous

nonspecific allegations of harassment unrelated to Goldstein.   For example, he complains:

- That certain unidentified faculty offered tutoring and boosts in grades to students
  who attend anti-Israeli, antisemitic rallies (Compl. ¶¶ 130-31), and that other
  faculty "threatened to withhold final grades" (*id*. ¶ 133), yet he does not allege he
  was in any of the courses at issue;

- That certain slogans, posters, online open letters, and social media images contain
  antisemitic content or symbols of hate (*id*. ¶¶ 82, 84, 86, 122-125), but he does not
  allege he ever saw, heard, or in any way interacted with those communications;

- That UVA permitted people who chant antisemitic slogans and publish antisemitic
  content to build an encampment on Grounds (*id*. ¶ 150), but does not allege he ever
  walked by or interacted with those encampments;

- That Defendant Hardie "threatened" another member of the Board of Visitors,
  Bertram Ellis, with "retaliatory animus," at a Board of Visitors meeting that
  Plaintiff does not allege he was involved with or attended (*id*. ¶¶ 164-168).

These allegations cannot support a harassment claim, as they are entirely unrelated to Plaintiff.

Goldstein alleges only two incidents of conduct relating to himself that might constitute harassment: (1) the October 25, 2023 protest, at which he alleges he was assaulted by a pro-Palestinian protester; and (2) the filing and dismissal of his Honor Charge. As to the assault, Plaintiff does not allege who assaulted him, whether he reported it, or what occurred in any meaningful detail. And in any event, his allegations are insufficient to support a Title VI harassment claim. *Felber*, 851 F. Supp. 2d at 1188. And the Honor Charge, as explained above, cannot support any discrimination claim, especially given that ███████████████ filed the Honor Charge against Plaintiff.

Ultimately, without more, these two events do not make out severe, pervasive, and objectively offensive harassment based on a protected characteristic within the meaning of Title VI.

      2.   <u>Plaintiff's alleged hostile environment is based in large part on speech not directed at Plaintiff and protected under the First Amendment.</u>

Many of Plaintiff's generalized allegations concern protected speech not directed at Plaintiff. This case is therefore similar to *Felber*, in which a Jewish student alleged a single assault and verbal insult by a pro-Palestinian student during an on-campus protest. In that case, after the assault, the plaintiff filed a federal lawsuit alleging a Title VI violation for severe and pervasive harassment occurring at the University, trying to make it about more than her single allegation of assault by referencing broader on-campus political activities, protests, signs, and events. The court dismissed the claims, noting that "a very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct, in a public setting, regarding matters of public concern, which is entitled to special protection under the First Amendment." 851 F. Supp. 2d at 1188. Relevant to the allegations here, the court observed that Plaintiffs were "attempting to draw an untenable line that would remove from protection signs and publications

that are critical of Israel and supportive of Hamas and Hezbollah. That protestors' signs may have contained language that plaintiffs believe was inflammatory, offensive, or untrue, does not warrant a different result." *Id.*

As the *Felber* court explained, political and protest activities do not make out a Title VI claim:

> The incident in which Felber was assaulted with a shopping cart, for example, did not occur in the context of her educational pursuits. Rather, that event occurred when she, as one person attempting to exercise free speech rights in a public forum was allegedly attacked by another person who likewise was participating in a public protest in a public forum.

*Id*. at 1187–88.  For this reason, the *Felber* plaintiff's claims, including regarding an assault, were insufficient just as Goldstein's claims of an alleged assault while participating in a public protest in an alleged public forum are insufficient.

The Fourth Circuit's ruling in *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993), is instructive.  In that case, after George Mason University affirmatively punished a fraternity for creating a racially and sexually hostile environment by hosting an "ugly woman contest" involving racially and sexually offensive conduct, the fraternity sued George Mason University for infringing on its First Amendment rights, and won.  The Fourth Circuit described the dispute as involving a skit in which a fraternity member "was painted black and wore stringy black hair decorated with curlers, and his outfit was stuffed with pillows to exaggerate a woman's breasts and buttocks. He spoke in slang to parody African-Americans." *Id.* at 388.  The Court agreed that the skit was offensive, crude, and juvenile.  However, the Court explained that just as the First Amendment protects nude dancing, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), it protected the fraternity's racially offensive humor as expressive conduct. *IOTA XI Chapter of Sigma Chi Fraternity*, 993 F.2d at 389-92.  Accordingly, the University was

prohibited, under the First Amendment, from imposing sanctions on the offending fraternity.  *Id.* at 393.

