**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| MATAN GOLDSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE RECTOR AND VISITORS OF THE | ) | |
| UNIVERSITY OF VIRGINIA (a/k/a and | ) | |
| hereinafter referred to as "THE | ) | |
| UNIVERSITY OF VIRGINIA" or | ) | CASE #: 3:24-cv-00036-RSB-JCH |
| "UVA"); PRESIDENT JAMES E. RYAN, | ) | |
| in his personal and individual capacity; | ) | **JURY TRIAL DEMANDED** |
| FACULTY FOR JUSTICE IN | ) | |
| PALESTINE UVA CHAPTER (a/k/a and | ) | |
| hereinafter referred to as "FJP at UVA"); | ) | |
| STUDENTS FOR JUSTICE IN | ) | |
| PALESTINE AT UVA (a/k/a and | ) | |
| hereinafter referred to as "SJP at UVA"), | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

*"We have come to know Man as he really is. After all, man is that being who invented the gas chambers of Auschwitz; however, he is also that being who entered those gas chambers upright, with the Lord's Prayer or the Shema Yisrael on his lips."*

Rabbi Harold S. Kushner, as quoted in the preface to Viktor Frankl's transcendent work, <u>Man's Search for Meaning</u>.

**<u>AMENDED COMPLAINT</u>**

COMES NOW PLAINTIFF Matan Goldstein, through undersigned counsel, who hereby avers, alleges, and complains of the Defendants as follows:

## I. INTRODUCTION

1.    An image of courage, an image of hate:



2.    The image in Paragraph 1 is a photograph depicting University of Virginia freshman student Matan Goldstein—eighteen years old at the time of the photograph, wearing his Yarmulke bearing the Star of David, and carrying the flag of Israel—being berated, heckled, threatened, harassed, and bullied by University of Virginia students and University of Virginia faculty members at the central, most famous and historic site on the University of Virginia campus on October 25, 2023, less than two months after his arrival in Charlottesville to begin his college education.

3.    The photograph depicts University of Virginia students and University of Virginia faculty members, on the steps of the University of Virginia Rotunda—with full notice to and awareness of the University officials tasked with preventing antisemitic harassment, abuse, and bullying—acting on behalf of groups or associations who have been directly linked to

Hamas, a federally designated Foreign Terrorist Organization whose sole aim is the destruction of the state of Israel and the extermination of the Jewish people.

4. The UVA students and UVA faculty members (all members of Defendants SJP at UVA and FJP at UVA) engaged in the intimidation, harassment,

5. and abuse for the purpose of carrying out Hamas's agenda to foment chaos within the United States regarding support for Israel and to instill fear in the hearts and minds of Jewish, Israeli-American, and Zionist students and faculty members like Matan Goldstein. The groups specifically threatened and targeted Matan because of his Jewish faith, ethnicity, and heritage, because of his Israeli-American national origins and shared ancestry, and because he is a Zionist. The students, student groups, faculty members, and faculty groups did in fact intimidate Matan Goldstein and instill fear and trepidation in Matan Goldstein because of his Jewish faith, ethnicity, and heritage, because of his Israeli-American national origins and shared ancestry, and because he is a Zionist.

6. In the moments shortly after the photograph was taken, Matan was surrounded and assaulted—pushed, shoved, and slapped—by protesters in the same, nearly identical fashion employed by members of other Students for Justice in Palestine "chapters" on other universities and colleges in similar antisemitic, anti-Israel, anti-Zionist disruptions of those educational environments. Protesters acting on behalf of and in concert with Defendants FJP at UVA and SJP at UVA threatened Matan with death and serious, grievous bodily injury, shouting that they would "teach him a lesson" if and when they could get their hands on him.

7. The photograph and the events surrounding it took place during one of the pre-planned, pre-announced antisemitic, anti-Israel, and anti-Zionism demonstrations and disruptions of

3

UVA and the Plaintiff's educational environment by UVA faculty members, UVA faculty groups, UVA students, and UVA student groups including Defendant Faculty for Justice in Palestine UVA Chapter and Defendant Students for Justice in Palestine at UVA.

8.    Defendants SJP at UVA and FJP at UVA are antisemitic, anti-Israel, anti-Zionist hate groups who enjoy the full support of the University of Virginia, including but not limited to receiving financial support, aid, and comfort from "Agency Level" and "Special Status" student groups such as UVA's student council, legal advice and representation from UVA's Law School, and a ready ear and helping hand from President Ryan who acts as an eager conduit for these hate groups to the University's resources and policy-making functionaries.

9.    As set forth in painstaking detail below, since October 7, 2023, and continuing into the foreseeable future, Matan's "educational environment" has been pervaded, saturated, and thoroughly infected with the sepsis of antisemitism, anti-Israel bias, and anti-Zionism.

10.   Matan has personally been exposed to and endured every instance of hate, harassment, and abuse that is contained in this Amended Complaint.

11.   The severe hate has thwarted, impaired, and blocked Matan's access to public accommodations and the public accommodation that is the University's educational environment. Matan has been personally deprived of the natural and reasonably expected benefits of his educational experience.

12.   Matan has been exposed to and forced to endure severe and intolerable harassment and abuse of an antisemitic, anti-Israel, and anti-Zionist nature that has been constant, frequent, and continuous throughout the University's educational environment since October 7, 2023.

13.   The University of Virginia administration, specifically including Defendant President Ryan, possessed full knowledge and awareness that antisemitic hate groups were being formed on campus and that they planned a campaign of hate-based and disruptive events to terrorize Jewish students, including Matan, and to destabilize and delegitimize support in the United States for Israel by creating an intolerable and hostile educational environment for Matan and other Jewish students.

14.   Matan has personally filed numerous formal complaints through a variety of University apparatuses and outlets, including the "Just Report It!" system, the University Judiciary Committee, the University's Office of Equal Opportunity and Civil Rights (or "EOCR"), Student Affairs, the University Police Department, the University Student Health System, the Charlottesville Police Department, a Title VI complaint with the United States Department of Education, in writing and face-to-face with President Ryan, and even this lawsuit.

15.   That the acts and misconduct of UVA student group Defendant SJP at UVA and its student members and UVA faculty group Defendant FJP at UVA and its members occurred is not in credible dispute. Most, if not all, are memorialized in photographs and social media posts, among other forms of recording.

16.   The antisemitism and antisemitic harassment, abuse, and misconduct at the University of Virginia are undisputably severe, unwelcome, and objectively offensive—obscenely so.

17.    The "pervasion" or "pervasive" nature of antisemitism at the University of Virginia has two legal effects: First, the facts as alleged above and below qualify as a "hostile educational environment" under applicable law; and, second, the complete saturation and infection of every element and component of the "educational environment" raises an

independent basis for the University's own culpability, independent of the "deliberate indifference" theory of imputation, which is likewise present here.

18.   At any moment from October 8, 2023, to the present, the University of Virginia and President Ryan have the power and duty to bring the antisemitic, hate-based discrimination and harassment of Matan and the school's Jewish students and faculty to an immediate end. The University and President Ryan are empowered by numerous policies and procedures specifically enacted for this very purpose. At all times, the University and President Ryan have possessed the organizational capacity and personnel to bring to a swift end the misconduct that is complained of in this Amended Complaint.

19.   The applicable and governing laws—and reasonable expectations, standards, and duties of care—require the University of Virginia and President Ryan to act.

20.   Yet, to this date, the University of Virginia and President Ryan have actively and purposefully refused to act, refused to properly and reasonably discharge their duties. The Plaintiff expressly alleges that the University of Virginia affirmatively chose to do the wrong thing—in this case, doing absolutely nothing at all—despite knowing what the law requires and despite knowing that UVA's Jewish population is at risk and has been subjected daily to illegal harassment, torment, and even physical danger. There can be no argument from the University about the reasonableness of the school's response, because there has been no response.

21.   To date, the University of Virginia and President Ryan have refused to acknowledge that antisemitism exists on UVA's campus, have refused to admit that those groups' antisemitic, anti-Israel, and anti-Zionist behavior and speech are antisemitic, and have

refused to implement any steps or measures whatsoever to protect Jewish students or their rights to attend and participate in the University of Virginia educational environment.

22.     Instead, the University of Virginia and its most senior leaders have used their platforms and their resources to shame, humiliate, and retaliate against Matan, his parents, and other Jewish students and their parents who have come forward to express their fears to the University administration.

23.     Lending credence to the allegations and claims that this is a much larger concerted and calculated movement against Jewish students by pro-Hamas groups across the country, are the numerous lawsuits brought by other Jewish students at UVA's "peer institutions" against schools whose administrators are closely connected and in many cases, close friends and colleagues with Defendant President Ryan, alleging similar misconduct by local chapters of Students for Justice in Palestine and Faculty for Justice in Palestine as well as unreasonable inaction and failures to respond (and deliberate indifference) on the part of the schools and their administrations.[1]

24.     Likewise, several lawsuits have been initiated by courageous victims of the October 7, 2023, terrorist attacks by Hamas in Israel. Those suits seek redress from a number of Hamas affiliates and proxies who are common in the terror-victim lawsuits, the most notable of which is National Students for Justice in Palestine. Importantly, Defendant Students for Justice in Palestine at UVA is a named defendant in the terror-victims' lawsuit pending

---

[1]     *Brandeis v. University of California at Berkeley*, 3:23-cv-06133 (N.D. Cal.); *Brandeis v. Harvard*, 1:24-cv-11354 (D. Mass.); *C.S. v. Columbia*, 1:24-cv-03232 (S.D.N.Y.); *Frankel v. UCLA*, 2:24-cv-04702 (C.D. Cal.); *Gerwaski v. UNLV*, 2:24-cv-00985 (D. Nev.); *Ingber v. NYU*, 1:23-cv-10023 (S.D.N.Y.); *Jews at Haverford v. Haverford*, 2:24-cv-02044 (E.D. Pa.); *Kestenbaum v. Harvard*, 1:24-cv-10092 (D. Mass.); *Yakoby v. Penn*, 2:23-cv-04789 (E.D. Pa.). This list is not exhaustive.

before the United States District Court in Tampa, Florida.[2] All of these lawsuits tell a chilling and compelling story of an internationally coordinated campaign of antisemitism and antisemitic terror, all purposefully calculated to destroy Israel and the Jewish people there by delegitimizing Israel on college campuses here and destabilizing support for Israel and Jewish people by harassing, abusing, and terrorizing Jewish students and faculty on our nation's "prestigious" university campuses.

25.     The Defendants have individually and collectively deprived Matan Goldstein of all that is good at the University of Virginia, all that is beautiful and joyous in the journey to wear the "honor of honors" as a University of Virginia student.

## II. STATEMENT OF THE CASE

26.     The instant lawsuit is a civil action sounding in federal constitutional and statutory and state statutory and common law causes of action and theories of relief.

27.     In this civil action, the Plaintiff, individually and on his own behalf, seeks injunctive and declaratory relief, compensatory damages, punitive damages, attorneys' fees, litigation costs, and pre- and post-judgment interest.

28.     This actual, justiciable controversy revolves around the Defendants' individual and collective liability for gross misconduct and the impairment and deprivation of the Plaintiff's right to live, study, learn, and thrive at a public university free of hate-based discrimination, abuse, harassment, and retaliation. The Plaintiff is a victim of hate-based, intentional discrimination, severe harassment and abuse, and illegal retaliation.

---

[2]     *Shnaider v. National Students for Justice in Palestine, et al.*, 8:24-cv-01067 (M.D. Fla.); *Parizer v. National Students for Justice in Palestine, et al.*, 1:24-cv-00724 (E.D. Va.).

## III. JURISDICTION AND VENUE

29.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

30.     Subject matter jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 in the United States District Court for the Western District of Virginia.

31.     Venue is proper in the United States District Court for the Western District of Virginia under 28 U.S.C. § 1391 because all of the events, acts, errors, and omissions giving rise to the Plaintiff's claims occurred within this judicial district.

32.     The United States District Court for the Western District of Virginia possesses and may exercise personal jurisdiction over all Defendants under applicable law.

## IV. PARTIES & ACTORS

33.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

**A.      THE PLAINTIFF**

34.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

35.     Plaintiff Matan Goldstein is a Jewish, Israeli-American, Zionist and a current, actively enrolled student at the University of Virginia in Charlottesville, Virginia.

36.     All of the events and incidents that are alleged in this Amended Complaint occurred, impacted, and damaged Matan, within the University of Virginia's "educational environment," while Matan was an actively enrolled, full-time student at the University of Virginia.

**B.      DEFENDANTS STUDENTS FOR JUSTICE IN PALESTINE AT UVA & FACULTY FOR JUSTICE IN PALESTINE UVA CHAPTER**

37.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

### 1.      Hamas and National Students for Justice in Palestine

38.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

39.     Hamas is a United States-designated Foreign Terrorist Organization founded in 1987 with the express goal of destroying the State of Israel. Hamas follows a "charter" that calls for the extermination of the Jewish people and the eradication of the Jewish homeland of Israel. Hamas also promotes and calls for the destruction of those who support Israel, including the United States.

40.     On October 7, 2023, Hamas terrorists invaded Israel and committed savage and barbaric atrocities, the likes of which have not been seen since the Holocaust. Many members of the University of Virginia Community and their family members, including the Plaintiff, were directly impacted by the terrorist attack.

41.     Defendant Students for Justice in Palestine at UVA has been called "the student arm of Hamas" and a "franchise without a franchise fee" for Hamas by United States government officials, antisemitism watch groups, anti-terror think tanks, and journalists reporting on these matters.

42.     Defendant Faculty for Justice in Palestine UVA Chapter is likewise an "arm" of Hamas and was purposefully created by Hamas proxies in the United States to support and assist student "chapters" such as Defendant SJP at UVA.

43.     For several decades, as part of its calculated, long-term strategy to destroy Israel and undermine all support for Israel in the United States, Hamas created and directed the creation of numerous corporate entities, non-profit groups, charitable organizations, and unincorporated associations within the United States to promote its agenda and aims and to serve as the propaganda machine for the terror organization.

44.     The Hamas web of people and entities in the United States is vast and includes "chapters" on college campuses across the country, including Defendants SJP at UVA and FJP at UVA.

45.     The Hamas conspiracy web in the United States mimics the structure and organization of criminal enterprises such as international drug cartels. Hamas's hate-based conspiracy employs numerous shell corporations that are routinely created, dissolved and often just abandoned without ever complying with any corporate governance laws or regulations. The formal and informal associations do not identify boards of directors or executive officers. The groups have limited or no articles of incorporation, no by-laws or operating agreements, and no organizational charts. Bank accounts for entirely separate organizations and entities, which are often sham "non-profits," are used to conduct the operations of these groups. The groups use the "dark web" and other high-tech, encrypted, and secret portals and platforms to communicate with one another and conduct their operations in furtherance of Hamas's mission.

46.     Among the many national and parent groups or associations that have been created within the United States by or at the direction of Hamas, three of the most currently active and prominent are: the "US Campaign for the Academic and Cultural Boycott of Israel," also known as "USACBI"; the "Americans for Justice in Palestine Educational Foundation,

Inc.," also known as "American Muslims for Palestine" or "AMP"; and "National Students for Justice in Palestine," also known as "NSJP," "Students for Justice in Palestine," or "SJP."

47.    AMP and NSJP are currently the subject of open investigations by state and federal authorities. The Office of Attorney General of the Commonwealth of Virginia recently secured a court order in the Circuit Court for the City of Richmond compelling AMP to produce important records regarding its financial support and activities. The United States Congressional Committee on Oversight and Accountability has demanded documents from AMP and NSJP regarding the groups' funding and finances, the groups' relationship and communications with Hamas or Hamas's affiliates, and the groups' communications and conduct surrounding Hamas's terrorist attack on October 7, 2023.

48.    An overwhelming body of compelling evidence conclusively demonstrates the existence of a direct connection and relationship among Hamas, AMP, and NSJP.

49.    Further, the same body of evidence conclusively demonstrates NSJP's preparations in advance of the horrors and atrocities of October 7, 2023, and its directives to local chapters such as Defendant Students for Justice in Palestine at UVA regarding Hamas's strategy to destabilize support for Israel in the United States and to terrorize Jewish students through intimidating and sometimes violent student protests, harassment, abuse, and bullying on college campuses across the United States.

### 2.    Defendant Students for Justice in Palestine at UVA

50.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

51.   As alleged and supported by compelling evidence in official reports and studies and in multiple federal lawsuits, Hamas employs unconventional weapons in its campaign to destroy Israel, exterminate the Jewish people, and eradicate all nations and people who support Israel. One such weapon is the virus of lies, propaganda, and chaos spread around the world.

52.   NSJP and its local chapter Defendant Students for Justice in Palestine at UVA are antisemitic, anti-Israel, anti-Zionist organizations formed for the purpose of advancing Hamas's international war on Jews and Israel.

53.   Prior to or contemporaneous with Hamas's October 7, 2023, massacre in Israel, Hamas transmitted a global "call" for the mobilization of its allies and affiliates, the propagation of disinformation and antisemitic hate, and the instigation of chaos in the "soft underbelly" of American society: "elite" college and university campuses.

54.   Defendant Students for Justice in Palestine at UVA ("SJP at UVA")[3] is a formally recognized (and perhaps funded) student group at the University of Virginia. It is known as a "CIO" or "Contracted Independent Organization." A majority of its members must be actively enrolled students and those members and its officers are subject to all of the University's anti-discrimination and anti-harassment policies, student codes of conduct, and local, state, and federal laws.

55.   As a "CIO" at UVA, Defendant SJP at UVA is a formal, unincorporated association organized and operating under the laws of the Commonwealth of Virginia and located in

---

[3]   As with many of the other NSJP chapters across the country, Defendant SJP at UVA forms and reforms alias and alter-ego organizations and also will, from time to time, rename itself or change its name, all in the continuing effort to avoid transparency or detection and avoid compliance with applicable laws, regulations and policies. As of the filing of this Amended Complaint, the University of Virginia's Student Affairs Division's Multicultural Student Services Division – Department of Middle Eastern/North African Resources still identifies "Students for Justice in Palestine (SJP)" with a direct link the @sjpuva for its contact information as a viable Contracted Independent Organization.

Albemarle County, Virginia at the University of Virginia. Students for Justice in Palestine at UVA is a formal student group that exists and operates at and within the institution of the University of Virginia. Defendant SJP at UVA is an entity that is capable of suing and being sued and is subject to the jurisdiction of this Honorable Court.

56.    As a "CIO" at UVA, Defendant SJP at UVA is required to have a membership, an organizational structure, including a "president" or executive, is required to convene regular meetings regarding activities and governance, and is required to have corporate governance documents such as a student group constitution and by-laws. SJP at UVA has somehow managed to secure organization and recognition from the University with only the barest minimum of documentation, none of which sets forth the identity of its members, its organizational structure, the identity of its officers, or the terms of any constitution or by-laws.

57.    Members of SJP at UVA and participants in SJP at UVA's disruptive and dangerous rallies and protests and other misconduct in UVA's educational environment are instructed by SJP at UVA to wear masks and other garments and adornments to conceal their identity and to take other precautions to ensure that their identities are not revealed. SJP at UVA also instructs its members and participants how to engage with law enforcement and media, all the while advancing the aims and agenda of NSJP and SJP at UVA.

58.    With the University of Virginia's assistance, Defendant SJP at UVA uses strict student records and privacy laws in its attempt to shield and conceal members' identities from the public and from other students.

59.    Defendant SJP at UVA and its principals have created and act on behalf of and in concert with dozens of similar student organizations that appear to be mere alter egos or aliases for

SJP at UVA and are simply antisemitic facsimiles of SJP at UVA. These antisemitic, anti-Israel, pro-Hamas organizations bear names such as "Students for *Peace and* Justice in Palestine" (italics added), "UVA Apartheid Divest" and "Dissenters @ UVA," to name but a few.

60.   The current "President" of Defendant SJP at UVA, "J.R.," is a rising "Fourth Year," or senior, student at University of Virginia. "J.R.'s" identity is known to the Plaintiff and all the Defendants. At all times relevant to this Amended Complaint, "J.R." was the "President" of SJP at UVA and the principal actor and agent for SJP at UVA and other antisemitic, anti-Israel, and anti-Zionist associations and groups within the UVA Community and educational environment. The President of SJP at UVA personally engaged in all of the acts, errors, and omissions that are attributed to SJP at UVA and did so entirely for the benefit and furtherance of the interests, aims, and directives of SJP at UVA, entirely within the course and scope of the student's membership and duties as an officer of SJP at UVA, entirely within the educational environment at UVA, and solely as a student at the University of Virginia.

61.   During a recent planned meeting with Defendant President Ryan regarding the antisemitic "BDS" movement, the President of SJP at UVA purported to speak for and represent as many as *forty-three* pro-Hamas, anti-Israel, antisemitic formal student organizations.

62.   Another actor or agent of what is described as the "coalition" of student groups that includes Defendant SJP at UVA is UVA Student "E.W.," a rising junior, or "Third Year" student who is actively and currently enrolled student at the University of Virginia. "E.W." has participated in the antisemitic, anti-Israel, and anti-Zionist actions and protests of SJP at UVA and its alias or alter-ego associations. "E.W." has spoken publicly in defense of

the "coalition" and expressly ridiculed the Plaintiff in the press. "E.W.'s" identity is known to the Plaintiff and the Defendants.

63.    The very existence of SJP at UVA; membership in the antisemitic, pro-Hamas organization; SJP at UVA's repeated violations of University policies and student codes of conduct; and the innumerable instances of hate-based misconduct alleged and referred to below constitute, as a matter of law, breaches of the numerous duties owed by SJP at UVA and its student-members to Matan and other members of the University community.

64.    A recent New York Times article described the NSJP network, which includes Defendant SJP at UVA:

> But unlike many national campus groups—whether they are sororities, fraternities, religious or political—Students for Justice in Palestine is by design a loosely connected network of autonomous chapters. There is no national headquarters and no named leader. There is a national student steering committee, but it is anonymous. The group has never registered as a nonprofit, and it has never had to file tax documents. One of the people who founded it about 30 years ago, Hatem Bazian, has described the setup as 'a symbolic franchise without a franchise fee.' That deliberate lack of hierarchy has been crucial to the network's ascent, allowing chapters to spring up with few obstacles, according to interviews with 20 people and a survey of videos, academic writings, archival news accounts and public records.[4]

---

[4]    Alan Blinder, *Inside the Pro-Palestinian Group Protesting Across College Campuses*, N.Y. TIMES (Nov. 17, 2023).

65.   Defendant SJP at UVA, according to its own published admissions, "is" National Students for Justice in Palestine:



*Social Media "posts" by National SJP and the "@SJPUVA" social media account for Defendant Students for Justice in Palestine at UVA.*



*SJP at UVA flyer distributed directing media inquiries and requests to National SJP.*

66.   Shortly before or within mere hours after Hamas committed the single worst incident of wholesale slaughter of Jewish people since the Holocaust, National Students for Justice in

Palestine transmitted the "Day of Resistance Toolkit" to its chapters, including Defendant SJP at UVA. The "toolkit" is both an antisemitic manifesto and an operator's manual for committing hate crimes on college campuses across the United States. The NSJP Day of Resistance Toolkit is attached as Exhibit A.

67.     In its toolkit, National Students for Justice in Palestine called "for a **national day of resistance** on college campuses across occupied Turtle Island [the United States and Canada] and internationally this **Thursday, October 12th, 2023**." The toolkit includes an invitation to a "how to organize a protest" seminar, "including roles, security, media training, and more[.]" The toolkit includes instructions regarding "messaging and framing" of the Hamas narrative, instructions for use of specific "hashtags" on social media posts, and "template graphics" for the creation of physical posters, "tabling materials," and social media posts.

68.     The NSJP toolkit goes on to proclaim:

> For over 75 years, our Palestinian people, through steadfast resistance, have waged a prolonged war for liberation and return to our colonized homeland. What we are witnessing now is a heightened stage of the Palestinian struggle—through tearing down colonial infrastructure and liberating our colonized land from illegal settlements and military checkpoints, our people are actualizing revolution. **Palestine will be liberated from the river to the sea**, and our resistance, through their bravery and love for land, continue to bring dignity and honor to the Palestinian people. As the diaspora-based student movement for Palestine liberation, our responsibility is to not only support, but struggle alongside our people back home. The forces of Zionism engage in media campaigns which attack our people and resistance from all sides—it is our responsibility, therefore, to break through their hegemonic narratives of "war" and "unprovoked aggression," and instead ground our campuses and communities in a **narrative which centers the legitimacy of resistance and the necessity of complete liberation**. Please find below a breakdown of framework and important messaging which help contextualize, frame, and above all normalize and support our fearless resistance. (Emphasis added.)

***

> Resistance comes in all forms—**armed struggle**, general strikes, and popular demonstrations. **All of it is legitimate, and all of it is necessary**. (Emphasis added.)
>
> ***
>
> **We as Palestinian students in exile are PART of this movement, not in solidarity with this movement.** *This is a moment of mobilization for all Palestinians*. We must act as part of this movement. All of our efforts continue the work and resistance of Palestinians on the ground.

69.   The plain text of the NSJP Toolkit confirms that chapters such as Defendants SJP at UVA do not merely assist Hamas's ongoing terror campaign abroad—they perpetuate it in the United States.

70.   The mission of National SJP and, by extension, its chapters, including Defendant SJP at UVA, mirror Hamas's Charter.

71.   National SJP proclaims its mission to be: "[T]o elevate the student movement for Palestinian liberation to a higher level of political engagement. We aim to develop a connected, disciplined movement that is equipped with the tools necessary to contribute to the fight for Palestinian liberation."[5]

72.   This parallels language in the 2017 Hamas Charter: "Resistance and jihad for the liberation of Palestine will remain a legitimate right, a duty and an honour [sic] for all the sons and daughters of our people and our Ummah." The Hamas charter calls for the annihilation of Israel through "jihad" (i.e., holy war) and seeks to establish an Islamic state in place of Israel, "from the (Jordan) River to the (Mediterranean) Sea." Hamas advocates the use of violence and terrorist attacks to achieve its ends. The leaders and founders of the parent or umbrella groups National Students for Justice in Palestine, American Muslims for

---

[5]   National Students for Justice in Palestine, https://nationalsjp.org/about (last visited Aug. 6, 2024).

Palestine, USACBI, those groups' precursor and predecessor entities, and the organizations themselves, were well-known vocal advocates and proponents of Hamas's ideology and political program.

73. NSJP and its "chapters" employ a number of tactics to advance their antisemitic, anti-Israel, and anti-Zionist agenda, including plastering offensive, hateful antisemitic posters and materials throughout school facilities, including residential spaces, classrooms, administrative buildings, and shared common places; disrupting the educational environment by staging protests, rallies, "Noise Demos," "sit ins," "die ins," "take overs" of buildings and facilities, and, of course, as discussed below and seen by every American who possesses a television, constructing "Jew Exclusion Zones" or "Gaza Encampments" in front of the most trafficked and frequently visited school spaces.

74. Another vicious tactic and retaliatory measure employed by National SJP and its chapters is "lawfare" or a variation thereof to target Jewish students and student-journalists who dare to stand up or speak out against antisemitism and hate. At Princeton, for example, National SJP is reported to have filed multiple "No Contact Orders" against innocent students and journalists in order to silence them.[6] At UVA, Defendant SJP at UVA, with the help of Defendant FJP at UVA and their legion of supporters, including the UVA administration (and its lawyers), would weaponize the most sinister instrument in the University of Virginia's history or culture: the Honor Charge.

---

[6]   Jessie Appleby, *Princeton keeps letting students weaponize no-contact orders against student journalists*, THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (Jan. 25, 2024), https://www.thefire.org/news/princeton-keeps-letting-students-weaponize-no-contact-orders-against-student-journalists.

### 3.     Defendant Faculty for Justice in Palestine UVA Chapter

75.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

76.    One of the primary instruments employed by Hamas in its worldwide propaganda campaign to erode support for Israel is the international "Boycott, Divestment and Sanctions" or "BDS" movement. BDS groups, the BDS "movement," and everything BDS "is," can fairly be characterized as antisemitic, anti-Israel, and anti-Zionist.

