**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| MATAN GOLDSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-00036-RSB-JCH |
| | ) | |
| THE RECTOR AND VISITORS OF THE | ) | |
| UNIVERSITY OF VIRGINIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA
AND PRESIDENT JAMES E. RYAN'S MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A
CLAIM</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 1

PROCEDURAL BACKGROUND............................................................................. 25

LEGAL STANDARD................................................................................................. 28

ARGUMENT .............................................................................................................. 28

I.      The Court should dismiss Count V because Plaintiff alleges no intentional discrimination based on race or national origin. ..................................................................................... 29

    A.      Plaintiff does not allege he was treated differently.................................................. 30

    B.      Plaintiff does not allege any facts suggesting discriminatory intent....................... 33

II.     The Court should dismiss Count V because Plaintiff alleges no facts to support a retaliation claim under Title VI....................................................................................... 35

III.    The Court should dismiss Count V because Plaintiff's hostile environment harassment claim fails.................................................................................................................. 37

    A.      Plaintiff has not alleged facts showing severe, pervasive and objectively offensive harassment that effectively denies equal access to education programs and activities. ................................................................................................................. 38

        1.      Many of Plaintiff's allegations are unrelated to Plaintiff.......................... 38

        2.      Plaintiff's alleged hostile environment is based in large part on speech not directed at Plaintiff and protected under the First Amendment.................................................................................................. 39

        3.      Plaintiff fails to adequately allege deprivation of educational benefits. .................................................................................................... 41

    B.      Plaintiff's allegations do not show deliberate indifference by UVA. .................... 43

IV.     All claims against President Ryan fail. .................................................................... 48

    A.      Plaintiff's allegations against President Ryan are not actionable. ........................ 48

        1.      Section 1983 does not permit vicarious liability....................................... 48

        2.      Plaintiff's allegations about President Ryan's speech or refusal to speak also cannot support a claim............................................................ 50

    B.      Plaintiff's allegations do not support any violation of constitutional rights under Section 1983................................................................................................ 52

        1.      Plaintiff's claim of disparate treatment by President Ryan fails............... 53

        2.      Plaintiff's allegation of retaliation by President Ryan fails. .................... 55

        3.      Plaintiff has not pleaded any discriminatory intent in relation to the harassment claim against President Ryan. ................................................ 58

    C.      President Ryan is entitled to qualified immunity................................................... 58

CONCLUSION..................................................................................................................... 60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*,
  819 F.3d 69 (4th Cir. 2016) ....................................................................................43

*Amison v. George Mason Univ.*,
  No. 23-1042, 2023 WL 8946774 (4th Cir. Dec. 28, 2023)...............................48, 59

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................48, 49

*Barnes v. Glen Theatre, Inc.*,
  501 U.S. 560 (1991)................................................................................................40

*Brown v. Porter*,
  No. 2:19-CV-376-RJK, 2019 WL 8503313 (E.D. Va. Nov. 26, 2019), *report
  and recommendation adopted as modified*, 438 F. Supp. 3d 679 (E.D. Va.
  2020) ................................................................................................................26, 59

*Butters v. James Madison Univ.*,
  145 F. Supp. 3d 610 (W.D. Va. 2015) ...................................................................3

*Buxton v. Kurtinitis*,
  862 F.3d 423 (4th Cir. 2017) ..................................................................................56

*Carter v. Wells Fargo Bank, Nat'l Ass'n*,
  689 F. Supp. 3d 253 (W.D. Va. 2023) ....................................................................28

*Clark v. Liberty Univ., Inc.*,
  No. 6:20-CV-58-NKM, 2021 WL 1827256 (W.D. Va. May 7, 2021) .............27, 32

*Conley v. Ryan*,
  92 F. Supp. 3d 502 (S.D.W. Va. 2015) ............................................................12, 26

*Constantine v. Rector & Visitors of George Mason Univ.*,
  411 F.3d 474 (4th Cir. 2005) ..................................................................................56

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022)........................................................................................42, 43

*Davison v. Rose*,
  19 F.4th 626 (4th Cir. 2021) ..................................................................................56

*Doe v. Bd. of Visitors of VMI*,
  494 F. Supp. 3d 363 (W.D. Va. 2020) ...................................................................37

*Doe v. Fairfax Cnty. Sch. Bd.*,
    1 F.4th 257 (4th Cir. 2021) ..........................................................................42, 43

*Doe v. Marymount Univ.*,
    297 F. Supp. 3d 573 (E.D. Va. 2018) ......................................................27

*Doe v. Washington & Lee Univ.*,
    No. 6:14-CV-00052-NKM, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015)..........27

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006)........................................................................27

*Doriety v. Sletten*,
    109 F.4th 670 (4th Cir. 2024) ........................................................3, 9

*Facchetti v. Bridgewater Coll.*,
    175 F. Supp. 3d 627 (W.D. Va. 2016) ..................................................43

*Falwell v. Liberty Univ., Inc.*,
    No. 6:23-cv-11-RSB, 2023 WL 4867432 (W.D. Va. July 31, 2023) ........................2

*Felber v. Yudof*,
    851 F. Supp. 2d 1182 (N.D. Cal. 2011) ..............................................37, 39, 40, 47

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) ....................................................35, 36, 58

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ........................................................2

*Hafer v. Melo*,
    502 U.S. 21 (1991)........................................................................58

*Hartman v. Moore*,
    547 U.S. 250 (2006)........................................................................56

*Healy v. James*,
    408 U.S. 169 (1972)........................................................................37

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ........................................................40, 41

*Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*,
    566 F.3d 138 (4th Cir. 2009)  ........................................................48

*Jennings v. Univ. of N.C.*,
    482 F.3d 686 (4th Cir. 2007) ........................................................42

iv

*Jett v. Dallas Indep. Sch. Dist.*,
  491 U.S. 701 (1989)................................................................................................27

*Johanns v. Livestock Marketing Ass'n*,
  544 U.S. 550 (2005)................................................................................................51

*Kashdan v. George Mason Univ.*,
  70 F.4th 694 (4th Cir. 2023).................................................................................32

*Kestenbaum v. President & Fellows of Harvard College*,
  --- F. Supp. 3d ---, 2024 U.S. Dist. LEXIS 139180 (D. Mass. Au. 6, 2024).........44, 45, 46, 51

*Mandel v. Bd. of Trs. of Cal. State Univ.*,
  No. 3:17-CV-03511-WHO, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018)...................... *passim*

*Mandel v. Bd. of Trs. of Cal. State Univ.*,
  No. 3:17-CV-03511-WHO, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ..........................38

*Monegain v. Dep't of Motor Vehicles*,
  491 F. Supp. 3d 117 (E.D. Va. 2020) ....................................................................36

*Monell v. Dep't of Soc. Servs. of City of New York*,
  436 U.S. 658 (1978)................................................................................................26

*Nat'l Endowment for Arts v. Finley*,
  524 U.S. 569 (1998) (Scalia, J., concurring in judgment) ....................................52

*Newman v. Howard Univ. Sch. of L.*,
  No. 1:23-cv-0436 (TNM), 2024 WL 450245 (D.D.C. Feb. 6, 2024) ......................30

*Nieves v. Bartlett*,
  587 U.S. 391 (2019)................................................................................................56

*Olgiati v. Breitschmid*,
  No. 7:23-CV-352-RSB, 2023 WL 8828647 (W.D. Va. Dec. 21, 2023)................................28

*Ortegel v. Virginia Polytechnic Inst. & State Univ.*,
  No. 7:22-cv-00510, 2023 WL 8014237 (W.D. Va. Nov. 20, 2023) .....................30, 33, 34, 53

*Peters v. Jenney*,
  327 F.3d 307 (4th Cir. 2003) .................................................................................35

*Phillips v. Rector & Visitors of Univ. of Virginia*,
  No. 3:22-cv-00075-RSB, 2024 WL 1201639 (W.D. Va. Mar. 20, 2024) ................................2

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)............................................................................................51, 52

*Raub v. Campbell*,
    785 F.3d 876 (4th Cir. 2015) ................................................................56

*Reynolds Foil Inc. v. Pai*,
    No. 3:09-CV-657, 2010 WL 1225620 (E.D. Va. Mar. 25, 2010) ...........................28

*Ridpath v. Bd. of Governors Marshall Univ.*,
    447 F.3d 292 (4th Cir. 2006) ................................................................57

*Rock for Life-UMBC v. Hrabowski*,
    411 F. App'x 541 (4th Cir. 2010) ...........................................................59

*Rust v. Sullivan*,
    500 U.S. 173 (1991) .........................................................................52

*Sheppard v. Visitors of Va. State Univ.*,
    993 F.3d 230 (4th Cir. 2021) ................................................................32

*Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v. Rector &*
    *Visitors of Univ. of Virginia*,
    503 F. Supp. 3d 433 (W.D. Va. 2020) ................................................26, 58

*StandWithUs Center for Legal Justice v. MIT*,
    --- F. Supp. 3d ---, 2024 U.S. Dist. LEXIS 134141 (D. Mass. July 30, 2024) ......43, 44, 45, 46

*Stover v. Coll. of William & Mary*,
    635 F. Supp. 3d 429 (E.D. Va. 2022) .......................................................36

*Suarez Corp. Indus. v. McGraw*,
    202 F.3d 676 (4th Cir 2000) ................................................................56

*Virginia v. Black*,
    538 U.S. 343 (2003) .........................................................................54

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ....................................................................51, 52

*Wilcox v. Lyons*,
    970 F.3d 452 (4th Cir. 2020) ............................................................55, 56

*Williams v. FirstPlus Home Loan Trust*
    *1996-2*, 209 F.R.D. 404 (W.D. Tenn. 2002) ................................................28

**U.S. Constitution**

First Amendment ................................................................................................ *passim*

Fourteenth Amendment .................................................................................27, 56

Eleventh Amendment.............................................................................................26

**Statutes**

20 U.S.C. § 1232g(d) ............................................................................................55

42 U.S.C. § 1981 ...................................................................................................27

42 U.S.C. § 1983 ........................................................................................ *passim*

Civil Rights Act of 1964 Title VI, 42 U.S.C. §§ 2000d, *et seq.* ............................ *passim*

Va. Code § 18.2-422 ..............................................................................................16

Va. Code § 18.2-423.2 ...........................................................................................54

Va. Code § 23.1-2209(A)(ii)...................................................................................18

**Other Authorities**

Fed. R. Civ. P. 8(a)(1) .............................................................................................1

Fed. R. Civ. P. 8(d)(1) .............................................................................................1

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 28

Fed. R. Civ. P. 12(f) .................................................................................................2

Fed. R., Civ. P. 34.................................................................................................25

Defendants The Rector and Visitors of the University of Virginia ("UVA" or "University") and President James E. Ryan ("Ryan" or "the President") (collectively, the "UVA Defendants"), by counsel, move to dismiss Plaintiff's Amended Complaint with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  In support of this Motion, Defendants state as follows:

## INTRODUCTION

Plaintiff Matan Goldstein's ("Goldstein" or "Plaintiff") Amended Complaint fails for the same reason that his original Complaint fails. There are no factual allegations that support the causes of action pled—under theories of intentional discrimination, retaliation or harassment. Goldstein's Amended Complaint may have added several hundred new paragraphs of conclusory and hyperbolic prose, but his efforts do little to correct the legal flaws in his pleading.  The University of Virginia is not, was not, and has never been deliberately indifferent to Goldstein's concerns or to antisemitism on Grounds. Plaintiff's claim of actionable harassment should therefore fail.  Moreover, the University of Virginia does not and has not treated Goldstein differently because of his Jewish or Israeli identity, and there is no plausible claim of retaliation. Finally, none of the allegations about Ryan show any liability under Section 1983, much less overcome his defense of qualified immunity.  The Amended Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

The Amended Complaint contains close to seven hundred paragraphs of allegations.  The vast majority are conclusory statements containing little to no factual matter, in violation of Rule 8's requirement for a "short and plain statement" of entitlement to relief, in which each allegation is "simple, concise, and direct." Fed. R. Civ. P. 8(a)(1) and 8(d)(1).  And many contain improper

references to unrelated cases or the harms of other people, subject to strike under Rule 12(f).  (*See, e.g.*, Am. Compl. ¶¶ 364-65 (a Jewish professor made a report through Just Report It!, which the University "buried" and "took no action whatsoever"); ¶ 208 (describing the Morgan Bettinger matter); ¶ 24 (describing unrelated lawsuits brought by Jewish students at other schools); ¶¶ 249, 331, 363 (alleging harms to Plaintiff's parents and other Jewish students' parents, who are not plaintiffs here)).  Many of Plaintiff's allegations are contradicted by documentary—and even video—evidence and publicly available facts, which the Court may consider on a Motion to Dismiss.

Plaintiff is not permitted to sue for the harms and experiences of other students, of Jewish parents, or Jewish people in general.  This is not a class action.  Nor is Plaintiff permitted, under the Federal Rules, to make factual allegations that have no evidentiary basis.  With this in mind, the UVA Defendants restate only factual allegations that they understand to be related to Plaintiff's claims, in chronological order and non-conclusory terms.  The UVA Defendants include additional publicly available facts about the pleaded events of which the Court can take judicial notice (though it does not need to, to dismiss the Amended Complaint).  *See Falwell v. Liberty Univ., Inc.*, No. 6:23-cv-11-RSB, 2023 WL 4867432, at *1 n.2 (W.D. Va. July 31, 2023).  Finally, the UVA Defendants attach, and the Court may consider for purposes of the UVA Defendants' motion to dismiss, a selection of records that have been "explicitly incorporated into the complaint by reference," *Phillips v. Rector & Visitors of Univ. of Virginia*, No. 3:22-cv-00075-RSB, 2024 WL 1201639, at *2 n.6 (W.D. Va. Mar. 20, 2024) (citation omitted), and which are "integral" to Plaintiff's claims.  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016).

In general, these exhibits include (1) the full text of the public statements Plaintiff references in his Complaint, including emails by UVA officials; (2) the records relating to

Plaintiff's alleged official complaints, which authentically document the University's response to Plaintiff's concerns, *see Butters v. James Madison Univ.*, 145 F. Supp. 3d 610, 618 (W.D. Va. 2015) (where topic of university administrator's email regarding response to plaintiff is "integral to her complaint," the court may consider the exhibit on motion to dismiss); and (3) video footage of the encounters at which Plaintiff claims he experienced harassment, which "blatantly contradict . . . the plaintiff's allegations." *Doriety v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024) ("[W]e hold that a district court can consider a video submitted at the motion to dismiss stage when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." (citation omitted)). Notably, the Court may "credit 'the document[s] over conflicting allegations in the [Amended Complaint].'" *Id.* at 679 (citation omitted).