Ultimately, here too, Plaintiff's claim of unlawful harassment, not including the assault, appears to run up against the protections of the First Amendment.  For example, Plaintiff alleges that he was harassed because:

- SJP's October 8, 2023 issued an Official Statement that the attack on Israel was an "unprecedented feat" (Compl. ¶¶ 82-85);

- Posters included words, phrases, and imagery such as, "Decolonization" (*id.* ¶ 103); "Intifada Revolution—there is only One Solution" (*id.* ¶ 123); "From the River to the Sea, Palestine will be Free" (*id.* ¶ 122); and bloody handprint imagery (*id.* ¶ 125);

- Faculty signed an Open Letter published by FJP (*id.* ¶ 86), and expressed support and solidarity for pro-Hamas faculty and students; and

- Faculty hosted a "Teach-in on Palestine" (*id.* ¶ 87).

Allegations that students and faculty were engaging in expressive conduct not directed at Plaintiff, protected under the First Amendment, cannot establish a hostile environment as a matter of law. The First Amendment protects Plaintiff's right to wave the Israeli flag in support of his beliefs as much as other student groups' rights to publish statements and literature in support of their beliefs, even if Plaintiff finds that speech offensive or hurtful.  (Compl. ¶¶ 82-84, 105.)  Allegations concerning others' protected First Amendment activity cannot support Plaintiff's harassment claim.

### 3.   Plaintiff fails to adequately allege deprivation of educational benefits.

Finally, Plaintiff has not alleged any deprivation of educational benefits.  The Fourth Circuit has explained that to allege deprivation of access to educational opportunities or benefits, a plaintiff must allege that the harassment "(1) results in the physical exclusion of the victim from an educational program or activity; (2) so undermines and detracts from the victim's educational

experience as to effectively deny her equal access to an institution's resources and opportunities; or (3) has a concrete, negative effect on the victim's ability to participate in an educational program or activity." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 275 (4th Cir. 2021) (quoting *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 699 (4th Cir. 2007) (cleaned up)).[54]  In *Doe v. Fairfax*, the Fourth Circuit found deprivation of educational benefits where a student's "academic performance and class attendance declined" after the harassment, where a student deliberately skipped or missed school activities to avoid her harasser, and where a student "sought and received professional counseling" and received a diagnosis arising from the trauma caused by the alleged assault.  1 F.4th at 276.  In *Jennings*, the Court compared the Plaintiff's GPA during the period of harassment and concluded that her "subpar academic performance" showed that the harassment "made it difficult to focus on her studies."  *Jennings*, 482 F.3d at 700.  *See also Mandel I*, 2018 WL 1242067, at *20 (alleging deprivation requires allegations such as moving to another district, lowering grades, increased absenteeism, or being hospitalized or rendered homebound due to harassment) (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) and *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003)).

Plaintiff alleges none of these things.  He has failed to articulate any impact to his grades, his coursework, or his ability to participate in educational programming or extracurricular activities.  Furthermore, his vague allegations about damage to his educational opportunities are entirely conclusory or speculative. In addition, his allegations of emotional distress are not redressable under federal antidiscrimination laws, including under Title VI.  (*See* Compl. ¶¶ 225-

---

[54] To the extent Plaintiff claims his experience have caused him emotional distress, the Supreme Court has clearly held that emotional distress damages are not available under Title VI.  *Cummings*, 596 U.S. at 230.

227, 232, 239, 242-244, 246-247); *Cummings*, 596 U.S. at 230 (emotional distress damages unavailable under federal antidiscrimination statutes, including Title VI).[55]   The Supreme Court of the United States has affirmed a dismissal of a complaint on the sole ground that emotional distress damages are not available under the federal antidiscrimination law.

In sum, Plaintiff fails to allege harassment that would meet Title VI's high standard.