77.    BDS is a weapon in Hamas's overall terror arsenal that it uses to achieve its objective of the destruction of Israel and all who support it.[7] Importantly, many "peer institutions" of the University of Virginia—but not UVA—have banned BDS movements or referenda from taking place at their schools.

78.    Within the United States, Hamas directs and promotes the BDS movement through its proxies, including AMP, NSJP, and the "US Campaign for the Academic and Cultural Boycott of Israel" or "USACBI."

79.    Like other Hamas affiliates in the United States, USACBI's fundraising and finances are managed through detached shadowy networks of what it calls "fiscal sponsors." USACBI's "fiscal sponsor" is "Al-Awda (Palestine Right to Return Coalition)" and all donations are funneled through that group. This type of behavior mirrors the sophisticated money-laundering techniques employed by international drug cartels and other organized crime entities.

80.    According to its own website and materials, USACBI "issued a call to form Faculty for Justice in Palestine (FJP) groups on campuses **in order to support NSJP**, **protect local**

---

[7]      Complaint, *Shnaider v. Am. Muslims for Palestine, et al.*, 8:24-cv-01067, ECF No. 1, at ¶¶ 86-125.

**SJP organizers**, **offer faculty defense**, organize teach-ins and other actions, and engage in Palestine solidarity work generally." (Emphasis added.)

81.  According to Defendant FJP at UVA's own materials and admissions, "we have established the University of Virginia Chapter of Faculty for Justice in Palestine (FJP) in response to the call by USACBI."

82.  Faculty for Justice in Palestine UVA Chapter is a formal faculty group that exists and operates at and within the educational environment of the University of Virginia. FJP at UVA is an unincorporated association organized, located, and operating under the laws and within the Commonwealth of Virginia, particularly the jurisdiction of Albemarle County, Virginia, where the University of Virginia is physically located. Defendant FJP at UVA is an entity that is capable of suing and being sued and is subject to the jurisdiction of this Honorable Court.

83.  FJP at UVA is comprised of over one hundred, and perhaps several hundred, "scholars," (self-described), "teachers," (self-described), faculty, employees, administrators, graduate students, and "members of the UVa Community" (self-described). Many FJP at UVA faculty members are tenured professors who occupy endowed "chairs" or prestigious positions within the academic infrastructure of the University. These positions carry and connote great influence and power over other professors and administrators, and, most importantly, students.

84.  Hundreds of UVA faculty members have specifically and personally joined and acted on behalf of Defendant FJP at UVA throughout the 2023-24 school year to create a hostile, unwelcome, and dangerous educational environment for the Plaintiff at the University of Virginia.

85.   The following University of Virginia faculty members are among the most visible UVA faculty members who have engaged and participated in open and obvious conduct within the University of Virginia's educational environment, within the course and scope of their employment and work for the University of Virginia, and in full concert with and in furtherance of the aims, agenda, and interests of Defendant FJP at UVA: the Julia Allen Cooper Professor of Government and Foreign Affairs and Ambassador Henry J. Taylor and Mrs. Marion R. Taylor Professor of Politics Robert J. Fatton, Jr.; the Rouhollah Ramazani Arabian Peninsula and Gulf Studies Associate Professor and Global Legal History teacher at UVA's School of Law Fahad Ahmad Bishara; Associate Professor of African Religious Thought & Democracy Oludamini Ogunnaike; Global Studies & Anthropology Associate Professor Tessa Farmer; Associate Professor Walter F. Heinecke; Global Development Studies Track Director & International Residential College Director of Studies Associate Professor David Edmunds; Global Commerce in Culture & Society Track Director and Global Studies & English Assistant Professor Laura Goldblatt; Middle Eastern & South Asian Languages & Cultures and Women, Gender & Sexuality Professor Geeta Patel; Irfan and Noreen Galaria Research Chair and Associate Professor in Islamic Studies Noah Salomon; former Director & Chair of the Carter G. Woodson Institute for African American & African Studies at the University of Virginia and Alice Griffin Professor Deborah E. McDowell; Head of Library and Research Librarian Benjamin Doherty; Art History Associate Professor Christa Noel Robbins; Religious Studies and African-American and African Studies Professor Ashon Crawley; and General Faculty Assistant Professor Levi Vonk. The foregoing is not an exhaustive list.

86.  Defendant FJP at UVA members regularly post aggressive and intimidating messages on social media that the Plaintiff finds threatening to his safety, well-being, and sense of belonging.

87.  As an example confirming the saturation of the UVA educational environment by Defendants FJP at UVA and SJP at UVA and their members' willingness to engage in ultra-aggressive and intimidating rhetoric:



*Popular FJP at UVA faculty member Professor Levi Vonk displaying the violent, antisemitic image of hate known as the "Bloody Hands," which is a pro-Hamas reference to the gruesome murder and mutilation of Israeli IDF soldiers. Adjacent to Professor Vonk's "Bloody Hands" post is his endorsement of violence to achieve a political aim by protesters and activists.*

88.  The "Faculty Defense" group or wing of Defendant FJP at UVA is comprised of UVA Law School professors and UVA Law School students. Many of the professors and students in the "Faculty Defense" group are also members of the group known as the "National Lawyers Guild at UVA Law." One glimpse at the National Lawyers Guild at UVA Law's

Instagram page demonstrates that the group is part of or closely affiliated with Defendants FJP at UVA and SJP at UVA and that its members have actively participated in SJP at UVA's protests and disruptions within the University of Virginia's educational environment. Whether the members of the "Faculty Defense" group or "NLG at UVA" group are acting as protesters, "legal observers" active in the protests and supporting the protesters, or acting as defense lawyers appearing in various courts and tribunals (and the press) on behalf of members of Defendants FJP at UVA and SJP at UVA (or some combination of all three categories of involvement), the law professors are acting within the UVA educational environment, fully within the course and scope of their employment and positions with the University of Virginia and the Commonwealth of Virginia, and in an adversarial posture to UVA student Plaintiff Matan Goldstein and other members of the UVA Community.

89. The FJP at UVA "Faculty Defense" team includes UVA Law professors the Lewis F. Powell, Jr. Professor of Law Anne M. Coughlin; Assistant Professor of Law Kelly Orians; Associate Professor of Law Thomas Frampton; and UVA Law Lecturer Bruce R. Williams. Charlottesville attorney Jeffrey E. Fogel is also part of the Defendant FJP at UVA's "Faculty Defense" team but does not appear to be formally associated with or employed by UVA Law School.

90. Importantly, the University of Virginia has ratified and approved its Law School engaging on behalf of pro-Hamas, antisemitic actors and entities against its own Jewish students, specifically including Matan.

91. Therefore, it can be fairly said that the University of Virginia, and therefore, the Commonwealth of Virginia, are actively engaged in, directing, and funding the legal

defense for Defendants SJP at UVA and FJP at UVA and are defending the interests and legal matters for pro-Hamas, antisemitic groups who harass and bully UVA Jewish students, specifically including Matan.

92.  It can also be fairly said that as a result of this enmeshment and official engagement, Defendant FJP at UVA *is* the University of Virginia, and vice versa.

93.  Faculty at the University of Virginia, including the UVA law professors identified above, are employees of the Commonwealth of Virginia and, as such, owe a host of duties to the Commonwealth, the University Community, and their students—meaning the entire student body, not just those "comrades" with whom they "stand" in ideological "solidarity."

94.  The very existence of FJP at UVA and membership in FJP at UVA, along with the numerous acts of misconduct set forth below are definitively antisemitic and are, as a matter of law, a breach of each faculty member's and the faculty group's legal duties.

95.  FJP at UVA acts in concert with and/or acts and speaks for dozens of other pro-Hamas groups at the University of Virginia. Collectively, these groups appear to be comprised of hundreds of University faculty, students, staff, and administrators.

96.  FJP at UVA raises funds and seeks donations; convenes meetings; hosts events; promotes other pro-Hamas entities and their events and efforts; makes University-wide "announcements"; issues "Open Letters" to UVA students and the world; has ratified "Principles of Unity" that include a pledge of fealty to "SJP" along with antisemitic declarations; has established a website and an email address; and has a governing body and executive, including the designation of "liaisons" to negotiate with the University of Virginia Administration:



*Members of FJP at UVA at the May 2024 pro-Hamas, antisemitic "Jew Exclusion Zone"*
*or "Gaza Encampment" that it established on Grounds.*

97.    According to FJP at UVA's announcements and materials, "FJP supports, amplifies, and

protects the work of SJP and other pro-Palestinian students and student groups at UVA,"

and "we have come together as a community of scholars, activists, and university staff in

solidarity with our colleagues across the world to demand the liberation of the Palestinian

people."

98.    In other words, Hamas issued a call to its supporters on college campuses nationwide to

form loyal faculty and student cells or "chapters." Those groups were instructed by parent

organizations created by Hamas to support, amplify, and carry out the directives and

mission of Hamas, namely the destruction of Israel and the extermination of the Jewish

people.

99.    On July 9, 2024, the United States Director of National Intelligence Avril Haines stated:

> In recent weeks, Iranian government actors have sought to opportunistically
> take advantage of ongoing protests regarding the war in Gaza, using a
> playbook we've seen other actors use over the years. We have observed
> actors tied to Iran's government posing as activists online, seeking to
> encourage protests, and even providing financial support to protesters.

100.   Defendant FJP at UVA and Defendant SJP at UVA heard and heeded the call from Hamas, and, apparently, even the Supreme Leader of the Islamic Revolution, as the Supreme Leader of Iran is formally called, the Ayatollah Seyyed Ali Hosseini Khameini himself, approves:



## C.   DEFENDANT THE UNIVERSITY OF VIRGINIA

101.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

102.   "The Rector and Visitors of the University of Virginia" is the official, corporate, and statutory name for the entity known and referred to herein as "The University of Virginia" or "UVA."

103.   The University of Virginia was founded in 1819. The school was conceived, founded, designed and, for the most part, constructed under the supervision of Thomas Jefferson. Today, the University of Virginia's annual operating budget exceeds $5 billion (less than half of which is expended on academics). The public school's endowment is estimated to far exceed $10 billion. The President of the University enjoys a salary and benefits that are reported to exceed $2 million in taxpayer cost and include housing, car allowances, and club memberships, to name but a few of the emoluments of the position. Numerous

administrators in the President's "inner circle" of "vice presidents," "counselors," and "deans" are likewise highly compensated.

104. The University of Virginia is an operation of enormous proportions that utilizes what has been called a "Byzantine" organizational structure, with a web of interlocking policies, procedures, and regulations.

105. The University employs over 25,000 people and educates more than 25,000 enrolled students. Annual student tuition for a significant percentage of the undergraduate student population exceeds $50,000, exclusive of living expenses. Graduate school tuition is even higher: at the Law School, for example, tuition can exceed $75,000 per year.

106. The University of Virginia is a vast, powerful, and prestigious institution and entity. Most importantly, the University is first and foremost a *public* entity, and its officers and directors are first and foremost *public officials and actors* who swear oaths to act in the best interests of the Commonwealth of Virginia.

107. The University and President James E. Ryan owe a host of duties to the Commonwealth, the University as an institution of higher learning, and the members of the University Community, but none are more sacrosanct or incontrovertible than their duty to protect and safeguard students' physical well-being.

108. The University of Virginia and President Ryan have failed in that charge, unreasonably so, when it comes to the protection of Jewish students and faculty.

109. The President of the University enjoys the full authority and power to direct, initiate, limit, alter, modify, or terminate the actions of the University's assets.

1.      **The University of Virginia Educational Environment**

110.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

111.   The organism or being that "is" the University of Virginia is vast and extends far and wide, both physically and virtually. The "educational environment," also known as the "University Community" includes people, places, and things that exist physically "in the real world," virtually or "online," and, finally, culturally and philosophically.

a.      The UVA Physical Educational Environment

112.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

113.   The first and most obvious component of UVA's "educational environment" is the physical realm. The UVA physical "educational environment" encompasses multiple sites throughout the City of Charlottesville and Albemarle County as well as other sites, campuses and facilities across the Commonwealth. These facilities are elaborate and extensive. They include multiple libraries, numerous residential halls, extensive and impressive classroom buildings with adjacent faculty offices and lounges, dozens of dining facilities, entertainment venues, study and meeting spaces, multiple state-of-the-art recreational buildings, and world-class student health facilities, to name but a few.

114.   The University's physical presence includes, of course, its "best-in-class" graduate schools, which also claim beautiful campuses in their own right within a stone's throw of the "Grounds," as the original university campus is known, where the undergraduate schools are located and most University operations take place.

115.   The most prominent, visible, and important component or area of the University of Virginia's physical educational environment is the "Academical Village," designed and built by Thomas Jefferson over two centuries ago. The "original" University—the Rotunda, the Lawn, the Range, and the surrounding Hotels and gardens—is an architectural wonder and philosophical masterpiece. "Mister Jefferson," as he has been referred to lovingly by generations of UVA students, intended the Rotunda to be a true temple (of learning), rising above the Lawn's manicured and serene plateau in near-spiritual expression of the University's and his adoration of the pursuit of knowledge. The Lawn and Range were designed to house students and faculty as well as their learning environments. Every facet of the Lawn, from the rows of the colonnade to the uniqueness of each Pavilion, is infused with a specific philosophical meaning and an architectural or engineering function.

116.   Today, "the Lawn," as the entire original Grounds and Academical Village are sometimes called, is a UNESCO World Heritage Site and widely considered one of the greatest architectural wonders of the world.

117.   People from around the world come to Charlottesville to see and learn about the Lawn and Thomas Jefferson's vision for the school and the world.

118.   At its heart, and, some might say, its soul, the Lawn and the Academical Village, no matter how far and wide the University may expand, irrespective of adoration and accolades, are and will always be a school—a public school.

119.   Classes are still taught on the Lawn, academic activities and pursuits still occur on the Lawn, and University operations are still directed in those ancient and well-preserved (and beautiful) buildings. Students still live in the Lawn and Range rooms, just as they did when Jefferson, Madison, and Monroe were in charge, or when Edgar Allan Poe was a student.

Many applicants will readily proclaim that their heart became set on UVA as their college when they first set eyes upon the Lawn. To be allowed to live on the Lawn as a Fourth Year is among the highest privileges that can be bestowed upon a University of Virginia student.

120.    It is difficult if not impossible to access classes, libraries, student organizations, or, really, any aspect of UVA student life without coming into close proximity and contact with the wonder that is the Lawn, and, under normal circumstances, who would want to avoid the Lawn? It is unfathomable to conceive of being a University of Virginia student without access to the Lawn or to be forced to live, study, and learn at UVA under circumstances in which the Lawn is an unsafe, hostile, and unwelcoming place. The Lawn represents everything that the University of Virginia educational environment is and will be, good and bad.

121.    The UVA physical educational environment also includes, of course, residential halls or dormitories; dining rooms, cafeterias, and coffee or snack shops; classrooms; meeting and study spaces; libraries; recreational and entertainment facilities; and all physical buildings, property, and facilities that are owned, rented, or operated by the University of Virginia for any purpose. Additionally, buildings and spaces that may not be directly "owned or rented" by the University of Virginia are nonetheless part of the UVA educational environment. These include spaces and buildings owned or rented by "contracted independent organizations" such as fraternities and sororities that are closely governed and managed by the University and are subject to its myriad of rules, regulations, and policies.

b.    <u>The UVA Virtual or Online Educational Environment</u>

122.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

123.    The UVA "educational environment" includes the "online" or "virtual" UVA Community and student experience. The University of Virginia has fully and thoroughly adopted, embraced, and integrated technology into every aspect of its core functions and mission as an institution. The University boasts of this fact. The operation of the university, and UVA's communications with and among its administrators, faculty, staff, and student body, all occur through the use of a dizzying array of technologies. UVA employs a multitude of "apps" or applications and social media platforms to execute its functions. Some of these platforms are strictly "internal," such as "Advocate" or the like, but many are platforms that can be open to the public, such as "X," "Instagram," "Meta," and "GroupMe," to name but a few. Finally, few, if any, members of the University Community, or the individuals and entities who make up the "educational environment," communicate with one another through traditional, "hard copy" forms such as paper letters. Instead, text messages and email, or similar versions thereof, are the ubiquitous and universal means by which members of the University community, ecosystem, and "educational environment" communicate.

124.    The University and President Ryan maintain official social media accounts that are used to advance their objectives and communicate with the University Community, including the student body. UVA and President Ryan's audience of "followers" number in the tens of thousands, or more.

125.   The Office of the University President also manages, maintains, and monitors social media and uses those platforms to communicate with the community. The official "@UVA" account on Twitter has more than 100,000 followers. The "@PresJimRyan" account on Twitter claims more than 24,400 followers. Those are just two of the many social media and communications applications utilized by the University and its thousands of faculty and administrators to conduct University business, communicate with the University community, and broadcast University "messaging."

126.   Every school, "college," division, department, and program at UVA maintains a vibrant and robust social media presence on publicly available platforms. Additionally, most faculty members, and especially those who occupy positions of prestige and high status at UVA, likewise have a well-developed social media presence that is both the product of their association with the University and is a means by which they promote their work and elevate their careers and status within the "community." Perhaps the best known and famous of these esteemed faculty members is Professor Larry Sabato, who is a veritable social media-posting machine, churning out a near-constant stream of commentary and observations. A number of UVA faculty members who occupy positions of great status and prestige within the University faculty and administration ranks, and who consider themselves to be "racial justice activists," are likewise highly visible online through various platforms including "X" and "Bluesky Social" and publish dozens of social media posts daily to their thousands, or tens of thousands, of followers.

127.   Most student groups, such as Defendant Students for Justice in Palestine at UVA, maintain a direct and active social media presence and use numerous accounts, including their own, "alias accounts," and the accounts of alter-ego groups to perform their core functions,

advance their group's interests, and communicate with one another and the world at large. In fact, Defendant SJP at UVA has designated its Instagram page or account as its official place of contact in its University-required organizational materials. When a person seeks to connect with SJP at UVA or to find out how to reach it, they are "linked" on UVA's own website to SJP at UVA's Instagram page. Though appearing to be contrary to Defendant UVA's own policies, procedures, guidelines, and protocols, the only information readily available from the University regarding the official UVA student group SJP at UVA is the group's Instagram page, which conveniently links to other alias groups, alter-ego associations, and affiliated organizations.

128.   Similarly, this online component of UVA's "educational environment" includes faculty groups such as Defendant Faculty for Justice in Palestine UVA Chapter and other UVA-endorsed groups such as the "National Lawyer's Guild" and its UVA members or affiliates.

129.   Whether these faculty members', faculty groups', students', student groups', or UVA administrators' websites or social media "posts" are officially or formally endorsed or approved by the University is of no moment: the groups' online expressions identify themselves as UVA actors and agents. They are known to the University, they are tolerated, and in some cases, supported by the University, and they are most certainly part of the "educational environment" and "University Community" that UVA has built, embraced, and fostered. When a student, faculty member, administrator, or a UVA group or organization—or the University itself—engages online, that post and material, including comments and "threads" are part of the "educational environment"—the "UVA Community" where students such as Matan exist.

130.   The "influence" of the University's online, social media presence and platform, when taking into account UVA's departments, programs, faculty, students, and affiliated boards, foundations, and groups, reaches an audience of millions of "followers" and "viewers."

      c.   <u>The UVA Human Educational Environment</u>

131.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

132.   Every organization or entity is defined by its people, and the University of Virginia and its educational environment are no different.

133.   The "student body," which includes the student population of individuals, student groups and organizations, and student leadership bodies, is one of the core components and fundamentally important ingredients of a university or college and its educational environment. The student body—its culture, behavior, ethos, and outwardly projected appearance—is among the most visible representations and embodiments of a university or college.

134.   Similarly, the "Faculty," which includes the university or college's teachers, professors, and assistants as well as formal and informal faculty groups and associations, is an indispensable human element of the university or college and its educational environment, without which an institution cannot be said to exist.

135.   Another cornerstone, foundational element of every university and college is its administration and its departments and divisions. The organization of the administration component of the modern university resembles that of a multi-national corporation, especially at the University of Virginia.

136.    Regarding the behemoth that is the University of Virginia Administration, Defendants the University of Virginia and President Ryan, possess a veritable arsenal of personnel, equipment, and capabilities that may be brought to bear in any crisis, circumstance, or situation to protect student well-being or to promote the interests of University (and, by extension, the Commonwealth as a whole).

137.    These assets include the University Police; the Office of University Counsel; the University Public Relations Apparatus; the "Division of Diversity, Equity & Inclusion" ("DEI"), which includes the Office of Equal Opportunity and Civil Rights (or "EOCR"); the Division of Student Affairs and the Office of the Dean of Students; and, finally, the Student Affairs Divisions' student organizations known as "Agency Organizations" and "Special Status Organizations" in which the student-administrators are considered agents of the University, are afforded the benefit of legal counsel, and are covered by the University's Risk Management Plan—these organizations include the Honor Committee, the University Judiciary Committee, and Student Council.

138.    These apparatuses employ hundreds of people. Few, if any, have any scholarly or teaching roles or obligations, but most are tasked—at least nominally—with protecting students from discrimination, harassment, abuse, violence, and retaliation, including antisemitism. The citizens of the Commonwealth of Virginia expend tens of millions of dollars annually on the salaries of these university administrators with the expectation that they will protect students from physical harm and illegal abuse, harassment, bullying, and discrimination.

139.    Regarding the "Administration" element of the educational environment, it should be noted that the University of Virginia, at President Ryan's direction, has purposefully and intentionally refused to adopt a position or principle of "institutional neutrality." This

decision has a direct and profound impact upon the educational environment at UVA. Just like UVA's "celebrity faculty members" who enjoy hundreds of thousands of followers on social media and who appear on television, podcasts, and print media routinely if not daily, the University, through its official channels and its senior leadership, including President Ryan, routinely takes positions about issues and controversies around the world, often when there is no discernible connection to the principle, core functions of the University. Under this activist philosophy or the absence of institutional neutrality, the University's and its leaders' failure or refusal to speak or take a position regarding circumstances or controversies, especially those that directly impact the educational environment is itself an expression of the University's position or view about matters that are often of great consequence to the University Community. The UVA Administration, particularly its decisions to speak or refuse to speak, have a great deal of influence upon and shape the educational environment in which UVA students exist.

140.   The human component of UVA's educational environment also includes individuals and groups who may or may not be directly employed, engaged by, or even associated with the University but who nonetheless maintain a regular presence in and around the physical and virtual University Community and play such a role and have such an impact on the educational environment that they are an element of it. For instance, members of local and regional "ANTIFA" groups dedicated to anarchy and civil disruption routinely appear alongside SJP at UVA and FJP at UVA protesters at UVA campus rallies.

      d.    The UVA "Academy" Educational Environment

141.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

142.   The "academy," or academic purpose and operations of the university, is supposed to be the central mission and focus of colleges and universities. UVA is no exception.

143.   In terms of the educational environment, the "academy" at UVA includes undergraduate schools and colleges and degree programs, non-degree courses of study and pursuits, institutes and "centers," graduate schools (including, the School of Law), programs such as study abroad opportunities and exchange agreements with other, often foreign, universities and colleges, research initiatives, and the varied and expansive curricula offered to students. Finally, "grades" and performance evaluations are an important part of the "academy" and are an important component of the educational environment at UVA.

144.   All of the elements and components identified above are the organs, limbs, connective tissue, soul, intelligence, and persona of the University of Virginia. These elements and components are the "educational environment" for the University of Virginia.

e.      The UVA "Community of Trust" Educational Environment

145.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

146.   Next to the physical place that is the Lawn and "Academical Village," The University of Virginia is most proud of its so-called "Community of Trust." While the "student-led" University Judiciary Committee and Student Council and the "adult-led" EOCR, Division of Student Affairs, and University Police Department are said to be key components of UVA's "Community of Trust," it is the "student-led" Honor System that is considered by the University to be the crown jewel of the proverbial "Community of Trust" tiara.

147.   Although touted as being "entirely student-run," this is simply not true. According to its own governing documents and resolutions of the Board of Visitors, the authority over and

administration of the Honor System is the province of the Rector of the University, the Board of Visitors, and the President of the University. Professional "legal advice and guidance" for the Honor System are delivered by the Office of University Counsel, in addition to and conjunction with the various University lawyers assigned to advise and assist the Honor Committee and its agents.

148. When the Honor System or Honor Committee acts, it is doing so on behalf of and as an agency of the University of Virginia, whether the actor or agent is a student-administrator or a paid employee-administrator. It is the University of Virginia that adjudicates the fate of those brought before the Honor Committee, and it is the University of Virginia that metes out the punishment levied by the Honor Committee, even when the so-called "judges" and "jurors" are mere teenagers in their first or second year of college.

149. The Honor System is considered a "Special Status" and "Agency" organization entitled to legal counsel and coverage under the Commonwealth of Virginia's risk management program. In that regard, the University of Virginia administration, which includes the Rector, the President, and the University Counsel, maintains authority, oversight, and supervision of the Honor System, including the highly consequential decision to accept a charge and proceed with a prosecution of a student.

150. It is the administrators—most notably, at all times relevant to this Amended Complaint, Defendant Ryan—who bears responsibility for the legality and correct execution of the University's most stern, severe, and grave disciplinary process. When the Honor System is misused or perverted or the Committee and its supervisors and participants engage in unconstitutional or illegal behavior and decisions—and punishments—it is those, most

senior administrators who are legally responsible and morally culpable and those who must be held to account.

151.    An Honor Charge is the single, most serious peril in which a University of Virginia student can find him or herself. UVA professors and administrators will readily admit that a student has more likelihood of rehabilitating his or her reputation and career following a *murder conviction* than from an Honor Charge at UVA.

152.    The University of Virginia has published glossy marketing materials touting the virtues of its Honor System and the "Community of Trust." In those materials, the University almost delights in recounting the vicious, draconian side of this "student-run" process. According to the University's own published materials, which are purposefully ominous, so devastating is the effect of being accused of an Honor Offense that accused students are known to have suffered severe psychological break downs along with permanent emotional and physical harm simply by being charged. Suicidal ideations and attempts are not uncommon, and, most upsetting, the University wants students to know it. Innocent or guilty, convicted or acquitted, an Honor Charge represents a terrible Rubicon that once crossed, cannot be uncrossed.

153.    Once a charge has been filed, no matter how obviously bogus, fraudulent, or fake, the University boasts that it cannot be withdrawn *by the accuser or "reporter."* The charge can, however, be summarily dismissed, *sua sponte*, by the so-called adults in the room: the University administration or the Honor Committee.

154.    Upon filing, the charge and the prosecution of the charge become the University's responsibility. The University immediately assumes the role of accuser, investigator, judge, jury, and executioner.

155.    One of the "sanctions" available to the Honor Committee to punish a student upon a "guilty verdict" rendered by student "jurors" is "permanent removal from the Community of Trust," meaning dishonorable expulsion from the University of Virginia. The Honor Committee proclaims that upon such a sanction being delivered, the Registrar of the University is obligated to terminate all of the student's rights and privileges and to append an "Outcome Letter" in the student's transcript and permanent educational record. That student is forever banished from everything that is the University of Virginia and its "Community of Trust."

156.    That is what faces a student when an Honor Charge is initiated.

157.    The "Community of Trust" and the Honor System are central components, perhaps the most central components, of the UVA educational environment.

158.    The University of Virginia "educational environment," whether considered in whole or in part, is a public accommodation.

159.    UVA's 2024 "Hype Video" depicts the UVA educational environment as it should be for all students in rich, vibrant detail.[8] The convincing and compelling video is both an admission and a promise. The video depicts what was taken from Matan Goldstein, forever, as a result of illegal and immoral hate, harassment, bullying, and abuse.

**2.    The Duties, Policies, and Procedures That Govern the University of Virginia's Educational Environment**

160.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

---

[8]     YOUTUBE, Get to Know UVA: Excellence & Energy, https://www.youtube.com/watch?v=YV87R54LYtc&t=6s (last visited Aug. 6, 2024).

161. The University of Virginia and every member of its "community" and the educational environment, including faculty and students, operate under and are governed by a number of federally imposed, state-imposed, and University-imposed standards and duties of care and conduct regarding their acts and omissions.

162. The duties of care and standards of conduct apply to and govern the behavior of faculty and students, especially the manner in which other students are treated in the UVA educational environment.