### A. <u>Plaintiff Matan Goldstein is Jewish and Israeli-American.</u>

Goldstein is a second generation Israeli-American—the first member of his family to be born in the United States, a direct descendant of Holocaust survivors and Israeli military veterans. (Am. Compl. ¶¶ 541-44.) He is also religiously Jewish, and describes his faith as a "deep belief" that goes "beyond . . . passing of traditions." (*Id.* ¶ 547.) Before college, he attended a Jewish school, wore a Yarmulke, prayed every morning, and studied Biblical Hebrew. (*Id.* ¶ 549.) He is also very connected to Israel. (*Id.* ¶ 548.) He visits Israel twice a year and considers himself a "staunch, unflinching Zionist." (*Id.*)

Plaintiff matriculated at the University of Virginia in the fall of 2023. (*Id.* ¶ 2.) Plaintiff alleges that "just a few weeks after his arrival at the University of Virginia," before the October 7, 2023 attacks had occurred, he personally viewed "widely disseminated" flyers and social media

3

posts by Defendant Students for Justice in Palestine at UVA ("SJP"), which is a Contracted Independent Organization ("CIO")[1] at UVA. (*Id.* ¶¶ 247, 54.)  One of the posts said, "Friends don't let friends visit apartheid states," and called for a boycott of UVA Law's January Term trip to Israel. (*Id.* ¶¶ 246-47.)  Another post said, "Remembering Black September, 53 Years Later." (*Id.*)[2]  Plaintiff describes both posts as "hateful." (*Id.*)

### B. <u>On October 7, 2023 Hamas launches a horrific terrorist attack on Israel.</u>

The University agrees, as Goldstein alleges, that on October 7, 2023, Hamas, a terrorist group, launched a horrific, premeditated, and large-scale terrorist attack on Israel, resulting in over 1,200 dead and 5,000 wounded, in addition to other atrocities. (Am. Compl. ¶¶ 289-291.)  The victims included "family members and friends of many UVA students and faculty." (*Id.* ¶ 293.)

---

[1] Pursuant to UVA's established policy, CIOs operate independent of the University and are not agents, servants, or employees of the University.  They do not have the authority to act for or commit the University to any activity, transaction, or agreement.  The University does not supervise, direct, or control CIOs' activities.  Further, a CIO understands and agrees that the University, the Commonwealth of Virginia, and its employees and agents will not be liable for injuries or harm caused to anyone in connection with or arising out of the CIO's activities, nor will they be liable for any of the CIO's contracts, torts, or other acts or omissions, or those of the CIO's directors, officers, members, advisors, coaches, staff, activity participants, or any other persons associated with the CIO.  *See* University of Virginia, UVA Policy, *STAF-002: Terms and Conditions for Contracted Independent Organizations and Fraternal Organizations*, July 6, 2023, https://uvapolicy.virginia.edu/policy/STAF-002.

[2] Black September refers to a battle in which Jordanian Armed Forces fought against the Palestinian Liberation Organization.  Thousands of Palestinian civilians were killed. BBC News, On this day [September 17, 1970], *1970: Civil War breaks out in Jordan*, http://cdnedge.bbc.co.uk/onthisday/hi/dates/stories/september/17/newsid_4575000/4575159.stm. Black September is also a reference to the Palestinian militant group that murdered 11 Israeli athletes at the 1972 Olympics and hijacked planes and held hostages. James Doubek, *50 years ago, Munich Olympics massacre changed how we think about terrorism,* NPR, Sept. 4, 2022, https://www.npr.org/2022/09/04/1116641214/munich-olympics-massacre-hostage-terrorism-israel-germany. *See also* Mati Wagner, *On anniversary of 1970 Black September hijacking, six survivors on life after captivity*, Times of Israel, Sept. 7, 2024, https://www.timesofisrael.com/on-anniversary-of-1970-black-september-hijacking-six-survivors-on-life-after-captivity/.

### C. **SJP issues a statement on October 8, 2023.**

The next day, October 8, 2023, at 8:43 a.m., Goldstein alleges that SJP posted an Official Statement online, co-signed by numerous student organizations.  (*Id.* ¶¶ 307-10, 316.)   The Statement called the October 7 attack on Israel an "unprecedented feat."  (*Id.* ¶ 309.)  Goldstein alleges he "received" the post and was traumatized by it.  (*Id.* ¶ 311.)  Goldstein complains that UVA and President Ryan did not "express any disapproval" with this statement.  (*Id.* ¶ 318.)

Goldstein alleges that beginning on October 8, 2023, posters were distributed or posted around Grounds,[3] which included images that seemed to celebrate Hamas' attack on Israel, and words or phrases Goldstein found antisemitic and anti-Israel.  (*Id.* ¶¶ 319 et seq.)  Antisemitic social media posts were also circulated "among the University Community" online.  (*Id.* ¶ 323.)  This includes a flyer distributed on October 9, 2023, which said: "Decolonization is not a metaphor: Gaza and Palestinian liberation," and contained an image of a site of the massacre, which Matan found threatening.  (*Id.* ¶¶ 336-342.)

### D. **President Ryan issues a letter condemning Hamas and the October 7, 2023 atrocities.**

On October 11, 2023, President Ryan published his letter in the University's *UVA Today* online magazine.  (*Id.* ¶ 355.).  Plaintiff alleges that the letter "does not condemn antisemitism" and was too "milquetoast."  (*Id.* ¶¶ 357-358.)  However, the Plaintiff said the exact opposite about President Ryan's letter in an editorial he published less than 45 days later.  *See infra,* November 22, 2023, Letter "Words are not Enough," attached as **Exhibit 1.**  In any event, contrary to Plaintiff's current allegations, President Ryan's letter, which is publicly available online, directly condemns Hamas for what happened:

> Since Hamas launched the brutal terrorist attacks on Israel on Saturday, it has been heartbreaking to learn of the devastation and sorrow wrought by what can only be

---

[3] At UVA, the physical university campus is referred to as "Grounds."

described as atrocities in a region that has experienced far too many of them in its history. There can be no justification for, and **we must <u>condemn</u>, the actions of Hamas and the horrific violence that has taken place against civilians, including children**.[4]

(Emphasis added).

### E. <u>SJP and FJP stage a "Teach-In" on October 12, 2023.</u>

On October 12, 2023, Plaintiff alleges that members of SJP and FJP staged a "Teach In" protest on the Rotunda steps, "brandishing signs and banners emblazoned with antisemitic slogans." (*Id.* ¶ 358). Some of the slogans visible on the photograph are "Solidarity with Palestine," "END the occupation," "Decolonization is not a metaphor," and "NO DIALOGUE WITH WHITE SUPREMACY." (*Id.*) Plaintiff alleges that one professor who is a member of FJP at UVA offered extra credit for students who attended the event. (*Id.* ¶ 359). He includes a screenshot of a class announcement which states that students can attend "an applicable event" and "write a reflection of 250-words tying the event to course readings." (*Id.*). The October 12 Teach-In was an applicable event. (*Id.* ¶ 360) Plaintiff alleges that other faculty members have "canceled classes altogether, encouraging their students to attend the pro-Hamas rally and support the antisemitism." (*Id.*) Plaintiff does not allege he attended the October 12 Teach-In or that he was in any course in which classes were canceled or extra credit was offered.

### F. <u>At a Walk-Out on October 25, 2023, Plaintiff alleges he was assaulted.</u>

On October 25, 2023, many students and faculty members joined a "walk out." (*Id*. ¶¶ 376-94.) Goldstein contends that the attendees carried "posters emblazoned with hateful, antisemitic images and slogans calling for the extermination of Jews," and chanted "insults calling for the

---

[4] University of Virginia University News, *Ryan appeals for Compassion, Offers Support in Aftermath of Attacks on Israel*, UVA Today, Oct. 11, 2023, https://news.virginia.edu/content/ryan-appeals-compassion-offers-support-aftermath-attacks-israel.

murder of the Jewish people and the destruction of Israel," though he does not state what was said. (*Id*. ¶ 377.)

Goldstein went to the event "wearing his Yarmulke, his Star of David, and carrying the flag of Israel" to stage a counter-protest.  (*Id*. ¶ 383.)  Upon request, a Jewish-Israeli UVA professor escorted him.  (*Id*. ¶ 384.)  At the walk-out, Plaintiff contends that he was the subject of ANTIFA-style protest and riot techniques.  (*Id*. ¶ 388.)  Specifically, Plaintiff claims two sets of pro-Palestinian protesters converged on Matan and "engulf[ed]" him, then "shoved him and tried to forcibly drag his flag from his hands and knock Matan down or off the steps."  (*Id*. ¶ 392.)  The UVA professor then "stepped into the melee" and "announced that he was a UVA professor," which led the protesters to back off.  (*Id*. ¶ 393.)  Later at the same event, Plaintiff claims he was "slapped or shoved in the upper chest and shoulder area by a female protester." (*Id*.)

A video of Plaintiff's activity at the October 25 walk-out is publicly available online.[5]  The video shows the Plaintiff and a peer holding the Israeli flag, and jostling for visibility with other protesters.  There are no "ANTIFA-style" tactics, no shoving, and no physical fighting. The contemporaneous interview of the Plaintiff likewise does not include any allegation of assault or complaints about his treatment other than the protected speech of his opponents.  *See also* **Exhibit 15** (selection of investigation records related to Plaintiff's later allegation that he was assaulted).

G. **FJP publishes an October 27, 2023 Open Letter.**

On October 27, 2023, Faculty for Justice in Palestine at UVA ("FJP") published an "Open Letter" signed by over 80 professors, including professors later assigned to a Task Force on Religious Diversity and Belonging.  (*Id*. ¶¶ 403, 420.)  Goldstein describes this letter as "pro-

---

[5] Felicity Taylor, *Pro-Palestine and pro-Israel students clash on Grounds*, CBS19 News, Oct. 25, 2023 (updated May 8, 2024), https://www.cbs19news.com/story/49891572/pro-palestine-and-pro-israel-students-clash-on-grounds.

Hamas" and "antisemitic." (*Id.*)  Plaintiff does not include the text of the letter in his Complaint, nor does he allege he received it.  Plaintiff does not allege that the UVA Defendants adopted, agreed or condoned the "Open Letter."

**H. <u>The University initiates new programming about the Middle East conflict and issues a public statement denouncing antisemitism and reiterating policies on harassment.</u>**

On October 31, 2023[6], the University announced various educational programming beginning that week related to the conflict in the Middle East.[7]  The University's Provost also launched a website to provide a central platform for publications and announcements related to the conflict and information about upcoming educational events.[8]

On November 6, 2023, the University's executive leadership provided the University community with an Update on the University's response to the Middle East conflict.[9]  With regard to safety, the Update recognized "that the turmoil in the Middle East and the increase in demonstrations on our Grounds have inspired real concerns for members of our community about Antisemitism, Islamophobia, and other potential threats to their safety and well-being."  The Update then expressly restated the University's prohibition on discrimination and harassment, including a link to the PADH policy, and a link to the University on-line reporting platform, Just Report It:

---

[6] On October 27 and November 2, 2023, a Jewish student group conducted an event on Grounds to raise awareness for individuals held hostage by Hamas. Caroline Hagood, *Jewish students on Grounds organize balloon installation to honor hostages*, The Cavalier Daily, Nov. 4, 2023, https://www.cavalierdaily.com/article/2023/11/jewish-students-on-grounds-organize-balloon-installation-to-honor-hostages.

[7] Bethanie Glover, *UVA Sets Educational Programming Related to Conflict in the Middle East* University of Virginia, UVAToday, Oct. 31, 2023, https://news.virginia.edu/content/uva-sets-educational-programming-related-conflict-middle-east.

[8] University of Virginia, Office of the Executive Vice President and Provost, *Events*, https://provost.virginia.edu/subsite/current-events-academic-programs/events.

[9] University of Virginia University News, *UVA Leaders Offer Update on Response to Middle East Conflict*, UVA Today, Nov. 6, 2023, https://news.virginia.edu/content/university-statement-war-gaza-and-its-effects-students.

> **To be perfectly clear, Antisemitism, Islamophobia, or any other discrimination or harassment have no place at UVA.** The University's Preventing and Addressing Discrimination and Harassment (PADH) policy prohibits discrimination and harassment on the basis of religion, race, and national or ethnic origin, as well as many other characteristics. Community members who feel they have been subjected to discrimination or harassment can file a report through UVA's Just Report It system, which will be reviewed by University staff for additional follow-up. We take concerns of bias, discrimination, and harassment very seriously and we are prepared to intervene to de-escalate situations and pursue disciplinary actions, as needed.

(Emphasis added).  The Update also reminded the University community that representatives from the University's Student Affairs Division and Police Department plan for and monitor events to ensure the activities remain peaceful and non-disruptive.  *Id.*

### I.   Plaintiff attends counterprotest at a November 11, 2023 demonstration.

On November 11, 2023, Plaintiff claims SJP and FJP conducted an "Apartheid Wall Demonstration & March," in which they constructed a physical barricade they invited protesters to paint.  (*Id.* ¶ 410.)  Plaintiff attended this event with some other Jewish students.  (*Id.* ¶ 411).  Plaintiff alleges that a group of UVA Police officers and Associate Vice President of Student Affairs Marsh Pattie were present and "prevent[ed] the Jewish students from leaving a small area" which the pro-Palestinian protesters "were themselves allowed to roam and traverse the student public spaces as they pleased."  (*Id.* ¶ 412.)  Plaintiff alleges that SJP protesters approached him and yelled "antisemitic slurs at him," and that neither University Police nor Pattie "took any action."  (*Id.*)

A video of this interaction, which was provided by Plaintiff himself to UVA Police, is attached here as **Exhibit 2,** in accordance with the Fourth Circuit's recent ruling in *Doriety*, 109 F.4th at 679-80.  The video contradicts Plaintiff's allegations— ██████████████████

████████████████████████████████████████████████████

**J.** **Plaintiff's November 17, 2023 lunch allegation is investigated by UVA Police.**

On November 17, 2023, Plaintiff alleges that he was having lunch with a professor at a restaurant close to Grounds when "a protester drove by and shouted, 'Free Palestine, you filthy Jew.'" (*Id.* ¶ 413.) Plaintiff alleges that he reported the incident to police but was "rebuffed" because he could not identify the harasser. (*Id.*)

An excerpt from the relevant SafeGrounds[10] records and investigative notes for this report are attached as **Exhibit 3**.