### B.   Plaintiff has not sufficiently alleged actual knowledge by the UVA Defendants.

Even if Plaintiff can make valid allegations of severe, pervasive, and objectively offensive harassment that go beyond protected speech, he has not further alleged that he put the UVA Defendants on actual notice of it.

The Fourth Circuit has held that actual notice under Title VI is established only "when a school official with authority to address complaints of [unlawful] harassment and to institute corrective measures receives a report that can objectively be construed as alleging [unlawful] harassment." *Doe v. Fairfax*, 1 F.4th at 265.  Constructive notice is not sufficient.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998).  Most importantly, "[i]n the Fourth Circuit, . . . there is a requirement that the defendant have actual notice of harassment *against the plaintiff*." *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 639 (W.D. Va. 2016) (emphasis added).  A plaintiff may not simply rely on general allegations about prior harassing conduct at the same institution not specific to the plaintiff.  *Id.*  Additionally, "generic allegations, devoid of factual content, are not sufficient for the purposes of showing actual knowledge."  *Doe*, 494 F. Supp. 3d at 378 (dismissing Title IX deliberate indifference claim because "Doe merely alleges some amorphous knowledge of [unlawful] incidents at the institution").

---

[55] *See also* n. 48 (discussing emotional distress damages on § 1983 claim).

Plaintiff's claims fail for all these reasons.  The only notice he alleges that he gave in his complaint seems to relate to a Zoom meeting he had with two administrators, Marsh Pattie and Alex Hall.  And, he does not even explain what he told them, beyond a conclusory statement that he "communicated" regarding some unidentified conduct he describes in a conclusory fashion as "harassment, abuse, and physical assault."  (Compl. ¶ 96.)  Without knowing what was said, the report cannot "objectively be construed" by the court to determine whether it was a complaint alleging a report of unlawful conduct.  *Doe v. Fairfax*, 1 F.4th at 265.  Plaintiff does not make any other allegations that he reported harassment he experienced or otherwise put UVA, Ryan, or Hardie on notice.

To the extent Goldstein points to the vague statements in the Complaint that some "reports were filed" and "[f]ormal complaints … were initiated" by "Jewish students, faculty and parents" (Compl. ¶¶ 88-89), these vague allegations do not meet the Fourth Circuit's "requirement that the defendant have actual notice of harassment *against the plaintiff*."  *Facchetti*, 175 F. Supp. 3d at 639 (citing *Baynard v. Malone*, 268 F.3d 228, 237-38 (4th Cir. 2001)) (emphasis added).  Goldstein has not alleged that *he* filed any of the reports or formal complaints described, or indeed, what was the subject of those complaints.  These allegations thus cannot save his claim.

**C.**    **Plaintiff's allegations do not show deliberate indifference by the UVA Defendants.**

Finally, Plaintiff's Complaint does not include any plausible allegation that the UVA Defendants acted with deliberate indifference to Plaintiff's concerns.  "[A] school acts with deliberate indifference where its "response to the alleged harassment or the lack of any such response is clearly unreasonable in light of the known circumstances."  *Doe v. Fairfax*, 1 F.4th at 271 (quoting *Davis*, 526 U.S. at 648) (cleaned up).  Plaintiff therefore must allege facts showing a response that is "so inadequate" that it goes beyond "mere negligence." *Facchetti*, 175 F. Supp.

43

3d at 636-37.  The response must cause plaintiff to "undergo harassment" or make him more "liable or vulnerable" to harassment.  *Id*.  Notably, "it is not enough [to allege] that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim."  *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016); *Facchetti*, 175 F. Supp. 3d at 638 (school is not required to "provide the remedy wanted by the victim," and negligence in addressing an assault is not enough to show deliberate indifference).  Additionally, school administrators are entitled to substantial deference in responding to student-on-student harassment.  *Id.*

Here, Plaintiff fails to allege specific facts showing that UVA was deliberately indifferent, and the facts he does allege undermine his claim.  Plaintiff does not once in his complaint reference UVA's policy for reporting discrimination and harassment.  Indeed, Plaintiff does not even allege what remedy he wanted, which he believes UVA has failed to offer him.  He certainly has not shown that he was made more liable or vulnerable to additional harassment as a result of any of the UVA Defendants' actions or inactions.