163. These interlocking statutes, regulations, and University policies and procedures also impose upon the University and its administrators certain duties and responsibilities to prevent, respond to, and correct infractions and violations of the rules that govern the educational environment and to respond to and address harms and damages suffered by members of the University Community, most notably students, as a result of the infractions and violations.

164. The University and its administration owe students a duty of care that obligates them to do everything in their power to guarantee student safety and to act swiftly, decisively, and effectively when student safety is jeopardized or threatened.

165. The University and its administration owe students a duty of care that obligates them to do everything in their power to prevent students from being harmed by violence, harassment, and abuse.

166. The University and its administration owe students who are victims of violence, harassment, or abuse a duty of care to respond swiftly, decisively, and effectively with the finest care and the full range of resources and capabilities, regardless of their personal

views about the subject matter at hand or their opinions about the severity of the harms or the extent and significance of the damages (or lack thereof).

167.    The University of Virginia is governed by a Board of Visitors, whose duties and powers are determined and controlled by the statutes of the Commonwealth of Virginia, as amended from time-to-time by the General Assembly. The portions of the Code of Virginia that provide for the general organization and governance of The University of Virginia may be found in Va. Code Sections 23.1-2200, *et seq*. <u>The Manual of the Board of Visitors of the University of Virginia</u> constitutes the corporate bylaws of The University of Virginia and sets forth the Board of Visitors' internal organization, procedures of operation, and the responsibilities of the administrative officers selected by it to carry out its directives of policy and program.

168.    According to the "Mission Statement" set forth in the Board of Visitors' <u>Manual</u>:

Purpose

The University of Virginia is a public institution of higher learning guided by a founding vision of discovery, innovation, and development of the full potential of talented students from all walks of life. It serves the Commonwealth of Virginia, the nation, and the world by developing responsible citizen leaders and professionals; advancing, preserving, and disseminating knowledge; and providing world-class patient care.

We are defined by:

•    Our enduring commitment to a vibrant and unique residential learning environment marked by the free and collegial exchange of ideas;

•    Our unwavering support of a collaborative, diverse community bound together by distinctive foundational values of honor, integrity, trust and respect;

•    Our universal dedication to excellence and affordable access.

169.   According to the University of Virginia's 2023-2024 <u>Faculty Handbook</u>, "[t]he Officers of the Board of Visitors are: *the Rector of the University of Virginia, the Vice Rector, the President of the University, the Chief Operating Officer of the University, the Provost of the University, and the Secretary to the Board of Visitors.*"

170.   Importantly, according to its "Statement of Visitor Responsibilities," enacted by the Board of Visitors and set forth in the Board of Visitors' <u>Board Basics</u> book, "Visitors do not speak on behalf of the University or the Board unless designated by the **rector** and/or the **president** to do so." (Emphasis added.)

171.   According to a formal, published legal opinion of the Attorney General of Virginia, announced in writing on October 2, 2023, every member of the University of Virginia's Board of Visitors and the Board itself, which naturally and logically includes the Board's officers, owes a "primary duty" to the Commonwealth of Virginia as a whole, rather than a duty to serve the interests of the university or college "only."

172.   The University of Virginia "educational environment" is a public accommodation under state and federal law.

173.   The University of Virginia is a "state government agency" of the Commonwealth of Virginia.

174.   It is the express public policy of the Commonwealth of Virginia to "safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, ethnic or national origin," "in places of public accommodation, <u>including educational institutions</u>." Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 (underscoring added).

175.   It is the express public policy of the Commonwealth of Virginia "to preserve the public safety, health, and general welfare." *Id*.

176.   It is the express public policy of the Commonwealth of Virginia "to further the interests, rights, and privileges of individuals within the Commonwealth." *Id*.

177.   Administrators, faculty, and non-faculty, non-administrative staff of the University of Virginia are employees of the Commonwealth of Virginia. The payor listed on the front of every UVA employee's paycheck, from the President of the University to a part-time, paid student manager for the football team, reads "The Rector and Visitors of the University of Virginia," which, legally, is the Commonwealth of Virginia.

178.   Members and officers of the Board of Visitors, administrators, faculty, and every non-faculty, non-administrative employee of the University of Virginia are bound by and have a duty to acknowledge, observe, and strictly adhere to the laws and public policies of the Commonwealth of Virginia.

179.   According to the regulations and laws governing the behavior and expectations of employees of the Commonwealth of Virginia:

> It is the policy of the Commonwealth to foster a culture that demonstrates the principles of civility, diversity, equity, and inclusion. In keeping with this commitment, workplace **harassment** (including sexual harassment), **bullying (including cyber-bullying)**, and workplace **violence of any kind** are prohibited in state government agencies.
>
> ***
>
> Expectations for appropriate behaviors extend to . . . **students** . . . and other third parties in the workplace.
>
> Virginia Department of Human Resource Management, Policy 2.35 Civility in the Workplace ("Authority and Interpretation: Title 2.2 of the Virginia Code") (emphasis added).

180. According to the UVA Office of the Executive Vice President and Provost's <u>Conflict of Interest—Faculty</u> portion of the University's <u>Academic Policies</u>:

> Faculty members are public officials whose professional activities may create situations in which their private or personal interests are potentially in opposition to their official responsibilities. A faculty member must be sensitive to the potential for conflict of interest situations and act in a manner to minimize their effects.
>
> \*\*\*
>
> As a matter of sound judgment and professional ethics, faculty members have a responsibility to avoid any apparent or actual conflict between their professional responsibilities and personal interests in terms of their dealings or relationships with students.
>
> \*\*\*
>
> Failure to abide by the conflict of interest principles described above can have serious consequences.

181. According to the <u>University Code of Ethics for Faculty and Staff</u>, expressly approved and adopted by the Board of Visitors on December 6, 2019, the Faculty are bound by the following duties and obligations, among others:

1. **Compliance and Ethics**: We perform our responsibilities ethically and honestly, in compliance with all University policies and applicable federal, state, and local laws.

2. **Use of University Resources**: We use University resources only for their intended business purpose, as aligned with the University's mission. We promote accurate financial reporting, protection of the University's assets, and responsible fiscal management. Our expenditures are reasonable and necessary.

3. **Conflicts of Interest**: We uphold our primary professional responsibilities to the University and the Commonwealth of Virginia, and actively avoid and report all actual, potential, and perceived conflicts of interest.

4. **Gifts and Gratuities**: We perform our public duties without accepting, soliciting or offering anything of economic value such as gifts, gratuities, favors, or benefits that may improperly influence

our professional judgment or seek to influence the judgment of others.

5.   **Confidentiality**: We preserve the confidentiality and security of University records and we protect the privacy of individuals who provide personal information to the University. We access information only as necessary and disclose information only to those individuals with a legitimate reason to receive it.

6.   **Equal Opportunity**: We promote an inclusive and welcoming community that respects the rights, abilities, and opinions of all people. We value equal opportunity and diversity. We do not tolerate discrimination or harassment of any kind.

7.   **Respectful Workplace**: We treat every individual with kindness, dignity and respect, regardless of position or status. We provide a safe and healthy environment for working, living, and learning. We collaborate with others in a positive and respectful manner.

8.   **Honesty and Integrity**: We act and communicate honestly and with integrity, upholding the University's values at all times. We do not condone dishonesty by anyone in any form, including fraud, theft, cheating, plagiarism or lying.

9.   **Reporting Without Fear of Retaliation**: We report all violations of law or University policy, without fear of retaliation for reports made in good faith. We investigate all concerns and determine corrective action. We will cooperate with all investigations into suspected wrongdoing.

182.   Every student, faculty member, administrator, and employee of the University of Virginia is bound and obligated by and owes a duty to observe and adhere to <u>HRM-009: Preventing and Addressing Discrimination and Harassment</u>. The policy extends and applies to "current and former employees of the University, students, and third parties, e.g., applicants for admission or employment, participants in University programs or activities, customers for services, vendors, contractors, and volunteers." The "Oversight Executive" of UVA's anti-discrimination and harassment policy is Defendant President Ryan. The policy provides, in pertinent part:

Reason for Policy:

The University is committed to providing a workplace and educational environment, programs, and activities free of discrimination and harassment. This policy does not allow curtailment or censorship of constitutionally protected expression.

*\*\**

Policy Statement:

The University will not tolerate discrimination or harassment in the workplace, academic setting, or in its programs or activities based on age, color, disability, family medical or genetic information, gender identity or expression, marital status, military status (which includes active duty service members, reserve service members, and dependents), national or ethnic origin, political affiliation, pregnancy, race, religion, sex, sexual orientation, or veteran status. This policy is intended to be consistent with applicable federal and state laws and state and University policies.

183. Every student, faculty member, administrator, and employee of the University of Virginia is bound by and obligated to observe and adhere to HRM-010: Preventing and Addressing Retaliation. In the policy, retaliation is defined as "[a]dverse action, including but not limited to reprisal, interference, restraint, penalty, discrimination, intimidation, or harassment." The "Oversight Executive" of UVA's anti-retaliation policy is Defendant President Ryan. The policy provides, in pertinent part:

Reason for Policy:

The University is committed to providing a workplace and educational environment, programs and activities free of retaliation against persons who, in good faith (holding a genuine belief in the truth of one's allegations), complain of discrimination and/or harassment as defined in policy, HRM-009, Preventing and Addressing Discrimination and Harassment, or who assist with or participate in the process outlined in EOCR's Preventing and Addressing Discrimination, Harassment and Retaliation Complaint Procedures. This policy does not allow curtailment or censorship of constitutionally protected expression.

Policy Statement:

> The University prohibits retaliation directed against a person for making a good faith complaint under the policy HRM-009: Preventing and Addressing Discrimination and Harassment or this policy or assisting or participating in the complaint process. Retaliation may exist even when the underlying complaint is without merit or not substantiated.
>
> This policy is intended to be consistent with applicable federal and state laws and state and University policies.

184.    In addition to the array of state and federal laws, regulations, and public policies, along with the University's policies and procedures set forth or alluded to above that govern how students and student groups at the University of Virginia should behave and how they should treat others, the University also has codified and announced numerous policies and procedures, including grievance and punishment procedures, regarding student rights and responsibilities.

185.    According to the Office of the Vice President and Chief Student Affairs Officer and the Dean of Students, at the University of Virginia, students enjoy certain rights and responsibilities and are bound by the following duties, rules, and codes of conduct:

> **Introduction**
>
> The University of Virginia is a community of scholars in which the ideals of freedom of inquiry, freedom of thought, freedom of expression, and freedom of the individual are sustained. The University is committed to supporting the exercise of any right guaranteed to individuals by the Constitution and the Code of Virginia and to educating students relative to their responsibilities.
>
> **Student Rights**
>
> The University of Virginia seeks to maintain an environment where students have the following rights:
>
> • *Expression* - Students can freely examine and exchange diverse ideas in an orderly manner inside and outside the classroom;
>
> • *Association* - Students can associate freely with other individuals, groups of individuals and organizations for purposes which do not infringe on the rights of others;

- *Freedom from Discrimination* - Students can expect to participate fully in the University community without discrimination as defined by federal and state law and University regulations;

- *Safe Environment* - Students can function in their daily activities without unreasonable concerns for personal safety;

- *Discipline* - Students can expect discipline to be implemented through established procedures containing all elements of due process for the adjudication of charges, and the opportunity for continued University involvement (as appropriate) until the resolution of the charges;

- *Privacy* - Students are free of unreasonable intrusions into personal records and/or matters relevant to identity, living space and well being;

- *High Quality Resources* - Students have access to high quality resources which support intellectual and social development;

- *Counseling* - Students have access to support in managing personal adjustments, understanding self and others, and career planning and personal decision making;

- *Grievance Process* - Students have access to established procedures for respectfully presenting and addressing their concerns/complaints to the University;

- *Learning Beyond Formal Instruction* - Students have access to a variety activities beyond the classroom, which support intellectual and personal development;

- *Education* - Students have access to excellent faculty, academic technology, classrooms, libraries, presentations and other resources necessary for the learning process;

- *Personal Growth* - Students live and study in a setting that fosters personal growth;

- *Participation in Community Affairs* - Students have opportunities to interact with people and institutions both within and beyond the University community;

- *Student Activity Fee Refunds* - Students may apply for a partial refund of their student activity fee if they do not wish to support the

particular speech activities of some student organizations receiving these funds;

- *University Governance* - Students participate in the governance of the University, with opportunities including but not limited to the Honor and University Judiciary committees, allocations of student activities fees, programming (University Programs Council), Residence Life (resident staff and house councils), and through membership on University and school committees;

- *Prompt Responses from Administration* - Students have the right to expect prompt and courteous responses from the University's academic and administrative departments;

- *Academic and Administrative Policies* - Students can expect academic and administrative policies that support intellectual inquiry, learning, and growth.

**Student Responsibilities**

The exercise and preservation of these freedoms and rights require a respect for the rights of all in the community. Students enrolling in the University assume an obligation to conduct themselves in a manner that is civil and compatible with the University's function as an educational institution. It is clear that in a community of learning, willful disruption of the educational process, destruction of property, and interference with the orderly process of the University, or with the rights of other members of the University, cannot be tolerated. In order to fulfill its functions of imparting and gaining knowledge, the University has the authority and responsibility to maintain order within the University and to exclude those who are disruptive of the educational process.

186.   As part of the Division of Student Affairs and as a vital component of the University's "Community of Trust," the "student-led" University Judiciary Committee (or "UJC") is charged with establishing the University's "judicial system," adjudicating cases brought before it, and, with the University administration's assistance and execution, "sanctioning" and punishing students.

187. According to University and UJC materials and governing documents, "[t]he UJC hears cases of alleged misconduct by a student or a student group brought to its attention by any member of the academic or civic community. Anyone can file a case." Importantly:

> While the Judiciary Committee is student-run, all decisions of the UJC are subject to review by the Vice President and Chief Student Affairs Officer. If they believe that any decision is so inappropriate that it is not in the best interest of the University, they may consult with the Committee for a possible revision or refer it to the Judicial Review Board. A case is finalized when either the Vice President and Chief Student Affairs Officer approves the decision or when the Judicial Review Board of the Board of Visitors has rendered a decision in cases of appeal.

188. The University Judiciary Committee investigates charges, conducts and presides over trials for guilt and punishment, and delivers punishment to those students found guilty by Committee. The UJC may levy up to ten different levels of "sanction" upon a student ranging in severity from an oral admonition to the ultimate penalty, permanent expulsion, or, as it calls it, "termination."

189. The University Judiciary Committee is charged with and has established a Student Code of Conduct that further codifies and announces the duties owed by students at the University of Virginia to one another, the University, and the surrounding community:

> **Purpose**
>
> To maintain and promote a community of respect, safety, and freedom
>
> **Philosophy**
>
> Students take responsibility for establishing the codes of conduct we desire in our academic community. By entering the University, we, as students, accept the responsibility: to respect the physical welfare of all persons in the University community, to keep from misuse or harm property which belongs to the University or members of this community, to maintain an atmosphere conducive to education and scholarship, to contribute to the pursuit of the University's goals, and to further the ideals of Honor and Freedom.

**The Standards of Conduct**

The University of Virginia is a community of scholars in which the ideals of freedom of inquiry, freedom of thought, freedom of expression, and freedom of the individual are sustained. It is committed to preserving the exercise of the rights and responsibilities in the Constitution. The exercise and preservation of these freedoms and rights require a respect for the rights of all in the community to enjoy them to the same extent. It is clear that in a community of learning, willful disruption of the educational process, destruction of property, and interference with the orderly process of the University or with the rights of other members of the University cannot be tolerated. Students enrolling in the University assume an obligation to conduct themselves in a manner compatible with the University's function as an educational institution. To fulfill its functions of imparting and gaining knowledge, the University has the responsibility to maintain an atmosphere conducive to its educational purpose.

1.    Physical assault of any person on University-owned or leased property, at any University sanctioned function, at the permanent or temporary local residence of a University student, faculty member, employee, visitor, or in the City of Charlottesville or Albemarle County, or Prohibited Conduct, as defined in the University of Virginia Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence.

2.    Conduct which intentionally or recklessly threatens the health or safety of any person on University-owned or leased property, at a University sanctioned function, at the permanent or temporary local residence of a University student, faculty member, employee or visitor, or in the city of Charlottesville or Albemarle County.

3.    Unauthorized entry into or occupation of University facilities which are locked, closed to student activities or otherwise restricted as to use.

4.    Intentional disruption or obstruction of teaching, research, administration, disciplinary procedures, other University activities, or activities authorized to take place on University property.

5.    Unlawfully blocking or impeding normal pedestrian or vehicular traffic on or adjacent to University property.

6.    Violation of University policies or regulations referenced in The Record, including policies concerning residence and the use of University facilities.

7.      Alteration, fabrication, or misuse of, or obtaining unauthorized access to University identification cards, other documents, or computer files or systems.

8.      Disorderly conduct on University-owned or leased property or at a University-sanctioned function. Disorderly conduct is defined to include but is not limited to acts that breach the peace, are lewd, indecent, or obscene, and that are not Constitutionally protected speech.

9.      Substantial damage to University-owned or leased property or to any property in the city of Charlottesville or Albemarle County or to property of a University student, employee, faculty member, or visitor, occurring on University-owned or leased property or at the permanent or temporary local residence of any student, faculty member, employee or visitor.

10.     Any violation of Federal, State, or local law, if such directly affects the University's pursuit of its proper educational purposes and only to the extent such violations are not covered by other Standards of Conduct and only where a specific provision of a statute or ordinance is charged in the complaint.

11.     Intentional, reckless, or negligent conduct which obstructs the operations of the Honor or Judiciary Committee, or conduct that violates their rules of confidentiality.

12.     Failure to comply with directions of University officials acting under provisions 1-11 set above. This shall include failure to give identity in situations concerning alleged violations of sections 1-11.

190.   In addition to the rules, regulations, policies, and procedures set forth above governing students and faculty at the University of Virginia, official and formal student groups at UVA, called "Contracted Independent Organizations" or "CIOs," such as Defendant SJP at UVA, must execute the Agreement for a Contracted Independent Organization for each school year. The "contract" includes the following terms:

For the duration of this Agreement and as a condition of this Agreement, the CIO represents that

(a)     at least 51% of its members are University students,

(b)      a minimum of 10 University students are listed as members, and

(c)      all of its officers are enrolled in a degree-granting program (they can be part-time or full-time fee-paying University students).

This agreement does not become effective **until approved by the Division of Student Affairs**.

\*\*\*

The CIO also represents that its associated activities and the associated activities of its members, whether or not sponsored or officially approved by the CIO, do not and **will not violate local, state or federal law or the University's Standards of Conduct**.

\*\*\*

The University's Preventing and Addressing Discrimination and Harassment (https://uvapolicy.virginia.edu/policy/HRM-009) and Preventing and Addressing Retaliation (https://uvapolicy.virginia.edu/policy/HRM-010) policies, as well as applicable state and/or federal law, **prohibit Discrimination, Harassment, and Retaliation** ("PADHR Conduct"). The CIO acknowledges that by signing this agreement, **the University has the authority to investigate reports of Prohibited Conduct or PADHR Conduct made by University students against members of the CIO**, and **to determine appropriate sanctions**, which may include **suspension or termination of the CIO** agreement, restrictions on the rights of the CIO to use University facilities, and access University services and resources. **CIO Members' failure to comply with the University's policies listed in this section may result in the University severing all ties with the CIO.**

The undersigned further attests that he/she is **bound by the University's Honor Code** and is knowledgeable of the responsibilities of the officers of the CIO. . . . The undersigned hereby acknowledges that **the CIO is responsible for adhering to all local, state, and federal laws, as well as the policies, deadlines, and guidelines applicable to CIOs at the University of Virginia**. (Emphasis added.)

191.  Defendant SJP at UVA's "CIO" contract was executed under the "Honor" of its President, UVA Student "J.R.," with a formal, executed copy supplied to "The Rector and Visitors of the University of Virginia."

192.   The University of Virginia is an "educational environment" that is composed of physical place and elements; a virtual and online presence and universe; the human and personnel component, including groups and associations; the "academy" or academic component; the "UVA Community of Trust;" and the duties, laws, regulations, policies and procedures that bind the pieces together.

193.   The University of Virginia "educational environment" is a public accommodation under state and federal law.

194.   The University of Virginia and President Ryan owe a special duty of care to protect and safeguard UVA students in an "educational environment" free of violence, harassment, abuse, bullying, and discrimination. This includes the affirmative duty to act to protect students at all times, to safeguard the educational environment, even when doing so is unpopular.

195.   UVA faculty, administrators, and staff are public employees and public officials who are bound by state and federal laws as well as University policies and procedures.

196.   UVA students possess a panoply of rights beyond being residents or citizens of the Commonwealth of Virginia and the United States. However, UVA students and student groups are also bound and governed by rules and regulations that do not apply to non-student private citizens.

197.   Regarding antisemitism and antisemitic abuse, harassment, and discrimination at the University of Virginia and within its "educational environment," the University of Virginia has, to date, failed to enforce and has refused to even threaten to enforce a single policy, rule, law, or student code of conduct.

3. __The University of Virginia's Capacity & Willingness To Punish "Hate" on Campus__

198.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

199.   As demonstrated above, the University of Virginia is obligated to adhere to and enforce numerous policies, codes of conduct, and governing laws regarding discrimination, harassment, and abuse, most notably its own policies and procedures regarding discrimination, harassment, and procedure.

200.   As demonstrated above and below, the University of Virginia possesses a veritable arsenal of resources and assets that can be deployed on a moment's notice to address what it perceives to be threats to student safety or incidents of "offensive" speech or misconduct.

201.   The University of Virginia routinely punishes and sanctions conduct and behavior, including "pure speech," that it finds offensive.

202.   Nevertheless, the University of Virginia has failed and purposefully refused to punish, sanction, or condemn, or take any action whatsoever regarding antisemitism and antisemitic harassment and abuse occurring in the UVA educational environment at the hands of its own students and faculty members.

203.   The University of Virginia and President Ryan readily admit that they have taken no actions whatsoever to enforce the laws, rules, regulations, policies, and codes of conduct that govern students, student groups, faculty, and faculty groups regarding credible accusations of antisemitism and antisemitic abuse, harassment, and misconduct.

204.   The University of Virginia and President Ryan now claim that their failure and refusal to protect Jewish students and faculty are warranted by the First Amendment and Free Speech principles.

205.   That excuse is a mere façade, a fake pretext.

206.   The Ryan Administration and the University have shown on a number of well-documented occasions that they possess the capability and willingness to suppress and punish even "pure speech" and will do so without regard to the First Amendment or other fundamental civil rights, so long as it finds the speech "offensive."

207.   In this educational environment, Jewish students are viewed as one particular "race" or "color," and those who are antisemitic, anti-Israel, and anti-Zionist are categorized as being of another "race" or "people of color." In other words, "but for" Matan's "race," as that term is defined by Title VI and the Fourteenth Amendment, President Ryan would have acted and would have enforced the laws, regulations, rules, policies, and codes of conduct that govern students and faculty at the University of Virginia that would have protected Matan from the harassment and abuse that he suffered.

208.   Similarly, the facts and circumstances surrounding the wrongful persecution, litigation, and ultimate settlement of the *Morgan Bettinger Matter*,[9] utterly refute any attempt by President Ryan to suggest that the University and he genuinely believe that the First Amendment prohibits disciplinary measures regarding matters of "pure speech" that are deemed "offensive." Morgan Bettinger was a victim or a racial hoax that was amplified and wrongfully prosecuted by the University of Virginia and President Ryan. Morgan was a twenty-one year old UVA student who was wrongfully persecuted, punished, and ostracized from the community by the University of Virginia and the Ryan Administration for speaking fifteen words during a friendly conversation with a truck driver who had no connection to the University, while she was caught unawares in the perimeter of a non-

---

[9]   *Bettinger v. The Rector and Visitors of the Univ. of Va., et al.*, 3:23-cv-00041-NKM (W.D. Va.).

University-related Black Lives Matter "noise demonstration" that disrupted businesses and caused a traffic stoppage in downtown Charlottesville on her way home from work, away from UVA's campus, during a time when UVA's premises were closed, the school was not in session, and operations were "locked down."

209. For that, the University of Virginia swiftly, publicly and officially condemned Morgan before ever speaking with her; the University offered resources and personnel to comfort people who never knew, spoke to or even saw Morgan; subjected Morgan to three separate investigations lasting thirteen months; investigated, tried, and punished Morgan in sham proceedings *initiated by UVA's Dean of Students*; and ultimately expelled Morgan from the University "in abeyance."

210. During the horrible crucible, Morgan was "doxxed," subjected to credible, detailed, and gruesome death threats, forced to go into hiding and wear disguises (at the suggestion of University Police), forced to attend class anonymously and via Zoom, and subjected to condemnation, humiliation, and ridicule by her fellow classmates and UVA faculty members.

211. President Ryan was personally aware of every detail and development in the matter, was personally aware and fully knowledgeable of the illegality and immorality of the University's treatment of Morgan, and was personally aware that he and he alone possessed the right and solemn duty to protect Morgan and put an end to the wrongful prosecutions and damages being inflicted on the young woman. The express message to Morgan from President Ryan's office, with full awareness and knowledge that the University and by extension the Commonwealth of Virginia, faced clear liability for egregious constitutional and civil rights violations, was "tell her to go ahead and sue." President Ryan personally

refused to intervene or properly discharge his executive oversight functions regarding her case. Even after Morgan was forced to engage counsel, file suit, and ultimately secure a meaningful settlement from the University, President Ryan personally refused to meet with Morgan or even acknowledge or express remorse for the harms she suffered.

212. The University of Virginia, under the Ryan Administration, demonstrated that it was more than capable and willing to suppress and punish "pure speech" despite its wariness of the First Amendment and Free Speech implications.

213. In the middle of the night of September 7, 2022, a person who was neither a student, a faculty member, nor in any way connected to the University of Virginia (and was not even a resident of the City of Charlottesville) placed a piece of rope around the Homer statue on the Lawn in an act of protest denouncing child sexual abuse and pedophilia. The piece of rope was tied in a manner resembling a noose and was discovered by University security personnel around 4:00AM. The display was not, to anyone's knowledge, ever seen or observed by any students, faculty members, or other visitors to the University.

214. President Ryan and every department of the University of Virginia immediately sprang into action to denounce the incident as a "hate crime" (which turned out to be erroneous) and to implement remedial and corrective measures throughout the University Community.

215. Importantly, in the hours after the "noose" was discovered, Defendant President Ryan publicly stated, in writing:

> The facts available indicate that this was an act intended to intimidate members of this community. A noose is a recognizable and well-known symbol of violence, most closely associated with the racially motivated lynchings of African Americans. The combination of those factors led University public safety officials to determine that this incident **met the criteria of a hate crime**. (Emphasis added.)

216.   The University and President Ryan broadcast multiple "Community Alerts" through the University's official online groups and communications channels; posted multiple condemnations and expressions of anguish through the school's and its officials' various social media platforms; published formal letters of outrage, condemnation, and promises to heal the community; convened the University's Threat Assessment Team (as the University did in the *Bettinger Matter*); launched investigations by the University Police Department (as the University did in the *Bettinger Matter*); notified and called upon the Albemarle County Police <u>and</u> the Virginia State Police <u>and</u> the Federal Bureau of Investigation to investigate, apprehend, and prosecute the perpetrator; offered a reward of $10,000 for information identifying the perpetrator; and convened numerous meetings for several weeks on end at the University's request with Black students, faculty members, and community residents to allay their fears, listen to their demands regarding the University's response, and to assure them that the University had complied with their requests and demands. Nearly every University organization or affiliate also immediately publicly published an expression of outrage and condemnation. At some point, the individual was arrested and charged in Albemarle County Circuit Court with felony hate crimes at the University's urging, even after it learned that the "noose" was not racially motivated.

217.   These examples of disparate treatment are yet another form of proof and evidence of racial animus and discriminatory intent.

218.   The University of Virginia and President Ryan's decisions regarding Matan Goldstein, the Jewish students population at UVA, and lack of adherence to or enforcement of governing laws, rules, policies, and codes of conduct are racially influenced and motivated.