---

[10] SafeGrounds is the University's incident management system used to document and record responses to reported behaviors, concerns, and potential policy violations involving students, employees, and third parties. The system is used by staff working in Student Affairs, the Office of Equal Opportunity and Civil Rights, Employee Relations, Clery Compliance, Threat Assessment, and UVA Compliance.

**K. SJP and FJP hold a vigil and Teach-In on November 17 and 29, 2023.**

On or around November 17, Plaintiff alleges that a group called "UVA Dissenters," which Plaintiff alleges is an alter ego of SJP, hosted a vigil on the South Lawn for children, women, and those injured and killed "at the hands of the occupation." (*Id.* ¶ 414.) On November 29, FJP hosted a "Teach-In on Palestine." (*Id.* ¶¶ 416-418.) Plaintiff alleges that one professor leading the event referred to the October 7 attack as "blah blah blah," and defended his pro-Palestinian bias. (*Id.* ¶ 418.) Plaintiff does not allege he attended either event.

**L. Plaintiff publicly commends President Ryan and UVA Administration for their "unwavering support."**

On November 22, 2023, after his alleged October 25, 2023 assault and after his alleged November 11, 2023 altercation, Plaintiff publicly commended President Ryan for his quick and unequivocal condemnation of October 7, 2023 and his unwavering support. Contrary to what Plaintiff alleges now, he stated:

> After the horrendous attacks on the state of Israel on Oct. 7, President Jim Ryan on Oct. 11 issued a statement to the entire community condemning the violent attacks against the Hamas. Taken at face value, I could not have asked for a better statement. Realizing that I am in a pluralistic university that safeguards free speech, I can not expect Ryan to have gone further on his conviction of the terrorists in the Gaza Strip. In comparison to other universities and even news outlets, Ryan had done what is, sadly, unprecedented by agreeing to call the actions of Hamas "brutal terrorist attacks."

**Exhibit 1**. Plaintiff went even further in commending the University Administration, when he said:

> I am incredibly grateful for Ryan's statements. He, the administration, and many professors, mine included, have shown unwavering support to the state of Israel and their students. The number of emails I have received from my professors, administration members and even Charlottesville community members offering their unwavering support must not go unnoticed. It truly warms my heart.

*Id*.



### M. President Ryan and the University Community celebrate Hannukah.

From December 7, 2023 to December 15, 2023, Jewish student groups displayed a large Menorah in the Amphitheatre for the duration of Hannukah with the University's support. President Ryan, along with other University leaders, attended the Menorah lighting.

### N. President Ryan announces UVA Task Force on Religious Diversity and Belonging.

On December 13, 2023, President Ryan announced the creation of a Task Force on Religious Diversity and Belonging. (*Id.* ¶ 419.) Plaintiff complains that the charter for the Task Force does not acknowledge that antisemitism is a current problem at UVA. (*Id.*) Plaintiff alleges that two of the members of the Task Force had engaged "publicly in patently antisemitic . . . pronouncements," but he does not articulate what these statements were. (*Id.* ¶ 420.)

### O. President Ryan issues a statement on January 18, 2024 condemning antisemitism.

On January 18, 2024, President Ryan issued a video statement to the University community in which he addressed the ongoing conflict in the Middle East. President Ryan acknowledged the tragic loss of life, including members of the University community who have lost friends and family in the conflict. President Ryan acknowledged the increase across the country in antisemitism and Islamophobia, including discrimination and harassment on the basis of nationality and emphasized, "these and any other forms of bigotry have no place in our Grounds."[11]

---

[11] University of Virginia, *Ryan: Spring Semester Will Be a Time for Learning, Growing, Celebrating*, UVAToday, Jan. 17, 2024, https://news.virginia.edu/video/ryan-spring-semester-

**P.  In January 2024, Plaintiff files 3 time-barred Judiciary Committee complaints and an EOCR Complaint, for *the first time* alleging he was assaulted in October 2023.**

Plaintiff filed three official complaints with the University Judiciary Committee, but they were dismissed as time-barred.  (*Id.* ¶ 428.)  He also submitted "other complaints and formal grievances."  (*Id.* ¶ 429.)  On January 25, 2024, administrators Marsh Pattie and Alex Hall (Associate Dean of Students) met with Matan to discuss his complaints of harassment, abuse, and physical assault.  (*Id.*)  Plaintiff contends that their "only . . . response[]" was to tell Matan he was free to move out of his dorm.  (*Id.*)

The email exchange *with Plaintiff* summing up the parties' meeting is attached here as **Exhibit 4**. ███████████████████████████████████████████████████████

████████████████████

On January 31, 2024, Plaintiff initiated a complaint with the Office for Equal Opportunity and Civil Rights ("EOCR"). (Am. Compl. ¶ 430.)  Accordingly, UVA EOCR Senior Compliance Director Nic Thompson met with Plaintiff.  (*Id.*)  On February 9, 2024, Thompson informed Plaintiff that the footage of the October 25, 2023 event was no longer available.  (*Id.*)  Plaintiff contends that EOCR declined to take any action regarding his concerns.  (*Id.*; *see also id.* ¶ 438.)  In fact, Director Thompson, along with Associate Dean of Students Alex Hall, reached out repeatedly to Plaintiff to provide support and investigate Plaintiff's concerns.  *See* **Exhibits 5, 6**; *see also* **Exhibits 8, 9.**

---

will-be-time-learning-growing-
celebrating?utm_source=DailyReport&utm_medium=email&utm_campaign=news.

Plaintiff also alleges that the U.S. Department of Education opened a formal civil rights investigation regarding antisemitism at UVA. (*Id.* ¶ 431.)  In UVA's responsive Position Statement, UVA allegedly claimed there had been "no complaints." *Id.*  Contrary to Plaintiff's allegation, all of Plaintiff's newly filed formal complaints, which came in hours before the deadline for UVA's Response, were submitted with UVA's Supplemental Index of Reports on January 29, 2024.   UVA's Supplemental Index is attached as **Exhibit 7.**

### Q. BDS Referendum began in early February 2024 pursuant to UVA Student-Governed Board of Elections.

Plaintiff alleges that around February 202[4], UVA's Boycott, Divest, Sanctions ("BDS") movement sought signatures calling for a referendum on divestment. (*Id.* ¶ 426.)  The referendum was run by students pursuant to published Rules.[12]  Plaintiff does not allege he was involved in the BDS referendum or the opposition to the referendum.

Notably, however, between February 7 and 9, 2024, Thompson and Hall continued to exchange emails attached hereto as exhibit with Plaintiff.   **Exhibits 8, 9.**  ████████████

████████████████████████████████████

---

[12] Ella Gilmore *et al.*, UBE [University Board of Elections] Rules Assessment Subcommittee, *UBE Final Rules Proposal*, available at Annotated Final UBE Election Rules Proposal_0.pdf (virginia.edu).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

**R.  President Ryan hosts personal meeting for Plaintiff and others on February 14, 2024.**

On February 14, 2024, after "four months" of petitioning by Jewish students and parents for a meeting, President Ryan hosted a meeting for Jewish parents and students, including Plaintiff. (¶ 363, 401-402, 432.)  Plaintiff alleges that President Ryan "limited [the meeting] to only four Jewish parents," who were forced to "attend in person with their 'biological child' student in attendance with them."  (*Id.* ¶ 433.)  The President hosted the meeting "in his office, in person," and "insisted that the meeting be 'confidential.'"  (*Id.*)  The Jewish parents and students at the meeting delivered a "multi-media presentation" regarding "the state of antisemitism at UVA," and informed the UVA President that they felt afraid, intimidated, and forced to hide their faith while on campus.  (*Id.* ¶ 436.)  Specifically, they complained about "the illegality and antisemitic nature of the masks" worn by pro-Palestinian protesters and the "antisemitic intent . . . of the BDS movement."  (*Id.* ¶ 440).  Two days after the meeting, on February 16, 2024, the President emailed the attendees, saying, "I appreciate your taking the time to join us, and I'm grateful for your willingness to share your perspectives and ideas."  (*Id.* ¶ 439.)

President Ryan's email was not the only follow-up communication.  ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

**S.  Plaintiff calls the police about masked protesters, and UVA police respond.**

On an unidentified date, Plaintiff called the University Police to report that protesters were wearing masks he believed to be illegal.  (*Id.* ¶ 445.)  Plaintiff alleges that University Police declined to take action in response to his report.  (*Id.*)  A copy of the investigative record for this complaint, dated February 20, 2020, is attached as **Exhibit 13**, █████████████████████ ██████████████████████[13]

**T.  UVA Shabbat 300 took place on February 25, 2024.**

On February 25, 2024, 300 people gathered for a Shabbat dinner to celebrate the Jewish community on Grounds including members of the UVA Administration.[14]

**U.  The student-run BDS Referendum passed in late February, and President Ryan responded against divestment.**

On February 26, 202[4] the BDS referendum took place, and passed.  (*Id.* ¶¶ 446-448.) Plaintiff claims that President Ryan did not condemn the referendum, but concedes that President Ryan publicly stated that "he would have voted against it."  (*Id.* ¶ 449). In fact, President Ryan's statement went further:

---

[13] Plaintiff makes much of the alleged non-enforcement of Va. Code § 18.2-422, which prohibits mask-wearing by adults in certain situations.  (Am. Compl. ¶ 331.)  Because Plaintiff played no part in the communications from which he has quoted, and has no right to require the prosecution of others in any event, this issue is a red herring, and irrelevant to Plaintiff's claims.  If the Court disagrees, UVA will be happy to supplement with further briefing and/or the relevant documents, which blatantly contradict Plaintiff's allegations.

[14] Brody Jewish Center-Hillel at UVa, *Shabbat 300 is back!*, Facebook, Feb. 26, 2024, https://www.facebook.com/story.php/?story_fbid=425627890028629&id=100077442645642&_r dr.  The Brody Jewish Center, Hillel at the University of Virginia, is the focal point in a renaissance of Jewish life for the estimated 1,000 Jewish undergraduates on Grounds. Brody Jewish Center – Hillel at UVA, *About Us*, https://www.brodyjewishcenter.org/about-us.html.

I do not favor divestment generally as a strategy. And the topic of Israel and the ongoing war is one that is hotly debated. I don't believe a university should use its investment strategy to weigh in on one side of such a complex and deeply contested set of issues. . . . [D]ecisions about how to invest the University endowment are made by the University of Virginia Investment Management Company, otherwise known as UVIMCO, which is a separate entity that is ultimately responsible to the Board of Visitors. And as we heard, UVIMCO has a Committee on Investor Responsibility that considers concerns raised by members of the community about their investment strategy.[15]

### V.  The Board of Visitors met on March 1, 2024.

On March 1, 2024, the UVA Board of Visitors held its spring meeting.[16]  (Am. Compl. ¶ 450.)  Plaintiff alleges that during the meeting, President Ryan and Provost Ian Baucom "gloss[ed] over" antisemitism at UVA, though he does not articulate how.  (*Id.* ¶ 451.) Board of Visitors member Bertram Ellis asked to be heard on the subject of antisemitism on Grounds during the open session.  (*Id.* ¶ 452.)  Rector Hardie interjected, explaining that those issues should be addressed in a closed session because they were a student safety issue. (*Id.* ¶¶ 453, 455.)  Goldstein alleges that "Hardie became aggressive and belligerent," calling Ellis "out of line."  (*Id.* ¶¶ 453, 455-56.)  Goldstein does not allege that he was present at, or in any way connected to, the Board of Visitors meeting.

### W.  Plaintiff sought counseling on March 1, 2024 and was offered other supports.

Also on March 1, 2024, Plaintiff alleges that he visited UVA Counseling and Psychological Services (CAPS) for "addressing the trauma he was experiencing as a result of antisemitism." (*Id.* ¶ 458.)  Plaintiff then alleges that the counselor he spoke to suggested that he try to empathize with students who oppose Israel.  (*Id.*)

---

[15]  Ryan's  March  2,  2024  Statement  is  publicly  available  online  at https://news.virginia.edu/content/text-uva-president-jim-ryans-statement-board-visitors.
[16] A video of the Board meeting, including the alleged interaction, is available online (The Jefferson Council, *Heated exchange between Board member Bert Ellis and Rector Robert Hardie*, YouTube (March 1, 2024), https://www.youtube.com/watch?v=9XNylWKevdY).

## X.  **The Honor Committee dismissed an Honor Charge against Plaintiff.**

On or around March 21, 2024, the president of SJP (███████████[17]) filed an Honor

Charge against Goldstein.  Although he does not say what honor violation the Charge alleged, it

was allegedly filed "because [Plaintiff] spoke out in the national media about antisemitism at

UVA."  (*Id.* ¶¶ 460-61.)[18]  Goldstein alleges that UVA and President Ryan were "aware of and

participating in" the charges against Matan, and that they should have halted the Honor

Committee's normal processes and prevented the Charge from proceeding.[19]  (*Id.* ¶ 462.)  As soon



---

[19]  The University of Virginia Honor Committee Bylaws are publicly available online at
https://honor.virginia.edu/sites/honor/files/Honor%20Committee%20Bylaws%20-
%20June%202023%2C%202024.pdf [hereinafter, "Honor Committee Bylaws"].    The Bylaws
explain that once a Report of an Alleged Honor Offense is made, and before making a formal
accusation, the Honor Committee engages in an investigation.  *See generally id.* at Sections IV.A.
and IV.B.  The Bylaws further explain that during or after investigation, a charge can be dismissed
before a formal accusation is made: "If either [student] Honor Advisor or either [student] Honor
Investigator request that a case be dropped at any time prior to the Investigative Panel, the
Executive Committee [of students] will determine, in its reasonable discretion, whether the case
should continue or should be dropped, for reasons that include, but are not limited to, lack of
evidence or Bad Faith."  *Id.* at Section IV.B.7.  Goldstein's Honor charge was dismissed for lack
of evidence pursuant to this procedure, and he was never formally accused.  (Am. Compl. ¶¶ 468-
69.)  The Honor Committee, including the Executive Committee, is fully and solely composed of
students.  Honor Committee Bylaws at Section II.A.2(b).  Pursuant to UVA policy and Va. Code
§ 23.1-2209(A)(ii), the President may, in extraordinary cases, intervene in an ongoing honor
proceeding. However, none of the relevant factors justifying intervention were at issue here:

> The University President may initiate, intervene in, and preempt proceedings before
> any University body when the President determines, in his or her sole discretion,
> that established processes will be unable to timely or properly adjudicate a case or

as Goldstein moved for dismissal, the Honor Committee dismissed the Charge for lack of evidence. (*Id.* ¶ 468.)  Neither UVA nor President Ryan have "offered any words of comfort, support, or words of encouragement" since the dismissal of his charge.  (*Id.* ¶ 470)

During the pendency of the Honor Charge, UVA made a statement to the media that: "ongoing inquiries into those allegations have yet to return evidence to substantiate the claims or to warrant disciplinary measures . . . .  This includes specific allegations of violence against one student at a protest, after which University Police investigated thoroughly, using video evidence, witness statements, and other methods."  (*Id.* ¶ 464.)[20]  Goldstein alleges that this statement was false and defamatory.  (*Id.*)  Goldstein complains that "at the time of the press release, five and a half months after the assault on the Rotunda steps, the University Police still had not spoken to or interviewed the UVA professor who witnessed Matan being assaulted."  (*Id.* ¶ 465.)