What he does allege is to the contrary: He alleges that UVA Administrators spoke to him by Zoom to hear more about his concerns.  (Compl. ¶ 96.)  When he was concerned for his safety, a UVA professor accompanied him to a protest, and intervened to protect him.  (*Id.* ¶¶ 110-11.)  The encampment of protestors allegedly harassing Jewish students was dismantled, and police arrested both students and non-students who did not comply with the law.  (*Id.* ¶ 158.)  His Honor Charge was dismissed for lack of evidence before an accusation was made.  (*Id.* ¶ 196.)  Plaintiff alleges no interactions with Hardie, and as to Ryan, Plaintiff acknowledges that Ryan met with Jewish students and their parents and sent a follow-up email to respectfully thank them for sharing

their concerns with him, a perfectly reasonable communication.  (*Id.* ¶ 163.)  Ultimately, Plaintiff

points to nothing clearly unreasonable about any of the UVA Defendants' actions.

Moreover, courts have been reticent to find schools deliberately indifferent when schools

are navigating their obligations in response to protected speech in furtherance of public, political

protest.  As the *Felber* court explained:

> [P]laintiffs fail to show how defendants have acted with "deliberate indifference"
> in ignoring wrongful conduct otherwise not amounting to protected speech. To the
> contrary, plaintiffs have alleged facts that campus police have made arrests of
> disruptive protestors, and that the administration has engaged in an ongoing
> dialogue with the opposing parties in an attempt to ensure that the rights of all
> persons are respected, and to minimize the potential for violence and unsafe
> conditions.

*Felber*, 851 F. Supp. 2d at 1188.  Goldstein's allegations are similar.  Although he complains that

he has been harassed, much of the speech he articulates in his Complaint is protected—if

offensive—political speech not directed at Plaintiff.  Though Goldstein may have wished for

different disciplinary sanctions or a different remedy to address the protestors on the other side of

the line, his own allegations demonstrate that UVA has made consistent and reasonable efforts to

ensure the safety of its students while avoiding any violation of its students' First Amendment

rights—including Goldstein's. *See also Mandel I*, 2018 WL 1242067, at *14 ("plaintiffs cite no

authority that would allow them to hold [a defendant administrator] liable for others' actions in

violating plaintiffs' constitutional rights where [the administrator's] only role was a post-hoc

failure to punish").  There is no plausible allegation of deliberate indifference here.

**D.      Count II should be dismissed because Plaintiff has not alleged any facts
         suggesting that Hardie or Ryan was motivated by discriminatory intent.**

To make out a Section 1983 claim against a school administrator arising from peer-to-peer

harassment, in addition to alleging harassment and deliberate indifference, a plaintiff "must allege

that the school administrator's deliberate indifference was motivated by a discriminatory intent."

45

*Hurley*, 911 F.3d at 703.  Goldstein alleges no facts to support such an inference.  Therefore, the claims against Hardie and Ryan must fail.

> Allegations Against Rector Hardie

As to Rector Hardie, Plaintiff's only allegation relates to a Board of Visitors meeting (which has nothing to do with Plaintiff), in which Hardie's actions are more plausibly motivated by his role as Rector—maintaining order at Board meetings and ensuring the agenda is addressed—than by any discriminatory intent.  *See* Manual of the Board of Visitors of Virginia, § 2.38 (conduct of meetings shall observe Roberts' *Rules of Order*).  Plaintiff alleges *nothing* else relating to Hardie.  *Mandel I*, 2018 WL 1242067, at *16 (dismissing claims where administrator was not "alleged to have played any direct role in either of the events, have knowledge of the alleged discriminatory conduct against plaintiffs, or have the authority to do anything about it").

> Allegations Against President Ryan

As to President Ryan, Plaintiff's only allegation relates to a meeting Ryan had with Jewish students and parents.  Plaintiff disliked the set-up of this meeting and complains that it took four months to schedule.  But there are many plausible reasons President Ryan would have wanted the meeting to be confidential (such as to preserve the privacy interests that Plaintiff references in his Complaint), or why it may have taken a while to schedule—reasons which are entirely unrelated to Plaintiff's constitutionally protected characteristics or activity.  And Plaintiff offers no factual allegations on which the Court could reasonably infer some kind of discriminatory intent.  *Mandel I*, 2018 WL 1242067, at *23 (dismissing claim because "there are no allegations that [defendant] herself took any affirmative actions against plaintiffs or otherwise acted with specific intent to discriminate against plaintiffs").