219.  The University of Virginia and President Ryan have refused to offer any rationale or legitimate educational basis to explain why, on the one hand, the University will readily punish "pure speech" that it finds "racially offensive" but has not taken any action or enforced any of its own policies and codes of conduct regarding antisemitism or antisemitic abuse and harassment occurring on its own campus. The only explanation is intentional discrimination on the basis of race, ethnicity, national origin, shared ancestry, and religion.

220.  The racial identity of perpetrator and victim are critical elements and factors regarding the University and President Ryan's student or faculty discipline decision-making.

221.  But for race, and specifically but for the Plaintiff's race, national origin, ethnicity, and shared ancestry, the University and President Ryan would have enforced the applicable and governing laws, rules, regulations, policies, and codes of conduct and would have afforded the Plaintiff protection from the illegal, immoral hate-based discrimination, harassment, and abuse in the University of Virginia educational environment.

222.  These are but a few examples of President Ryan and the University punishing "pure speech," and yet, these examples alone beg the question: If a piece of rope hung on a statue constitutes a "hate crime," in President Ryan's own words, why don't antisemitic chants on Grounds and posters on University facilities calling for the murder of Jews and the extermination of the state and people of Israel constitute "hate crimes?" The only explanation is intentional discrimination.

223.  The Plaintiff alleges and claims that the University of Virginia and President Ryan's express refusal to protect him and their failure to enforce governing laws, rules, policies, and codes of conduct are because of race, specifically, because of his race.

224.   The evidence adduced thus far in this matter would suggest that the University of Virginia is perfectly willing to take substantial, aggressive actions, even the suppression of "pure speech," when it finds the perpetrators, the misconduct, or the speech repugnant or offensive, but will not take any actions of any kind against antisemitism or antisemitic abuse, harassment, or even violence.

225.   At all times and in all events relevant and material to this action, Defendants the University of Virginia and President Ryan acted under color of state law and authority.

226.   As to Defendant the University of Virginia, the Plaintiff seeks a declaratory judgment, prospective injunctive relief, compensatory damages, and attorneys' fees and costs under Title VI and 42 U.S.C. § 1988.

**D.   DEFENDANT PRESIDENT JAMES E. RYAN**

227.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

228.   Defendant James E. Ryan, who is being sued in his official, individual, and personal capacities, is the ninth President of the University of Virginia and was serving in that position at all times relevant to this action. Pursuant to Sections 4.22(1), (7), (8) and (9) of The Manual of the Board of Visitors of the University of Virginia:

> As the principal administrative officer of the University and chief executive officer of the Academic Division, the President shall have the following powers and duties:
>
> ***
>
> (1) The President shall have responsibility for the operation of the University in conformity with the purposes and policies determined by the Board;
>
> ***

(7) The President shall at all times maintain cordial relationships with the students, guarding and protecting their best interests;

\*\*\*

(8) The President shall use particular efforts to preserve and foster the Honor System;

\*\*\*

(9) The President shall be responsible for the discipline of students with the power to impose appropriate penalties including expulsion;

\*\*\*

229. President Ryan lives at Carr's Hill, the University President's mansion across from the Rotunda on the University Grounds in Charlottesville. According to public interest groups who have conducted studies and evaluations of salaries and compensation at the University of Virginia, the value of President Ryan's annual compensation and benefits purportedly exceed a taxpayer cost of $2,000,000.

230. Defendant President Ryan is the University of Virginia's supreme and ultimate arbiter and administrator over the protection of every student's "best interests," including their physical safety and most fundamental civil rights. Defendant President Ryan does not have the legal authority to shirk or abrogate his ultimate responsibilities, and he is not legally permitted to delegate away his duties to protect his students' "best interests" and their constitutionally protected civil rights, even under the guise of "student self-government."

231. By operation of law, as a matter of fact, and according to his own admissions, President Ryan was and remains to this day the sole person with the authority to render and approve the decisions, efforts, strategy, resolution, and disposition of Matan Goldstein's student experience; his mistreatment at the hands of the University itself; the University's tolerance and encouragement of discrimination, harassment, and abuse on University premises and

during the course and scope of University operations by University actors, agents, and University Community members; the University's mishandling of these matters, including the instant litigation; and, finally, the University's purposeful retaliation against Matan for engaging in protected activities.

232.   President Ryan is a constitutional law and education law expert whose advisors and counselors are also constitutional law and education law experts. President Ryan was fully aware and cognizant at all times that his acts, errors, and omissions unequivocally violated clear the Plaintiff's well-established federally protected civil rights. Therefore, the defense of qualified immunity is not available to him.

233.   As to Defendant Ryan, the Plaintiff seeks a declaratory judgment, injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 1981, 1983, and 1988. At all times and in all events relevant and material to this action, President Ryan acted under color of state law and authority, and he is sued in his personal and individual capacities. Defendant Ryan is a resident of Charlottesville, Virginia, is competent and capable of suing and being sued, and is subject to the jurisdiction of this Honorable Court.

## V. THE FACTS

234.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

### A.   THE WORLD'S OLDEST HATRED

235.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

236.   Antisemitism and the hatred of and desire to eradicate the Jewish people from the Earth have been called "the world's oldest form of hate."

237.   Anti-Israel bias is antisemitism and antisemitic. It also constitutes a form of national origin and shared ancestry discrimination.

238.   Anti-Zionism or being anti-Zionist is antisemitism and antisemitic. It also constitutes a form of religious, national origin, and shared ancestry discrimination.

239.   The phrase or chant "from the river to the sea, Palestine will be free" whether written or spoken, is an antisemitic slogan that implies and calls for the death of Jews and the destruction of Israel and its people. The phrase refers to and calls for the ethnic cleansing of the land between the Jordan River and the Mediterranean Sea: Israel. This definition and interpretation are not subject to multiple meanings nor can they be credibly disputed.

240.   The phrase or chant "intifada, revolution, there is only one (or final) solution," whether written or spoken, is an antisemitic slogan that implies and calls for the death of Jews, the destruction of Israel and its people, and evokes the horrors of the Holocaust, which was termed "the Final Solution" by the Nazis. The word "intifada" means "uprising against Israel (or Jews)." This is another statement of fact that cannot be credibly disputed.

241.   Images of Hamas terrorists or Hamas's terrorist symbols posted are antisemitic, especially when posted within an educational environment. The images are meant to evoke and celebrate the massacre of Jews. The images and symbols are broadcast and displayed for the sole purpose of threatening and intimidating Jews, for the purpose of causing Jewish students such as Matan to experience fear, anxiety, and severe anguish, and for the purpose of causing Jewish students such as Matan to feel unwelcome, and, if the antisemitism is successful, to avoid or leave the educational environment altogether.

242.    Defendants SJP at UVA and FJP at UVA routinely display images and paint graffiti depicting an inverted "red triangle." According to the Anti-Defamation League, the red triangles are used to "represent Hamas itself and glorify its use of violence in many popular anti-Zionist memes and political cartoons. For example, individuals will place the symbol over an image of Israeli soldiers or overlaid on a Star of David as a way to call for further violent resistance."



*Image depicting the Columbus Memorial Fountain at Union Station in Washington, D.C., defaced by pro-Hamas agitators during the July 24, 2024, official State address to a joint session of Congress by Israel Prime Minister Benjamin Netanyahu.*

243.    Glorifying the Holocaust or the slaughter of Jewish people or anti-Israel terrorist attacks within an educational environment is antisemitic and calculated to cause Jewish students such as Matan anguish and fear.

244.    As discussed above, the Boycott, Divestment, and Sanctions Movement, also known as "BDS" or the "BDS Movement," is an antisemitic, anti-Israel, and anti-Zionist maneuver or tactic employed by Hamas and its worldwide proxies with "demonization and delegitimization of Israel" as its "predominant drive," according to the Anti-Defamation League. Proponents of BDS cynically and falsely attempt to cast BDS as similar to the efforts used to dismantle apartheid in South Africa in the 1980s. The BDS movement demands that universities and colleges eliminate student exchange programs with Israel

and its schools and cancel all joint research initiatives with Israel and its institutions of higher learning, among other patently antisemitic positions.

245.   In truth, BDS is just another phony codeword for the hatred of Jews and an antisemitic strategy by Hamas to undermine, delegitimize, and destabilize Israel.

246.   In the weeks and days leading up to the October 7, 2023, massacre in Israel, Students for Justice in Palestine chapters across the country, specifically including Defendant SJP at UVA, came alive with increasing hateful chatter and intensity:



*A Defendant SJP at UVA flyer interfering with the educational environment of UVA students planning to study in Israel and showing the involvement of other antisemitic groups and connection to UVA Law School.*



*Defendant SJP at UVA's Instagram post of September 17, 2023.*
*"Black September" is universally recognized and most widely identified as the Palestinian terror organization,*

69

*formed in 1970, that carried out the Munich Massacre at the 1972 Munich Olympiad*
*in which eleven Jewish, Israeli athletes and coaches were murdered.*

247.    As with all of the virtual and physical expressions of antisemitic hate by Defendants SJP
        at UVA and FJP at UVA, the posts above were widely disseminated and were all viewed
        by Matan, just a few weeks after his arrival at the University of Virginia.

248.    Matan and his parents, like most of the other Jewish students at UVA and their parents, are
        intimately aware of and sensitive to antisemitism in the world, in the United States, and at
        UVA. Matan and his parents are in constant contact with other UVA Jewish students and
        their parents, and all are in constant contact with Jewish students and their parents at other
        colleges and universities. Countless social media groups exist in which students and parents
        share their hopes, dreams, fears, and awareness of danger.

249.    Matan and his parents are not "unusual" or "outliers." Matan and his parents are deeply
        devout and faithful to Judaism and are deeply attached both spiritually and culturally to the
        Jewish homeland of Israel and the idea and faith that is Israel. They are also aware, vigilant,
        and alert to antisemitism and hate directed at their faith, their people, and their sacred
        homeland. This is true for most Jewish students and their parents at UVA and schools just
        like UVA across the country. Thanks to social media and the ubiquity of smartphones,
        Jewish students and their parents can and do connect to thousands of other Jewish students
        and parents in their communities, their schools, and across the country.

250.    When a national group such as NSJP announces openly that it seeks and desires the
        extermination of Jews and the destruction of Israel, the Jewish community, specifically
        including Matan and his parents, are immediately aware of it, and they pass the word. When
        a school's "chapter" or franchise, such as SJP at UVA and FJP at UVA, announces that it
        "is" the national organization and that it "supports and stands in solidarity" with its

"comrades" who have announced their desire to kill Jews and destroy Israel "by any means necessary," Matan and his parents and thousands, if not tens of thousands of Jewish students and their parents, will have heard it and read it and feared the inevitable hate-based torment that would be sure to follow within seconds of the hatred being announced.

251.    Students like Matan and parents like Matan's parents share their fears and warn others of what's coming.

252.    The antisemites and antisemitic organizations know this. That their messages of hate—their antisemitic bullying and torment—will be seen and viewed and shared by the Jewish community is not a "bug" of their vile program, it is a feature. They want to sow terror and anguish and anxiety among the Jewish families. They want Jewish students who support Israel to flee campuses in fear for their lives. Their aim is to make the educational environment for every Jewish student, every supporter of Israel, every Zionist, an inhospitable, hostile, toxic environment.

253.    Social media posts such as the ones above were shared widely among the Jewish community at UVA and beyond, and specifically reviewed by Matan and his parents. It is important to remember that these posts would have been transmitted just a few weeks after Matan's arrival for his freshman year in college.

254.    The posts above are clear evidence of the pervasion of severe, objectively offensive antisemitism throughout the virtual or online world that is the UVA educational environment, which, in today's world, occupies the vast majority of time, attention, and resources of the entire "educational environment." These posts were viewed tens of thousands of times and shared, "liked," and "reposted" thousands of times by UVA

students and faculty, further confirming saturation and infection of the human component of the University of Virginia's educational environment.

255.    That is what SJP at UVA and FJP at UVA want, and that is what they have created.

256.    The University of Virginia and President Ryan have enabled and allowed antisemitism to happen, they have illegally remained deliberately indifferent to the campaign of hate being waged against Jewish students, and they have illegally refused to take a single action to protect Jewish students or give them the full, unfettered access to the educational environment that they deserve and are entitled to receive.

257.    The antisemitism at UVA has caused Matan great anguish and fear of imminent danger and harm, caused him to worry that UVA was sponsoring and supporting groups that openly celebrated the massacre of Jews, and has effectively barred and impaired Matan's access to the UVA educational environment.

258.    The lie that being "anti-Israel" or "anti-Zionist" is not antisemitic or *not necessarily antisemitic* is a dishonest form of antisemitism much in the way that David Duke of the Ku Klux Klan claims not to be a racist but rather a "proponent of European-American rights."

259.    As with nearly all Jewish people known to the Plaintiff and, polls show, as many as 90% of Jewish people in the world, Israel lies at the core of Matan Goldstein's identity. Israel represents the homeland of the Jewish people, given to them by God and set aside for them for thousands of years. Judaism is synonymous with supporting Israel. To be a faithful Jew means to support the right of Israel to exist.

260.    To oppose these Jewish ideals and principles of faith is to be antisemitic.

261.    Just as white supremacists use thinly veiled "codes" to express their hate while appearing benign, innocuous, or defensible (such as emblazoning the numbers "88" on garments or

tattoos in place of "HH" or "Heil Hitler"), antisemites attempt to cloak their bigotry and hatred in code words and phrases and craft images that have symbols of hate embedded in what might otherwise be innocuous imagery.

262.    Saying, "I am not antisemitic, I just oppose the right of Israel to exist," or "I am not antisemitic, I am anti-Zionist," is synonymous with antisemitism, and when institutions or individuals feign ignorance in understanding what those hateful slogans and beliefs mean, they are being willfully ignorant or masking their own antisemitism.

263.    Denial of the existence of antisemitism is a form of antisemitism and a form of prejudice, discrimination and hate. A particularly pernicious form of denial is known as "gaslighting" where the victim is belittled and ridiculed as crazy (or, as in this case, an "imbecile"), a liar (as has been done here), or, worse, as someone whose act of speaking out "harms" the Jewish community (as has been done here). Gaslighting is as old as antisemitism itself and is a form of psychological abuse and manipulation. Gaslighting in the context of antisemitism is itself antisemitic.

264.    UVA students who are members of SJP at UVA have been recruited by the University to claim, without condemnation or reproach, that Matan and others like him can be likened to "the boy who cried wolf" in published, mainstream media articles.

265.    Lawyers who are members of FJP at UVA's "Faculty Defense" team have likewise taken to the press to publicly refer to Matan as an "imbecile," calling him a liar, and saying that his lawsuit is an "embarrassment to the legal profession."

266.    Since October 7, 2023, numerous high-profile, "celebrity" professors at UVA have taken to social media to espouse antisemitic, anti-Israel, and anti-Zionist rhetoric and positions. These posts and positions have been viewed by Matan and most of the members of the

UVA Community, and they are known to the University Administration and President Ryan.

267.   Rather than working with Matan, the University and President Ryan have actively taken steps in public to brand him a liar and to portray his claims as "lacking credibility."

268.   The University has publicly published false claims that no Jewish students or faculty members have lodged complaints or grievances about antisemitic harassment and abuse.

269.   These are not just outright lies, they are also a classic example of "gaslighting."

270.   Likewise, those who seek to "gaslight," deny the existence of antisemitism, or defend their antisemitic behavior by recruiting or pressuring Jews to support their denial are guilty of antisemitism and antisemitic abuse and harassment.

271.   To Jewish people who are adherents to their faith and the deep, sacred bond among God, their people, and Israel, a particularly hurtful and noxious form of "gaslighting" is the so-called "As a Jew defense."[10]

272.   At the direction of NSJP, Defendant SJP at UVA and its members formed and operate multiple alter-ego and alias groups, specifically including the local chapter of a national antisemitic, anti-Israel, anti-Zionist group that calls itself Jewish Voice for Peace.

273.   National and international Jewish organizations such as Canary Mission have investigated Jewish Voice for Peace and have alleged that the group's leader is a man named Hatem Bazian, who, according to experts and investigators, is neither Jewish nor a voice for peace. Mr. Bazian is reported to be a virulent antisemite, the founder of both NSJP and AMP, and

---

[10]   Eli Lake, *A Brief History of the 'AsAJew'*, COMMENTARY MAGAZINE (Mar. 2024), https://www.commentary.org/articles/eli-lake/asajew-brief-history/. The University's decision to solicit, craft, publish, and rely upon a "statement" by a group identifying itself as the "UVA Jewish Leadership Advisory Board" to defend its inaction and deny the existence of antisemitism on Grounds while denouncing Matan is a prime example of the "As A Jew defense" and antisemitic "gaslighting" in practice.

a leader in the antisemitic Boycott, Divestment, and Sanctions movement who routinely defends Hamas and has called for "intifada" in the United States.

274. Defendant SJP at UVA and FJP at UVA's conduct, including the conduct depicted above, is objectively offensive, severe, antisemitic, and purposefully calculated to interfere with the rights of Jewish students and diminish Jewish students' access to the educational environment.

275. None of this behavior or these antisemitic slogans, chants, or images have any place in a public accommodation or a publicly supported educational environment such as a public university.

276. The antisemitic slogans, chants, and images violate University of Virginia policies and student codes of conduct. Importantly, the antisemitic chants, slogans, posters, and social media posts are <u>all</u> violations of the University of Virginia's anti-harassment policies and student codes of conduct.

277. The expressions of hate were specifically calculated to intimidate Jewish students and faculty and specifically disseminated to create a hostile educational environment where Jewish people were made to feel unwelcome and unsafe and to deprive Jewish students of free and unfettered access to the public accommodation educational environment.

278. The University of Virginia administration, specifically including President Ryan, the Office of the President, the UVA Police Department, the Office of University Counsel, the EOCR, and the UVA Student Affairs Division were all well-aware of the existence of the antisemitic groups operating on campus. They were well-aware of the increasing expressions of hostility and antisemitism towards the Jewish population in their community.

279.  The body of written, documentary evidence, mostly in email format, that has been secured by the Plaintiff thus far demonstrates that all of the administrative bodies identified above were specifically and actually aware not only of the antisemitism and antisemitic abuse occurring on grounds, but the multitude of complaints that were being lodged with every possible outlet or apparatus by Jewish students, including Matan, and Jewish faculty members.

280.  Most notably and shockingly, the Plaintiff possesses written evidence conclusively demonstrating beyond credible dispute that the University and all of the administrators and administrative bodies listed above were specifically aware and on notice of the antisemitic harassment and abuse occurring in the educational environment and specifically aware of formal complaints by UVA students and faculty members reporting the offensive and threatening behavior by Defendants SJP at UVA and FJP at UVA and expressing fear of grave danger before the University dishonestly reported to the press and the University Community that it had not received "any" complaints or concerns about antisemitism or antisemitic misconduct.

281.  Despite possessing actual knowledge of the student and faculty antisemitic misconduct and despite multiple formal complaints by students and faculty members, the University of Virginia has, to date, refused to take any actions of any kind in response.

282.  The University of Virginia should have taken precautions to protect its Jewish students and faculty and to plan and prepare for the inevitable onslaught of harassment, abuse, bullying, and even physical violence that was certain to occur.

283.  The University of Virginia did not condemn the student groups on its campus with known ties to organizations created, directed, and funded by federally designated Foreign Terrorist

Organizations. The University of Virginia did not transmit "Community Alerts" warning the students and faculty of the presence of this menace in their educational environment.

284. The University of Virginia did not mobilize the "Threat Assessment Team" regarding antisemitism on campus, antisemitic "hate crimes," or Defendants SJP at UVA and FJP at UVA or their affiliates.

285. The University of Virginia did not engage its own University Police Department regarding antisemitism on campus, antisemitic "hate crimes," or Defendants SJP at UVA and FJP at UVA or their affiliates. The University of Virginia did not report to or call upon the Albemarle County Police Department, the Virginia State Police, or the Federal Bureau of Investigation (FBI) regarding antisemitism on campus, antisemitic "hate crimes," or Defendants SJP at UVA and FJP at UVA or their affiliates.

286. To date, the University of Virginia has not enforced or taken any measures or steps to enforce a single one of its many anti-discrimination, anti-harassment, anti-bullying, and anti-retaliation policies and codes of conduct regarding antisemitism and antisemitic misconduct occurring at UVA.

287. The University of Virginia and President Ryan could have taken and was required to take action against the hate building and being fomented in their backyard, their educational environment. But they did not. Instead, they stood purposefully silent, frozen, and would remain so for the entire school year while hate descended on Charlottesville.

**B.    OCTOBER 7, 2023**

288. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

289. On October 7, 2023, the state and people of Israel, people of Jewish faith worldwide, and, indeed, every decent and civilized person with even an ounce of dignity or humanity within them, suffered and experienced the single most catastrophic act of antisemitic terrorism since the Holocaust. The atrocities are too numerous and the savagery too grotesque to adequately depict in this Complaint.

290. Make no mistake, however, the atrocities <u>were</u> numerous. The savagery <u>was</u> grotesque. The acts constituted crimes against humanity.

291. On that day, in Israel, more than 1,200 innocent people, almost all of them Jews, were butchered, murdered, mutilated, raped, and tortured by Hamas. On that day, babies were slaughtered, whole families were burned alive, women were raped and sexually mutilated, and well over one thousand innocent people lost their lives. On that day, 250 innocent civilians were taken hostage and removed from Israel to hidden Hamas bunkers and other terrorist encampments deep within Gaza, where many continue to be held, murdered, tortured, and raped to this very day.

292. While the following excerpt of evidence from the attacks obtained by Israeli defense and security forces is but one tiny glimpse into the perverted display of inhumanity exhibited by Hamas and those who support it, it is telling nonetheless. Thoroughly disturbing and unsettling, it must be read to understand the depravity of the antisemitic pestilence that has been allowed to shroud the University of Virginia in a cloak of hate:

| Terrorist: | "*Hey Dad, I'm calling you from Miflasim!* [the Israeli Kibbutz] *Open WhatsApp now and see all the murdered! Look how many I killed with my hands! Your son just killed Jews!*" |
| --- | --- |
| Father: | "*Allahu Akbar!*" [Allah is the greatest] |
| Terrorist: | "*This is from Miflasim!*" |

| Father: | *"Allah yahfazuk*!" [May Allah keep you safe] |
|---|---|
| Terrorist: | *"Dad, I'm calling you from the phone of a Jew! I just killed her and her husband with my own hands! I killed 10! Dad, I killed 10 with my own hands! Dad, open WhatsApp and see how many I killed!"* |

293.   Among the living, the dead, and the missing were family members and friends of many UVA students and faculty. Actively enrolled UVA students learned that relatives were sequestered in bomb shelters. Actively employed UVA faculty learned that close relatives had been brutally murdered. UVA Community members learned that friends and relatives had been taken hostage. Students and faculty alike watched their phones and computers for news of friends and family on a second-by-second basis.

294.   The innocent Jewish, Israeli, and Israeli-American members of this nation and this University Community did not know that Hamas, the foreign terrorist organization responsible for the atrocities, had simultaneously mobilized its United States-based propaganda arm and proxies to launch pre-programmed public relations campaigns aimed at promoting Hamas and societal disruption within the United States.

295.   Hamas's attack on Israel took months, if not years, to plan and execute, and its efforts within the United States were likewise meticulously crafted and coordinated.

296.   On Hamas's signal, United States-based proxies, affiliates, and "chapters" launched an offensive campaign within our borders to advance Hamas's antisemitic, anti-Israeli, and Anti-American objectives.

297.   Within the United States, pro-Hamas support groups, activists, and agents number in the tens of thousands and encompass hundreds of organized and regimented groups, affiliates, and "chapters."

298.    In the immediate aftermath of October 7, 2023, posts and openly expressed sentiments such as the following became ubiquitous and commonplace throughout the United States:[11]



299.    Matan is a Jew. Matan is an Israeli-American. Matan is a Zionist.

300.    Describing the storm clouds of antisemitic hate that have darkened the skies above our nation, particularly on university and college campuses since October 7, 2023, United States President Joseph R. Biden, speaking at the United States Capitol for the Holocaust Memorial Museum's *Days of Remembrance* ceremonies on May 7, 2024, remarked, in pertinent part:

> Germany, 1933.  Hitler and his Nazi party rise to power by rekindling one of the world's oldest forms of prejudice and hate: antisemitism.  His rule didn't begin with mass murder.  It started slowly across economic, political, social, and cultural life: propaganda demonizing Jews; boycotts of Jewish businesses; synagogues defaced with swastikas; harassment of Jews in the street and in the schools; antisemitic demonstrations, pogroms, organized riots.
>
> With the indifference of the world, Hitler knew he could expand his reign of terror by eliminating Jews from Germany, to annihilate Jews across

---

[11]    Every aspect of this vile post, whether taken literally or within some "context," qualifies as hate speech. Sadly, the words and their meaning are entirely consistent with the epithets and treatment hurled at Jewish students at the University of Virginia during the 2023-24 academic year.

Europe through genocide the Nazi's called the "Final Solution" — concentration camps, gas chambers, mass shootings.

By the time the war ended, 6 million Jews — one out of every three Jews in the entire world — were murdered.

This ancient hatred of Jews didn't begin with the Holocaust; it didn't end with the Holocaust, either, or after — or even after our victory in World War Two. This hatred continues to lie deep in the hearts of too many people in the world, and it requires our continued vigilance and outspokenness.

That hatred was brought to life on October 7th in 2023. On a sacred Jewish holiday, the terrorist group Hamas unleashed the deadliest day of the Jewish people since the Holocaust.

Driven by ancient desire to wipeout the Jewish people off the face of the Earth, over 1,200 innocent people — babies, parents, grandparents — slaughtered in their kibbutz, massacred at a musical festival, brutally raped, mutilated, and sexually assaulted. Thousands more carrying wounds, bullets, and shrapnel from the memory of that terrible day they endured. Hundreds taken hostage, including survivors of the Shoah.

Now, here we are, not 75 years later but just seven and a half months later, and people are already forgetting. They're already forgetting that Hamas unleashed this terror, that it was Hamas that brutalized Israelis, that it was Hamas who took and continues to hold hostages. I have not forgotten, nor have you, and we will not forget. (Applause.)

And as Jews around the world still cope with the atrocities and trauma of that day and its aftermath, **we've seen a ferocious surge of antisemitism in America and around the world: vicious propaganda on social media, Jews forced to keep their — hide their kippahs under baseball hats, tuck their Jewish stars into their shirts**.

**On college campuses, Jewish students blocked, harassed, attacked while walking to class**.

**Antisemitism — antisemitic posters, slogans calling for the annihilation of Israel, the world's only Jewish State**.

Too many people denying, downplaying, rationalizing, ignoring the horrors of the Holocaust and October 7th, including Hamas's appalling use of sexual violence to torture and terrorize Jews.

It's absolutely despicable, and it must stop.

Official White House Transcript, www.whitehouse.gov (emphasis added).

301.  The October 7, 2023, atrocities, the massacre, the crimes against humanity in Israel were merely the beginning, the initial thrust, of the Hamas campaign to destroy Israel, exterminate Jews from the Earth, and to preside over the demise over every nation, people, and culture that supports Israel. The next phase of Hamas's campaign was the mobilization of the United States-based propaganda "franchises."

302.  Defendants SJP at UVA and FJP at UVA were ready for and awaiting Hamas's call, and when NSJP ordered them to engage and attack the Jewish populations on their campuses, they did so with bloodthirsty zeal.

303.  Importantly, as family members of UVA students and faculty were huddled in bunkers in Israel or lying dead in the killing fields of the Be'eri kibbutz, as Hamas began mobilizing its United States proxies to wage a war of harassment and propaganda on college campuses, President Ryan and the entire University of Virginia Administration slept unawares, having undertaken no precautions whatsoever for the onslaught of hate that was about to be unleashed.

**C.    OCTOBER 8, 2023 – PRESENT**

304.  The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

305.  In the early hours of October 8, 2023, while Hamas's terrorist attacks were still underway, as planned by Hamas, an aura of menace once again descended upon Charlottesville; hate once again returned to the "Grounds" of the University of Virginia, fomented by the "student arm" of Hamas, Defendant SJP at UVA and its pro-Hamas faculty support group, Defendant FJP at UVA.