An excerpt from the relevant investigative record is attached as **Exhibit 15**. ███████

████████████████████████████████████████████████

████████████████████████████████████

complaint including, but not limited to, cases involving **students arrested, charged, or convicted of criminal conduct** or other serious conduct not involving criminal proceedings which reasonably endangers or threatens to disrupt the University community or University operations. The foregoing shall include, without limitation, conduct involving the possession or distribution of controlled substances on or off University property, attempted or inflicted bodily injury or other harm to any member of the University community, and destruction or attempted destruction of University property.

*See* University of Virginia, UVA Policy*, STAF-003: Statement of Student Rights and Responsibilities*, Section VIII, Sept. 9, 2018 (last revised July 7, 2023)  (emphasis added), https://uvapolicy.virginia.edu/policy/STAF-003).

[20] The complete statement is available online at *UVA gets an F on Campus Antisemitism Report Card*, 29news.com (Apr. 11, 2024), https://www.29news.com/2024/04/11/uva-gets-an-f-campus-antisemitism-report-card/

███████████████████████████████████████████████████

████████████

**Y.** **Between the filing of the Honor Charge and dismissal, the University continued to reach out to Plaintiff.**

Plaintiff makes the conclusory allegation that "The University of Virginia ignored and rejected the Plaintiff's pleas for help." (Am. Compl. ¶ 438.) The Court does not need to accept this conclusory allegation as true. It is uncontradicted that the University did not ignore the Plaintiff. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

**Z.** **At the April 2024 Board Meeting, UVA denounces antisemitism.**

In early April, Rector Hardie requested a Board briefing on investigations on Grounds, and what the University is doing to care for members of the community, specifically regarding the reports of antisemitic attacks. After the meeting, Rector Hardie released a public statement: "**The University Board of Visitors and the administration are united in our opposition to antisemitism and all forms of discrimination** . . . We care deeply for our students and are committed to supporting all members of our community as we continue to work through a deeply difficult time that is affecting our community and countless others around the world." (Emphasis added).[21]

---

[21] Emily Hemphill, *A campaign is calling on UVa's rector to resign. But who is funding it?*, The Daily Progress, Apr. 6, 2024, https://dailyprogress.com/news/local/education/a-campaign-is-calling-on-uvas-rector-to-resign-but-who-is-funding-it/article_4518c63a-ed14-11ee-9d1d-bf74121b4a22.html.

**AA.**      <u>UVA Jewish student leaders pronounce support for President Ryan, Rector and University Leadership.</u>

On April 3, 2024, the UVA Jewish Leadership Advisory Board[22] sent a letter to the Board of Visitors that included the following statements:

> o [W]e feel supported by the University's administration in issues surrounding Jewish students around Grounds.
> o In the isolated incidents where student safety has been threatened, we have full confidence in the leadership of Chief Timothy Longo.
> o We, the Jewish Leadership Advisory Board, fully reject the notion that Rector Hardie has acted in ways which have harmed our community. It would be a disgrace if Rector Hardie is forced to resign as a result of deceitful politics.
> o We remain grateful to the University administration, including President Ryan, Provost Baucom, and Dean Rucker, for all that they have done regarding the safety and well-being of Jewish students.[23]

**BB.**      <u>UVA Provost admonishes any disruption of classes in the name of protest.</u>

In late April 2024, Provost Ian Baucom sent a message to all UVA academic deans asking them to remind faculty that, "while students have a right to protest, UVA will continue with regular academic operations during this week's walkout and that course instruction was expected to continue."[24] And "in response to the report of a class having been canceled in contravention of

---

[22] JLAB is composed of students elected to govern the Hillel Jewish Leadership Council. This organization plans programming for Jewish students on Grounds, and carries out the Brody Jewish Center's self-proclaimed mission of empowering Jewish students to take ownership of their identity. Brody Jewish Center – Hillel at UVA, *About Student Leadership*, https://www.brodyjewishcenter.org/student-leaders.html. JLAB oversees the largest Jewish organization of Jewish students in Charlottesville, serving roughly 700 students each year with over 100 students regularly attending weekly events.

[23] Thomas Baxter, *Jewish Leadership Advisory Board criticizes politicization of Jewish student experiences*, The Cavalier Daily, Apr. 16, 2024 (emphases omitted), https://www.cavalierdaily.com/article/2024/04/jewish-leadership-advisory-board-criticizes-politicization-of-jewish-student-experiences, citing to JLAB April 3, 2024 Letter to the Board of Visitors, https://drive.google.com/file/d/1TD0V7M2UFJI7hFSPu9ZEh9KkD4UjMx-r/view.

[24] Haley Cohen, *UVA professor cancels class to support BDS as referendum passes*, Yahoo!News, JewishInsider, Mar. 1, 2024, https://www.yahoo.com/news/uva-professor-cancels-class-support-084209510.html?guccounter=1.

that expectation, the Provost's office and School Dean will address this matter with the faculty member in question and undertake disciplinary measures if the instructor is found to have violated University policy."[25]

**CC.      An "Encampment" lasted from April 30-May 4, 2024 until it was disbanded by Virginia State Police at the Request of the University.**

On April 30, 2024, FJP and SJP and their supporters "cordoned off sections of the University at the Lawn" and transported gear, tents, food, and clothing to encampments they established. (Am. Compl. ¶¶ 484-85.)  The encampment included "antisemitic signs" and "chants calling for the death of Jews." (*Id.* ¶ 494.)  Plaintiff alleges that the encampments excluded Jewish students from portions of the campus and made Plaintiff and others feel threatened with harassment or physical harm. (*Id.* ¶¶ 495-96, 502.) Plaintiff does not allege any specific interactions he had with the encampment.  Plaintiff does not identify any portion of the University that Jewish students were excluded from or did not have access to –no buildings, no class, no walkway.  Plaintiff alleges that many of UVA's academic departments expressed support and solidarity in writing with the pro-Palestinian faculty and students' actions. (*Id.* ¶ 499.)  Plaintiff alleges that certain unidentified faculty and student teachers gave academic assistance within the encampment, and that others "threatened, without repercussion or any consequences, to withhold final grades or impair the grading process for their students" to support the protesters. (*Id.* ¶ 503.) Plaintiff does not allege that he had his grades withheld.

Goldstein alleges that on May 1 and 2, 2024, UVA administrators including Vice President for Student Affairs Kenyon Bonner, Dean of Students Cedric Rucker, Associate Vice President for Student Affairs Marsh Pattie, and University Police Chief Tim Longo "engaged in deep dialogue with masked pro-Hamas encampment dwellers." (*Id.* ¶¶ 507-08.)  On May 3, 2024, FJP

---

[25] *Id.*; *compare with* Am. Compl. ¶ 500.

and SJP "posted a list of demands to the University of Virginia and its administration" which Goldstein considered "patently antisemitic." (*Id.* ¶¶ 509-10.) They "demanded a response by 12:00PM the following day." (*Id.*)

Goldstein alleges that the following day, May 4, 2024, UVA responded with a letter signed by Vice President for Student Affairs Kenyon Bonner and Vice Provost for Academic Affairs Brie Gertler. (*Id.* ¶¶ 511-12.) UVA wrote that it "welcome[d] the opportunity for further conversation." (*Id.* ¶ 512), but declined to cancel existing programming involving Israel. (*Id.* ¶ 513.) As to specific demands related to the BDS Movement,[26] the letter offered to arrange a meeting with administrators. (*Id.* ¶ 512.) Although Goldstein alleges that the letter promised the protestors "would *not* be charged with or face any University disciplinary measures or proceedings," and they "could continue on without fear of 'administrative discipline,'" (*id.*), the letter in fact emphasized that UVA will "enforce reasonable restrictions on the time, place, and manner of expressive activities, so as to assure the safety of our community and to avoid disruption to University life or the rights of others."[27] The same day, University, local, and state police removed and dismantled the encampments and their occupants, including making arrests. (*Id.* ¶ 519.)

---

[26] Plaintiff alleges that the BDS movement is antisemitic and anti-Israeli. (Am. Compl. ¶ 76.)

[27] The full text of the letter is available online, https://news.virginia.edu/sites/default/files/2024-05/UVA%20Response%20to%20%E2%80%9CLiberation%20Zone%E2%80%9D%20for%20Gaza%20-%205.3.24.pdf. Notably, at least 25 demonstrators *were arrested* for violating UVA policies on May 4, specifically in relation to the encampment. Patrick Larsen & Dawnthea Lisco, *UVA encampment cleared by force after four days; 25 arrested*, VPM: NPR, updated May 6, 2024, https://www.vpm.org/news/2024-05-05/university-of-virginia-gaza-protest-state-police-arrests-grounds.

On May 8, 2024, contrary to the suggestion that students ambushed and intimidated Jews and Israelis including the Plaintiff, students actually confronted the UVA President for the University's investment in Israel and disciplinary actions against anti-Israel protesters on May 4, 2024.[28]



### DD.     <u>Post-Encampment Judiciary Committee actions are filed against protesters.</u>

In May 2024, after the University and Virginia State Police removed the encampments that violated University policies, UVA's Division of Student Affairs referred eleven students to the University of Virginia's student-run Judiciary Committee for violations of the University's standard of conduct.[29]

### EE.     <u>In August 2024, the Religious Task Force Report was released.</u>

In August 2024, after six months of work, the Task Force on Religious Diversity and Belonging reported its findings and recommendations to President Ryan.[30] President Ryan responded: "We initiated the work of this task force to better understand the experiences of

---

[28] Jason Armesto, *Students confront UVa President Jim Ryan, demand answers after police crackdown on protestors*, The Daily Progress, May 9, 2024, https://dailyprogress.com/news/local/education/students-confront-uva-president-jim-ryan-demand-answers-after-police-crackdown-on-protesters/article_7ae0ea66-0e4f-11ef-a08e-5bd6e13efa4e.html.

[29] Jason Armesto, *UVa withholds degrees from students who participated in pro-Palestine protest*, The Daily Progress, July 3, 2034, https://dailyprogress.com/news/local/education/uva-withholds-degrees-from-students-who-participated-in-pro-palestine-protest/article_ca695bb2-34ca-11ef-b74c-ff23e8b899af.html.

[30] *See* Brian Coy, *Task Force Recommends Steps To Enhance Climate for Religious Minorities*, UVA Today, Aug, 22, 2024, available at https://news.virginia.edu/content/task-force-recommends-steps-enhance-climate-religious-minorities; *see also* Task Force Report (PDF), available at https://provost.virginia.edu/sites/provost/files/2024-09/religious-diversity-and-belonging-task-force-report-with-provosts-cover-memo_508.pdf.

students from different faith traditions on Grounds and to receive guidance on steps we can take to enhance the sense of safety, belonging and respect within our Jewish, Muslim and other religious communities."  After receiving a briefing about the Task Force Report, the Board of Visitors passed a resolution in support of "University Leadership's efforts to continue work already underway and direct[ing] the Academic and Student Life Committee to consider additional actions to ensure that **there is zero tolerance for harassment, bias, and discrimination based on religious differences on University Grounds**."[31] (Emphasis added).

### FF. Plaintiff alleges conclusory and speculative damages.

Plaintiff makes conclusory allegations about his damages, including that as a result of this year's events, he feels unsafe on University premises.  (*Id*. ¶ 561.)  He claims that he has "lost the joys of his academic pursuits," has "suffered a profound wounding," has been denied access to health and safety resources, and that his UVA First Year experience was ruined. (*Id*. ¶¶  562-564.) He alleges that he has suffered unidentified physical injuries related to the exacerbation of an undisclosed auto-immune disease and Post-Traumatic Stress Disorder. (*Id*. ¶ 566.) Plaintiff does not identify any Rule 34 category of damages.

### PROCEDURAL BACKGROUND

Plaintiff filed suit on May 17, 2024.  On July 1, 2024, SJP and FJP filed a motion to dismiss all claims against them for lack of standing and failure to state a claim, and on July 16, 2024, the Rector Robert D. Hardie (whom Plaintiff has since voluntarily dismissed), President Ryan, and the University also moved to dismiss all claims against them for lack of standing and failure to state a claim.  ECF Nos. 21, 26.  On August 6, 2024, Plaintiff filed an Amended Complaint. ECF No. 39.

---

[31] Rectors & Visitors of University of Virginia, Minutes of Board of Visitors, Aug. 22, 2024, available at https://bov.virginia.edu/sites/g/files/jsddwu1171/files/2024-08/%2724%20AUGUST%2022%20FULL%20BOARD%20MINUTES.pdf

Plaintiff's claim against UVA (Count V) arises under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* ("Title VI"), which prohibits discrimination on the basis of race or national origin by entities that receive federal funds, including public universities such as UVA. Plaintiff alleges three theories: (1) Intentional Discrimination (Am. Compl. ¶ 629); (2) Harassment/Hostile Environment (*id.* ¶ 632); or (3) Retaliation (*id.* ¶ 636). His claim against UVA is based on his Israeli national origin and Jewish ethnicity, race, and faith.

Plaintiff also purportedly includes a claim against UVA under 42 U.S.C. § 1983 for injunctive relief in this Count, (*id.* ¶ 643), and asks for attorneys' fees, interest, and litigation costs under Section 1988. (*Id.* ¶ 644). The Eleventh Amendment to the U.S. Constitution bars Section 1983 claims against a state agency; Section 1983 is only actionable against persons.[32]  *Conley v. Ryan*, 92 F. Supp. 3d 502, 519 (S.D.W. Va. 2015) ("Section 1983 claims must be raised against a 'person.'"); *Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v. Rector & Visitors of Univ. of Virginia*, 503 F. Supp. 3d 433, 442 (W.D. Va. 2020) ("To the extent that SLU seeks relief against UVA under §§ 1983, 1985, and 1986, the claims are barred by the Eleventh Amendment."); *Brown v. Porter*, No. 2:19-CV-376-RJK, 2019 WL 8503313, at *12 (E.D. Va. Nov. 26, 2019) (Section 1983 does not provide a remedy against state universities, which are immune from suit), *report and recommendation adopted as modified*, 438 F. Supp. 3d 679 (E.D. Va. 2020). The Court should therefore disregard and dismiss this portion of Plaintiff's claim.