Because Plaintiff has not pled severe, pervasive, or objectively offensive harassment, about which he put UVA, Ryan, or Hardie on actual notice, and to which they responded with deliberate indifference, and because Plaintiff fails to plead facts showing discriminatory intent by Ryan or Hardie, Plaintiff's hostile environment claims fail.

## V.   Count II should be dismissed because Plaintiff's claims against Hardie and Ryan are barred by the Eleventh Amendment and qualified immunity.[56]

### A.   Official-capacity claims against Hardie and Ryan must be dismissed.

Plaintiff purports to sue President Ryan and Rector Hardie in both their official and personal capacities.[57]   (Compl. ¶¶ 34, 38.)   To the extent Plaintiff has brought claims against the President and Rector in their official capacities for monetary relief, those claims are barred by the Eleventh Amendment, as they are considered claims against UVA itself, which is an arm of the state and therefore immune to claims for damages.  *Brown v. Porter*, No. 2:19-CV-376-RJK, 2019 WL 8503313, at *12 (E.D. Va. Nov. 26, 2019), *report and recommendation adopted as modified,* 438 F. Supp. 3d 679 (E.D. Va. 2020) (Section 1983 does not provide a remedy against state universities, which are immune from suit);  *Amison v. George Mason Univ.*, No. 23-1042, 2023 WL 8946774, at *3 (4th Cir. Dec. 28, 2023) ("Similarly, as a state officer, Dimitriadis is entitled to sovereign immunity on the claims brought against him in his official capacity.").   The only exception under which Section 1983 claims are permitted against a state official is a narrow one— permitting prospective injunctive relief relating to an agency action or policy over which the named

---

[56] Plaintiff's claim under 42 U.S.C. §§ 1981 and 1983 appears to be against Rector Hardie and President Ryan.  To the extent that Plaintiff attempts to allege a claim under 42 U.S.C. §§ 1981 and 1983 against the Rector and Visitors of the University of Virginia, such claim fails because the Eleventh Amendment bars any form of relief.  *Tigrett v. Rector & Visitors of Univ. of Va.*, 97 F. Supp. 2d 752, 756 (W.D. Va. 2000) (holding "the Rector and Visitors of the University, as an instrumentality of the state, is immune from suit in federal court").

[57] Ryan and Hardie are only listed in the case caption in their individual capacities, not official capacities. It is therefore not clear whether Plaintiff's use of the word "official" in the Complaint allegations was a typographical error.

official has enforcement authority.  *Garner v. Steger*, 69 F. Supp. 3d 581, 588 (W.D. Va. 2014).
Plaintiff has not articulated the nature of any prospective injunction he seeks, nor explained how
Defendants Ryan or Hardie are responsible for enforcement of any requested relief.  Accordingly,
all claims against Ryan and Hardie in their official capacities should be dismissed.

      **B.**      **Plaintiff's individual capacity claims fail to overcome qualified immunity.**

To the extent Plaintiff has brought Section 1981 and 1983 claims, which are collapsed into
a Section 1983 claim, against Hardie and Ryan in their individual or personal capacity for monetary
damages, there is no allegation of any action taken by either relating to Plaintiff.  Even if Plaintiff
had adequately alleged any claim against either in their personal capacity, Plaintiff's claims against
Hardie and Ryan must overcome the bar of qualified immunity.  They do not.

"In determining whether an individual is entitled to qualified immunity, a court must
determine (1) 'whether the facts that a plaintiff has alleged . . . make out a violation of a
constitutional right', and (2) 'whether the right at issue was clearly established at the time of
defendant's alleged misconduct.'"  *Amison*, 2023 WL 8946774, at *3 (citing *Pearson v. Callahan*,
555 U.S. 223, 232 (2009)).  "For a right to be 'clearly established,' some 'existing precedent must
have placed the statutory or constitutional question beyond debate.'"  *Brown*, 2019 WL 8503313,
at *14 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]he focus is 'not upon the right
at its most general or abstract level, but at the level of its application to the specific conduct being
challenged.'"  *Id.* (quoting *Zepp v. Rehrmann*, 79 F.3d 381, 385 (4th Cir. 1996)).  As the Fourth
Circuit has put it, qualified immunity protects "all but the plainly incompetent or those who
knowingly violate the law."  *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 555 (4th Cir.
2010) (citation omitted).