306.    Hamas directed its United States proxy, National Students for Justice in Palestine, to prepare its followers—students and faculty in dozens of "chapters" across the United States—to amplify Hamas's public relations campaign, propagate hate and sow widespread dissension in their communities.

307.    Within mere hours of the gruesome attacks in Israel and while many members of the University of Virginia Community were still reeling and trying to confirm whether their loved ones were dead, alive, or taken hostage, a number of formal and well-organized, pro-Hamas, UVA faculty and student groups emerged publicly with slick messaging and public relations efforts, pre-prepared by Hamas-proxy National SJP, specifically calculated to promote Hamas, to oppose Israel, Israelis, and people of the Jewish faith, and to create a toxic, abusive, intimidating educational environment for Jews and Israelis in this community:



*Official Statement of Students for Justice in Palestine at UVA*
*at approximately 8:43AM on October 8, 2023, transmitted widely to the University Community.*

308.    Defendants SJP at UVA and FJP at UVA's opening salvo in the pro-Hamas campaign was delivered on the morning of October 8, 2023, when it published and widely distributed the

utterly grotesque and indefensible "Students for Justice in Palestine at UVA Statement on Current Situation in Gaza, Palestine," circulated at approximately 8:43AM.

309.   The "Statement" is a vile expression of hate and antisemitism. In the Statement's very first paragraph, Defendant SJP at UVA refers to the worst act of terror against Jews, the single, most devasting and gruesome massacre of Jewish people since the Holocaust was **"an unprecedented feat for the 21st century[.]"** Defendant SJP at UVA then goes on to extol the virtues of the rape, mutilation, and torture of innocent Jewish people as noble acts in Hamas's mission to destroy Israel and secure "Palestinian liberation."

310.   The loathsome, antisemitic publication was widely and thoroughly disseminated throughout the University of Virginia educational environment and beyond. The Jewish community, specifically including Matan and his parents, were immediately aware of and confronted with this stark, hateful celebration of antisemitic terrorism.

311.   Matan received and was horrified and traumatized by SJP at UVA's pro-Hamas, murderous, antisemitism, as were many other Jewish student, faculty members, and their families. Equally disturbing to Matan was the University's total silence.

312.   Jewish students and their parents immediately received SJP at UVA's expression of antisemitism. With the exception of those antisemitic students and faculty members at UVA who support the wholesale murder of Jews and destruction of Israel, the "Statement" was met with revulsion and horror. Parents of Jewish students, including Matan's, urged their children to avoid going out in public, to refrain from wearing their kippahs or jewelry that could identify them as Jews, and to consider returning home—in other words, getting out.

313.   This UVA-based, pro-Hamas campaign of abuse and harassment would become widespread, pervasive, coordinated, and include an "all-University" effort involving every constituency and apparatus of the higher education institution and its mission.

314.   From October 8, 2023, to the present, the whole educational environment—the physical realm, the virtual space that is an integral part of University life and operations (and a part of every human's daily life), the human element of students, student groups, student leaders, faculty members, and faculty groups, the "academy" or academic element of schools, departments, institutes, grades, and, finally, the "UVA Community of Trust"— have been thoroughly saturated and pervaded by a constant, unending barrage of antisemitic hate and animus that have warped and altered both the terms and conditions of the student experience that is the educational environment but also has perverted and thwarted free and unfettered access to the public accommodation that is the educational environment.

315.   Every day since October 8, 2023, Matan has been met with some form of antisemitic insult or threat in and on UVA's educational environment. Every day and in every way, Jewish students, including Matan, have been intimidated and threatened because of their Jewish identity, their shared ancestry, and national origins and ethnicity. Every day and in every way, Jewish students, including Matan, have been made to feel "less than" and "unwelcome" in the UVA educational environment.

316.   On October 8, 2023, Defendant SJP at UVA, identifying itself as "We, Students for Justice in Palestine," and "students at the University of Virginia's SJP Chapter," published a "SJP Statement on occupied Palestine" that was co-signed by *thirty-eight* student organizations, including the Black Student Alliance, the National Pan-Hellenic Council, and the "secret

society" known as the "13 Society," to name but a few. Many of the student leaders and executive officers of some of the most prominent, influential, and powerful student Agency Organizations and Special Status Organizations, such as the Honor Committee, were and are members of the student groups that co-signed the antisemitic, hate-based manifesto published by Defendant SJP at UVA.

317. This conglomeration of student groups and their members supporting Hamas and antisemitism further demonstrates and is conclusive evidence that the human element or component of the UVA educational environment has been thoroughly pervaded by antisemitic hate that is severe and objectively offensive.

318. The University of Virginia and President Ryan did not condemn or express any disapproval of any kind with Defendant SJP at UVA or Defendant FJP at UVA's October 8th antisemitic misconduct and harassment.

319. Shortly after the issuance of the atrocious "Statement" by SJP at UVA, pre-made antisemitic posters—created using templates provided by NSJP—as well as graffiti slogans praising Hamas and glorifying the massacre of Jews and the destruction of Israel began appearing all over the University physical educational environment where they would remain, emblazoned for everyone to see for the rest of the school year:



*Image of a "Lawn Room" door depicting Hamas terrorists and the antisemitic phrase "From the River to the Sea, Palestine will be Free."*

320.  Dozens of Lawn Room doors and other physical places of prominence, as well as school facilities and classrooms around the University's campus were similarly adorned with identical images of hate.

321.  These posters, images, and graffiti are antisemitic, deeply hurtful, and are severe and objectively offensive forms of hate.

322.  Matan was exposed to and forced to study, eat, live, and exist among these images, every single day throughout the remainder of the school year.

323.  Simultaneously, every day, thousands of students and faculty members began circulating hateful, disgusting, antisemitic social media posts that were quickly forwarded among the University Community, the educational environment, and shared around the world. This practice has continued through the present:



*An Instagram "post" by UVA Student Council <u>President</u> "reposting" Defendant SJP at UVA's antisemitic and plainly threatening "Bloody Handprint" image (taunting and threatening the Hillel at UVA - Brody Jewish Center).*

324. Equally threatening, students and faculty across UVA's campus and in class began wearing pro-Hamas adornments such as "keffiyehs" and "Bloody Handprint" pins and patches.

325. The wearing of masks and face-coverings is a troubling behavior of the University of Virginia faculty members and University of Virginia students while engaged in antisemitic protests and harassment and abuse.

326. The practice of wearing masks and Hamas-inspired face coverings is purposefully meant to conceal the protester's identity while causing terror and fear in those who know what the masks and keffiyehs represent. The wearing of masks and face coverings while protesting is also a clear, open, and obvious violation of Virginia law.

327. Moreover, the masks and garb mimic the uniforms of Hamas terrorists. When accompanied by hateful signs and the chanting of antisemitic slogans and jeers calling for the murder of

Jews and extermination of Israel, the masks have the effect of purpose of terrorizing and intimidating Jewish students such as Matan Goldstein:



*Image of a Hamas militant terrorist.*



*SJP at UVA's University of Virginia CIO "profile picture."*



*A terrifying and intimidating image taken from a video distributed worldwide by Hamas promising to create a "river of blood" in Paris as a result of allowing Israeli and Jewish athletes to participate in the Olympics. The video ended with the terrorist raising a severed human head. The video was seen by Matan and millions of Jewish people around the world.*

328.   One of the most oft-repeated concerns from Jewish students, their parents, and Jewish faculty members regards the wearing of masks and antisemitic face-coverings by pro-Hamas protesters on University premises during antisemitic, anti-Israel, and anti-Zionist protests.

329.   Masks and pro-Hamas face coverings are not just intimidating and antisemitic—and taken that way by Matan—they are illegal in Virginia. In fact, the wearing of masks in the manner worn by SJP at UVA and FJP at UVA throughout the 2023-24 school year constitutes a felony. *See*, Prohibition of wearing of masks in certain places, Va. Code Ann. § 18.2-422.

330.   Matan personally witnessed this and was terrified and traumatized by this severe and objectively offensive behavior.

331.   As the frequency, number, and intensity of complaints and concerns from Jewish students, faculty members, and the parents of Jewish students to the University Administration increased, with particular focus on the "mask issue," the Commonwealth Attorney for Albemarle County specifically admonished the University Administration that its failure to impose any consequences on students who refuse to comply with the law will break the law with impunity. "I doubt it would take long for the word to get around that the University is willing, in cases of mask wearing, to forgo enforcement of the law altogether."

332.   The Commonwealth Attorney was clearly explaining to the University of Virginia the logical consequences of "deliberate indifference."

333.   Still, the University of Virginia refused to respond. Still, the University of Virginia refused to take action.

334.   On October 8, 2023, UVA and President Ryan remained silent.

335.   On October 9, 2023, UVA and President Ryan remained silent.

336.   On October 9, the faculty arm of UVA's pro-Hamas movement raised its head and publicly

announced its presence:



*SJP at UVA and FJP at UVA flyer widely distributed and disseminated
throughout the University of Virginia's educational environment on October 9, 2023.*

337.   The poster and image above demonstrate that by October 9th, the faculty element of UVA's

educational environment had publicly and openly joined the frenzy of antisemitism and the

efforts to demonize and terrorize Jews on campus.

338.   The poster and social media posts are premade, using templates provided by NSJP that are

identical to those used by other SJP "chapters." The image depicts a doctored photograph

of the massacre site where terrorists (edited by SJP at UVA and FJP at UVA out of the

image) entered the Israel Kibbutz to murder innocent civilians and committed crimes

against humanity and acts of unprecedented barbarity.

339.   The image itself is shocking and offensive and is, in and of itself, a vulgar act of

intimidation.

340.  The poster, distributed and adhered physically to University facilities across campus and circulated digitally online via social media platforms, demonstrates that University faculty members had joined and were supporting the pro-Hamas, antisemitic efforts and intended to overtake the University educational environment.

341.  The image is meant to convey that Defendants SJP at UVA and FJP at UVA were engaged in an "all-University" onslaught, that the UVA faculty, meaning the school's teachers and professors, were "on the side" of Hamas and yearned for the destruction of Israel and the extermination of Jewish people. The posters and images were a message that Jewish students were no longer safe in any classroom on UVA's campus. No longer could Matan or any Jewish student expect fair, objective, unbiased, and impartial treatment or safety from a UVA professor or teacher.

342.  The poster was meant to and in fact did intimidate and threaten Matan and other Jewish students. The very images and the exhortations to wear Palestinian colors and Hamas "kuffiyyes" are by definition antisemitic, anti-Israel, anti-Zionist, exclusionary, and intentionally calculated to segregate and thwart or outright bar Jewish students' access to the educational environment. This was the actual impact the posters had on Matan.

343.  The planned demonstrations involving University faculty, students, and University facilities, the published "statements," endorsements from student and faculty groups, multitude of physical posters, widespread graffiti, and the cacophony of social media posts demonstrate that just one day into the Hamas campaign, by October 9, 2023, the entire University of Virginia "educational environment" was pervasively saturated and thoroughly infected with illegal and hostile harassment and abuse.

344.   "Decolonization" is a direct call for violence against Jews and Israelis. There is no other reason for or interpretation of that term.

345.   On October 10, 2023, Attorney General for the Commonwealth of Virginia Jason Miyares published a pointed and detailed condemnation of Defendant SJP at UVA:

> I denounce the hateful message of the UVA Students for Justice in Palestine in the strongest terms possible. You cannot 'mourn the loss of human life' and 'hope for long-lasting peace' and also cheer on the murder, rape, and hostage-taking by Hamas, a terrorist organization that exists for the destruction and murder of Jewish people. There should be room on our college campuses for free speech and substantive foreign policy discussions, but the hateful message of the Students for Justice in Palestine is exactly the wrong approach.

346.   In the widely disseminated statement, the Attorney General for the Commonwealth actively and openly condemned the hate-based misconduct on UVA's campus by a UVA student group, Defendant SJP at UVA.

347.   The University did not respond to or acknowledge the Attorney General's condemnation of antisemitic abuse occurring on its campus.

348.   On the same day, October 10, 2023, Delegate Todd Gilbert, Speaker of Virginia's House of Delegates at the time, joined the chorus of prominent public figures denouncing Defendant SJP at UVA:

> Some students at my alma mater @UVA fully endorse the rape, murder and kidnapping of innocent people which we now know includes the beheading of babies. I implore the University and @presjimryan to condemn this vile statement in the strongest possible terms and to take action.

349.   The University did not respond to or even acknowledge the Speaker of the House of Delegates' condemnation of antisemitic harassment and abuse at UVA and call for action.

350.   Instead, on October 10, 2023, UVA and President Ryan remained silent.

351.    The United States Senate quickly spoke out specifically against Defendant SJP at UVA. On October 19, 2023, "Senate Resolution 418 -- Condemning Hamas and Antisemitic Student Activities on College Campuses in the United States" was introduced to the legislative body. In the resolution, the United States Senate identified and condemned the "University of Virginia chapter of Students for Justice in Palestine." Among other pronouncements, the United States Senate denounced "the rhetoric of anti-Israel, pro-Hamas student groups as antisemitic, repugnant, and morally contemptible for sympathizing with genocidal violence against the State of Israel and risking the physical safety of Jewish Americans in the United States." The resolution passed on October 26, 2023.

352.    The United States House of Representatives followed suit, passing House Resolution 883: "that the slogan 'from the river to the sea, Palestine will be free' is antisemitic and must be strongly condemned.'"

353.    To date, President Ryan and the University of Virginia administration have refused to acknowledge or admit that the vile phrase is antisemitic. To date, President Ryan and the University of Virginia administration have refused to acknowledge or admit that the vile phrase is emblazoned on posters affixed across University buildings. To date, President Ryan and the University of Virginia administration have refused to acknowledge or admit that the vile phrase is chanted with regularity on campus by SJP at UVA and FJP at UVA members. To date, President Ryan and the University of Virginia administration have refused to condemn the vile phrase or its regular usage orally and in writing in the UVA educational environment.

354. Imagine racist "nooses" being hung on doorways and buildings across campus and allowed to hang, unmolested, for an entire school year. Imagine the worst racial slur, beginning with the letter "N," being yelled and chanted with impunity, constantly, across campus, for an entire school year. Imagine the University and its President remaining absolutely silent and inactive in the face of those vile, racist expressions. That is what Matan and other Jewish students have experienced in the 2023-2024 school year at UVA and will almost certainly experience when classes resume later this month.

355. Finally, on October 11, 2023, President Ryan spoke in a letter published in the University's UVAToday online magazine.

356. The letter is a shocking display of weakness, callousness, and cowardice. While the letter feigns compassion with worn-out platitudes and does, just once, use the word "condemn,"—but only then in an indirect and convoluted manner—the missive quickly equivocates, mourning the future loss of "innocent lives" that will be caused by a "terrible war" that is sure to follow (apparently suggesting Israel as the cause and responsible party).

357. President Ryan's letter does not use or make any reference to the words "Jew," "Jewish," "antisemitism," or "antisemitic." President Ryan makes no mention of antisemitism on UVA's campus and makes no mention of the pro-Hamas student groups terrorizing UVA's Jewish population. The letter does not condemn antisemitism, does not condemn or denounce antisemitic harassment, and does not remind pro-Hamas UVA students and faculty members that they are bound by UVA's anti-harassment policies and codes of conduct.

358. Unsurprisingly unfazed and undeterred by President Ryan's milquetoast letter to UVAToday magazine, *the very next day*, on October 12, 2023, Defendants SJP at UVA

and FJP at UVA, along with their members and adherents, staged the "Teach In" protest

on the University's Rotunda steps:



*Image of the October 12, 2023, "Day of Resistance" called for by NSJP, depicting over 100 protesters,*
*mere feet from President Ryan's office, wearing masks and face-coverings in violation of Virginia law and*
*brandishing signs and banners emblazoned with antisemitic slogans calling for the destruction of Israel and*
*extermination of Jewish people.*

359.    Defendant FJP at UVA confirmed its active involvement in concert with SJP at UVA and

proved that antisemitic hostility had pervaded throughout the educational environment into

the classroom, or "Academy" component of the educational environment, when FJP at

UVA agents offered "extra credit" in their UVA classes to UVA students who attended the

"teach in" on UVA premises:



*Image depicting UVA instruction and teaching software being used by FJP at UVA agent and UVA Professor Tessa Farmer to communicate that "extra credit" will be offered to students who attend the pro-Hamas "teach in and demonstration" where they can learn "how we can be in solidarity with Palestinians resisting occupation."*

360.    Matan was aware of the October 12, 2023, "teach in." Matan was immediately aware that UVA faculty members were supporting Hamas and pro-Hamas groups and offering UVA students who supported Hamas and pro-Hamas groups "extra credit" and other academic advantages (which necessarily implies disadvantages to unfavored students or those who did not similarly support Hamas or pro-Hamas groups). Pro-Hamas faculty members have offered "extra credit" and boosts in grades to students who attend anti-Israeli, antisemitic rallies. UVA professors and student teachers who are members of FJP at UVA and SJP at UVA canceled classes altogether, encouraging their students to attend the pro-Hamas rally and support the antisemitism. Those acts and decisions are express and tangible education actions that are unlawful and actionable as to the professors who committed them <u>and</u>, as a matter of law, are imputed to the University of Virginia itself.

361.   Matan was also aware that the University has chosen to remain silent, in apparent ratification of the antisemitism and intimidating conduct occurring on its premises.

362.   Matan, his parents, other Jewish students, and their parents, as well as Jewish and Israeli faculty members began lodging frequent concerns and complaints with every possible outlet at the University of Virginia.

363.   The written evidentiary record contains countless direct pleas from Jewish students and their parents to Defendant President Ryan himself as early as October 14, 2023, just three days after his weak and ineffectual letter in UVAToday magazine and continuing to the present.

364.   The Plaintiff has come into possession of written documentary evidence that a Jewish University of Virginia professor expressly reported "I feel danger to my personal physical safety" through a variety of avenues, including the University's "Just Report It" system. This faculty member has also filed human resources complaints and a Title VII charge relating to physical dangers faced by him and other Jewish people at UVA and the dangers and threats posed by mask-wearing antisemitic protesters.

365.   The Plaintiff possesses written documentary evidence that the University buried the Jewish faculty member's report in its "SafeGrounds" archives and took no action whatsoever to address the fears of violence being expressed by members of the University Community.

366.   The University has publicly, repeatedly claimed that Matan, his parents, other Jewish students and their parents, and Jewish faculty members have never complained, file grievances, or alerted them of their concerns, their worries, or their fears. This is a lie.

367.   Meanwhile, identical antisemitic misconduct was occurring at colleges and universities across the country, mainly at so-called and self-described "elite" or "prestigious" schools in New York, New England, and California.

368.   Defendants SJP at UVA and FJP at UVA were quick to express their "solidarity" with these other "chapters," endorsement and ratification of their misconduct, including outbreaks of violence, and their common lineage with and allegiance to National Students for Justice in Palestine. All of these groups and their members pledged their loyalty and support to Hamas and its mission to destroy Israel and the Jewish people and frequently posted or "re-posted" social media posts and images from other SJP chapters as if they were their own.

369.   SJP chapters around the country, including SJP at UVA, employ materially similar or identical protest and disobedience tactics (including the use of similar garb and gear), materially similar or identical posters and images, and identical hateful, antisemitic chants.

370.   Students at the University of Virginia were made plainly aware that antisemitic hate groups like members of SJP and FJP chapters across the country were committing violent crimes and even murdering Jewish people. Videos of protesters wearing the same garb as the UVA protesters, chanting the same chants as the UVA protesters, belonging to the same hate groups as the UVA protesters, and sharing the same beliefs and hatred as the UVA protesters depicted the protesters attacking, harassing, and terrorizing Jews at campuses nationwide. These news reports were viewed by Matan.

371.   The University and its administration were obligated to be aware of the antisemitic crimes being committed by SJP chapters on college campuses across the country.

372.   Matan was specifically aware that individuals affiliated with or loyal to Hamas or its cause were committing violent, despicable acts of terror, on a daily basis, around the world.

373.   Matan was specifically aware that NSJP chapters to whom Defendants SJP at UVA and FJP at UVA had pledged fealty, allegiance, and "solidarity" were increasing the frequency and intensity of illegal misconduct, including ever-increasing harassment and abuse and even violence against Jews.

374.   Defendants SJP at UVA and FJP at UVA planned and executed the October 25, 2023, "Walkout for Gaza," specifically designed and calculated to create a hostile educational environment, disrupt University operations and scholastic activities, and terrorize and intimidate Jewish students in the hopes that they would leave the University.

375.   In preparation for the disruptive and antisemitic event, Defendants SJP at UVA and FJP at UVA distributed physical flyers and social media posts created from templates supplied by NSJP instructing protesters in a veritable "how to" manual for carrying out an illegal, hate-based antisemitic disruption of the educational environment:



*Flyer widely distributed by Defendants SJP at UVA and FJP at UVA directing pro-Hamas students and faculty members to disrupt classes and operations at the University of Virginia on October 25, 2023. Note the professional nature of the communique and instructions, the directives to avoid being "identified," and the pejorative and hostile use of the term "Zionist."*

376.    On October 25, 2023, hundreds of members of Defendants FJP at UVA and SJP at UVA conducted the disruptive and riotous "protest," called a "walk out" during which students and faculty members abruptly rose from their seats or podiums in class and converged upon the Rotunda, the University's physical operations center and spiritual temple at the center of the University's Academical Village, a UNESCO World Heritage Site.

377.    Hundreds of protesters carried NSJP-generated posters emblazoned with hateful, antisemitic images and slogans calling for the extermination of Jews. The protesters chanted antisemitic tropes and insults calling for the murder of the Jewish people and the destruction of Israel.

378.    Defendants SJP at UVA and FJP at UVA also used their alter-ego and alias organizations to amplify notice of their antisemitic rally, to rationalize their antisemitism, and to disrupt the educational environment:



*Image of widely distributed flyer promoting the October 25 "Walk Out" depicting the support and endorsement of antisemitism and the planned antisemitic misconduct by numerous student groups and organizations.*

379.    Matan, like most, if not all of the Jewish students and faculty, was acutely and personally aware of every development and incident referenced above and below.

380.   The October 25th antisemitic demonstration occurred barely two months after classes had begun at UVA.

381.   Matan and other Jewish and Israeli students discussed what was happening at UVA, discussed the October 25th protest that was planned, and discussed their shared fears for their safety and their well-being.

382.   Matan learned that other Jewish students were afraid to attend or even be seen observing the rally for fear of being harassed or abused by pro-Hamas students and faculty and out of fear of retaliation by any or all of Defendants.

383.   Matan, in an extraordinary act of courage, conviction, and faith—an 18-year-old, college freshman away from home for the first time—decided to attend the rally, wearing his Yarmulke, his Star of David, and carrying the flag of Israel.

384.   Before going, Matan asked a Jewish, Israeli UVA professor to escort him. When interviewed months later by the University Police, the professor stated that he did not "want" to go to the event, but when Matan expressed fear, the professor felt it was his moral and ethical duty as a professor, teacher, adult, Jew, and Israeli to escort Matan and "bear witness" to the events. This Jewish UVA Professor lost his cousin to murder in Israel at the Hamas October 7th massacre.

385.   At the protest, as Matan approached the Rotunda steps, a masked, female FJP at UVA member, who is a UVA professor, approached Matan aggressively and shouted that he "should not be there."

386.   Photographic evidence confirms that known members of ANTIFA were also present at the October 25, 2023, Rotunda antisemitic demonstration and disruption of classes and University operations. Just two weeks earlier, on October 11, 2023, the very same ANTIFA

members were photographed protesting a speaking event featuring Jewish author Abigail Shrier. At the Abigail Shrier event, agitators physically accosted elderly attendees by and followed them to their cars in a menacing and threatening fashion, prompting calls to the police. Other very sophisticated disruptive measures were taken, and, coincidentally, pro-Hamas posters and chants were likewise alleged to have been seen and heard.

387.   These very same ANTIFA members would appear at other SJP at UVA and FJP at UVA disruptive events on UVA's campus, most notably the UVA Encampment for Gaza later in the school year.

388.   NSJP chapter members and their affiliates, specifically including SJP at UVA and FJP at UVA employ the exact same protest and riot techniques used by ANTIFA chapters. One such technique is to "huddle" or crowd closely around a human target, sometimes with backs turned to the target with the agitators facing outwards, so that the target cannot move in any direction without coming into contact with the agitator. Another technique used is the use of umbrellas, flags, and banners in an aggressive manner to block the vision of the target and to prevent anyone from seeing or helping the target or filming the assault. Often, insults and chants are shouted at the target while the person is surrounded.

389.   These maneuvers, styles, and tactics have been used and widely seen in thousands of videos regarding SJP chapters at other schools such as UCLA and Harvard.

390.   Both of these ANTIFA-inspired techniques were used on Matan on the Rotunda steps. As Matan stood on the Rotunda steps holding an Israeli flag, the SJP at UVA and FJP at UVA protesters converged closer to the steps, all facing him, shouting horrible slurs and insults and threatening him with physical violence and death.

391.   Matan refused to run away.

392.     Suddenly, four or more protesters converged on Matan in the manner described above. Two sets of two protesters, holding "Gaza" or "Palestinian" flags at face or head height, advanced upon Matan to engulf and surround him, one set of two protesters descending from above him, the other two ascending from below. Once they came into physical contact with Matan, they shoved him and tried to forcibly drag his flag from his hands and knock Matan down or off the steps.

393.     The UVA professor who escorted Matan was standing nearby, and, as he has stated to University Police, witnessed Matan being shoved, the attempts to rip the flag from his hands, and the attempts to surround Matan, block his vision and block Matan from sight, and possibly knock him down and off the Rotunda steps. The UVA professor stepped into the melee, and as a SJP at UVA protester shoved and started to swing at him, he announced that he was a UVA professor and "that they did not want to shove him." The protesters backed off and Matan descended the Rotunda stairs. On the brick walkway in front of the Rotunda between the steps and the phalanx of SJP at UVA and FJP at UVA protesters howling and chanting for death to Israel and the extermination of Jews, Matan was physically assaulted once again, this time being slapped or shoved in the upper chest and shoulder area by a female protester.

394.     At the October 25, 2023, event, Matan was berated, insulted, threatened with violence, and physically assaulted. Matan was placed in imminent danger of grievous bodily injury and was frightened, humiliated, and threatened.

395.     Matan was scared to death.

396.     Matan was also harassed, abused, and bullied by members of SJP at UVA and FJP at UVA because of his Jewish faith, because of his national origin, because of his shared ancestry,

because he is a Zionist, and because he was expressing his First Amendment rights of Free Speech and Religion.

397. The frequency and volume of written pleas for help to the University Administration and directly to President Ryan by Matan and his parents and other concerned Jewish students and their parents began to increase.

398. The University of Virginia should have taken steps to safeguard and shield its Jewish students from harm, to do everything in its power to make them feel safe, valued, and cherished, but mainly safe.

399. The University did nothing of the sort.

400. Instead, the University, and specifically President Ryan, insisted that antisemitism was not occurring on Grounds, that none of the affected Jewish students had complained or been harmed, and that Islamaphobia was just as big a problem on campus and required as much or more attention than antisemitism, anti-Israel bias, and anti-Zionism.

401. Unlike his meetings with aggrieved community members after the "noose incident" or his frequent parlays with members of SJP at UVA, FJP at UVA, and other antisemitic, pro-Hamas groups, President Ryan subjected Matan, his parents, and other Jewish students and their parents to months of "negotiations" over his "terms" before he would even agree to meet with them.

402. Four months would elapse before President Ryan met with Matan, his mother, and three other Jewish students and their parent.

403. Emboldened by the University's silence and refusal to take action or even condemn their antisemitic bullying, Defendants SJP at UVA and FJP at UVA amplified the tempo of their outbursts and coordinated incidents of antisemitism and hate-based harassment and abuse.

On October 27, 2023, FJP at UVA published a pro-Hamas, antisemitic "Open Letter," co-signed by at least *eighty* professors, including the FJP at UVA agents and members identified above.

404. The "Open Letter" was quickly followed by regular antisemitic, disruptive "rallies" and anti-Israel, anti-Zionist events throughout the University, always on University premises, always staffed and attended by UVA students and faculty, using UVA resources, and always occurring throughout the UVA educational environment.