Plaintiff's claim against President Ryan (Count VI) arises under 42 U.S.C. § 1983, which provides a private right of action for damages against any person acting "under color of" state law who deprives the plaintiff of the "rights, privileges, or immunities secured by the Constitution and

---

[32] While a municipal corporation can be a person for purposes of Section 1983, UVA, as an arm of the state, does not qualify. *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-92 (1978).

laws" of the United States.   Plaintiff alleges he was deprived of his rights under the Equal Protection Clause of the Fourteenth Amendment, and the Free Exercise and Free Speech Clauses of the First Amendment.

Plaintiff also alleges a claim under Section 1981 against the President.   Section 1981 provides that individuals of all races and ethnicities have "the same right in every State and Territory to make and enforce contracts" and "the full and equal benefit of all laws and proceedings."  42 U.S.C. § 1981.  However, "the express cause of action for damages created by § 1983 constitutes *the exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental" actors.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) (emphasis added).  Accordingly, Plaintiff's Section 1981 claim is subsumed by his Section 1983 claim.[33] Plaintiff's claim under Section 1983 is based on the same theories: (1) Intentional Discrimination (Am. Compl. ¶ 653); (2) Harassment/Hostile Environment (id. ¶ 654); and (3) Retaliation (*id.* ¶ 657).

---

[33] Even if Plaintiff were asserting a standalone § 1981 claim, he has not established the elements of a contract between himself and President Ryan.  "Any claim brought under § 1981 . . . must initially identify an 'impaired contractual relationship' . . . under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  Plaintiff is in no direct contract with President Ryan in his personal capacity.  Even to the extent Plaintiff would argue that there is a University policy or code of conduct which he seeks to enforce, well-established caselaw forecloses his claim.  *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 587 (E.D. Va. 2018) ("a [u]niversity's student conduct policies are not binding, enforceable contracts"); *Clark v. Liberty Univ., Inc.*, No. 6:20-CV-58-NKM,  2021 WL 1827256, at *6 (W.D. Va. May 7, 2021) (university's Title IX policy was not a contract because "different versions of the policy can exist over time" and are "subject to the unilateral revisions of the University"); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052-NKM, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (finding that a university's sexual harassment policies "are not contractual in nature because they are subject to 'continual examination and revision.'" (internal citation omitted)).

## **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint contains "sufficient factual matter to state a claim to relief that is plausible on its face." *Carter v. Wells Fargo Bank, Nat'l Ass'n*, 689 F. Supp. 3d 253, 254 (W.D. Va. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up)).  To survive, a complaint must plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).  A complaint "does not satisfy this standard with only 'labels and conclusions' or a 'formulaic recitation of the elements of cause of action.'"  *Olgiati v. Breitschmid*, No. 7:23-CV-352-RSB, 2023 WL 8828647, at *2 (W.D. Va. Dec. 21, 2023) (citing *Iqbal*, 556 U.S. at 678).

While the Court must draw inferences in Plaintiff's favor, Plaintiff's legal conclusions are not entitled to any presumption of truth.  *Carter*, 689 F. Supp. 3d at 254.  Additionally, the Court need not ignore Defendant's uncontradicted factual claims, either. *See Reynolds Foil Inc. v. Pai*, No. 3:09-CV-657, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010) ("For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true."); *see also Williams v. FirstPlus Home Loan Trust 1996-2*, 209 F.R.D. 404, 409-10 (W.D. Tenn. 2002).

## **ARGUMENT**

Despite submitting an Amended Complaint with nearly 700 paragraphs of allegations, Plaintiff's whole case can be distilled to the use of offensive speech and imagery by protesters online and on Grounds throughout the year, and a handful of events related to Plaintiff: (1) an alleged assault on October 25, 2023, which Plaintiff reported to UVA and University Police in late January 2024 and for which there is video footage; (2) an alleged conflict between protesters at a

demonstration on November 11, 2023, for which there is video footage; (3) the meeting with President Ryan on February 14, 2024; and (4) the filing and dismissal of an Honor Charge against Plaintiff in March and April 2024. These allegations do not make out a violation of the law by the UVA Defendants.

As to UVA, none of the events at issue make out a plausible claim of harassment or disparate treatment. Nor can the incidents plausibly support a retaliation claim. Plaintiff's complaints about other students' offensive speech not directed to him cannot make out a harassment claim, nor does UVA's response suggest deliberate indifference. And to the extent the Plaintiff experienced an assault at a protest last October, the incident was exhaustively investigated and pursued—UVA's response has been anything but indifferent. Simply put, Plaintiff's claims against UVA do not make out a violation of Title VI.

As to President Ryan, all claims are fatally flawed. First, hardly any allegations in the Amended Complaint are actionable. Section 1983 does not permit vicarious liability or vague pleading, and President Ryan's discretion whether to speak or not to speak on issues of importance to Plaintiff cannot be actionable. Considering claims based on the few non-conclusory and non-speech-related allegations against Ryan, Plaintiff's claims cannot survive dismissal. Finally, even if anything could survive the 12(b)(6) standard, it would not be a violation of a clearly established constitutional right, and President Ryan is therefore entitled to the defense of qualified immunity.

All claims against UVA and President Ryan should be dismissed with prejudice.

## I.     **The Court should dismiss Count V because Plaintiff alleges no intentional discrimination based on race or national origin.**

Plaintiff alleges disparate treatment discrimination based on his Jewish ethnicity and/or his Israeli national origin. To make out a disparate treatment claim, Plaintiff must allege facts, which, "if true, raise a plausible inference that the university discriminated against the student on the basis

of [race or national origin]," and "demonstrat[e] the existence of a but-for causal link between the student's [ethnicity or national origin] and the university's challenged decision." *Ortegel v. Virginia Polytechnic Inst. & State Univ.*, No. 7:22-cv-00510, 2023 WL 8014237, at \*9-10 (W.D. Va. Nov. 20, 2023) (quoting *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235-36 (4th Cir. 2021) (cleaned up)).[34]  Absent direct evidence of discrimination, this means a plaintiff must "plead that he was treated differently from similarly situated . . . students of another race, and that such treatment was *because of* his race." *Newman v. Howard Univ. Sch. of L.*, No. 1:23-cv-0436 (TNM), 2024 WL 450245, at \*10 (D.D.C. Feb. 6, 2024) (requiring a Title VI plaintiff to plausibly allege (1) membership in a protected class, (2) adverse action, and (3) facts giving rise to an inference of discrimination).  Here, Plaintiff's discrimination claim fails because he does not allege any adverse decision or disparate treatment by UVA, and because he fails to allege any facts plausibly suggesting discriminatory intent.

### A.  Plaintiff does not allege he was treated differently.

Plaintiff does not point to or challenge a particular decision by UVA that he contends shows disparate treatment.  For this reason alone, his discrimination claim fails.  Even assuming the claim can survive without having been properly pleaded, none of Plaintiff's allegations support a disparate treatment claim.  As best the UVA Defendants can decipher, Plaintiff's only allegations suggesting disparate treatment are the alleged conflict between protesters on November 11, 2023; the responses of the President and University to the request for meeting with President Ryan, as compared to the Homer Noose incident and the May encampments; and the filing and dismissal of

---

[34] As explained in *Ortegel*, "Title VI parallels Title IX" and the two schemes "operate in the same manner."  2023 WL 8014237, at \*10 (citation omitted).  Accordingly, the elements of sex discrimination claims under Title IX track the elements of race discrimination claims under Title VI, and it is appropriate to cite Title VI and Title IX case law interchangeably.

an Honor Charge against Plaintiff in April 2024.   None of these allegations show disparate treatment.

To the extent Plaintiff alleges that he was treated differently from non-Jewish students at the Apartheid Wall Demonstration on November 11, 2023, video footage of the interaction shows that this comparison fails.  *See* **Exhibit 2**. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

As to Plaintiff's allegations of different responses or response times to events on Grounds, Plaintiff's Amended Complaint does not contain sufficiently similar comparators.  For example, Plaintiff alleges the "Homer Noose" incident from September 2022 as a comparator.  (Am. Compl. ¶¶ 213-216.)  On September 7, 2022, in the middle of the night, an unknown perpetrator placed a rope around the Homer statue, in what appeared to be the shape of a noose.  (*Id.* ¶ 213.)  President Ryan publicly condemned the act, based on "the facts available," as a hate crime against African Americans.   (*Id.* ¶ 215.)   UVA broadcast a community alert, and UVA police began an investigation.  (*Id.* ¶ 216.)

President Ryan's scheduling of a meeting with Jewish parents and students, (*id.* ¶ 401), cannot reasonably be compared to President Ryan's public response to the Homer Noose incident, (*id.* ¶¶ 214-215), as the Homer Noose incident did not require coordinating the schedules of

multiple students and parents.  The University's response to the May encampments, (*id.* ¶¶ 508-512), is likewise dissimilar.  The May encampments ended because of an imminent threat of physical violence.  This is very different from scheduling a private meeting or responding to a potential, overnight hate crime.  And in any event, Plaintiff himself acknowledges that UVA Police and administrators were present to offer protection to Jewish students at the November 11, 2023 demonstration, (*id.* ¶ 412), the UVA Defendants took down the encampments and enforced its policies against pro-Palestinian protesters, (*id.* ¶ 519), and that the UVA President personally met with Jewish parents and students about their concerns, (*id.* ¶¶ 436, 439), undermining his own disparate treatment theory.

Finally, to the extent Plaintiff seeks to raise this claim based on UVA failing to stop his Honor Charge from proceeding to the motion to dismiss stage, (Am. Compl. ¶ 462), as this Court explained in a similar case, this claim "fails because he was not subject to any discipline by [the school]."  *Clark*, 2021 WL 1827256, at *7 & n.5 (J. Moon) ("The fact that Liberty did not find Clark responsible for any wrongdoing is paramount in this case. Indeed, Liberty did not impose any sanctions or disciplinary punishment against him.").  Plaintiff's hyperbolic effort to assert harms simply because another student filed an Honor Charge against him cannot serve to show any harm by UVA.

Even if there were actionable harm here, Plaintiff's allegations fail.  A selective enforcement claim regarding a school disciplinary proceeding requires the Plaintiff to plead that race "was a but-for cause . . . of the decision to initiate the challenged disciplinary proceeding in the first place."  *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023).[35]  Here,

---

[35] This framework was acknowledged, though not adopted, by the Fourth Circuit in *Sheppard*, 993 F.3d at 235 (finding "no inherent problem" with the selective enforcement theory under Title IX).

Plaintiff's own allegations show that the Charge never got off the ground—a student submitted a Report of an Alleged Honor Offense against Plaintiff, which the Honor Committee (a group of students) investigated, then dismissed for lack of evidence, deciding *not* to initiate formal proceedings.   (Am. Compl. ¶ 468); *see also* UVA Honor Committee Bylaws, Section IV (explaining that formal accusation occurs after an investigation into a report is completed, if a claim is not dismissed).   And Plaintiff pleads no facts that support an inference of racial motivation—in fact, Plaintiff does not plead any facts about the contents of the Charge at all, he simply states in a conclusory fashion that it was filed because Plaintiff "spoke out in the national media about antisemitism at UVA."  (Am. Compl. ¶¶ 460-461.)  Such conclusory allegations are insufficient to state a claim of discrimination.

The allegations of intentional discrimination are also rebutted by the document itself. ▮

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████

In sum, Plaintiff's allegations do not even support that he was treated differently.

**B.  Plaintiff does not allege any facts suggesting discriminatory intent.**

Moreover, Plaintiff does not plausibly allege that any of the above actions or responses "were motivated by a discriminatory purpose." *Ortegel*, 2023 WL 8014237, at *11.  Plaintiff fails

to point to any "sufficiently particularized" allegations of discriminatory motive by UVA such as "statements" or "patterns of decision-making" that show the influence of race. *Id.* at *9.

For example, any purported disparate treatment between the two groups of protesters at the November 11, 2023 demonstration would be far more plausibly motivated by concerns for student safety and considerations related to the relative size of the two groups. (Am. Compl. ¶ 411.) Nothing "sufficiently particularized" in Plaintiffs' allegations or the corresponding footage suggests that UVA's response was "motivated by a discriminatory purpose." *Ortegel*, 2023 WL 8014237, at *9, *11.

Plaintiff's complaint about President Ryan's meeting with Jewish parents and students similarly lacks a plausible allegation of discriminatory motive. In his follow-up email, sent on Friday, February 16, Ryan wrote, "I appreciate your taking the time to join us, and I'm grateful for your willingness to share your perspectives and ideas." (Am. Compl. ¶ 439.) This sentence contains nothing suggesting a discriminatory motive. Similarly, nothing about the timing of the meeting suggests such a motive—scheduling a planned meeting between the UVA President and multiple parents and students can take time for a completely nondiscriminatory reason: it is hard to coordinate so many schedules (or even determine which parents and students would attend). And Plaintiff's other comparisons of discriminatory responses also fail. In contrast to the meeting with Jewish students and parents or the Homer Noose incident, the May encampment became an imminent safety issue, and the only plausible motivation for UVA's response was a concern for maintaining safety and order on Grounds.

Finally, Plaintiff's allegations about his Honor offense do not show a discriminatory motive. Plaintiff was charged by another student with an Honor offense, and through ordinary Honor Committee procedures, that charge was dismissed for lack of evidence. There is no

indication of some type of unlawful motivation behind UVA's observance of its ordinary Honor

procedures.   *See* Honor  Committee  Bylaws.  Similarly, Plaintiff's complaints to the University

Judiciary Committee were dismissed based on an evenhanded, neutral application of the policy

because these Charges were time-barred and not based on any discriminatory motive.

Ultimately, Plaintiff's allegations do not show that any of the conduct allegedly attributed

to UVA was plausibly motivated by anything other than a nondiscriminatory purpose such as

student safety, practical or logistical considerations, or a fair application of institutional policies

and practices such as observance of the Honor Committee Bylaws.

In sum, Plaintiff fails to state a claim for intentional discrimination under Title VI.

## II.   <u>The Court should dismiss Count V because Plaintiff alleges no facts to support a retaliation claim under Title VI.</u>

Plaintiff's next theory is that UVA retaliated against him for engaging in protected conduct.

To make out a claim for retaliation under Title VI, a plaintiff "must allege that [he] engaged in

protected activity under Title [VI], and second, [he] must allege that — as a result of [his] protected

activity — [he] suffered an adverse action attributable to the defendant educational institution."

*Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018); *see also Peters v. Jenney*,

327 F.3d 307, 320-21 (4th Cir. 2003) (Plaintiff "must show (1) that [he] engaged in protected

activity; (2) that [Defendants] took a material adverse [] action against [him], and (3) that a causal

---

36 ██████████████████████████████████

connection existed between the protected activity and the adverse action.").[37]   Protected activity

can include filing complaints or engaging in advocacy, but does not include a "matter of mere

personal interest." *Monegain v. Dep't of Motor Vehicles*, 491 F. Supp. 3d 117, 133 (E.D. Va.

2020); *see Hurley*, 911 F.3d at 694 (examples of "protected activities included advocating against

and reporting sexual harassment, plus filing the OCR complaint"); *Stover v. Coll. of William &

Mary*, 635 F. Supp. 3d 429, 444 (E.D. Va. 2022) ("complaint to the Office of Compliance and

Equity was protected activity").

Like his intentional discrimination claim, Plaintiff's theory of retaliation is vaguely pled

and hard to follow.   Even assuming Plaintiff engaged in protected activity by submitting

complaints, (Am. Compl. ¶ 429), for example, Plaintiff does not point to *any* specific adverse

action taken against him by UVA, much less one which would be "suffic[ient] to 'dissuade a

reasonable person from making or supporting a charge of discrimination.'"   *Hurley*, 911 F.3d at

694 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (cleaned up)).   Indeed,

even if Plaintiff had identified an adverse action, it would not support a retaliation claim because

he has not pleaded a "causal connection" to his protected activity.   *Id.*   Plaintiff makes no allegation

at all that the various complaints he filed with UVA or grievances he mentioned during the meeting

with President Ryan caused UVA to treat him differently.

To the extent Plaintiff argues that the Report of an Alleged Honor Offense filed against

him constituted an adverse action, this fails for the reasons already stated: 1) the UVA Defendants

did not bring the Honor Charge, and 2) it was promptly dismissed according to UVA Honor

Committee procedures.   Plaintiff was never even accused, much less disciplined, by UVA.   Nor

---

[37] The Fourth Circuit has not held whether Title VI/IX claims require but-for causation, but has
indicated that they may.   *See Hurley*, 911 F.3d at 696 n.10.   Here Plaintiff has not pleaded facts
suggesting *any* causal connection, so he has certainly not met the "but-for" causation requirement.

does Plaintiff allege any facts supporting a causal connection between any complaints to UVA administrators or protected activity and the Honor Charge proceeding, which he expressly pleads was initiated by SJP and through SJP's Jewish President, and was investigated and dismissed by the student Honor Committee.  (*See* Am. Compl. ¶¶ 460-61, 466-68.)

Plaintiff's claims of retaliation against UVA should be dismissed.

### III.  <u>The Court should dismiss Count V because Plaintiff's hostile environment harassment claim fails.</u>

To state a claim under Title VI for student-to-student harassment that creates a hostile environment, Plaintiff must "allege conduct that is[] 'so severe, pervasive, and objectively offensive that it denies its victims the equal access to education' that the statute is designed to protect, and that the University acted with 'deliberate indifference' towards that conduct." *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187 (N.D. Cal. 2011) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999)); *see also Doe v. Bd. of Visitors of VMI*, 494 F. Supp. 3d 363, 376–77 (W.D. Va. 2020).  Schools must interpret Title VI consistent with the First Amendment because public universities are prohibited from violating students' First Amendment rights.  *Healy v. James*, 408 U.S. 169, 180-81 (1972) (public universities may not infringe upon the First Amendment rights of faculty, students, and staff); *see also* Gerald A. Reynolds, Assistant Sec'y, Off. for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter (July 28, 2003) ("Any private post-secondary institution that chooses to limit free speech in ways that are more restrictive than at public educational institutions does so on its own accord and not based on requirements imposed by" the Department.).

**A. Plaintiff has not alleged facts showing severe, pervasive and objectively offensive harassment that effectively denies equal access to education programs and activities.**

"A hostile environment is one that is so severe, pervasive, and objectively offensive, and that so detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." *Mandel v. Bd. of Trs. of Cal. State Univ.*, No. 3:17-CV-03511-WHO, 2018 WL 5458739, at *21 (N.D. Cal. Oct. 29, 2018) (quoting *Davis*, 526 U.S. at 652). Goldstein's allegations fail to meet this standard for a few reasons: (1) his allegations are vague, nonspecific, and do not show harms particularized to himself; (2) much of the harassment he alleges is protected speech that is not directed at a particular individual and is not actionable under Title VI; and (3) he fails to meaningfully allege the loss of educational benefits.

1. Many of Plaintiff's allegations are unrelated to Plaintiff.

Courts have emphasized that the analysis of harassment under Title VI must be based on "specific *current* allegations or peer-to-peer harassment." *Mandel v. Bd. of Trs. of Cal. State Univ.*, No. 3:17-CV-03511-WHO, 2018 WL 1242067, at *18 (N.D. Cal. Mar. 9, 2018) [hereinafter *Mandel I*]. In *Mandel I*, for example, the plaintiffs also asserted claims of antisemitism related to on-campus protest activity. The court explained that the plaintiffs' allegations that the defendant school "tolerates, if not promotes, anti-Semitism" were too "vague and conclusory" to state a claim:

> There are no details with respect to time, frequency of occurrence, who was involved, and in some instances whether the acts were aimed at the Student Plaintiffs or otherwise known to the Student Plaintiffs. . . . The same is true of the allegations that "students" had to take alternative routes to class and hide their Jewish identity to avoid being threatened. In general, these vaguely identified events and assertions, without more factual support, cannot prop up the Student Plaintiffs' hostile environment claim.

*Mandel I*, 2018 WL 1242067, at *18. *See also Felber*, 851 F. Supp. 2d at 1188 (dismissing Title VI harassment claim where "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present"). Here too, the Amended Complaint similarly makes numerous nonspecific allegations of harassment unrelated to Goldstein. For example, he complains:

- that certain unidentified faculty offered tutoring and boosts in grades to students who attend anti-Israeli, antisemitic rallies (Am. Compl. ¶¶ 359), and that other faculty "threatened to withhold final grades" to support pro-Palestinian protesters (*id.* ¶ 503), yet he does not allege he was in any of the courses at issue;

- that members of SJP and FJP staged a protest that used slogans such "Solidarity with Palestine," "END the occupation, "Decolonization is not a metaphor," and "NO DIALOGUE WITH WHITE SUPREMACY," (*id.* ¶ 358), but Plaintiff does not allege he attended the protest, walked past, or otherwise experienced it;

- that a Jewish professor's Just Report It! complaint was "buried," (*id.* ¶ 364-65);

- that Rector Hardie "threatened to retaliate" against another member of the Board of Visitors, Bertram Ellis, at a Board of Visitors meeting that Plaintiff does not allege he was involved with or attended (*id.* ¶¶ 452-458).

These allegations cannot support a harassment claim—or any claim at all, as they are entirely unrelated to Plaintiff or his harms.

    2.  <u>Plaintiff's alleged hostile environment is based in large part on speech not directed at Plaintiff and protected under the First Amendment.</u>

Many of Plaintiff's other allegations concern protected speech not specifically directed at Plaintiff which Plaintiff alleges he experienced in the context of various protest activity on Grounds. This case is therefore similar to *Felber*, in which a Jewish student allegedly experienced a single assault and verbal insult by a pro-Palestinian student during an on-campus protest. Like Plaintiff, the *Felber* plaintiff alleged a Title VI violation for severe and pervasive harassment occurring at her university from a single allegation of assault by a protester in addition to broader on-campus political activities, protests, signs, and events. The court dismissed the claims, noting that "a very substantial portion of the conduct to which plaintiffs object represents pure political

speech and expressive conduct, in a public setting, regarding matters of public concern, which is entitled to special protection under the First Amendment." 851 F. Supp. 2d at 1188. Relevant to the allegations here, the court observed that the plaintiffs were "attempting to draw an untenable line that would remove from protection signs and publications that are critical of Israel and supportive of Hamas and Hezbollah. That protestors' signs may have contained language that plaintiffs believe was inflammatory, offensive, or untrue, does not warrant a different result." *Id.* As the *Felber* court explained, political and protest activities do not make out a Title VI claim:

> The incident in which Felber was assaulted with a shopping cart, for example, did not occur in the context of her educational pursuits. Rather, that event occurred when she, as one person attempting to exercise free speech rights in a public forum was allegedly attacked by another person who likewise was participating in a public protest in a public forum.

*Id.* at 1187–88. For this reason, the *Felber* plaintiff's claims (even including an alleged assault), were insufficient just as Goldstein's claims of an alleged assault or verbal abuse while participating in a public protest in an alleged public forum are insufficient.

The Fourth Circuit's ruling in *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993), is instructive. In that case, after George Mason University affirmatively punished a fraternity for creating a racially and sexually hostile environment by hosting an "ugly woman contest" involving racially and sexually offensive conduct, the fraternity sued George Mason University for infringing on its First Amendment rights, and won. The Fourth Circuit described the dispute as involving a skit in which a fraternity member "was painted black and wore stringy black hair decorated with curlers, and his outfit was stuffed with pillows to exaggerate a woman's breasts and buttocks. He spoke in slang to parody African-Americans." *Id.* at 388. The Fourth Circuit agreed that the skit was offensive, crude, and juvenile. However, the Court explained that just as the First Amendment protects nude dancing, *Barnes v. Glen Theatre,*

*Inc.*, 501 U.S. 560 (1991), it protected the fraternity's racially offensive humor as expressive conduct. *Iota Xi Chaptery*, 993 F.2d at 389-92. Accordingly, the university was prohibited, under the First Amendment, from imposing sanctions on the offending fraternity. *Id.* at 393.

Ultimately, here too, Plaintiff's claim of unlawful harassment appears to run up against the protections of the First Amendment. For example, Plaintiff alleges that he was harassed because:

- SJP's October 8, 2023 issued an Official Statement that the attack on Israel was an "unprecedented feat" (Am. Compl. ¶¶ 309);

- Posters included words, phrases, and imagery such as, "Decolonization" (*id.* ¶ 336, 344); "intifada revolution—there is only one (or final) solution" (*id.* ¶ 240); "from the river to the sea, Palestine will be free" (*id.* ¶ 239); and bloody handprint imagery (*id.* ¶ 323-24);

- Faculty signed an Open Letter published by FJP (*id.* ¶ 403), and expressed support and solidarity for pro-Hamas faculty and students (*id.* ¶ 499); and

- FJP hosted a "Teach-in on Palestine" in which one professor referred to the October 7 attack as "blah blah blah" (*id.* ¶ 416-18).

Allegations that students and faculty were engaging in expressive conduct not directed at Plaintiff, protected under the First Amendment, cannot establish a hostile environment at a public university as a matter of law. The First Amendment protects Plaintiff's right to wave the Israeli flag in support of his beliefs as much as other student groups' rights to publish statements in support of their beliefs, even if Plaintiff finds that speech offensive or hurtful. Allegations arising from others' protected First Amendment activity cannot support Plaintiff's harassment claim.

### 3. Plaintiff fails to adequately allege deprivation of educational benefits.

Finally, Plaintiff has not alleged the deprivation of educational benefits. The Fourth Circuit has explained that to allege such deprivation, a plaintiff must include facts that the harassment "(1) results in the physical exclusion of the victim from an educational program or activity; (2) so undermines and detracts from the victim's educational experience as to effectively deny her equal access to an institution's resources and opportunities; or (3) has a concrete, negative effect on the

41

victim's ability to participate in an educational program or activity." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 275 (4th Cir. 2021) (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 699 (4th Cir. 2007) (cleaned up)).[38] In *Doe v. Fairfax*, the Fourth Circuit found deprivation of educational benefits where a student's "academic performance and class attendance declined" after the harassment, where a student deliberately skipped or missed school activities to avoid her harasser, and where a student "sought and received professional counseling" and received a diagnosis arising from the trauma caused by the alleged assault. 1 F.4th at 276. In *Jennings*, the Court compared the Plaintiff's GPA during the period of harassment and concluded that her "subpar academic performance" showed that the harassment "made it difficult for her to focus on her studies." *Jennings*, 482 F.3d at 700. *See also Mandel I*, 2018 WL 1242067, at *20 (alleging deprivation requires allegations such as moving to another district, lowering grades, increased absenteeism, or being hospitalized or rendered homebound due to harassment) (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) and *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003)).

Plaintiff alleges none of these things. He has failed to articulate any impact to his grades, his coursework, or his ability to participate in educational programming or extracurricular activities—indeed, ███████████████████████████████████████ ███████████████████████████████ Furthermore, his vague allegations about damage to his educational opportunities are entirely conclusory or speculative. (*See* Am. Compl. ¶¶ 556, 564-65).[39] Plaintiff's only other harms are alleged PTSD related to the alleged harassment, and the

---

[38] To the extent Plaintiff claims his experience have caused him emotional distress, the Supreme Court has clearly held that emotional distress damages are not available under Title VI. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022).

[39] Note that Plaintiff's generalized allegations of emotional distress damages are not redressable under federal antidiscrimination laws, including under Title VI. (*See* Am. Compl. ¶ 566);

exacerbation of an unidentified autoimmune disorder due to stress.  (*Id.* ¶ 566.)  Plaintiff has not alleged that he has been denied access to or excluded from educational programs or activities.

In sum, Plaintiff fails to allege harassment that would meet Title VI's high standard.

### B.  Plaintiff's allegations do not show deliberate indifference by UVA.

Finally and most importantly, Plaintiff's Amended Complaint does not include any plausible allegation that UVA acted with deliberate indifference to Plaintiff's concerns—if anything, it shows the opposite.  "[A] school acts with deliberate indifference where its 'response to the alleged harassment or the lack of any such response is clearly unreasonable in light of the known circumstances.'"  *Doe v. Fairfax*, 1 F.4th at 271 (quoting *Davis*, 526 U.S. at 648 (cleaned up)).  Plaintiff therefore must allege facts showing a response that is "so inadequate" that it goes beyond "mere negligence." *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 636-37 (W.D. Va. 2016).  Notably, "it is not enough [to allege] that a school has failed to eliminate student-on-student harassment, or to impose the disciplinary sanctions sought by a victim." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016); *Facchetti*, 175 F. Supp. 3d at 638 (school is not required to "provide the remedy wanted by the victim," and negligence in addressing an assault is not enough to show deliberate indifference).  The response must cause plaintiff to "undergo harassment" or make him more "liable or vulnerable" to harassment.  *Id.* at 636-37 (citation omitted) (cleaned up).   Furthermore, school administrators are entitled to substantial deference in responding to student-on-student harassment. *Id.*

Two recent decisions from Judge Stearns of the District of Massachusetts help shed light on how the deliberate indifference analysis plays out in a university's approach to on-campus protest activity like this.  In *StandWithUs Center for Legal Justice v. MIT*, --- F. Supp. 3d ---, 2024

---

*Cummings*, 596 U.S. at 230 (emotional distress damages unavailable under federal antidiscrimination statutes, including Title VI).