As already explained, Plaintiff has not shown that either Ryan or Hardie has violated any of his rights.  Because no constitutional violation occurred at all, both Ryan and Hardie are entitled to qualified immunity.  Moreover, Section 1983 does not permit vicarious liability, and Plaintiff has not pleaded that any of his alleged deprivation of any constitutional right is directly attributable to either Ryan or Hardie.  *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  For this reason as well, Ryan and Hardie are entitled to immunity.  *Amison*, 2023 WL 8946774, at *4 (granting qualified immunity because the defendant professor was not the person who disciplined plaintiff); *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 149 (4th Cir. 2009) (dismissing Section 1983 claims because plaintiff did not name the actual university official who conducted the challenged disciplinary hearing).  Plaintiff has not alleged any facts under which Ryan or Hardie deprived him of equal protection (including his rights under Section 1981 to racial equality) or his right to religious expression or free speech, and his general allegations about the climate at the University do not suffice to create liability under Section 1983.

Finally, even if Plaintiff's constitutional rights were somehow violated by either Rector Hardie's call to order at the March Board meeting (Compl. ¶¶ 164-172); by President Ryan's organization of, and follow-up email related to, the February parents' meeting (*id.* ¶¶ 160-163); or by President Ryan's decision not to interfere with the student Honor Committee proceedings that dismissed Plaintiff's Charge (*id.* ¶¶ 186-196), there is absolutely no precedent which would make any related constitutional rule "clearly established."  With respect to the Rector, recent Supreme Court precedent indeed suggests just the opposite.  Although the Rector did not censure any Board member, a "purely verbal" censure of one member of an elected body by other members of the

same body cannot support a First Amendment retaliation claim.  *See Wilson*, 595 U.S. at 475, 482.

Plaintiff cannot point to any case, much less a case on point, which would "place[] the

constitutional question beyond debate."  *Amison*, 2023 WL 8946774, at *3 (quoting *Ashcroft*, 563

U.S. at 741) (cleaned up).

All claims against Ryan and Hardie should be dismissed.

## **CONCLUSION**

WHEREFORE, the UVA Defendants respectfully request that all claims against the UVA

Defendants be dismissed and any such further relief this Court deems just and necessary.

Dated: July 16, 2024                                        */s/Jonathan T. Blank*
                                                            Jonathan T. Blank (VSB No. 38487)
                                                            **McGuireWoods LLP**
                                                            323 2nd St. SE, Suite 700
                                                            Charlottesville, VA 22902
                                                            Tel.: (434) 977-2509
                                                            Fax: (434) 980-2258
                                                            jblank@mcguirewoods.com

                                                            Farnaz F. Thompson (VSB No. 75982)
                                                            **McGuireWoods LLP**
                                                            888 16th Street N.W., Suite 500
                                                            Black Lives Matter Plaza
                                                            Washington, D.C.
                                                            Tel: (202) 857-1000
                                                            Fax: (202) 857-2737
                                                            fthompson@mcguirewoods.com

                                                            Heidi E. Siegmund (VSB No. 89569)
                                                            Juliet B. Clark (VSB No. 96918)
                                                            **McGuireWoods LLP**
                                                            800 East Canal Street
                                                            Richmond, VA 23219
                                                            Tel.: (804) 775-1000
                                                            Fax: (804) 775-1061
                                                            hsiegmund@mcguirewoods.com
                                                            jbclark@mcguirewoods.com

*Counsel for Defendants the Rector and
Visitors of the University of Virginia,
Robert D. Hardie, and James. E. Ryan*

## CERTIFICATE OF SERVICE

I certify that on July 16, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/Jonathan T. Blank*
Jonathan T. Blank

*Counsel for Defendants the Rector and Visitors of the University of Virginia, Robert D. Hardie, and James. E. Ryan*