405. Around the time of the SJP at UVA "Walkout" and the FJP at UVA "Open Letter," the two groups and their affiliated, alter-ego groups announced the initiation of the UVA "BDS" campaign, in which the groups planned to stage an official UVA-sanctioned and sponsored "election" regarding the antisemitic Boycott, Divestment, and Sanctions movement.

406. Despite alarms being raised by multiple sources about the antisemitic and dangerous nature of the "BDS" movement and the planned "referendum," the University Administration and President Ryan remained silent, refused to take any action whatsoever or even investigate whether the BDS movement was, as alleged, antisemitic, and refused to prevent the "referendum" from going forward. Even Board of Visitors members were alerted and made public note of their concern and consternation that an antisemitic movement that had been banned at some of the most liberal universities in the country was being allowed to take root at UVA.

407. On November 6, 2023, the Attorney General of the Commonwealth of Virginia, Jason S. Miyares, corresponded with President Ryan and other public university presidents in Virginia regarding the clear and present danger of antisemitism and antisemitic harassment and abuse on Virginia's college campuses. The letter is attached as Exhibit B.

408.   The letter is startling in its courage, its frankness, and its unequivocal condemnation of the illegal misconduct that was being reported on college campuses, including, specifically, the University of Virginia:

> The barbaric terrorist attack against Israel on October 7th was without excuse or justification. Since then, we've seen tensions rise on our campuses in Virginia amid a spasm of anti-semitic protests, chants, and rage. Countless Virginia students of Jewish background feel threatened and unsupported in today's climate on our college campuses.
>
> This is unacceptable.
>
> Concerned students and parents are urging us to act with decisiveness and moral clarity. Our Virginia universities should do more to address antisemitism.
>
> First, groups like "Students for Justice in Palestine" have repeatedly held demonstrations in Virginia where protestors chant "from the river to the sea, Palestine will be free." This statement is a call for the complete destruction of Israel and a denial of its right to exist. Conveniently, these protestors never explain what would happen to the eight million Jews who live between the river and the sea, leading to the inescapable conclusion that the protestors are calling for a second Holocaust against innocent men, women, and children.
>
> These slogans and chants mostly have been met with silence from university leaders, a silence both agitators and the most vulnerable have noticed. The Anti-Defamation League reports a 388% increase in antisemitic incidents compared to the same period last year. Across the country, Jewish students have been threatened in person and online.
>
> The First Amendment does not protect speech that is directed to inciting or producing imminent lawless action, and which is likely to incite or produce such action. *See Brandenburg v. Ohio*, 395 U.S. 444, 47 (1969). I strongly recommend that you review your policies to ensure that you are taking those steps necessary to protect your students and others in your campus community from unlawful incitement beyond the bounds of the First Amendment.
>
> ***
>
> We need leaders with moral clarity, not leaders who shirk the responsibility of calling out bigotry and antisemitism. I urge you to help demonstrate that,

in Virginia, we oppose antisemitism and anti-religious bigotry in all its forms.

\*\*\*

Now is not the time for moral equivalency or half measures. Now is the time for moral courage and leadership.

409.     The University of Virginia and President Ryan ignored Attorney General Miyares' admonitions and directives.

410.     Unsurprisingly, after UVA and President Ryan's silence and inaction, just five days later, on November 11, 2023, SJP at UVA and FJP at UVA conducted the "Apartheid Wall Demonstration & March," once again carrying and displaying antisemitic banners calling for the murder and extinction of Jews. In this latest iteration of hate, SJP at UVA and FJP at UVA constructed a physical barricade called the "Apartheid Wall" that they invited their protesters to paint and display in the areas of the "Main Grounds" that include the Lawn, the Rotunda, and the entrance plazas to the University's main libraries:



*Banners and social media posts widely disseminated throughout the University's educational environment.*

411.   Matan was present with approximately fifteen to twenty other Jewish students. The pro-Hamas SJP at UVA and FJP at UVA protesters numbered in the hundreds, with some estimates suggesting as many as three hundred anti-Israel, anti-Zionist, antisemitic protesters present.

412.   Approximately five University Police officers and UVA Associate Vice President for Student Affairs Marsh Pattie were present and positioned themselves in a manner to prevent the Jewish students from leaving a small area away from the pro-Hamas agitators, who were themselves allowed to roam and traverse the student public spaces as they pleased. At some point during the demonstration, several SJP at UVA protesters approached Matan, specifically, yelling and cursing antisemitic slurs at him, which were heard by the Jewish students <u>and</u> Mr. Pattie and the UPD officers. When Matan asked Mr. Pattie why they were allowed to approach him, and do so in an aggressive manner, Mr. Pattie responded that he believed that one of the SJP at UVA protesters yelling at Matan was not a University student. Neither Mr. Pattie nor the University Police took any action to protect Matan or force the protester to retreat.

413.   On November 17, 2023, Matan was having lunch with a professor on "the Corner," a popular strip of student-friendly stores and restaurants and an iconic part of University life and culture. As Matan and the professor sat quietly, a protester drove by and shouted "Free Palestine, you filthy Jew." Matan reported the incident to the police but was quickly rebuffed because Matan could not identify the harasser. However, this unsettling incident conclusively demonstrates the troubling climate for Jewish students at the University of Virginia.

414.   Later that same day, the staccato of antisemitic events continued:



*Image depicting another flyer calling for another antisemitic, anti-Israel, anti-Zionist disruptive. Note that "UVA Dissenters is an alter-ego or alias of SJP at UVA created to advance NSJP and SJP at UVA's "BDS" agenda.*

415.   For the 2023 Fall Semester, the University of Virginia academic calendar indicates no classes on November 22-24, 2023, for Thanksgiving, that classes ended on December 5, 2023, and a final exam period running from December 5 to 17, 2023.

416.   That did not stop the pro-Hamas "chapters" of SJP at UVA and FJP at UVA from continuing their cacophony of antisemitism and antisemitic disruptive events:



*Image depicting another "Teach-In" hosted by FJP at UVA. Note the location and use of University facilities, the use of the official University logos and banners, the official-sounding "Coalition of Concerned Faculty Members," the professional, highly-technical "QR Code," and the availability of "pizza and beverages."*

417.    The November 29, 2023 "Teach-In" was led by FJP at UVA members and agents UVA Professor Tessa Farmer and UVA Professor Fahad Bishara. In materials specifically supplied to President Ryan from concerned Jewish students and their parents, including Matan and his parents, the University and President Ryan were alerted that the "Teach In" was entirely antisemitic in nature.

418.    UVA Professor Bishara and UVA Professor Farmer used phrases like "blah blah blah" in reference to the October 7 massacre in Israel. When asked why the "Teach-In" was so one-sided in favor of Hamas and pro-Hamas interests, UVA Professor Bishara responded, "I never said that any of us had to be academic." This further confirms that the sole purpose was the advancement of NSJP and Hamas's antisemitic campaign through its chapters.

419.    On December 13, 2023, just as exams were concluding and most students were away from Grounds for the holidays, President Ryan announced the creation of the "Task Force on Religious Diversity and Belonging" through another article in the UVAToday online magazine. The Task Force was never meant to and does not address antisemitism at UVA or combat the antisemitic harassment and threats to the educational environment being experienced by Jewish students and faculty at UVA. In its mandate or charter, the "Task Force" does not even acknowledge or admit that antisemitism and antisemitic abuse exist at UVA or are a current problem.

420.    In an arrogant display of callous indifference, President Ryan appointed two pro-Hamas members and agents of FJP at UVA to the committee, both of whom signed the FJP at UVA "Open Letter" and both of whom had engaged very publicly in patently antisemitic conduct and pronouncements in the weeks leading up to the announcement.

421.    Jewish students and parents, specifically including Matan and his parents, were outraged and explained to President Ryan that his selections for staffing of the so-called "Task Force" confirmed that addressing and combatting antisemitism were not part of its agenda.

422.    Between students' departure for the holidays and February 14, 2024, when President Ryan finally granted a meeting to four Jewish students, including Matan, the presence of antisemitic posters, signs, and graffiti did not diminish from the prior semester, nor did the cadence of antisemitic, disruptive events in the educational environment decrease.

423.    Matan was and continued to be personally exposed to and forced to endure near-constant antisemitic harassment and abuse and an educational environment that was corroded by severe, objectively offensive, antisemitic hostility.

424.    For instance:



*Image depicting an official pro-Hamas, antisemitic event hosted by a large coalition of cross-University groups, including Defendants SJP at UVA and FJP at UVA and others. Note that the event is taking place on UVA's Grounds, in UVA facilities, and that dinner will be provided.*

425.    Sometime in late January or early February 2024, Defendants SJP at UVA and FJP at UVA and their alter-ego and alias groups learned that the University of Virginia administration

was not going to prevent them from proceeding with the antisemitic "BDS Referendum" if they secured a certain number of signatures, which was all but guaranteed given the number of students and faculty who were already actively supporting and engaging in their pro-Hamas antisemitic misconduct on a regular, if not daily, basis.

426.   Accordingly, on February 6, 2023, SJP at UVA and FJP at UVA announced the formation of yet another alter-ego, alias antisemitic, anti-Israel, and anti-Zionist "student group" called UVA Apartheid Divest, with the Instagram handle @UVAAD. The group secured 950 signatures for its "BDS Referendum" campaign in less than 48 hours:



*Image depicting a workshop, for UVA students and faculty in furtherance of the antisemitic, anti-Israel, anti-Zionist BDS campaign, hosted in UVA facilities by "UVA Apartheid Divestment Coalition," which includes Defendants SJP at UVA and FJP at UVA.*

427.   Importantly, by the time the four Jewish students were allowed to meet briefly with President Ryan on February 14, 2024, evidence possessed by the Plaintiff confirms that at least one Jewish UVA Professor, and perhaps others, had filed several complaints, including grievances with EOCR, UVA Human Resources, and the EEOC about exposure to and threats of "physical danger" in UVA's educational environment because he is Jewish.

428.   Before the meeting with President Ryan, the Plaintiff himself initiated no less than three official complaints with the University Judiciary Committee about antisemitic misconduct under the UVA student code of conduct, all of which were summarily dismissed as "time barred."

429.   Before meeting with President Ryan, in addition to his other complaints and formal grievances, on January 25, 2024, Matan was summoned or invited to meet with University of Virginia Associate Vice President for Student Affairs Marsh Pattie and Associate Dean of Students Alex Hall at the Rotunda where he was asked to explain, again, in great detail, his complaints of antisemitic harassment, abuse, and physical assault at UVA. Vice President Pattie and Dean Hall's only actions or responses were to inform Matan that he was free to "move out" of the First Year dorms if he felt unsafe or uncomfortable on Grounds.

430.   Before the meeting with President Ryan, at the direction of the University Judiciary Committee, the Plaintiff himself initiated a complaint with UVA EOCR. On January 31, 2024, the Plaintiff met with UVA EOCR Senior Compliance Director for Equal Opportunity and Civil Rights Nic Thompson, during which the Plaintiff described all of the incidents of antisemitic harassment and abuse that he had endured, in great detail. On February 9, 2024, Ms. Thompson advised the Plaintiff that "video footage [of the October 25, 2023 disruptive event] was no longer available." Ultimately, the EOCR declined to take any actions regarding antisemitism and antisemitic discrimination, harassment, and retaliation occurring regularly at UVA.

431.   Before the meeting with President Ryan, at least one formal, federal civil rights investigation by the United States Department of Education's Office for Civil Rights had

been opened regarding antisemitism at UVA. President Ryan's lawyers filed the University's Position Statement in which they repeated the false "no complaints" claim.

432. On February 14, 2024, after four months of pleas and requests and subsequent negotiations over conditions demanded by President Ryan and his "inner circle," President Ryan finally met with four Jewish students.

433. When Jewish students and their parents asked President Ryan for help and petitioned him for a meeting, he forced them to wait nearly four months before he would meet with them. When President Ryan did agree to meet with his Jewish students, he demanded that the meeting be limited to only four Jewish parents, insisting that they attend in person with their "biological child" student also in attendance with them. President Ryan insisted that the meeting take place in his office, in person. Despite being a matter of serious, public importance at a public school, President Ryan insisted that the meeting be "confidential."

434. The obstructions and delays thrown up by the Ryan Administration bespeak the philosophy of denial regarding antisemitism. The demand that the students "out themselves" and present themselves before the most powerful administrator in the University ecosystem, a man who can make or break their academic and future careers with a blink of an eye or stroke of the pen bespeaks the culture of power and retaliation that is the hallmark of this school, this administration, and this president.

435. President Ryan never made members of the African-American community at UVA or Charlottesville comply with any terms before he willingly met with them to discuss the "Noose Incident" and their feelings of safety afterwards.

436. During the meeting, the Jewish parents and students delivered a detailed and extensive multi-media presentation to President Ryan in their attempt to bring their plight and the

state of antisemitism at UVA to President Ryan's attention. The Jewish students informed President Ryan that they felt afraid on campus. They felt intimidated on campus. They felt forced to hide indicia of their faith, lest they be targeted by pro-Hamas students and faculty. They feared retaliation by the University.

437.     The Jewish community also feared retaliation from President Ryan, and they continue to fear retaliation from President Ryan. They were right to fear retaliation by the University and its senior administrators.

438.     The University of Virginia ignored and rejected the Plaintiff's pleas for help. Instead, after the meeting with President Ryan, and while University, state, and federal investigations into antisemitic civil rights violations were ongoing, the Plaintiff suffered retaliation at the hands of the Defendants.

439.     Because Jewish students and their parents repeatedly advised President Ryan that they were traumatized by bias-related incidents that included threats of violence, they reasonably believed that they would have allies and protectors within the University Administration. Far from responding to their concerns, President Ryan "gaslit" the Jewish students with a series of lies, evasions, and acts of retaliation, further confirming Defendant UVA's deliberate indifference toward antisemitic abuse, harassment, and intimidation that had sadly become a fact of everyday life for Jewish students and their parents at UVA.



*This email, more than four months after the terrorist attacks and following months of negotiations regarding the terms under which President Ryan would agree to meet with victims who were his own students, speaks for itself and is the best evidence of the Administration's total lack of seriousness and its deliberate indifference to the profound and severe suffering being experienced by UVA's Jewish students.*

440.   Two serious and pressing issues regarding antisemitism that were raised by the Jewish students and their parents in their presentation to President Ryan were the illegality and antisemitic nature of the masks and face coverings worn by anti-Israel, anti-Zionist, pro-Hamas protesters on UVA's campus in clear violation of Virginia law and the patently antisemitic intent and nature of the BDS movement.

441.   President Ryan was acutely aware that every major national and international Jewish organization, such as the Anti-Defamation League, had designated the BDS movement as a clear act of antisemitism and a front for antisemitic, anti-Israel, anti-Zionist hate. President Ryan was also acutely aware that other prominent schools and universities that UVA considers "peer" institutions had refused to allow BDS referendums to take place.

442.   Nevertheless, President Ryan pledged to meet with BDS movement student and faculty groups and learn of their demands and how the University could best address their concerns. In fact, President Ryan and his inner circle of administrators, including Vice President for Student Affairs Kenyon Bonner, established lines of communication and

committed to prompt responsiveness with the BDS movement leader, which was none other than the President of Defendant SJP at UVA.

443.     The evidence regarding President Ryan's handling and responses to the hate-based, antisemitic BDS movement is conclusive and compelling evidence of President Ryan and the University of Virginia's commitment to a policy of appeasement regarding antisemites and antisemitism, and a policy of denial, gaslighting, and retaliation regarding Jewish students. President Ryan and his staff members did not force the BDS antisemites to "negotiate" the terms for meeting with him, nor did they force the agitators to wait months on end to meet with him. Instead, President Ryan made it abundantly clear that he would drop everything and meet with them on nearly a moment's notice if the BDS miscreants so desired.

444.     While the pro-Hamas, BDS movement sponsors were gathering signatures and conducting their antisemitic campaign on UVA's Lawn and elsewhere, they did so while wearing masks and face coverings in violation of Virginia law. Again, the wearing of antisemitic masks is intimidating and frightening to Jewish students and these acts did in fact intimidate and frighten Matan and create a barrier to his free, peaceful, and unfettered access to and enjoyment of the public accommodation educational environment.

445.     As evidence of the University's total unwillingness to take any actions to prevent or combat the hostile educational environment that existed at UVA, when Matan called the University Police to report the violations, he was told by University Police that the University administration had "endorsed" the wearing of masks by antisemitic protesters and disrupters, and, therefore, the University Police would not be taking any actions or responding to his report.

446.   The overtly antisemitic, anti-Israel, anti-Zionist BDS referendum proceeded to take place on February 26, 2023, with the full technical, structural, and organizational support of the University and its various divisions and agencies that handle and govern "referendums" and elections at the University.

447.   FJP at UVA faculty members and agents allowed pro-Hamas, BDS movement supporters to lecture their classes regarding the merits of antisemitism and voting in favor of the "Boycotting, Divestment, and Sanction of Israel." FJP at UVA faculty members and agents canceled classes so students could support and vote for the BDS Referendum.

448.   The BDS referendum passed, in further proof of the thorough saturation of antisemitism in the University's educational environment.

449.   President Ryan never condemned or even expressed consternation over the overtly antisemitic BDS "referendum" taking place on his campus. Instead, President Ryan stated that if "he were a student, he would have voted against it." A profile in courage this most definitely was not, and, most certainly, President Ryan's embarrassing display of institutional and personal cowardice fell far short of Attorney General Miyares' impassioned call for "moral courage and leadership" from Virginia's university presidents.

450.   Four days after the BDS referendum, on March 1-3, 2024, the University of Virginia's Board of Visitors met at their regularly appointed time. What took place at the meeting was an unprecedented display of hostility to the Jewish community and marked one of the lowest points in University history.

451.   During the open session of the Board, President Ryan and several of his senior lieutenants, including Provost Ian Baucom, attempted to gloss over the "antisemitism problem" at UVA and assure the Board that, once again, "there was nothing to see here." President Ryan and

Provost Baucom happily proclaimed that Jewish students and their parents were perfectly satisfied with UVA and its handling of the pro-Hamas, antisemitism crisis plaguing other universities.

452.   Board of Visitors member E. Bertram Ellis with the support of other Board members, asked to be heard and to bring the matter of antisemitism at UVA to the full Board's attention during the public, open session. Mr. Ellis stated that contrary to President Ryan and Provost Baucom's declarations, he and other Board members, and the University's administration, had received "hundreds" of complaints from parents regarding antisemitism and antisemitic harassment and abuse at the University of Virginia.

453.   Rector Robert Hardie immediately interjected and stated that Mr. Ellis was "out of line" and that the issues he intended to raise would be addressed only in a non-public, closed session. That proclamation appears to be contrary to well-settled public records and open meetings laws in Virginia.

454.   Mr. Ellis persisted in calling for a discussion, debate, and investigation into the claims of antisemitism and antisemitic harassment and abuse in the daylight, during public, open session.

455.   Rector Hardie became aggressive and belligerent, and stated that the matter would be addressed, but only in "closed session," and, for the first time, claimed that the subject of antisemitism and antisemitic harassment and abuse of students was a "student safety issue" that precluded discussion during open session, when the very subject had been discussed openly in public session just moments before, when the comments were benign, glowing, and patently untrue. President Ryan and his University Counsel did not interject or contradict Rector Hardie, who repeatedly stated with ever increasing volume and intensity

that the matter absolutely would not be addressed in open, public session, because it was an issue of "student safety."

456.    When Mr. Ellis made another appeal to bring the matter out in the open, Rector Hardie blurted out, with heat and venom, his face reddening, "you will be reprimanded!" and "you are out of line!" Rector Hardie then formally moved that the Board immediately proceed into closed, non-public session, reading language prepared by the University Counsel. The Board went into closed session, and the public will never know how or even whether antisemitism at UVA was addressed by the very public officials appointed by the Governor of Virginia to protect students and the school. Rector Hardie's outburst was telling and served as strong evidence of the denial and gaslighting that has haunted the University for nearly a year.

457.    Importantly, despite Rector Hardie proclaiming (very loudly) that the issue of antisemitism at UVA is a "student safety" matter during the tumultuous Board meeting, the University of Virginia has never taken a single action meant to protect the safety of Jewish students or prevent antisemitic hate-based violence, harassment, or abuse from permeating the University's educational environment.

458.    On the very same day that Rector Hardie was threatening to retaliate against and reprimand Mr. Ellis for discharging his duty as a public official to the Commonwealth of Virginia, Matan met with the UVA Counseling and Psychological Services student health clinic for the specific reason of addressing the trauma he was experiencing as a result of antisemitism at UVA and specifically the assault he had endured. The UVA "CAPS" professional responded that "students tend to get emotional" about Palestine and Gaza and that Matan should "try" to "empathize" with those who oppose Israel.

459.   As stated above, one of the instruments that NSJP and its chapters utilize to attack Jews on college campuses, akin to their disruptive events, antisemitic harassment, and the hateful BDS movement, is a form of "lawfare," or the pursuit of bogus and fraudulent proceedings against Jewish students or their supporters in an effort to silence, intimidate, and harass them.

460.   On or around March 21, 2024, Defendant SJP at UVA, by and through its President, "J.R.," a UVA student, initiated a knowingly false and malicious Honor Charge against Matan. Defendant SJP at UVA did not even bother to disguise its motives: it admitted, in the false "charge," that it was doing so because Matan spoke out in the national media about antisemitism at UVA and the harassment, abuse, and bullying that he had personally suffered.

461.   The absurdity and fraudulence—and the thorough illegality—of the Honor Charge brought by SJP at UVA and quickly accepted for prosecution by the University against Matan were abundantly clear and obvious on the very face of the "Honor Report" or Charge.

462.   Defendant UVA has admitted that before Matan was forced to engage counsel, President Ryan, the Office of the University President, and the Office of University Counsel were specifically aware of and participating in Matan's Honor Case and the charges against him. This awareness included specific knowledge that Matan Goldstein, who had just met with President Ryan regarding antisemitism at UVA, was being charged and prosecuted for an "Honor Offense" by the President of Students for Justice in Palestine, for the "crime" of describing his experiences with antisemitism at UVA to a CBS reporter, which Defendnt SJP at UVA claimed "delegitimized" the pro-Hamas movement. President Ryan, his Office, and the Office of University Counsel were not only fully aware of the bogus and

retaliatory "lawfare" nature of the Honor Charge against Matan, they provided advice, support, and counsel to the Honor Committee in its wrongful prosecution of Matan.

463.   Defendant UVA's Office of University Counsel assisted and counseled the Honor Committee in its decisions, which were being closely monitored and overseen by the Office of the University President, to accept and move forward with the fraudulent and retaliatory proceeding, even in the face of the Matan's personal pleas that the Honor Charge was false and brought in bad faith.

464.   During the pendency of the fraudulent Honor Charge, when Matan's entire life and his status as a UVA student hung in the balance, the University of Virginia knowingly and purposefully published a false and defamatory claim in the press, with full awareness that the University Community, the student body, and the Honor Committee would read it and be aware of the University's (false) assertions of fact:

> ongoing inquiries into those allegations **have yet to return evidence to substantiate the claims** or to warrant disciplinary measures, despite substantial investigative efforts. This includes specific allegations of violence against **one student** at a protest, after which University Police investigated thoroughly, using video evidence, witness statements, and other methods. (Emphasis added.)

465.   It is vitally important to understand that the University Police and the EOCR, among other agencies in the University administration, have confirmed and admitted on multiple occasions that they do not and have never possessed "video evidence, witness statements," or any other form of evidence regarding the assault on Matan. In fact, at the time of the press release, *five and a half months after the assault on the Rotunda steps*, the University Police still had not spoken to or interviewed the UVA professor who witnessed Matan being assaulted.

466.    The University's public relations and crisis response team, directed by President Ryan, knew that this statement to the press was false and knew that the false press release could create the impression that the phony Honor Charge was viable and credible. The University issued the false press release for the purpose of bolstering and justifying the University's refusal and failure to address or prevent antisemitism on Grounds.

467.    The Plaintiff was forced to engage private counsel at his own expense. The Plaintiff was forced to secure the sworn declaration, under penalty of perjury, from the UVA professor who witnessed all of the events and incidents.

468.    After enduring nearly a month of extreme stress, anguish, and excruciating pain as an accused in the most grave of UVA disciplinary proceedings, Matan filed a motion to dismiss the Honor Charge, carefully outlining the deficiencies and illegality of the proceedings. The very next day, the Honor Committee met and mysteriously decided suddenly that the Honor Charge lacked any evidence to support it—a fact that was plainly obvious and well-known at the time of filing of the Charge, but somehow was purposefully overlooked when the University administration's Honor Committee, with the assistance of the Office of University Counsel, elected to proceed forward with the illegal prosecution.

469.    Though the fraudulent Honor Charge was dismissed and the Plaintiff exonerated, the illegal and improper aims and objectives of SJP at UVA and NSJP were achieved. Jewish students, including Matan, are afraid to speak out or stand up to antisemitism lest they too find themselves falsely charged with the worst crime imaginable in UVA culture.

470.    Even in the aftermath, the University of Virginia, President Ryan, and the Honor Committee have not offered any comfort, support, or words of encouragement to Matan, nor have their subordinates or agents.

471.  So, as of today, the *only* action that the University of Virginia has actually undertaken regarding antisemitic hate, discrimination, harassment, and abuse on its campus was the Honor Charge that it chose to prosecute *against* the lone Jewish victim of antisemitism who openly spoke out about his experiences and suffering.

472.  On the day that the Honor Committee dismissed the bogus and fraudulent charges against the Plaintiff, Virginia Attorney General Jason Miyares personally communicated with Matan, offering support and encouragement and providing him with a means to communicate with his office and him if he ever needed anything or if the antisemitism and hate continued.

473.  President Ryan and his administration have <u>never</u> said or done anything remotely similar to those small acts of kindness and compassion for Matan or other victims of antisemitic hate on their own campus.

474.  Throughout the school year and deep into the spring term at the University of Virginia, the displays of antisemitism, anti-Israel bias, and anti-Zionist prejudice were constant and continuous and ever-increasing in frequency, volume, hostility and rancor. The disruptive events occurred frequently. Matan was acutely and personally aware of all of it, and the antisemitism had the direct effect of closing off the University educational environment— in all of its components and elements—to him.

475.  NSJP's well-crafted, precise, and deliberate strategy was playing out on college campuses across the country and the SJP chapters were poised and directed to launch their most aggressive antisemitic attacks of the campaign, starting in mid-April as schools prepared for final exams and the pomp and circumstance of graduation: The pro-Hamas "Gaza Encampments" also known as "Jew Exclusion Zones."

476.   Just as Hamas's terror attacks on October 7 involved thousands of murderous jihadis attacking multiple sites in Israel simultaneously, just as the 9/11 hijackers commandeered multiple planes simultaneously in different cities with different targets, so too did dozens of SJP chapters across the country start preparations for and launching of "liberation zones" and the "popular university for Gaza" areas in the most prominent, centerpiece areas and facilities of universities across the country.

477.   Jewish students at UVA, specifically including Matan, watched in horror as NSJP encampments sprang up like a grotesque, hateful fungus without any recrimination, warning, or preventive measures by the University of Virginia, where SJP at UVA and FJP at UVA pledged fealty to NSJP and its satellite "chapters." Matan and others feared that the NSJP chapters at UVA would soon launch their own antisemitic encampments and exclusionary zones.

478.   Jewish students at UVA, specifically including Matan, watched in terror and were debilitated with heartbreak as violence broke out at on their friends' college campuses, caused by students and faculty members chanting the same chants that were being chanted at UVA, displaying the same hateful banners that were being displayed at UVA, wearing the same garb and uniforms of Hamas that were being worn at UVA, all supported and directed by the same parent organizations, NSJP and Hamas, and all for the same deadly, immoral, inhumane aims: the extermination of the Jewish people and the destruction of Israel.

479.   What Jewish student wouldn't be terrified and feel that a safe and secure educational environment was closed to them? Matan felt that way.

480.    Jewish students at UVA, specifically including Matan, watched with desperate heartbreak and grim resignation as "Jew Exclusion Zones" were established by miscreants with whom SJP at UVA and FJP at UVA proudly proclaimed and pledged their "solidarity," at UVA's "peer" institutions, all tolerated and enabled by administrators who are close friends and colleagues of President Ryan.