U.S. Dist. LEXIS 134141 (D. Mass. July 30, 2024), a group of Jewish students brought a putative class action alleging MIT's deliberate indifference to harassment by other students, who engaged in conduct such as:

- Issuing a statement holding Israel responsible for the October 7 attack, which was sent to all students by email;
- Shouting and chanting offensive things at a rally;
- Protesting in a major thoroughfare on the MIT campus; and
- Erecting an encampment on Kresge lawn, which was dismantled then restarted, ultimately resulting in numerous suspensions and arrests.

*Id.* at *2-3, *4-5  In response, MIT took measures that ranged from "suspending student protestors from non-academic activities," to "arrest[ing] trespassing students" who failed to heed warnings to clear an encampment of protesters. *Id.* at *12.  Judge Stearns explained that in addressing "a campus embroiled in an internecine conflict that caused Jewish and Israeli students great anguish," MIT was <u>*not*</u> deliberately indifferent, even if "[i]n hindsight, one might envision things MIT could have done differently." *Id.* at *11-12.  Rather, "MIT's evolving and progressively punitive response largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students," which showed that as a matter of law, "MIT did not react in a clearly unreasonable manner." *Id.* at *12-13.  Judge Stearns therefore dismissed the Title VI claim.  *Id.*

In contrast, in *Kestenbaum v. President & Fellows of Harvard College*[40] Judge Stearns concluded that Harvard's response was "not just simply inadequate but skewed in its bias." --- F. Supp. 3d ---, 2024 U.S. Dist. LEXIS 139180 (D. Mass. Aug. 6, 2024).  Specifically, after pro-

---

[40] The allegations in *Kestenbaum* were also far more egregious than those made in either this case or in the *StandWithUs* case, including incidents such as "demonstrators blockad[ing] Jewish students in a study room," *Kestenbaum*, 2024 U.S. Dist. LEXIS 139180, at *6 (internal citation omitted); social media commentary that included students "calling a Jewish student a 'pedo lover,' claiming that 'all of you Zionists' are '[k]illers and rapists of children,' and referring to a Jewish student's nose as 'crooked,'" *id.* at *4 n.4 (alteration in original), and a professor suggesting that antisemitism "should be generally acceptable." *Id.* at *8 n.6.

Palestinian protesters occupied a student lounge for two weeks, Jewish students sought permission to hold a demonstration in the lounge.  Instead of granting permission and treating all equally, the school introduced a new rule that it failed to enforce:

> [T]he day after Dean Ball emailed all Harvard Law students that Caspersen lounge was limited to "personal or small group study and conversation," demonstrators hosted a "vigil for martyrs" in the lounge without any pushback from law school administrators. Rather than call a halt to the vigil, Dean Ball attended it. In another venue, while Harvard police officers were on scene at the encampment, when a Jewish student was openly "charged" and "push[ed]," the officers failed to react. And while Harvard, on April 22, 2024, suspended the [Palestinian Solidarity Committee (PSC)] until the end of the semester, the short-term suspension proved to be in name alone, as the PSC spearheaded the creation of the encampment in Harvard Yard just two days later.

*Id.* at *15 (citations omitted).  In another instance, "Harvard required Chabbad, a campus Hasidic Jewish community center, to remove its Hanukkah menorah from campus each night to prevent it being vandalized but it provided 24/7 security to the PSC's Wall of Resistance." *Id.* at *7-8.  And although Harvard established an "Antisemitism Advisory Group" in November 2023, the Group was dissolved before it could make any recommendations. *Id.* at *8.  In sum, reviewing the alleged facts, Judge Stearns found that Harvard was "indecisive, vacillating, and at times internally contradictory" in its response, failing to take "disciplinary measures against offending students and faculty." *Id.* at *16-17.  He compared this to his conclusion in *StandWithUs*, that there was no deliberate indifference where the alleged facts showed that MIT "respond[ed] with a perhaps overly measured but nonetheless consistent sense of purpose in returning civil order and discourse to its campus." *Kestenbaum.* 2024 U.S. Dist. LEXIS 139180, at *17.

Goldstein's allegations are far more similar to *StandWithUs v. MIT*.  For one, Plaintiff has made similar allegations regarding student conduct and school responses.  For example, both schools experienced encampments in late spring, and both schools initiated disciplinary proceedings or made arrests when the protesters refused to comply. *Compare* Am. Compl. ¶ 519,

*with StandWithUs*, 2024 U.S. Dist. LEXIS 134141,at *5-6.   Both schools experienced similar offensive and provocative speech.   *Compare* Am. Compl. ¶¶  239, 307, *with StandWithUs*, 2024 U.S. Dist. LEXIS 134141, at *3.   And unlike Harvard, Plaintiff has not pleaded any "vacillating" response by UVA.   *Kestenbaum*, 2024 U.S. Dist. LEXIS 139180, at *15-16.   UVA, for example, and specifically President Ryan, celebrated Hanukah and honored Jewish life on grounds, accepted recommendations from its Task Force on Religious Diversity and Belonging, and has offered an ever-evolving response to on-Grounds protest activity, including listening to the concerns of students and parents.

Indeed, on the whole, Plaintiff's own allegations undermine his claim.   He alleges that UVA's president condemned the attack by Hamas and pleaded for civil discourse (Am. Compl. ¶ 355); indeed, Plaintiff publicly expressed his gratitude for President Ryan, the administration, and many professors, for their unwavering support.   **Exhibit 1**.   When Plaintiff was concerned for his safety, a UVA professor accompanied him to a protest, and intervened to protect him.   (*Id.* ¶¶ 384, 393.)   When he and other Jewish students wanted to hold a counter-protest at an SJP demonstration, UVA Police officers and administrators were present and provided supervision, intervening to protect Plaintiff and the large group of opposing protesters.   (*Id.* ¶¶ 411-12); **Exhibit 2**.   When Plaintiff made complaints to the administration or reported offenses to the police, UVA investigated, responded, and reached out.   (*Id.* ¶¶ 413, 429, 445); **Exhibits 3-6, 8-10, 13, 15-17.** Indeed, he was even able to have a face-to-face private meeting with the President of the University, who listened to his concerns and respectfully followed up by email.   (*Id.* ¶¶ 433-439). When a student filed a Report of an Alleged Honor Offense against Plaintiff, the Honor Committee swiftly dismissed the Honor Charge within one month after it was filed, pursuant to UVA Honor Committee procedures.   (*Id.* ¶ 468.)   The encampment of protestors allegedly harassing Jewish

students was dismantled, and police arrested both students and non-students who did not comply with the law.  (*Id.* ¶ 519.)   Ultimately, Plaintiff's own allegations show the UVA Defendants' efforts that go well beyond the deliberate indifference standard and were clearly reasonable in light of the known circumstances.

Moreover, courts have been reticent to find schools deliberately indifferent when schools are navigating their obligations in response to protected speech in furtherance of public, political protest.  As the *Felber* court explained:

> [P]laintiffs fail to show how defendants have acted with "deliberate indifference" in ignoring wrongful conduct otherwise not amounting to protected speech. To the contrary, plaintiffs have alleged facts that campus police have made arrests of disruptive protestors, and that the administration has engaged in an ongoing dialogue with the opposing parties in an attempt to ensure that the rights of all persons are respected, and to minimize the potential for violence and unsafe conditions.

*Felber*, 851 F. Supp. 2d at 1188.

Goldstein's allegations are similar.  Although he complains that he has been harassed, much of the speech he articulates in his Complaint is protected—if offensive—political speech not directed at Plaintiff.  Though Goldstein may have wished for different disciplinary sanctions or a different remedy to address the protestors on the other side of the line, his own allegations demonstrate that UVA has made consistent and reasonable efforts to ensure the safety of its students while avoiding any violation of its students' First Amendment rights—including Goldstein's.  *See also Mandel I*, 2018 WL 1242067, at *14 ("plaintiffs cite no authority that would allow them to hold [a defendant administrator] liable for others' actions in violating plaintiffs' constitutional rights where [the administrator's] only role was a post-hoc failure to punish").  There is no plausible allegation of deliberate indifference here.

IV.    **All claims against President Ryan fail.**

Plaintiff purports to raise a claim under 42 U.S.C. § 1983 against President Ryan.  This count fails as well.  First, Plaintiff's allegations against President Ryan are not actionable.  President Ryan does not have an affirmative duty to side with one group of students over another group of students and cannot be vicariously liable for all the University's employees.  Second, Plaintiff's remaining allegations do not state a claim at all.  Even if Plaintiff adequately alleged a constitutional violation, President Ryan is entitled to qualified immunity.

**A.  Plaintiff's allegations against President Ryan are not actionable.**

1.   Section 1983 does not permit vicarious liability.

As a preliminary matter, Section 1983 does not permit vicarious liability.  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Accordingly, any allegations in the Amended Complaint related to processes, statements, or acts in which President Ryan was not directly involved and which are not specifically attributed to Ryan cannot support a Section 1983 claim.  *Amison v. George Mason Univ.*, No. 23-1042, 2023 WL 8946774, at *4 (4th Cir. Dec. 28, 2023) (granting qualified immunity where the defendant professor was not the person who disciplined plaintiff); *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 149 (4th Cir. 2009) (dismissing Section 1983 claims because plaintiff did not name the actual university official who conducted the challenged disciplinary hearing).

Plaintiff attempts to attribute liability to President Ryan for events related to Plaintiff's Honor Charge on the theory that the Honor Committee was "being closely monitored and overseen by the Office of the University President," (Am. Compl. ¶ 463), and "[w]hen the Honor System is misused or perverted or the Committee and its supervisors and participants engage in

48

unconstitutional or illegal behaviors and decisions," Plaintiff claims that Ryan is "legally responsible." (*Id.* ¶ 150.)  This form of liability is not permitted under Section 1983.  Although Ryan can be evaluated for his own actions, the words or actions of Honor Committee members cannot be attributed to him.  Even if they could, Plaintiff acknowledges that the Honor Charge was swiftly dismissed.  (*Id.* ¶ 468.)

Plaintiff also makes the conclusory allegation that President Ryan is the "oversight executive" for UVA's PADH and PAR policies, (*id.* ¶¶ 182-83), and that he is liable because "[UVA] and President Ryan . . . have taken no actions whatsoever to enforce the laws, rules, regulations, policies, and codes of conduct that govern students, student groups, faculty, and faculty groups" regarding complaints of antisemitism. (*Id.* ¶ 203.)  The policies that Plaintiff incorporated by reference in the Amended Complaint expressly provide for *other* decision-makers and investigators within EOCR (who were, in fact, heavily involved in supporting Plaintiff and responding to his complaints, *see* **Exhibits 5, 6**).  President Ryan should not and cannot violate the PADH and PAR policies by disrupting that process and inserting himself on a student's behalf.  Where an administrator is not "alleged to have played any direct role" in the events at issue, claims should be dismissed.  *Mandel I*, 2018 WL 1242067, at *16.

For the same reasons, Plaintiff's numerous conclusory allegations vaguely suggesting President Ryan's involvement in UVA's collective harm to Plaintiff cannot support a Section 1983 claim because those allegations are insufficient under *Iqbal* and *Twombly* to show direct, non-vicarious liability.  For example, Plaintiff makes vague contentions that President Ryan served as a "ready ear and helping hand . . . [or] an eager conduit for [] hate groups," (Am. Compl. ¶ 8), and that Ryan has "actively taken steps in public to brand [Plaintiff] a liar." (*Id.* ¶¶ 267-68.)  Given that these vague allegations do not allow the Court to evaluate whether President Ryan had a

"direct role" in the events at issue, they cannot, as a matter of law, support Plaintiff's 1983 claim. *Mandel I*, 2018 WL 1242067, at *16.

In sum, Plaintiffs' allegations vaguely purporting to impose vicarious liability on President Ryan must fail. Only specifically pled factual allegations showing Ryan's "direct role" in the events alleged are relevant to Plaintiff's Section 1983 claim.

> ## 2. Plaintiff's allegations about President Ryan's speech or refusal to speak also cannot support a claim.

Of those handful of factual allegations that specifically allege Ryan's direct role in the events at issue, most are not actionable because they arise solely from Ryan's governmental speech. Although Plaintiff sues President Ryan in his personal and individual capacity only, Plaintiff's allegations concern President Ryan's speech in his official capacity as the University's President. For example, Plaintiff complains that President Ryan "did not condemn or express any disapproval" with SJP's October 8, 2023 statement as the University's President, (Am. Compl. ¶ 318), that President Ryan "remained silent" for three days after October 7, 2023, (*Id.* ¶¶ 334-35), and that when Ryan "spoke in a letter published in the University's UVAToday online magazine" the letter did "not condemn antisemitism" sufficiently. (*Id.* ¶¶ 355-57.) After students on campus called for a BDS referendum, then voted in favor of divestment, "President Ryan never condemned or even expressed consternation over" the referendum. (*Id.* ¶ 449.) After Plaintiff's Honor Charge was dismissed for lack of evidence, "President Ryan . . . ha[s] not offered any comfort, support or words of encouragement to Matan." (¶ 470.) Repeatedly throughout the Amended Complaint, Plaintiff alleges that President Ryan did not say what Plaintiff wanted him to say, with the words Plaintiff wanted him to use, when Plaintiff wanted him to speak. These allegations—which are uncontradictably false in any event—are not actionable.

Contrary to Plaintiff's argument, he himself has alleged and incorporated factual matter showing that the President *has* directly condemned antisemitism and Hamas, including in the October 11 letter that President Ryan published just four days after October 7, 2023, (Am. Compl. ¶ 355); Plaintiff's own November 23, 2023 Letter to the Editor acknowledges that President Ryan's statements condemning the October 7 atrocities have gone above and beyond even Plaintiff's expectations (**Exhibit 1**); that the President has spoken out against the BDS referendum (*id.* ¶ 449); and that the President supported Plaintiff by meeting with him and his mother as well as following up with a personal email to Plaintiff after this meeting, (*id.* ¶ 439 ("I'm grateful for your willingness to share . . .")).  Indeed, President Ryan's remarks and actions, including with respect to calling for the removal of the encampments, have caused students supporting the Palestinian cause to exercise their First Amendment rights by confronting and criticizing President Ryan.[41]

Even if Plaintiff's allegations had any factual basis, there can be no constitutional cause of action arising from what President Ryan chooses to say or not to say in his position as President of UVA.  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."); *Pleasant Grove City*

---

[41] Notably, Ryan's commentary unequivocally condemning Hamas for the October 7 attacks is a far cry from the positions and statements of other University presidents.  *Compare Ryan Appeals to Compassion,* UVAToday Oct. 11, 2023 *supra* note 4 ("There can be no justification for, and we must condemn, the actions of Hamas and the horrific violence that has taken place against civilians, including children.") *with Kestenbaum*, 2024 U.S. Dist. LEXIS 139180, at *7 ("[W]hen asked before the U.S. House of Representatives whether 'calling for the genocide of Jews violate[s] Harvard's rules of bullying and harassment,' then-President Claudine Gay disconcertingly replied that 'it depends on the context.'" (second alteration in original)).