481.    Jewish students at UVA, specifically including Matan, prayed and begged that the University of Virginia and its President would do something . . . anything . . . to quell the tide of antisemitism that was rising to a tsunami of hate at UVA.

482.    On April 26, 2024, Attorney General Miyares once again took action regarding the illegality of "Jew Exclusion Zones" or "Gaza Encampments" on Virginia's public universities or colleges by publishing the following legal opinion and directive to Virginia Secretary of Education Aimee Guidera and all of the Commonwealth's university presidents and administrations:

> It is the legal position of the Office of the Attorney General that setting up a tent or **establishing an encampment** on university or college property **is disruptive of the school's activities** and may violate other administrative policies. The university or college has the authority to refuse to allow such activity and also has the authority to take down any tents that have been set up. The Attorney General will vigorously defend the university or college from any challenge to this authority. (Emphasis added.)

483.    After months of despicable Jew hatred at UVA, just as classes were coming to an end and the stress of exams was setting in, the tsunami of antisemitism crested on UVA's "Grounds."

484.    On April 30, 2023, masked SJP at UVA and FJP at UVA agitators, along with their members and supporters who are known ANTIFA agitators with a history of violent

behavior, cordoned off sections of the University at the Lawn, on both sides of the Rotunda, establishing their own University of Virginia Jew Exclusion Zone and Gaza Encampment.

485.   Masked University of Virginia student and faculty agitators who are members of SJP at UVA and FJP at UVA publicly and openly conducted preparation sessions in the manner of soldiers. Expensive gear, equipment, tarps, tents, food, and clothing were transported to the encampments and distributed among the agitators.

486.   Teams of protesters claiming to be "official legal observers" from UVA Law School and UVA Law School's National Lawyers Guild UVA Chapter, adorned in matching neon green hats, assembled and participated in advising other protesters how to protest, resist, and riot effectively.

487.   Important data and phone numbers were written with indelible markers on protesters' limbs, as if they were preparing for violence or combat, which in hindsight, they were.

488.   The aura and sense of menace were palpable.

489.   President Ryan and University Police Chief Timothy Longo would later claim and confirm that "known" violent offenders from "around the Commonwealth," were among the protestors and, at some point, Chief Longo himself feared that he would become a victim of violence.

490.   Many Jewish students, at the urging of their parents and leaders in the Jewish community, immediately fled, leaving their school and seeking shelter and solace at home.

491.   By this time, Matan was living in hiding with the family of an anonymous local resident.

492.   Like the other Jewish students, Matan was personally driven away and would flee home to safety, returning discretely to satisfy an academic obligation here and there, but not able to

enjoy access to the University or its educational environment safely or in any manner of unfettered access to which he is entitled.

493. This was not the cherished and beloved "First Year Experience" that UVA promises its students. This was something far different, something that evoked images of Germany in the 1930s, at least in the hearts and minds of UVA's vulnerable and beleaguered Jewish students and faculty.

494. As the UVA Jew Exclusion Zone was coming together, with its gear and structures, the antisemitic signs appeared, everywhere, and the chants calling for the death of Jews, the extermination of Israel began anew, with ever increasing vigor.

495. The encampments occupied substantial portions of the University of Virginia's central Grounds, the "Academical Village," meaning that Jewish students and faculty members were forced to pass by and navigate around antisemitic banners, oaths, and slurs whenever they went to the library, class, or even passed by the University's "campus."

496. As a result of the "Jew Exclusion Zones" and "Gaza Encampments" on the University of Virginia's campus, Matan and other Jewish students found access to the UVA educational environment, a public accommodation, impossible—including many of the main academic buildings or main University offices or the libraries—without encountering the antisemitic hate, abuse, and harassment.

497. University of Virginia faculty members who are members of FJP at UVA joined the encampment and proclaimed their presence, lending weight to the proposition that the entirety of the University of Virginia educational environment was consumed by and acting in concert with the antisemitic campaign. Jewish students at UVA, specifically including

Matan, were aware that over a thousand UVA faculty members had openly pledged their loyalty and support of the pro-Hamas, antisemitic, anti-Israel, and anti-Zionist movement.

498. Dozens of University of Virginia faculty groups, such as the American Association of University Professors – UVa Chapter, to name but one, joined, sponsored, and expressed their support and "solidarity" with SJP at UVA and FJP at UVA.

499. Entire University of Virginia academic departments such as the world-renowned Center for Politics, the vaunted UVA Department of English, the esteemed UVA Corcoran Department of History, the Department of Religious Studies, and the Department of Global Studies, again, naming just a few, expressed their "support and solidarity" in writing with pro-Hamas UVA faculty and students and the antisemitic discrimination and harassment taking place on Grounds against Jewish and Israeli students and faculty.

500. University of Virginia faculty members and student teachers who are members of FJP at UVA and SJP at UVA canceled classes and exams as expressions of support for pro-Hamas students such as SJP at UVA and to deprive students, including Jewish students such as Matan, of any notion of an educational environment that was safe and secure and free of antisemitic bias, prejudice, and hatred.

501. SJP at UVA and FJP at UVA faculty members and student teachers conducted tutoring sessions, essay writing assistance, exam preparation support, and student advancement sites within the Jew Exclusion Zone or "Gaza Encampment," offering benefits to pro-Hamas students and depriving others of the educational benefits and opportunities on the basis of their religion, their ethnicity, and their shared ancestry.

502. Matan was made to feel and did in fact perceive and understand that he was unwelcome in the public accommodation UVA educational environment. Matan was left with the distinct

belief and perception that if he attempted to avail himself of these benefits and opportunities, he would be harassed and bullied, physically assaulted, and possibly even killed, all because of his faith, his ethnicity, his national origin, and his shared ancestry.

503.    University of Virginia faculty members and student teachers who are FJP at UVA and SJP at UVA members threatened, without repercussion or any consequences, to withhold final grades or impair the grading process for their students, with the full understanding that doing so will cause tremendous harm to all students and create a hostile educational environment for Jewish students. Some of these faculty members even went so far as to acknowledge that their practices and threats were likely illegal and wrongful but that the advancement of the pro-Hamas cause to pressure the United States to withhold support for Israel would be worth it. A more blatant form of illegal, antisemitic discrimination or hostile environment is difficult to imagine:



*Social media posts confirming the withholding of grades by pro-Hamas professors and teaching assistants.*

504.    The University of Virginia conducted "alternative" graduation ceremonies for pro-Hamas students, faculty, and their families, presided over by FJP at UVA agent and member Robert Fatton.

505. The University was fully aware of the antisemitic nature and illegality of the "encampments" and still condoned the "Jew Exclusion Zones" on their campus. President Ryan and his senior advisors repeatedly characterized and referred to the antisemitic discrimination, hate-based harassment and the illegal disruption of the educational environment as "peaceful" examples of "civil discourse" and an appropriate exercise of free speech and expression rights. At his own initiative, President Ryan assigned high-ranking administrators to monitor and be physically present at the Jew Exclusion Zones, without objection or protest, so they could "liaise" with the agitators and fully understand, "hear," and meaningfully respond to the agitators' antisemitic demands.

506. The Ryan Administration did not demand that the antisemitic agitators who were breaking the law and disrupting University operations comply with multiple terms just to parlay with his administration or him, as he had with his Jewish students and their parents.

507. Defendant UVA assigned members of its administration, such as Vice President for Student Affairs Kenyon Bonner, Dean of Students Cedric Rucker, Associate Vice President for Student Affairs Marsh Pattie, and University Police Chief Timothy Longo to maintain a close, cordial, and interactive presence with the protesters and encampment dwellers.

508. At various times throughout the day on May 1, 2024, and May 2, 2024, these UVA administrators were observed engaged in deep dialogue with masked pro-Hamas encampment dwellers who were serving as "liaisons" between FJP at UVA and SJP at UVA and the University Administration. Some of these "liaisons" appear to resemble members of the "Faculty Defense" legal team.

509. On Thursday, May 3, 2024, or thereabouts, Defendants FJP at UVA and SJP at UVA posted a list of demands to the University of Virginia and its administration.

510.    The demands are patently antisemitic. The protesters demanded a response by 12:00PM the following day, Friday, May 4, 2024.

511.    Within twenty-four hours of the demands being affixed to the front door of the Rotunda and elsewhere, on May 4, 2024, the University of Virginia fearfully and gingerly responded to the demands, in writing, signed by Vice President and Chief Student Affairs Officer Kenyon Bonner and Brie Gertler, Vice Provost for Academic Affairs.

512.    The letter included the following statements, in pertinent part:

a.    "We welcome the opportunity for further conversation."

b.    In response to the "encampment's" demands for "divestment" from Israel and support for the "BDS movement," both of which have been deemed to be patently antisemitic and prohibited by even the most liberal of universities nationwide, the University Administration stated that it would "welcome the opportunity to hear more about your questions and concerns. We would be happy to arrange this [a meeting with President Ryan and other senior administrators] for you."

c.    The administrators agreed that the protestors, despite violating numerous University anti-discrimination policies, codes of conduct, and state and federal civil rights laws, based on their conduct to date, would <u>not</u> be charged with or face any University disciplinary measures or proceedings and could continue on without fear of "administrative discipline."

513.    The University did manage to politely decline to cancel all existing academic programming and exchange trips involving Israel or Israelis or Zionists, as demanded by the pro-Hamas disruptors.

514.   However, like Commonwealth's Attorney Hingeley predicted, the University's policy of appeasement and rapid capitulation served only as evidence of the University's endorsement and ratification of the antisemitic, disruptive, and illegal misconduct. The University's tender treatment and coddling of students and faculty who were openly calling for the murder of Jews and the extermination of the Jewish people simply reinforced and rewarded the hate-based, illegal behavior.

515.   Any parent, teacher, military officer, coach, business executive, or camp counselor could have advised President Ryan of the maxim "you get the conduct you tolerate." Somehow, though, President Ryan failed to discharge his most fundamental, sacred duty—the safeguarding of his students—when it counted most.

516.   Defendants SJP at UVA and FJP at UVA responded immediately to President Ryan's entreaties: The pro-Hamas antisemites wrote "BULLSHIT" and "FREE PALESTINE" across the University's responsive letter of capitulation and tacked it to the Rotunda and then posted pictures of their handiwork online for the world—but most importantly, UVA's Jewish students and faculty—to see.

517.   The effect of these behaviors has been to make Matan feel that his life was in danger and that he was unwelcome at the University of Virginia. Matan was made to feel unsafe, ashamed of his immutable, protected characteristics, uneasy moving freely within the University Community, and hesitant to attend classes and exams. Matan felt uncertain and insecure about his experience and whether he was being treated fairly by professors and peers.

518.   Most disturbing of all, the effect of these behaviors has been to place Matan and other Jewish and Israeli students and faculty at UVA in imminent and constant fear of physical attack, violence, and even death.

519.   On Saturday, May 4, 2024, University, local, and state police were summoned to remove and dismantle the encampments and their occupants. Arrests were made. However, the University never accused or charged the antisemitic protesters with charges or criminal accusations related to hate, hate-based violence, or illegal harassment and abuse. Instead, the University argued that the sole basis for dismantling the encampments was the violation of the University's "tent policy." Of course, this all occurred after the University assured the antisemitic agitators that their antisemitism and their antisemitic harassment and abuse was perfectly within the bounds of "peaceful" behavior and applicable codes of conduct, and they would not be sanctioned, disciplined, or punished for any hate-based misconduct.

520.   On May 6, 2024, the University of Virginia Student Council, led by the same student leader who, earlier in the year, published and widely disseminated the antisemitic, threatening "Bloody Hands" image on social media, issued a "Public Statement from UVA Student Council on UVA Liberation Encampment for Gaza." The UVA Student Council is an "Agency Level" and "Special Status" organization, meaning that it is formally part of the University Administration, even if students staff and operate it. In the "Statement," the UVA Student Council pledged to "actively seek" pro-Hamas students to whom it would provide funds for "water, food, masks, goggles, tear-gas first aid, and more." Equally telling, the UVA Student Council offered "low-cost, confidential legal assistance to UVA students, both in and outside of the courtroom. Free consultations can be arranged either

in-person, virtually, or by phone, and **our attorneys** are dedicated to providing guidance and representation as needed." (Emphasis added.)

521.   That Defendants UVA and Ryan stubbornly cling to the notion that their administration and institution are not fully engaged in supporting, promoting and extending a legal defense at taxpayers' expense to Defendants SJP at UVA and FJP at UVA is beyond credulity.

522.   At no time have the University, President Ryan, or any members of the administration condemned or expressed any disagreement with the protesters' misconduct or antisemitic harassment of Jewish students and faculty members.

523.   Matan wanted to study and just be a UVA student in the last weeks of what was supposed to be a glorious "First Year" of college at the prestigious and esteemed University. Instead, Matan spent his last days on Grounds either in hiding or traveling back and forth to his parents' home in Maryland, to safety. Matan wanted to lounge on the Lawn during the sunny days of late Spring and early Summer and study freely and openly without fear of harassment, persecution, or violence. But he could not. Matan wanted to attend graduation to see peers and friends "wear the honor of honors," but by then, the University educational environment was so hostile and dangerous to Matan, his parents convinced him not to return to Grounds after his last exam. This caused great shame and hurt to Matan and this outcome was exactly what SJP at UVA and FJP at UVA were seeking to accomplish regarding Matan and other Jewish students at UVA.

524.   Some of these antisemitic professors have even used their massive platforms, which have been built and created as a result of their association with and work for the University of Virginia, to degrade, humiliate, harass, and castigate Matan, specifically.

525.   In social media posts that have been drafted, posted, and "reposted" by prominent UVA professors and then viewed by many thousands or tens of thousands of followers and audiences, including other UVA professors and students, Matan and his efforts to fight antisemitic harassment have been called "batshit insane," "frivolous," a "fake victim," "Jewish Jussie," "absurd," and a "shit," to name but a few.

526.   These are University of Virginia faculty members taking to their massive UVA-supported platforms to amplify messages of hate and to degrade one of their students, an eighteen-year-old Jew, and doing so while acting in the course and scope of their roles as professors, agents, and public employees of the University of Virginia. Such behavior is entirely inappropriate, indefensible, and reprehensible for many reasons, and yet, the University of Virginia refuses to do anything about it.

527.   Matan has been personally subjected to severe, unwelcome, objectively hostile antisemitic abuse and harassment that has pervaded every facet of his UVA educational environment and has totally and completely deprived him of access to the public accommodation that is the UVA educational environment and has deprived him of the privileges, rights, and opportunities to which he is entitled as a student at the public university. There can be no doubt that the conduct that is alleged above is antisemitic and constitutes antisemitism, and that the antisemitic conduct is severe and objectively offensive.

528.   Matan has been targeted and tormented by SJP at UVA and FJP at UVA because he is Jewish, because he is Israeli-American, because he is a Zionist, and because he has proudly spoken the truth about his faith and his experiences with antisemitism and antisemitic hate at UVA. The illegal torment and bullying has included, but is not limited to: physical assault, verbal insults, constant exposure to vulgar, antisemitic banners and slogans calling

for his death and the death of his people, being subjected to a bogus and fraudulent Honor Charge brought in bad faith by an agent of SJP at UVA and wrongfully pursued and prosecuted by the University of Virginia administration, being ostracized by students and faculty, being ridiculed and humiliated by famous, "celebrity" faculty members, being forced into hiding and out of his dormitory, being deprived of any and all support or protections from the University, including its Student Affairs Division and its Student Health Services, being forced to leave Grounds for his safety and well-being on numerous occasions, and, finally, being forced to flee Grounds early, before graduation, out of fear for his safety and well-being.

529.  Every facet, element, and component of the University of Virginia's "educational environment," as set forth above and below, has been pervaded and infected by antisemitism and antisemitic hate, abuse, discrimination, and harassment. This includes, as set forth above in exacting detail, pervasion of the physical educational environment; pervasion of the online and virtual environment; pervasion of the human or "people" environment; pervasion of the Academy; and, finally, pervasion of the "Community of Trust" and unique culture and institutions that are and make up the University of Virginia.

530.  The University of Virginia's culpability goes far beyond mere imputation of responsibility as a result of its deliberate indifference to the open and obvious antisemitism and the express, multiple, formal complaints and cries for help from Matan and his fellow Jewish students. To be sure, the University of Virginia's behavior in this matter is a textbook example of deliberate indifference, and worse. However, the University of Virginia is culpable because it has tolerated and encouraged antisemitism and antisemitic harassment and discrimination on Grounds to the point of enabling and promoting this ugly, illegal

misconduct. The University of Virginia itself has falsely denied the existence of antisemitism and antisemitic harassment and abuse on Grounds. The University of Virginia itself has engaged in the practice of "gaslighting" the community, especially Matan and other Jewish students, with dishonesty, false narratives, and denials. The University of Virginia has so obstinately refused to acknowledge the antisemitism on Grounds and has forcefully refused to take any action of any kind, whatsoever, to correct or call a halt to antisemitism on Grounds.

531.    As a result of the whole-of-university or institutional pervasion of antisemitism throughout the entire school, the University of Virginia, itself, can be said to be engaged in antisemitism.

532.    The term used by the Ryan Administration to describe this level of saturation and pervasion in the context of other "-isms" is "institutional" or "systemic."

533.    Importantly, and this cannot be stressed enough, from October 7, 2023, to the present, even through the conclusion and eventual dismantling of the "Jew Exclusion Zones" and "Gaza Encampments," the University of Virginia has <u>never</u> enforced a single University policy, code of conduct, or state or federal law regarding antisemitism or antisemitic, hate-based harassment and abuse of Jewish UVA students and faculty. The University has expressly and specifically refused to press charges, initiate investigations, or punish or sanction any SJP at UVA or FJP at UVA member for committing violations of the University's anti-discrimination and anti-harassment policies and codes of conduct.

534.    The University of Virginia cannot claim that it responded to the harassment and abuse of Matan because *there has been no response*.

535. The University of Virginia cannot claim that a response to antisemitism on campus was "reasonable" because *there has been no response*.

536. Thus, the Defendants individually and collectively created, fostered, and enabled a hostile educational environment for Jewish students and have exhibited nothing but disdain, discrimination, deliberate indifference, and retaliatory animus regarding the events and their Jewish students.

537. Defendants SJP at UVA and FJP at UVA, at the urging of Hamas and their "parent organization" NSJP, have turned what once was a beautiful bastion of enlightened freethinking and tolerance into a trash-laden, vulgar wasteland of antisemitic and anti-Israeli hate.

538. Worse still, the University of Virginia and its President, Defendant James E. Ryan, did not just allow it to happen, they can fairly be said to have encouraged it to happen.

539. Sometimes, hate needs no further explanation or elaboration than a simple image:



*Photograph depicting University of Virginia students and faculty intimidating Jews and Israelis with the antisemitic hate symbols of the "bloody hands" during a pre-planned ambush on the Lawn, the sacred and cherished heart of the Academical Village at the center of the University.*

D.      **MATAN GOLDSTEIN**

540.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

541.    As alleged and discussed above, Plaintiff Matan Goldstein is an eighteen-year-old, Jewish, Israeli-American, Zionist, actively and currently enrolled, full-time student at the University of Virginia.

542.    Matan is the first member of his family to be born in the United States.

543.    Matan is the direct descendant of Holocaust survivors.

544.    Matan's father Alon was born in Israel. Matan's paternal great-grandparents on Matan's grandmother Gina's side met in a Displaced Persons Camp after World War II and emigrated from Europe to Israel in 1949. Matan's paternal grandfather Abraham fought for Israel in the 1967 Six-Day War, the 1967-1970 War of Attrition, and the 1973 Yom Kippur War, in which he was permanently paralyzed. Matan's father also served in the Israeli Army.



*Image depicting Matan and his grandfather in Israel.*

545.   Matan's mother Vered was born in Israel. Matan's ancestors on his mother's side are Jewish and originated in the Middle East. They endured innumerable hardships and sacrifice, including the loss of Matan's great-aunt in the journey to Israel. Matan's great-uncle fought and died in Israel's War for Independence at the Battle of Nabi-Samuel. Every year, Matan and his family visit and pay respects at his tomb in Israel. During the Arab Revolt during the British Mandate, Matan's grandfather's house was burned to the ground.

546.   Matan's mother and father are proud and staunch Zionists, as is Matan. They were raised to understand the horrors of the Holocaust and to cherish the sacred value of their homeland, Israel. They raised Matan with the same ideals, values, and faith.

547.   Matan's parents and Matan were raised Jewish and consider themselves "deeply connected" to Judaism and Israel. Their faith goes far beyond simply the passing of traditions or the observance or maintenance of the dictates of religion but a deep belief that their faith is a form of standing proud and defiant and defeating their ancestral oppressors. In Matan's family and throughout his life, all of the Jewish holidays are observed, the Sabbath is celebrated, and every male owns a Jewish star necklace. From a very early age, Matan felt a passion to study history, especially the classics and antiquity. When the time came for Matan to make his Bar Mitzvah, he requested that the ceremony take place where he "could feel the ground of his ancestors below him." His mother was left with three places from which he could choose: the Western Wall in Jerusalem, Masada in southern Israel, or Caesarea, in north-central Israel. Matan chose the site of Caesarea due to his own sense of connection to the important place. Even today, when Matan is at a synagogue, he reads his Bar Mitzvah portions.



*Image depicting Matan in Israel, praying and wrapping Teffilin.*

548.    Matan and his family have visited Israel at least twice a year, every year, for many years on end and Matan has spent over four whole years of his life in Israel. Matan's mother raised him, in his words, to be a "staunch, unflinching Zionist who loves his people, his religion, and his country." Matan's father taught him first and foremost to approach all things in life, especially people, with an open mind, and to always stand firm in matters of his values and his aspirations.

549.    Before college, Matan attended a Jewish school where he wore his Yarmulke, prayed every morning, read the Bible daily, engaged in the holy practice of wrapping Tefillin (phylacteries), studied rhetoric and debate, and learned to read Biblical Hebrew and Ancient Aramaic.

550.    Like his counsel, hundreds of thousands of students and faculty, and millions of visitors to Mr. Jefferson's University, Matan fell in love at first sight with the Academical Village, the Palladian, classical architecture, and the near-molecular level of historical significance

imbued in every brick and column. Matan knew that he absolutely must apply to the University the moment he set foot on Grounds for the first time. In his recollection, the entire educational environment—people, places, the learning environment, and the culture—was welcoming, and "the campus was gorgeous." Matan's father advised Matan not to apply to the school but to the professors, the "people" part of the educational environment. As Matan explored the University as an option for college, he discovered that many of the classics books he loved and was studying, especially and joyously including the edition of Marcus Aurelius' <u>Meditations</u> that he was reading, were written and translated by University of Virginia professors. Matan learned and is extremely proud of the fact that the University of Virginia houses one of the most distinguished and impressive collections of classics materials, documents, and books, and the classics department at UVA is considered preeminent in the United States. As Matan puts it, "holding my personal copy of <u>Meditations</u>, seeing the UVA professor who wrote it and getting it autographed by him, during my First Year, was a dream come true." Matan loves the study of classics, and he adores studying classics at the University of Virginia.

551. During the past year, Matan has continued to pray daily and read the Bible, but only in private. Matan still wraps Tefillin every day, but only in private. Though he would normally wear his Yarmulke, he only does so in private and has refrained from wearing his kippah in public for safety reasons, especially when he will be somewhere where he cannot be sure who will be near him or behind him, such as in class, in UVA facilities, or on Grounds where antisemitic demonstrations are taking place, which, today, is everywhere.

552. Matan was not prepared for the overt, baldfaced, virulent antisemitism that he encountered as a student at the University of Virginia, and, frankly, he should not be expected to have been prepared for that hatred. No one should be.

553. Matan should not have been denied access to the thing he loves most in his life next to his faith and his family, the study of classics at the University of Virginia, because he is Jewish, or Israeli or a Zionist. But he was.

554. Matan should not have been forced to deny or hide his faith or forced to hide himself because he is Jewish or Israeli or a Zionist. But he was.



*Image depicting Matan at the Homer Statue on the Lawn
during his early days at the University of Virginia.*

555. As a result of antisemitic abuse and harassment at the University of Virginia, Matan's life has been irrevocably altered, harmed, and impaired. Matan's ambitions, career prospects, reputation, physical and mental well-being, and opportunities for happiness have been altered, harmed, and impaired.

556.   The Plaintiff has lost his innocence, his sense of wonder, his aspirations, his sense of safety and security, and his belief in the goodness and sanctity of the institutions where he should feel safe and secure and be free to live, study, learn, and thrive as a young adult.

557.   Matan has been threatened, physically assaulted, and called vile names and slurs on multiple occasions. "Filthy Jew" is but one of the many epithets to which the Plaintiff is treated on a regular basis.

558.   President Ryan and the University of Virginia have denied Matan the protections and privileges that they afford non-Jewish students, because of his race, his faith, his ethnicity, his national origin, and his shared ancestry—in other words, all of the identities of being Jewish. But for race, Matan's race— his faith, his ethnicity, his national origin, his shared ancestry, his "Jewishness"—which is considered by the Ryan Administration to be "white" and an "oppressor," Defendant Ryan and the University of Virginia would have afforded him necessary protections, opportunities, and privileges.

559.   As a result of Defendants UVA and Ryan's failure and refusal to comply with their own policies and legal obligations to prevent and prohibit discrimination and harassment against Jewish students, Matan, unlike other UVA students, has been totally denied and deprived of the benefits, privileges, and protections that those other students enjoy at UVA. As a result of Defendants UVA and Ryan's direct, discriminatory acts and deliberate indifference, Matan has been totally isolated and ostracized from access to the educational environment that is the University of Virginia.

560.   University of Virginia students and faculty members who are members of Defendants FJP at UVA and SJP at UVA, acting individually and in concert with other groups and

individuals, taunt, malign, ridicule, assault, abuse, harass, intimidate, isolate, exclude and marginalize Matan with impunity and without consequence.

561.   Matan does not feel physically safe in Charlottesville or anywhere on University premises and as a result spent much of his First Year away from his dormitory and away from Charlottesville, away from his college friends, his teachers, and his college experience in order to remain safe and secure.

562.   The antisemitic events and incidents described and set forth in this lawsuit and the absence of action by the University of Virginia have devastated and frustrated Matan's ability to participate in and enjoy UVA's expansive educational programs and other University experiences. Matan has lost the joys of his academic pursuits and the adoration of his studies as a result of the severe, pervasive, objectively offensive, hostile educational environment.

563.   Matan does not feel safe walking on Grounds, being on University property or in University facilities, or going to class. Matan is fearful—resulting in constant, unhealthy vigilance—that he will be identified as Jewish and targeted as a result of his identity, faith, national origin, ethnicity, and shared ancestry. Matan has been denied meaningful access to all of the benefits and resources of UVA student life, including health and safety resources.

564.   Matan has suffered a profound wounding—a lasting heartache and deep disappointment—as a result of the Defendants' discrimination, harassment, and retaliation. Matan has lost an entire year of college—the sacred and near-mythical "UVA First Year Experience" and his entire college experience will be forever tarnished, impaired, and ruined. Matan and his reputation have been forever branded and tarnished by the fraudulent "Honor Charge," that the University took up and illegally prosecuted, knowing that it was illegitimate and

brought in utter bad faith as a means of harassing and tormenting Matan because he is Jewish and because he expressed his faith and his experiences.

565. Matan's legitimate expectations for his college career and experience—rights, privileges, and opportunities—have been entirely frustrated, impaired, and lost.

566. Matan has suffered significant physical injuries, harms, and damages. Matan suffers from a serious auto-immune disease that affects major life functions and can often be fatal. Physical and mental stress are known triggers of the conditions and symptoms associated with this disease. The exacerbation of the disease, its symptoms, and its long-term effects by the types of distress and anguish that Matan has suffered is widely accepted by the scientific and medical community. Matan has also suffered mental anguish, severe emotional distress, paralyzing anxiety, constant oppressive fear, depression, feelings of worthlessness, humiliation, embarrassment, a constant sense of dread and impending doom, Post Traumatic Stress Disorder and related syndromes or conditions, Traumatic Invalidation, and severe psychological distress of the gravest degree. Privacy concerns and the utterly heartbreaking, gruesome, personal, and sensitive nature of the health and medical conditions suffered by Matan limit what can or should be alleged in this pleading, but they are real, tangible, scientific, and medically cognizable. Matan has suffered and will continue to suffer actual long-term economic and financial repercussions and damages.