*v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). While government is limited in the restrictions it can impose on *private* speech, in its own speech the government is entitled to say what "it wishes" and to select the views that it wants to express. *Walker*, 576 U.S. at 207. Citizens' complaints about those views must be directed to the political process, not to the courts. *Id.* ("[I]t is the democratic electoral process that first and foremost provides a check on government speech."); *Pleasant Grove City*, 555 U.S. at  468 (absent establishment clause violation, government speech is primarily regulated by the political process).  Thus, the Supreme Court has refused to permit viewpoint discrimination-based claims arising from Government speech. *Walker*, 576 U.S. at 208 ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position."); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect."); *see also Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) (it "is the very business of government to favor and disfavor points of view").

Plaintiff's complaints about President Ryan's speech or silence reflect non-actionable government speech decisions.  No Section 1983 claim can arise from them.

**B.  Plaintiff's allegations do not support any violation of constitutional rights under Section 1983.**

Plaintiff's remaining, non-conclusory, non-vicarious, and non-speech-related allegations are: (1) that President Ryan treats Jewish students differently because he will "suppress and punish" speech he disagrees with on behalf of other groups but not for Jewish people, (*id.* ¶ 206);

and because he took longer to meet with Plaintiff and other Jewish students in comparison to other groups, (*id.* ¶ 401); and (2) that after Plaintiff engaged in protected activity by making complaints, President Ryan provided support to the Honor Committee when Plaintiff suffered retaliation through an Honor Charge filed against him by the Jewish President of SJP.  (*Id.* ¶ 462.)  These allegations are insufficient to make out a Section 1983 claim on any of the three theories raised by Plaintiff.

1.   <u>Plaintiff's claim of disparate treatment by President Ryan fails.</u>

A Section 1983 equal protection claim contains three elements: "a litigant must first demonstrate that he has been treated differently from others with whom he is similarly situated," that "the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." *Ortegel*, 2023 WL 8014237, at *10 (internal quotation marks and citations omitted). Plaintiff raises an equal protection claim on two different factual scenarios.  First, Plaintiff contends that President Ryan's reactions and actions in the aftermath of the Homer noose incident reveal that President Ryan allegedly will punish pure speech when he disagrees with it in support of African-American people but not Jewish people.  (Am. Compl. ¶¶ 214-17, 219.)[42]  Second, Plaintiff alleges that President Ryan deliberately took longer to meet with Plaintiff and his parents as well as other Jewish students and their parents in comparison to student groups of a different race or national origin, such as meeting with community members "after the 'noose incident'" and "frequent parlays with members of SJP at UVA."  (*Id.* ¶ 401.)

---

[42] Plaintiff also references the Morgan Bettinger matter.  Even if it were proper to reference that unrelated matter (and it is not), President Ryan had no direct role in the proceedings resulting in Ms. Bettinger's expulsion, and as Plaintiff himself alleges, President Ryan never even met her. (Am. Compl. ¶ 211.)  Accordingly, Plaintiff here has no actionable Section 1983 claim against Ryan using her as a comparator.

53

Neither of these scenarios demonstrate disparate treatment because Plaintiff is not similarly situated to his comparators.  First, the overnight Homer noose incident is a notably different situation than the ongoing on-Grounds protest activity occurring over weeks and months and involving the crowds of students that Plaintiff has alleged.  Concerns about student safety, the ongoing threat of disorder, and impact to the educational environment on Grounds greatly differ. Second, unlike engaging in protected speech at public protests, "display[ing] a noose on a . . . public place in a manner having a direct tendency to place another person in reasonable fear or apprehension of death or bodily injury" is a Class 6 felony in Virginia.  Va. Code § 18.2-423.2; *see also Virginia v. Black*, 538 U.S. 343, 359-60 (2003) (holding that it is constitutional to prohibit expressive conduct that constitutes a true threat, such as Virginia's ban on cross burning). President Ryan's allegedly different responses cannot suggest disparate treatment because the situations are not comparable.

Plaintiff's complaints about the February meeting similarly fail to offer any meaningful comparison.  Plaintiff contends that President Ryan "subjected Matan, his parents, and other Jewish students and their parents to months of 'negotiations' over his 'terms' before he would even agree to meet with them," whereas President Ryan quickly met with community members after the 'noose incident' and had "frequent parlays with members of SJP."  (Am. Compl. ¶ 401.)  But Plaintiff has not alleged any of these other supposed meetings.  The Amended Complaint contains no allegations that President Ryan met with the parents of any other students after the Homer Noose incident or in any other situation.  Indeed, there is nothing remotely close to an allegation that SJP members and their parents were granted a private audience with the University President for several hours in his office as Plaintiff and his mother were.  For this reason alone, Plaintiff cannot raise a disparate treatment claim.

In any event, Plaintiff's allegations about the meeting do not show disparate treatment by President Ryan. To the contrary, the only plausible reading of Plaintiff's allegations is that President Ryan worked for months to coordinate schedules and arrange for a FERPA-compliant meeting at which he could hear the students' concerns with their parents present. (*Id.* ¶ 363 (noting requests from Jewish students *and their parents*)); (¶ 433 (President Ryan "insist[ed] that [the Jewish parents] attend in person with their 'biological child' student also in attendance with them.")) FERPA prohibits the disclosure of information from a student's educational record without consent, and once "a student has attained eighteen years of age, or is attending an institution of postsecondary education, the permission or consent required of and the rights accorded to the parents of the student shall thereafter *only be required of and accorded to the student*." 20 U.S.C. § 1232g(d) (emphasis added). Under FERPA, and under UVA policy and practice, a student like Plaintiff has the authority to consent to disclosure of his personally identifiable information from his education record, and his parents are not permitted access to such information unless Plaintiff consents. President Ryan therefore properly approached the meeting request as one requiring students to be in attendance.

Because Plaintiff fails to allege sufficient comparators, his disparate treatment theory fails.

### 2. Plaintiff's allegation of retaliation by President Ryan fails.

Plaintiff also purports to raise a theory of retaliation against President Ryan. Retaliation is actionable under § 1983 for First Amendment violations. *See Wilcox v. Lyons*, 970 F.3d 452, 461 (4th Cir. 2020) ("To the extent a [plaintiff] contends [he] suffered adverse consequences for expressing complaints or reporting discrimination . . . , [his] claim arises under the First

Amendment.").[43]  A plaintiff claiming First Amendment retaliation must demonstrate that: "(1) he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendants' conduct." *Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) (cleaned up); *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017).  There is no dispute that Plaintiff alleged he engaged in protected activity.  Plaintiff, however, has not demonstrated that the UVA Defendants, including President Ryan, took any action against him nor alleged any causal relationship between Goldstein's protected speech and some adverse action.  In the context of a First Amendment retaliation claim, courts require *but-for* causation: "It is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [Defendant] would not have taken the alleged retaliatory action." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (citation omitted).  Plaintiff must demonstrate that President Ryan engaged in some conduct that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rector & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  This test "focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 686 (4th Cir 2000).

To prove causation, Plaintiff must show that President Ryan desired to retaliate against him for his speech or exercise of religion and that this desire was the "but-for" cause of their actions. *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019); 139 S. Ct. 1715, 1722 (2019); *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006).  And this "rigorous" requirement is not met by showing that

---

[43]  The Equal Protection clause of the Fourteenth Amendment cannot support a retaliation claim on its own.  Such claims instead should be considered First Amendment retaliation claims. *Wilcox*, 970 F.3d at 461.

Defendants merely acted in response to Plaintiff's speech. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006).

Although Plaintiff alleges that he engaged in protected activity, he fails to allege any retaliation at all, much less any causal connection to his protected conduct. Plaintiff alleges he engaged in protected activity before meeting with President Ryan, by sharing his grievances with Associate Vice President Marsh Pattie and Associate Dean Alex Hall, (Am. Compl. ¶ 429), and filing a complaint with UVA's EOCR, (i*d.* ¶ 430.; *see also* ¶ 436.) Plaintiff then alleges that on March 21, 2024, approximately a month after the meeting with President Ryan, the President of SJP filed an Honor Charge against him. (*Id.* ¶ 460). He acknowledges that ███████████ is the one who allegedly took an adverse action against him—not President Ryan. (Am. Compl. ¶ 462). And in any event, the Honor Charge swiftly was dismissed in accordance with UVA policies and procedures. (Id. ¶ 468.) Plaintiff points to nothing else.

If anything, the Amended Complaint alleges that the Honor Charge was dismissed *after* President Ryan and the Office of the University Counsel allegedly advised the Honor Committee, which is a student-led committee. (*Id.* ¶¶ 462-68) Although UVA Defendants deny that President Ryan had any involvement with the Honor Committee, the facts as alleged demonstrate that the supposed intervention resulted in the Honor Charge's dismissal, not its prosecution. (*Id.*)

Plaintiff also cannot point to any specific action by President Ryan that would deter a person of ordinary firmness from the exercise of First Amendment rights. As Plaintiff acknowledges, President Ryan swiftly and unequivocally condemned Hamas and its terrorist acts on October 11, 2024, (Am. Compl. ¶¶ 355-57), publicly acknowledged that he would not vote for the BDS referendum, (*id.* ¶ 449), assembled a Task Force with prominent Jewish members in the

community to address religious diversity and belonging, (*id.* ¶ 419), and personally met with Plaintiff and other Jewish students and parents about their concerns (*id.* ¶¶ 432-433).

        3.  <u>Plaintiff has not pleaded any discriminatory intent in relation to the harassment claim against President Ryan.</u>

Plaintiff purports to allege a Section 1983 claim against President Ryan arising from the harassment he allegedly experienced. This claim fails for the reasons already articulated above—Plaintiff has not alleged severe and pervasive harassment, deprivation of educational benefits, or deliberate indifference. Plaintiff fails to make out a Section 1983 claim against any school administrator arising from peer-to-peer harassment, as explained above. Additionally, a plaintiff "must allege that the school administrator's deliberate indifference was motivated by a discriminatory intent." *Hurley*, 911 F.3d at 703. Plaintiff offers no factual allegations on which the Court could reasonably infer some kind of discriminatory intent by President Ryan. *Mandel I*, 2018 WL 1242067, at *23 (dismissing claim because "there are no allegations that [defendant] herself took any affirmative actions against plaintiffs or otherwise acted with specific intent to discriminate against plaintiffs").

## C. President Ryan is entitled to qualified immunity.[44]

Even if Plaintiff had adequately alleged a constitutional violation sufficient to make out a Section 1983 claim (which he has not), Plaintiff's claim against Ryan would need to overcome the bar of qualified immunity. Plaintiff does not come close.

---

[44] Plaintiff also purports to seek "permanent, prospective injunctive relief" against President Ryan in his personal capacity. Am. Compl. ¶ 667. This appears to be a pleading faux pas, as prospective injunctive relief against a state official must be sought from the state officer *in his official capacity* (*i.e.*, against the holder of President Ryan's office, not President Ryan the individual person). This request fails as a matter of law because no constitutional violation has occurred, but even if not, the Court should deny this request as unsupported by law. *See generally Hafer v. Melo*, 502 U.S. 21, 27 (1991) (state officials may be sued for damages in personal capacity, and for prospective injunctive relief in their official capacity); *Sigma Lambda Upsilon*, 503 F. Supp. 3d at 449–50

"In determining whether an individual is entitled to qualified immunity, a court must determine (1) 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right', and (2) 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Amison*, 2023 WL 8946774, at *3 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "For a right to be 'clearly established,' some 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Brown*, 2019 WL 8503313, at *14 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]he focus is 'not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.'" *Id.* (quoting *Zepp v. Rehrmann*, 79 F.3d 381, 385 (4th Cir. 1996)).  As the Fourth Circuit has put it, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 555 (4th Cir. 2010) (citation omitted).

As a preliminary matter, since Plaintiff fails to state a claim at all, he cannot have alleged a constitutional violation as a matter of law.  President Ryan never treated Plaintiff in a discriminatory manner, retaliated against him, or acted with deliberate indifference to Plaintiff's harassment.  But even if there were a plausible constitutional violation arising from Plaintiff's allegations, there is absolutely no precedent which would make any related constitutional rule "clearly established." *Amison*, 2023 WL 8946774, at *3.  Plaintiff cannot point to any case, much less a case on point, which would "place[] the constitutional question beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741 (cleaned up)).  President Ryan is therefore entitled to the defense of qualified immunity and all claims against him must be dismissed.

---

("Because the allegations in the second amended complaint do not establish a constitutional violation, much less an ongoing one, SLU is not entitled to . . . injunctive relief.").

## <u>CONCLUSION</u>

WHEREFORE, the UVA Defendants, by their undersigned counsel,  respectfully request that all claims against them be dismissed with prejudice and any such further relief this Court deems just and necessary.

Dated: September 10, 2024                    <u>/s/Jonathan T. Blank</u>

Jonathan T. Blank (VSB No. 38487)
**McGuireWoods LLP**
323 2nd St. SE, Suite 700
Charlottesville, VA 22902
Tel.: (434) 977-2509
Fax: (434) 980-2258
jblank@mcguirewoods.com

Farnaz F. Thompson (VSB No. 75982)
**McGuireWoods LLP**
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C.
Tel: (202) 857-1000
Fax: (202) 857-2737
fthompson@mcguirewoods.com

Juliet B. Clark (VSB No. 96918)
**McGuireWoods LLP**
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1000
Fax: (804) 775-1061
jbclark@mcguirewoods.com

*Counsel for Defendants the Rector and
Visitors of the University of Virginia and
James. E. Ryan*

60

## **CERTIFICATE OF SERVICE**

I certify that on September 10, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

_/s/Jonathan T. Blank_
Jonathan T. Blank

_Counsel for Defendants the Rector and Visitors of the University of Virginia and James. E. Ryan_