567. Perhaps worst of all, Matan, a young man of deep faith and spiritual adoration and adherence of Judaism, was forced to deny his faith, to hide his Jewish identity, to shield himself from recognition as a Jew and an Israeli. This has caused him endless personal suffering of a spiritual and existential nature.

568.    The individuals who personally committed the underlying actionable, egregious misconduct were University of Virginia students and faculty members and were, at all times, acting in furtherance of and fully in the course and scope of their membership in and association with Defendants SJP at UVA and FJP at UVA. These bad actors were all University of Virginia students and faculty members, and they were all acting on behalf of SJP at UVA and FJP at UVA when they broke the law and violated University policies and codes of conduct.

569.    All of the damages that the Plaintiff has suffered—physical, emotional, mental, psychological, economic, and financial—are the direct, proximate, and foreseeable result of the illegal, immoral, and egregious acts, errors, and omissions of each Defendant individually and collectively.

## VI. LEGAL CLAIMS & CAUSES OF ACTION

*"Those who kept silent yesterday will remain silent tomorrow."*
<u>Night</u>, Elie Wiesel.

570.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

## A.    CLAIMS AGAINST DEFENDANTS SJP at UVA and FJP at UVA

571.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

### COUNT I
### VIOLATIONS OF VIRGINIA CODE § 8.01-42.1
### *Against Defendants FJP at UVA & SJP at UVA*

572.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

573.   Virginia Code § 8.01-42.1 creates a civil cause of action for any person who is subjected to acts of intimidation, harassment, or violence based upon racial, religious, or ethnic animosity.

574.   As set forth in exacting and exhaustive detail above, the Plaintiff was subjected to and a victim of acts of intimidation, harassment, and violence by Defendants FJP at UVA and SJP at UVA that were motivated by racial, religious, and ethnic animosity.

575.   As a result, the Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendants FJP at UVA and SJP at UVA's violations of Virginia Code § 8.01-42.1.

576.   The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendants FJP at UVA and SJP at UVA's violations of Virginia Code § 8.01-42.1.

577.   The Plaintiff is entitled to an award of compensatory damages, including a financial award reflecting the substantial economic and non-economic damages and losses the Plaintiff has suffered from Defendants FJP at UVA and SJP at UVA's violations of Virginia Code § 8.01-42.1.

578.   Because Defendants FJP at UVA and SJP at UVA's acts, errors, and omissions were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages under Virginia Code § 8.01-42.1 is warranted.

579.   The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendants FJP at UVA and SJP at UVA under Virginia Code § 8.01-42.1.

## COUNT II
### NEGLIGENCE, GROSS NEGLIGENCE &
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### *Against Defendants FJP at UVA & SJP at UVA*

580.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

581.    Defendants FJP at UVA and SJP at UVA were negligent. Defendants FJP at UVA and SJP at UVA owed the Plaintiff and other students and faculty at the University of Virginia certain duties of care, including the duty of ordinary care, the duty to follow the anti-discrimination and anti-harassment rules and policies of the University of Virginia, including those pertaining specifically to student and faculty conduct and the duty to faithfully adhere to local, state, and federal laws when "on Grounds" or acting as a student or faculty member associated with the University of Virginia.

582.    As set forth in exacting and exhaustive detail above, Defendants FJP at UVA and SJP at UVA individually, separately, and repeatedly breached the applicable duties and standards of care and were repeatedly negligent in the discharge of each's duties and responsibilities as members of the University Community.

583.    Defendant FJP at UVA is liable for negligence.

584.    Defendant SJP at UVA is liable for negligence.

585.    As set forth in exacting and exhaustive detail above, Defendants FJP at UVA and SJP at UVA's behavior and breaches constitute gross negligence. These Defendants separately and jointly engaged in egregious, hate-based misconduct. Defendants FJP at UVA and SJP at UVA separately and jointly engaged in acts, errors, and omissions that represented a heedless and palpable violation of the legal duties respecting the rights of others that amounted to the total and abject absence of slight diligence, or the want of even scant care.

Defendants FJP at UVA and SJP at UVA's behavior and misconduct are shocking to fair-minded people and the Defendants exhibited willful recklessness and an utter disregard of prudence amounting to complete neglect of the safety of others.

586.   Defendant FJP at UVA's acts, errors, and omissions constitute gross negligence. Defendant SJP at UVA's acts, errors, and omissions constitute gross negligence.

587.   Defendants FJP at UVA and SJP at UVA individually and jointly intentionally inflicted severe emotional distress upon the Plaintiff and, consequently, must answer in tort for their respective acts, errors, and omissions. As set forth in exacting and exhaustive detail above, Defendants FJP at UVA and SJP at UVA's behavior and breaches were purposeful, calculated, intentional, pre-meditated, and beyond reckless. Defendants FJP at UVA and SJP at UVA's behavior and breaches were outrageous and intolerable and entirely unacceptable in any version of decent society. Defendants FJP at UVA and SJP at UVA's behavior and breaches were specifically intended to and did in fact cause the Plaintiff severe emotional, mental, and psychological harm, and the emotional damages and harms suffered by the Plaintiff as a result of the Defendants' willful and heinous misconduct was the very definition of serious and severe.

588.   The Plaintiff has suffered substantial, severe, and permanent physical and psychological damages as well as financial and economic losses as a proximate, direct, and foreseeable result of Defendants FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

589.   The Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendant FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

590.    The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendant FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

591.    The Plaintiff is entitled to an award of compensatory damages, including a financial award reflecting the substantial economic and non-economic damages and losses the Plaintiff has suffered from Defendants FJP at UVA and SJP at UVA's negligence, gross negligence, and intentional infliction of emotional distress.

592.    Because Defendants FJP at UVA and SJP at UVA's acts, errors, and omissions were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages is warranted.

593.    The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendants FJP at UVA and SJP at UVA.

### COUNT III
### VIOLATIONS OF 42 U.S.C. §§ 1981, 1985, 1986 & 1988
### *Against Defendants FJP at UVA & SJP at UVA*

594.    At and in universities and colleges, 42 U.S.C. § 1981 prohibits intentional discrimination and hostile educational environments on the basis of race, shared ancestry, or ethnicity (whether perceived or actual) and prohibits retaliation based on participation or support of protected activities.

595.    Courts are uniform in the conclusion that the "relationship" between student and university or college is "contractual in nature," bringing the conduct alleged in this lawsuit within the ambit, protections, and governance of 42 U.S.C. § 1981.

596.    42 U.S.C. § 1985 of the Ku Klux Klan Act provides that

> [i]f two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving,

153

either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. 42 U.S.C. § 1985(3).

597.   Defendants SJP at UVA and FJP at UVA conspired both among themselves and with the others for the purpose of depriving Matan of his rights and protections and privileges, including his constitutional rights and equal protection under the law, specifically including access to all parts of the UVA public accommodation educational environment and campus, equal to the access enjoyed by others.

598.   As a result of these Defendants' actions, Matan has been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical damages and stress that has diverted time, attention, and focus from study, and by other harms.

599.   Intentional discrimination against Jews and Israelis based on actual or perceived shared ancestry, race, and/or ethnicity, is prohibited under 42 U.S.C. §§ 1981, 1985, and 1986.

600.   Defendants FJP at UVA and SJP at UVA intentionally discriminated against the Plaintiff on the basis of race, shared ancestry, and ethnicity or ethnic characteristics in violation of 42 U.S.C. §§ 1981, 1985, and 1986.

601.   Harassment, intimidation, humiliation, and abuse, on the basis of his race, shared ancestry, and ethnicity or ethnic characteristics, called a "hostile environment," are prohibited by 42 U.S.C. §§ 1981, 1985, and 1986.

602.   Defendants FJP at UVA and SJP at UVA intentionally and deliberately harassed, intimidated, humiliated, physically assaulted, and abused the Plaintiff on the basis of his

race, shared ancestry, and ethnicity or ethnic characteristics in violation of 42 U.S.C. §§ 1981, 1985, and 1986.

603.    Retaliation against those who engage or participate in protected activities or support others who do is prohibited 42 U.S.C. 42 U.S.C. §§ 1981, 1985, and 1986.

604.    Defendant SJP at UVA intentionally and deliberately retaliated against the Plaintiff in response to and because of his participation and engagement in protected activities and because of, or "but for" his race, shared ancestry, and ethnicity or ethnic characteristics when it fraudulently and maliciously filed a false "Honor Charge" against the Plaintiff with the sole purposes of silencing the Plaintiff, retaliating against the Plaintiff, and causing him excruciating and severe mental, emotional, and psychological distress along with reputational harm and financial and economic losses.

605.    Defendant SJP at UVA sought to drive the Plaintiff away from UVA, to "exterminate" him from his college experience, all because of his race, his shared ancestry, and his ethnicity.

606.    "But for" the Plaintiff's race, shared ancestry, and ethnicity or ethnic characteristics, Defendants FJP at UVA and SJP at UVA would not have mistreated, discriminated, harassed, or retaliated against the Plaintiff, all in violation of 42 U.S.C. §§ 1981, 1985, and 1986.

607.    Defendants FJP at UVA and SJP at UVA's intentional discrimination and harassment have the aim and result of denying and depriving the Plaintiff equal access to the full panoply of educational opportunities, experiences, benefits, and privileges on the basis of race, religion, ethnicity, ethnic characteristics, and shared ancestry in violation of 42 U.S.C. §§ 1981, 1985, and 1986.

608.  "But for" the Plaintiff's race, religion, shared ancestry, and ethnic characteristics, Defendants FJP at UVA and SJP at UVA would not have discriminated against, harassed, or retaliated against the Plaintiff in violation of 42 U.S.C. §§ 1981, 1985, and 1986.

609.  The Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendants FJP at UVA and SJP at UVA's violations of 42 U.S.C. §§ 1981, 1985, and 1986.

610.  The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendants FJP at UVA and SJP at UVA's violations of 42 U.S.C. §§ 1981, 1985, and 1986.

611.  The Plaintiff is entitled to an award of compensatory damages in his favor arising from Defendants FJP at UVA and SJP at UVA's violations of 42 U.S.C. §§ 1981, 1985, and 1986. The Plaintiff is entitled to recover monetary relief and/or a financial award of compensatory damages for the profound and heartbreaking injuries and harm he has suffered, including substantial economic and non-economic damages and losses.

612.  Because Defendants FJP at UVA and SJP at UVA's acts, errors, and omissions that violated the federal civil rights laws were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages reflective of their purposeful intent, their willful disregard for the Plaintiff's federally protected rights, the extent of the harm they caused the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate under 42 U.S.C. §§ 1981, 1985, and 1986.

613.  The Plaintiff is entitled to an award of attorneys' fees, pre- and post-judgment interest, and taxable litigation costs against Defendants FJP at UVA and SJP at UVA's pursuant to 42 U.S.C. § 1988.

<u>COUNT IV</u>
**CIVIL CONSPIRACY**
*Against Defendants FJP at UVA & SJP at UVA*

614.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

615.    In Virginia, the common law has long recognized actions based on civil conspiracy. *Dunlap v. Cottman Transmission Systems LLC,* 287 Va. 207, 214-15 (2014).

616.    Members of Defendants FJP at UVA and SJP at UVA, acting as members and on behalf of those entities, agreed to participate in the illegal, unlawful, and tortious conduct alleged in great detail above that was part of a planned and calculated common scheme to illegally, unlawfully, and tortiously harass, terrorize, and abuse Jewish students and faculty members at the University of Virginia for the overall pro-Hamas, anti-Israel, antisemitic, and anti-Zionist aims and common cause. Defendants FJP at UVA and SJP at UVA's overt acts in furtherance of the common scheme and conspiracy proximately, directly, and foreseeably injured and damaged Matan.

617.    As set forth in exacting and exhaustive detail above, the Plaintiff was subjected to and a victim of acts of intimidation, harassment, and violence by Defendants FJP at UVA and SJP at UVA that were motivated by racial, religious, and ethnic animosity and part of the common pro-Hamas scheme.

618.    As a result, the Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendants FJP at UVA and SJP at UVA's civil conspiracy.

619.    The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendants FJP at UVA and SJP at UVA's civil conspiracy.

620.   The Plaintiff is entitled to an award of compensatory damages, including a financial award reflecting the substantial economic and non-economic damages and losses the Plaintiff has suffered from Defendants FJP at UVA and SJP at UVA's civil conspiracy.

621.   Because Defendants FJP at UVA and SJP at UVA's conspiracy and the underlying acts, errors, and omissions were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages is warranted.

622.   The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendants FJP at UVA and SJP at UVA.

**B.     CLAIMS AGAINST DEFENDANT THE UNIVERSITY OF VIRGINIA**

623.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

<u>COUNT V</u>
**VIOLATIONS OF TITLE VI – 42 U.S.C. § 2000d *et seq.* and 42 U.S.C. § 1983**
***Against The University of Virginia***

624.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

625.   Title VI, found at 42 U.S.C. § 2000d *et seq.*, prohibits intentional discrimination, including disparate treatment and harassment, on the basis of race, color, or national origin in any program or activity that receives federal funds or other federal financial assistance.

626.   The University of Virginia receives federal funds and financial assistance and has admitted in other matters and at other times that it falls within the jurisdiction and purview of Title VI. In imposing liability under Title VI upon public universities that qualify as state actors, Congress has abrogated any sovereign or Eleventh Amendment immunities that might otherwise apply to the University of Virginia.

158

627.   On May 25, 2023, just one year ago, The Honorable Catherine E. Lhamon, the United States Department of Education Assistant Secretary for Civil Rights, writing to universities and colleges nationwide who are subject to Title VI in what is known as a "Dear Colleague Letter," stated the following:

> I write to remind you of schools' legal obligation under Title VI of the Civil Rights Act of 1964 (Title VI) to provide all students, including Jewish students, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.
>
> Earlier this year, the Department of Education's Office for Civil Rights (OCR) issued a fact sheet - Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics - explaining how the protection offered by Title VI, which prohibits discrimination based on race, color, or national origin by programs or activities of recipients of federal financial assistance, extends to students who experience discrimination, including harassment, based on their actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity.
>
> Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin. For example, OCR may investigate complaints that students have been subjected to ethnic or ancestral slurs; harassed for how they look, dress, or speak in ways linked to ethnicity or ancestry (e.g., skin color, religious attire, language spoken); or stereotyped based on perceived shared ancestral or ethnic characteristics.

628.   Discrimination against Jews and Israelis, including based on actual or perceived shared ancestry, race, national origin, and/or ethnicity, is prohibited under Title VI.

629.   The allegations set forth above describe direct violations of Title VI by the University of Virginia for intentional discrimination against the Plaintiff on the basis of race, national origin, shared ancestry, and ethnic characteristics.

630.   The Plaintiff is and identifies as Jewish and Israeli and his status and identification as a Jew and an Israeli brings him within the purview and scope of Title VI's protections.

631.   The University of Virginia expressly refused to protect Matan on the basis of race, because of race, because of his race, and, "but for" Matan's race, it would have acted and followed its obligations to protect Matan. The University of Virginia's decisions that were motivated and driven by race constitute a basis for liability independent of the direct creation of a hostile educational environment and its deliberate indifference to the hostile educational environment under both Title VI and 42 U.S.C. § 1983.

632.   The University of Virginia created, tolerated, nurtured, fomented, and fostered intentional, severe, and pervasive harassment and abuse, known as a hostile environment, against the Plaintiff on the basis of his race, national origin, shared ancestry, and ethnic characteristics, in violation of Title VI.

633.   The University of Virginia intentionally discriminated against the Plaintiff and treated the Plaintiff worse than other non-Jewish and non-Israeli students on the basis of the Plaintiff's race, national origin, shared ancestry, and ethnic characteristics, in violation of Title VI.

634.   The University of Virginia's intentional discrimination and hostile educational environment deny and deprive the Plaintiff equal access to the full panoply of educational opportunities, experiences, benefits, and privileges that are available and afforded to non-Jewish and non-Israeli students in violation of Title VI.

635.   "But for" the Plaintiff's race, national origin, shared ancestry, and ethnic characteristics, the University of Virginia would not have discriminated against or harassed the Plaintiff.

636.   The allegations set forth above describe direct violations of Title VI by the University of Virginia for retaliation against the Plaintiff, including tangible adverse actions because of and as a result of the Plaintiff's engagement or participation in protected activities.

637. The University of Virginia's own acts, errors, and omissions constitute violations of Title VI, meaning that Defendant UVA is directly responsible and liable to the Plaintiff for violations of Title VI.

638. The University of Virginia is also vicariously liable for violation of Title VI, and the acts, errors, and omissions of administrators, employees and agents that violate Title VI are attributable and imputable to the University of Virginia.

639. The University of Virginia's violations of Title VI, including intentional discrimination; the creation, maintenance, and deliberate indifference to a hostile educational environment; and retaliatory actions have directly, proximately, and foreseeably damaged, injured, and harmed the Plaintiff.

640. As a result, the Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding the University of Virginia's Title VI violations.

641. As a result, the Plaintiff is entitled to an award of compensatory damages in his favor regarding the University of Virginia's Title VI violations.

642. The University of Virginia's acts, errors, and omissions violate the Plaintiff's Fourteenth Amendment right to Equal Protection and First Amendment rights of Free Speech and Free Exercise. Absent prospective injunctive and declaratory relief against the University of Virginia, the Plaintiff will continue to be harmed by the University of Virginia's actions.

643. As to claims under 42 U.S.C. § 1983 against the University of Virginia, the Plaintiff only seeks *prospective* injunctive relief.

644. As a result, the Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs pursuant to Title VI and 42 U.S.C. § 1988.

C.      **CLAIMS AGAINST DEFENDANT PRESIDENT JAMES E. RYAN**

645.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

**COUNT VI**
**VIOLATIONS OF 42 U.S.C. §§ 1981, 1983 & 1988**
*Against Defendant Ryan*

646.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

647.    Defendant Ryan is a public official who owes duties to the Commonwealth of Virginia and is a state actors who acted at all times under color of state law and within the course and scope of his position, employment, and duties as the senior and ultimate representative of the University of Virginia and as a public official.

648.    At and in universities and colleges, 42 U.S.C. § 1981 prohibits intentional discrimination and hostile educational environments on the basis of race, shared ancestry, or ethnicity (whether perceived or actual) and prohibits retaliation based on participation or support of protected activities.

649.    Courts are uniform in the conclusion that the "relationship" between student and university or college is "contractual in nature," bringing the conduct alleged in this lawsuit within the ambit, protections, and governance of 42 U.S.C. § 1981.

650.    Intentional discrimination against Jews and Israelis, including based on actual or perceived shared ancestry, race, and ethnicity, is prohibited under 42 U.S.C. § 1981.

651.    The Fourteenth Amendment of the United States Constitution, as applied to state actors and public officials and made actionable under 42 U.S.C. § 1983, prohibits unlawful

discrimination, harassment, and retaliation on the basis of race, religion, national origin, ethnicity, or shared ancestry at public universities or colleges.

652. The First Amendment of the United States Constitution, as applied to state actors and public officials and made actionable under 42 U.S.C. § 1983, prohibits unlawful discrimination, harassment, and retaliation on the basis of religion or expressions of faith, or other expressions of public concern at public universities or colleges.

653. Defendant Ryan intentionally discriminated against Matan on the basis of his race, shared ancestry, ethnicity, ethnic characteristics, and religion (and the free expression and exercise thereof) in violation of 42 U.S.C. §§ 1981 and 1983.

654. The creation, toleration, nurturing, fomenting, and fostering of intentional, severe, and pervasive, harassment and abuse, on the basis of his race, shared ancestry, ethnicity, ethnic characteristics, and/or religion (or the free expression or exercise thereof), called a "hostile environment," is prohibited by 42 U.S.C. §§ 1981 and 1983.

655. The creation, toleration, nurturing, fomenting, and fostering of intentional, severe, and pervasive, harassment and abuse, on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities violates the First and Fourteenth Amendments of the United States Constitution, as applied to Defendant Ryan by 42 U.S.C. § 1983.

656. Defendant Ryan intentionally and deliberately created, tolerated, nurtured, fomented, and fostered a hostile environment of severe and pervasive harassment, intimidation, and abuse on the basis of Matan's race, shared ancestry, ethnicity, ethnic characteristics, and/or

religion (or the free expression or exercise thereof) in violation of 42 U.S.C. §§ 1981 and 1983.

657.   Retaliation against those who engage or participate in protected activities or support others who do is prohibited 42 U.S.C. §§ 1981 and 1983.

658.   Defendant Ryan intentionally and deliberately retaliated against Matan in response to and because of his participation and engagement in protected activities and because of, or "but for" his race, shared ancestry, ethnicity, ethnic characteristics, and his religion in violation of 42 U.S.C. §§ 1981 and 1983.

659.   "But for" Matan's race, including shared ancestry, ethnicity, ethnic characteristics, and religion, Defendant Ryan would not have mistreated, discriminated, or retaliated against; maintained a hostile environment against; nor refused to protect the Plaintiff, all in violation of 42 U.S.C. §§ 1981 and 1983.

660.   Defendant Ryan's intentional discrimination and creation of a hostile educational environment denied and deprived Matan of equal access to the full panoply of educational opportunities, experiences, benefits, and privileges on the basis of race, ethnicity, ethnic characteristics, shared ancestry, and religion in violation of 42 U.S.C. §§ 1981 and 1983.

661.   "But for" the Plaintiff's race, shared ancestry, ethnic characteristics and religion, Defendant Ryan would not have discriminated against, harassed, or retaliated against the Plaintiff in violation of 42 U.S.C. §§ 1981 and 1983.

662.   Defendant Ryan intentionally discriminated against the Plaintiff on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities in violation

of the First and Fourteenth Amendments of the United States Constitution, as applied to Defendant Ryan by 42 U.S.C. § 1983.

663. Defendant Ryan intentionally and deliberately created, tolerated, nurtured, fomented, and fostered a hostile environment of severe and pervasive harassment, intimidation, and abuse on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities in violation of the First and Fourteenth Amendments of the United States Constitution, as applied to Defendant Ryan by 42 U.S.C. § 1983.

664. Retaliation against those who engage or participate in protected activities or support others who do on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities violates the First and Fourteenth Amendments of the United States Constitution, as applied to Defendant Ryan by 42 U.S.C. § 1983.

665. Defendant Ryan intentionally and deliberately retaliated against the Plaintiff in response to and because of his participation and engagement in protected activities on the basis of religion, national origin, protected free speech and expressions, race, shared ancestry, ethnicity or ethnic characteristics, and engagement or participation in protected activities in violation the First and Fourteenth Amendments of the United States Constitution, as applied to Defendant Ryan by 42 U.S.C. § 1983.

666. The Plaintiff is entitled to entry of a Declaratory Judgment in his favor regarding Defendant Ryan's violations of 42 U.S.C. §§ 1981 & 1983.

667. The Plaintiff is entitled to permanent, prospective injunctive relief regarding Defendant Ryan's violations of 42 U.S.C. §§ 1981 & 1983.

668.    The Plaintiff is entitled to an award of compensatory damages in his favor arising from Defendants Ryan's violations of 42 U.S.C. §§ 1981 & 1983. The Plaintiff is entitled to recover monetary relief and/or a financial award of compensatory damages for the profound and heartbreaking injuries and harm he has suffered, including substantial economic and non-economic damages and losses.

669.    Because Defendant Ryan's acts, errors, and omissions that violated the federal civil rights laws were malicious, intentional, intentionally discriminatory, and impermissibly motivated, an award of punitive damages reflective of their purposeful intent, their willful disregard for the Plaintiff's federally protected rights, the extent of the harm they caused the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate under 42 U.S.C. §§ 1981 & 1983.

670.    The Plaintiff is entitled to an award of attorneys' fees and pre- and post-judgment interest and litigation costs against Defendant Ryan pursuant to 42 U.S.C. § 1988.

## VII. JURY DEMAND

671.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

672.    The Plaintiff respectfully requests and demands a jury trial on all issues and matters so triable.

## VIII. PRAYER FOR RELIEF

673.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

674.    WHEREFORE, the Plaintiff respectfully prays for, petitions, and requests the Honorable

Court to enter Final Judgment in the Plaintiff's favor, including the following award and

relief:

a.    A Declaratory Judgment in the Plaintiff's favor pursuant to 28 U.S.C. § 2201;

b.    An order compelling permanent, prospective injunctive relief in the Plaintiff's

favor;

c.    An award of compensatory damages against all Defendants to be determined by the

jury and trier of fact, that is reasonably calculated to compensate the Plaintiff for

the significant losses, injuries, and lasting damages and harm he has directly,

proximately, and foreseeably suffered as a result of the Defendants' acts, errors,

and omissions;

d.    An award of punitive damages against Defendants FJP at UVA, SJP at UVA, and

Ryan, separately and individually, in an amount to be determined by the jury that

is calculated to reflect the severity of the harm inflicted upon and damages suffered

by Matan Goldstein and taking into account for the intentional, purposeful, and

deliberate nature of these Defendants' decisions, committed with the certainty that

Matan Goldstein would be damaged and that his life and future would be

irreparably impaired and ruined;

e.    An award of attorneys' fees and litigation and taxable costs to the maximum extent

permitted by applicable law;

f.    Pre- and post-judgment interest to the maximum extent permitted by applicable

law;

g.    Such other relief as the Court deems just and proper; and

h.      **A JURY TRIAL ON ALL ISSUES AND MATTERS SO TRIABLE.**

Respectfully submitted, August 6, 2024,

**MATAN GOLDSTEIN**

By his counsel:

/s/ Gregory W. Brown
GREGORY W. BROWN – VA Bar # 36369
KRISTI L. GAVALIER – VA Bar #96707
BROWN & GAVALIER, PLLC
320 West Main Street
Charlottesville, Virginia 22903
Telephone & Facsimile (One Talk): 434-996-2606
partners@brownandgavalier.com (Lawyers' Email)
admin@brownandgavalier.com (CM/ECF)
*Counsel for Matan Goldstein*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of August, 2024, I will electronically file a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

| | |
|---|---|
| Kelly Orians (VSB No. 98047)<br>580 Massie Road<br>Charlottesville, Virginia 22903<br>keorians@gmail.com<br>*Counsel for Defendants SJP at UVA and FJP at UVA* | Jonathan T. Blank (VSB No. 38487)<br>McGuireWoods LLP<br>323 2nd St. SE, Suite 700<br>Charlottesville, VA 22902<br>Tel.: (434) 977-2509<br>jblank@mcguirewoods.com<br>*Counsel for Defendants UVA, Ryan, and Hardie* |
| Asim Ghafoor (*pro hac vice*)<br>Law Office of Asim Ghafoor<br>23465 Rock Haven Way, Suite 100<br>Dulles, Virginia 20166<br>asim@glawoffice.com<br>*Counsel for Defendants SJP at UVA and FJP at UVA* | Farnaz F. Thompson (VSB No. 75982)<br>McGuireWoods LLP<br>888 16th Street N.W., Suite 500<br>Black Lives Matter Plaza<br>Washington, D.C.<br>Tel: (202) 857-1000<br>fthompson@mcguirewoods.com<br>*Counsel for Defendants UVA, Ryan, and Hardie* |
| Jonathan Wallace (*pro hac vice*)<br>Post Office Box 728<br>Amagansett, New York 11930<br>jonathan.wallace80@gmail.com<br>*Counsel for Defendants SJP at UVA and FJP at UVA* | Heidi E. Siegmund (VSB No. 89569)<br>Juliet B. Clark (VSB No. 96918)<br>McGuireWoods LLP<br>800 East Canal Street<br>Richmond, VA 23219<br>Tel.: (804) 775-1000<br>hsiegmund@mcguirewoods.com<br>jbclark@mcguirewoods.com<br>*Counsel for Defendants UVA, Ryan, and Hardie* |

/s/ Gregory W. Brown
Brown & Gavalier, PLLC